No. _____

# In the United States Court of Appeals for the Ninth Circuit

---

ROBERTO VERTHELYI
*on behalf of himself and all others similarly situated*

*Plaintiff-Respondent,*

*v.*

PENNYMAC MORTGAGE INVESTMENT TRUST;
PNMAC CAPITAL MANAGEMENT, LLC,

*Defendants-Petitioners.*

---

*On Petition for Permission to Appeal from the United States District Court for the Central District of California, No. 2:24-cv-05028-MWF-JC, Hon. Michael W. Fitzgerald*

---

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

---

MATTHEW DONALD UMHOFER
JONAS P. MANN
UMHOFER, MITCHELL AND KING LLP
  767 South Alameda St., Ste. 270
  Los Angeles, CA 90021
  (213) 394-7979
  matthew@umklaw.com

*Counsel for Defendants-Petitioners*
*PennyMac Mortgage Investment Trust*
*and PNMAC Capital Management, LLC*

STEVEN M. FARINA
MELISSA B. COLLINS
WILLIAMS & CONNOLLY, LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  sfarina@wc.com

*Counsel for Defendant-Petitioner*
*PennyMac Mortgage Investment Trust*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Petitioners PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC, state as follows:

PennyMac Mortgage Investment Trust, a Maryland real estate investment trust, is a publicly-traded entity listed on the New York Stock Exchange (NYSE: PMT). It has no parent company, and no publicly held corporation owns 10% or more of its common stock, other than any publicly-traded corporations who have independently reported their beneficial ownership on Schedule 13G with the United States Securities & Exchange Commission ("SEC"). On January 22, 2024, BlackRock, Inc. filed Amendment No. 4 to Schedule 13G with the SEC and disclosed that it had sole voting power over 15,164,191 PennyMac Mortgage Investment Trust common shares and sole dispositive power over 15,249,166 PennyMac Mortgage Investment Trust common shares as of December 31, 2023.

PNMAC Capital Management, LLC is indirectly owned by PennyMac Financial Services, Inc., a publicly-traded company (NYSE: PFSI). PNMAC Capital Management, LLC is not aware of any publicly-traded corporation that owns more than 10% of PennyMac Financial Services, Inc.'s stock.

/s/ *Matthew Donald Umhofer*
MATTHEW DONALD UMHOFER

MAY 15, 2025

i

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT .........................................................i

INTRODUCTION ........................................................................................1

QUESTIONS PRESENTED.........................................................................3

STATEMENT OF THE CASE......................................................................3

REASONS FOR GRANTING THE PETITION .......................................8

I.    This Court Should Review Whether PennyMac's Fallback Dividend Rates Are Qualifying "Benchmark Replacements" Under the LIBOR Act.............................................................................................................9

    A.    This Issue Presents a Controlling Question of Law. ...........................11

    B.    Substantial Grounds Exist For a Difference of Opinion. ....................13

    C.    An Immediate Appeal May Materially Advance the Litigation. ........18

II.    This Court Should Review Whether Maryland Law Governs this Dispute. ................................................................................................19

    A.    This Issue Presents a Controlling Question of Law. ...........................20

    B.    Substantial Grounds Exist For a Difference of Opinion. ....................21

    C.    An Immediate Appeal May Materially Advance the Litigation. ........23

CONCLUSION.........................................................................................24

CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-COUNT LIMITATIONS.............................................................................25

CERTIFICATE OF SERVICE ...............................................................26

# TABLE OF AUTHORITIES

**CASE**                                                    **PAGE(S)**

*Brown v. Gardner*,
   513 U.S. 115 (1994) ........................................................................17

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ..................................................................13

*Cont'l Airlines, Inc. v. Mundo Travel Corp.*,
   412 F. Supp. 2d 1059 (E.D. Cal. 2006) .......................................20

*Douglas v. Xerox Bus. Servs., LLC*,
   875 F.3d 884 (9th Cir. 2017) .......................................................11

*E.E.O.C. v. Luce, Forward, Hamilton & Scripps*,
   345 F.3d 742 (9th Cir. 2003) .......................................................17

*Henley v. Jacobs*,
   2019 WL 8333448 (N.D. Cal. Oct. 25, 2019) .............................12

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
   22 F.4th 1125 (9th Cir. 2022) ................................................ 11, 13

*Irwin Nats. v. Securenet, LLC*,
   2010 WL 11598030 (C.D. Cal. May 25, 2010) ...........................22

*Joffe v. Google, Inc.*,
   746 F.3d 920 (9th Cir. 2013) ................................................. 11, 14

*Kim v. Cedar Realty Tr., Inc.*,
   116 F.4th 252 (4th Cir. 2024) ......................................................22

*Loughrin v. United States*,
   573 U.S. 351 (2014) ......................................................................16

*Muniz v. Sabol*,
   517 F.3d 29 (1st Cir. 2008) ..........................................................22

*Namleb Corp. v. Garrett*,
   814 A.2d 585 (Md. Ct. Spec. App. 2002) ....................................23

iii

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) ........................................................................14

*Palomino v. Facebook, Inc.*,
    2017 WL 76901 (N.D. Cal. Jan. 9, 2017) ...........................................22

*Reese v. BP Exploration (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ........................................... 13, 14, 18, 21

*Ruiz v. Affinity Logistics Corp.*,
    667 F.3d 1318 (9th Cir. 2012) ..........................................................20

*San Antonio Winery, Inc. v. Jiaxing Micarose Trade Co.*,
    53 F.4th 1136 (9th Cir. 2022) ...........................................................11

*Starr Indem. & Liab. Co. v. Rolls-Royce Corp.*,
    2016 WL 11603022 (D. Ariz. Sept. 9, 2016) ....................................21

*Steering Comm. v. United States*,
    6 F.3d 572 (9th Cir. 1993) ................................................................12

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ...........................................................................16

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989) .........................................................................14

*United States v. Woods*,
    571 U.S. 31 (2013) ...........................................................................17

*Walter v. Hughes Communications, Inc.*,
    682 F. Supp. 2d 1031 (N.D. Cal. 2008) ...................................... 21, 22

*Wash. Mut. Bank, FA v. Superior Ct.*,
    24 Cal. 4th 906 (2001) .....................................................................19

## STATUTES

12 U.S.C. § 5802(1) ...............................................................................15

12 U.S.C. § 5802(3) ....................................................................... *passim*

12 U.S.C. § 5802(6) .................................................................................5

iv

12 U.S.C. § 5802(11) .................................................................5

12 U.S.C. § 5803(a) ...............................................................5, 6

12 U.S.C. § 5803(b) ...............................................................5, 6

12 U.S.C. § 5803(f)(2) ..............................................................6

12 U.S.C. § 5806 ......................................................................13

12 U.S.C. § 5806(1) ..................................................................6

12 U.S.C. §§ 5801–5807 (LIBOR Act) ....................................5

28 U.S.C. § 1292(b) ......................................................... *passim*

Cal. Bus. & Prof. Code § 17200 ........................................ 2, 10

Md. Code Ann., Corps. & Ass'ns § 8-101(b) ...........................4

Md. Code Ann., Corps. & Ass'ns § 8-201 .................................4

Md. Code Ann., Corps. & Ass'ns § 8-203(b) ...........................4

**REGULATIONS**

12 C.F.R. Part 253.....................................................................5

**RULES**

Federal Rule of Appellate Procedure 32(f).............................25

## INTRODUCTION

Defendants-Petitioners PennyMac Mortgage Investment Trust ("PennyMac") and PNMAC Capital Management, LLC ("PCM") (hereinafter collectively, "Defendants") respectfully petition this Court pursuant to 28 U.S.C. § 1292(b) for permission to appeal the district court's order denying Defendants' motions to dismiss. *See* Ex. A (Dkt. 52). Defendants seek review of the district court's holdings that (1) PennyMac's fallback dividend rate is not a qualifying "benchmark replacement" under the LIBOR Act, 12 U.S.C. § 5802(3), such that Plaintiff adequately alleged a violation of the Act, and (2) the choice-of-law provision in PennyMac's operative charter document is unenforceable because application of Maryland law would conflict with a fundamental policy of California.

This Court's decisions on these issues will have implications for this case and beyond. This Circuit would be the first to interpret the relevant provisions of the LIBOR Act, a federal statute passed in 2022 directing parties how to interpret and apply the terms of countless financial instruments incorporating LIBOR rates that later ceased to be published. A definitive interpretation of the Act—which Defendants respectfully submit can be determined by the plain text of the statute— is essential for application of the Act with consistency and certainty going forward. So, too, is it important that this Court make clear that when a publicly-traded entity and its shareholders have agreed that their relationship is governed by the laws of

1

the state in which that entity is organized, those decisions will be respected, not upended by an effort to shoehorn corporate governance and shareholder rights issues into an inapplicable consumer-protection framework.

On May 5, 2025, the district court determined that its order meets the requirements for interlocutory review pursuant to 28 U.S.C. § 1292(b): (1) the order involves "controlling question[s] of law"; (2) there is "substantial ground for difference of opinion"; and (3) an "immediate appeal from the order may materially advance the termination of the litigation." 28 U.S.C. § 1292(b); *see* Ex. B (Dkt. 64).

Both questions presented are pure, controlling legal questions. Plaintiff's sole claim arises under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. This "claim is premised on Defendants' purported violation of the LIBOR Act." Ex. B at 8. If this Court agrees with Defendants' reading of the statute, then PennyMac's fallback dividend rate complies with the Act and Plaintiff's complaint must be dismissed. Moreover, Plaintiff's UCL claim is viable only under California law. If PennyMac's choice-of-law provision is enforceable, and Maryland law applies, then Plaintiff's asserted claim cannot survive.

There are also substantial grounds for difference of opinion: as the district court recognized, the LIBOR Act question presents a "novel" issue of statutory interpretation that neither this Court nor any other has addressed, *id.* at 6–8, and the choice-of-law question presents a "difficult issue" that has "not directly been

2

decided by the Ninth Circuit," *id*. at 5. Finally, an appeal is virtually certain to advance the ultimate termination of this case: if this Court agrees with Defendants on *either* question, then Plaintiff's sole claim will be dismissed. And even if the Court agrees with Plaintiff, it can clarify the meaning of the statute and the governing legal framework, thereby substantially streamlining future proceedings.

For all the reasons given by the district court, and those stated below, this Court should accept certification.

## QUESTIONS PRESENTED

1.  Whether, as a matter of law, PennyMac's fallback dividend rate is a qualifying "benchmark replacement" under the LIBOR Act, 12 U.S.C. § 5802(3), such that the use of that rate complies with the Act.

2.  Whether, as a matter of law, the choice-of-law provision in PennyMac's operative charter document (the "Declaration of Trust") compels the application of Maryland law.

## STATEMENT OF THE CASE

1. PennyMac is a Real Estate Investment Trust ("REIT") organized under Maryland law and managed by PCM, a Delaware LLC. Compl. ¶ 28 (Dkt. 1). This case concerns the terms of two series of PennyMac's preferred stock: the Series A and Series B Fixed-to-Floating Preferred Shares ("Preferred Shares"), which were issued in 2017. *See* Ex. D (Dkt. 36-2); Ex. E (Dkt. 36-3). PennyMac set out the

3

terms for issuing dividends on the Preferred Shares in its Articles Supplementary (the "Articles"), *see id.*; Compl. ¶ 3, which are Maryland corporate documents that authorize a REIT to issue additional shares and are incorporated into the REIT's charter document, the Declaration of Trust, *see* Ex. F (Dkt. 36-4); Md. Code Ann., Corps. & Ass'ns §§ 8-101(b), 8-201, 8-203(b). The Declaration of Trust provides that the parties' rights and the effects of its provisions are "subject to and construed according to" Maryland law. Ex. F § 13.1.

The Articles envisioned that, in 2024, the dividends would transition from a fixed rate to a floating rate tied to the London Interbank Offered Rate ("LIBOR"). *See* Ex. D ¶¶ 4(a), (g); Ex. E ¶¶ 4(a), (g); Compl. ¶ 3. And, as relevant here, the Articles also contain provisions that the parties agreed would apply if LIBOR were unavailable. *See* Ex. D ¶ 4(g); Ex. E ¶ 4(g). Specifically, the Articles provide that the contractually-defined term "Three-Month LIBOR" is initially set at a LIBOR rate appearing on a Reuters page. *Id.* If such a rate is unavailable, a series of fallbacks kick in: first, "Three-Month LIBOR" equals the average interest rate quoted to PennyMac from a set of individual banks. *Id.* If *that* rate is unavailable, then "the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period." *Id.* Finally, "if there was no such Dividend Period"—that is, there was no immediately preceding Dividend Period utilizing a Three-Month LIBOR rate—then the Articles set the dividend rate

4

outright: "the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." *Id.*

2. In June 2023—after PennyMac issued the Preferred Shares, but before the dates on which the dividend rates were to float—LIBOR was discontinued. Compl. ¶ 7. LIBOR had long served as a key benchmark for interest rates across various financial products, and many outstanding financial instruments that relied on LIBOR could not function on their own terms in its absence. *See* 12 C.F.R. Part 253; Compl. ¶¶ 4–5.

To address what would otherwise be non-functioning financial instruments, Congress passed the Adjustable Interest Rate (LIBOR) Act ("LIBOR Act" or "Act") in 2022. *See* 12 U.S.C. §§ 5801–5807. The Act serves as a gap-filler, requiring some—but not all—contracts to transition to a floating dividend rate based on the Secured Overnight Financing Rate ("SOFR"). *Id.* §§ 5803(a)–(b), 5802(6). The Act requires parties to evaluate instruments benchmarked to LIBOR and their "fallback provisions" to determine whether a switch to SOFR is mandatory. *Id.* § 5803(a)–(b). "Fallback provisions" are "terms in a LIBOR contract for determining a benchmark replacement…." *Id.* § 5802(11). A "benchmark replacement," in turn, is "a benchmark, or an interest rate or dividend rate … to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis…." *Id.* § 5802(3).

5

Specifically, parties are to "disregard[]" references in contracts' fallback provisions to (1) "benchmark replacement[s]" based on LIBOR, and (2) requirements that parties poll banks. *Id.* § 5803(b). If an instrument does not include another "specific benchmark replacement" or a "determining person,"[1] the LIBOR Act directs the instrument to switch to a SOFR-based rate. *Id.* § 5803(a).

However, contracts that provide for non-LIBOR-based fallbacks remain in effect and are not directed to switch to SOFR:

> Nothing in this chapter may be construed to alter or impair ... *any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value....*

*Id.* § 5803(f)(2) (emphasis added). To ensure nationwide uniformity, the Act expressly preempts state law "relating to the selection or use of a benchmark replacement" rate. *Id.* § 5806(1).

3. PennyMac applied the Act's provisions to determine the dividend rates owed on the Preferred Shares. After disregarding the provisions relying on LIBOR-as-published and bank polling, the final sentence of the fallback provision remains: "the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period, or, if there was no such Dividend

---

[1] The "determining person" provision is not at issue here.

6

Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." *See* Ex. D ¶ 4(g); Ex. E ¶ 4(g).

The relevant "immediately preceding Dividend Period[s]" were the periods before each Series was set to float. *See* Ex. D ¶¶ 4(a), (i); Ex. E ¶¶ 4(a), (i); Compl. ¶¶ 31, 35. Because there had been "no such Dividend Period" that employed a Three-Month LIBOR rate, *see* Compl. ¶ 7, the first half of the sentence is inapplicable, and the Articles direct that "the dividend rate in effect for the immediately preceding Dividend Period" applies: the fixed rates. Ex. D ¶ 4(g); Ex. E ¶ 4(g). Accordingly, in August 2023, PennyMac informed shareholders that it would continue issuing the dividends for its Preferred Shares at the initial rates, and it has done so. Compl. ¶¶ 19, 53.

4. In June 2024, Plaintiff Roberto Verthelyi (a New Jersey resident) brought this putative class action against Defendants, asserting a single claim under California's UCL. *See* Compl. ¶¶ 27, 69–82. Specifically, Plaintiff alleges that Defendants violated the LIBOR Act—and hence the UCL's ban on "unlawful" and "unfair" practices—by continuing to issue dividends for its Preferred Shares at fixed rates, rather than implementing a floating dividend rate based on SOFR. Compl. ¶¶ 50–52, 76.

Defendants moved to dismiss the complaint. Dkt. 34, 35. Defendants argued that (1) Plaintiff's UCL claim is not cognizable because the choice-of-law provision

7

in the Declaration of Trust compels the application of Maryland law; and (2) PennyMac's dividend rates comply with the Act, which expressly permits contracts like PennyMac's to continue using their contractual replacement rates. *See id.*

On February 26, 2025, the district court denied Defendants' motion to dismiss. The court held that, although the choice-of-law provision applies to this dispute, it was unenforceable as contradicting California policy, so "California law governs this action." Ex. A at 8–13. The court also disagreed that PennyMac complied with the LIBOR Act as a matter of law, concluding that the Act's language is "ambigu[ous]" as to what qualifies as a "benchmark replacement," and that Plaintiff had pled that PennyMac's actions do not "comport" with the Act's "purpose or overall structure." *Id.* at 16.

Defendants moved for certification under 28 U.S.C. § 1292(b). Dkt. 53. On May 5, 2025, the district court granted that motion, concluding that each question presented meets the Section 1292(b) criteria and thus that its order should be immediately appealable. Ex. B at 3–8. The district court also stayed proceedings pending a decision by this Court. *Id.* at 9.

## REASONS FOR GRANTING THE PETITION

Section 1292(b) authorizes a district court to certify an order for interlocutory appeal where it "involves a controlling question of law as to which there is substantial ground for difference of opinion" and when "an immediate appeal from

8

the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The order below meets this standard, and is well-suited for appellate review now.

It is in all parties' interests to reach resolution on the meaning of the LIBOR Act as quickly and efficiently as possible. That is the central question presented by this case, and it will fall to this Court to determine whether Plaintiff's or Defendants' reading of the Act is correct. The question is appropriately teed up now; discovery will neither moot nor shed new light on the issue; and establishing a proper interpretation of the Act is crucial for all other parties who rely on the statute to apply their financial instruments. Further, it is in all parties' interests to ensure application of the appropriate state's law from the outset. There is no reason to delay resolution of these two fundamental legal issues. Accordingly, this Court should exercise its discretion and grant the petition.

## I.    This Court Should Review Whether PennyMac's Fallback Dividend Rates Are Qualifying "Benchmark Replacements" Under the LIBOR Act.

Defendants are two out of scores of commercial actors applying the LIBOR Act to millions of financial instruments, all of whom look to the statute's terms to guide their compliance with the law. Whether Defendants comply with the LIBOR Act turns on the meaning of the term "benchmark replacement." 12 U.S.C. § 5802(3). Defendants contend that the plain text of the statute provides that any

9

dividend rate not based on LIBOR or bank polling—including PennyMac's fallback rates—may be a "benchmark replacement." Dkt. 34 at 14–15. Plaintiff, on the other hand, argues based on selective legislative history that fixed rates do not fall within the definition, Dkt. 37 at 11–15, and therefore that Defendants' conduct violates the Act and is "unlawful" and/or "unfair" under the UCL. *See* Compl. ¶¶ 72–82; Cal. Bus. & Prof. Code § 17200.

The district court concluded that the statutory term "benchmark replacement" is ambiguous, and looked beyond the plain text to the supposed statutory purpose. Ex. A at 16. That purpose, the district court concluded, included "prevent[ing] floating-rate instruments from unfairly converting into fixed-rate instruments." *Id.* Although the court did not expressly state that it was adopting Plaintiff's construction of the statute, its holding that Plaintiff adequately alleged "that PennyMac violated the LIBOR Act when it issued dividends at a fixed rate," *id.* at 17, is grounded in a conclusion that PennyMac's fallback-dividend rate is not a qualifying "benchmark replacement."

The district court certified this novel question of statutory interpretation for interlocutory review, finding all the Section 1292(b) factors satisfied. There is no question that the "interpretation of the statute" is "fundamental to the case," and it should be resolved now. Ex. C at 4; *id.* at 6–7 (Plaintiff's counsel acknowledging

that "the LIBOR Act question is the key question" and "the main issue"); Ex. B at 6–8.[2]

## A. This Issue Presents a Controlling Question of Law.

To qualify for interlocutory review, a question must be a "controlling" question "of law," the resolution of which "materially affect[s] the outcome of the litigation in the district court." *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1130 (9th Cir. 2022) (internal quotation marks omitted).

The parties' LIBOR Act dispute presents a pure question of law because it involves the interpretation of a federal statute that does not rest on any factual dispute between the parties. Ex. B at 6–7.[3] "[T]he parties primarily dispute the meaning and purpose" of 12 U.S.C. § 5802(3), the provision in the LIBOR Act which defines the statutory term "benchmark replacement." Ex. B at 7; Ex. A at 15. As described above, *supra* pp. 9–10, the district court found both parties' readings of the statute

---

[2] At oral argument, Plaintiff's counsel expressed that Plaintiff is "on the same page" in terms of "sav[ing] … cost to the investors and to the company," and the primary concern with certification was that this Court may address the choice-of-law issue without reaching the merits of the LIBOR Act. Ex. C at 11. The meaning of the LIBOR Act is a matter of federal statutory interpretation, so this Court can (and, Defendants submit, should) decide the issue independently from any choice-of-law analysis.

[3] This Court routinely accepts certification under Section 1292(b) for questions of statutory interpretation. *See, e.g., San Antonio Winery, Inc. v. Jiaxing Micarose Trade Co*., 53 F.4th 1136, 1140 (9th Cir. 2022); *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 886 (9th Cir. 2017); *Joffe v. Google, Inc*., 746 F.3d 920, 923–36 (9th Cir. 2013).

11

"plausible," and therefore the statute itself "ambigu[ous]," ultimately concluding that Plaintiff had alleged a violation of the LIBOR Act. Ex. A at 16–17. To review that holding, this Court would need to consult only the text of the statute and the Articles Supplementary. *See* Ex. B at 7. The question presented is therefore a "purely legal one" that be "resolved quickly without delving into [the] particular case's facts." *Henley v. Jacobs*, 2019 WL 8333448, at *2 (N.D. Cal. Oct. 25, 2019) (citing *Steering Comm. v. United States*, 6 F.3d 572, 575–76 (9th Cir. 1993)).

This legal question is also "controlling" because "the correct interpretation of a 'qualifying benchmark' under the LIBOR Act is highly material to the outcome of Plaintiff's claim." Ex. B at 7. Plaintiff's theory of liability under both the "unlawful" and "unfair" prongs of the UCL rests on PennyMac's alleged violation of the LIBOR Act. *See id.* at 8. If PennyMac's initial dividend rate fallback qualifies as a "benchmark replacement" under 12 U.S.C. § 5802(3), its use of that rate complies with the Act and no "unlawful" theory could survive. *See id.* at 7.

Plaintiff has argued that, even if PennyMac's dividends comply with the LIBOR Act, Defendants' conduct may still be found "unfair" under the UCL. Not so. Although each prong of the UCL can, in theory, be its own basis for liability, Plaintiff's theory of liability under both prongs here "is premised on Defendants' purported violation of the LIBOR Act." Ex. B at 8. As Defendants explained below, the LIBOR Act expressly preempts any state law that would impose a different

12

benchmark replacement than that directed by the Act. *See* Dkt. 34 at 18–19; 12 U.S.C. § 5806. Similarly, the UCL's safe-harbor immunizes from UCL liability practices that are approved by the government. *See* Dkt. 34 at 17–18; *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 182 (1999). Plaintiff does not and has never disputed either of these legal points, instead arguing only that his unfair claim may proceed because PennyMac violated the LIBOR Act. *See* Dkt. 37 at 17–18. As the district court noted, "there is a high likelihood" that reversal "would result in Plaintiff's [unfair] claim failing under both federal preemption and the UCL's safe-harbor doctrine." Ex. B at 7. "Accordingly, the issue presents a controlling question of law" suitable for appeal pursuant to Section 1292(b). *Id.*

### B.  Substantial Grounds Exist For a Difference of Opinion.

The district court also correctly determined that a "substantial ground for difference of opinion" exists as to this controlling legal question. 28 U.S.C. § 1292(b). Where the legal issue consists of a "novel and difficult question[] of first impression," as here, "[c]ourts traditionally will find that a substantial ground for difference of opinion exists." *ICTSI Oregon Inc.*, 22 F.4th at 1132. That is true even where there is no contradictory precedent. *Reese v. BP Exploration (Alaska) Inc*., 643 F.3d 681, 688 (9th Cir. 2011).

13

Whether fixed dividend rates may qualify as "benchmark replacements" under the LIBOR Act is undisputedly an issue of first impression. The district court's order on the motions to dismiss highlights the absence of any "relevant authority analyzing the construction [of the LIBOR Act]," Ex. A at 16, and its certification order reaffirmed the novelty of the question presented, Ex. B at 8. This Court has often granted interlocutory review on questions of first impression like the one presented here. *See, e.g., Joffe*, 746 F.3d at 924; *Reese*, 643 F.3d at 688.

Not only is this question novel, but Defendants have compelling arguments on the merits. Defendants' position is grounded in the text, which is the bedrock of statutory interpretation. When interpreting statutes, the analysis should ordinarily "begin[] and end[] with the text." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240–41 (1989). Although the district court did not find the plain text of the statute clear here, and therefore turned to legislative history, in certifying the question for review, it acknowledged that "reasonable jurists could disagree with the Court's analysis as to this issue." Ex. B. at 8.

Reasonable jurists could (and, Defendants submit, should) conclude that the statutory text is clear, and that PennyMac's initial dividend rates qualify as

14

"benchmark replacements" under the LIBOR Act.  The statute defines "benchmark replacement" as "a benchmark, *or an interest rate or dividend rate* (which may or may not be based in whole or in part on a prior setting of LIBOR), to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract."  12 U.S.C. § 5802(3) (emphasis added).  The statute separately defines the term "benchmark" as "*an index* of interest rates or dividend rates that is used … as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." *Id*. § 5802(1) (emphasis added).

Defendants contend that a "benchmark replacement" may therefore be one of three things: (1) a "benchmark" (as defined in § 5802(1)); (2) an "interest rate"; or (3) a "dividend rate." *See* Dkt. 41 at 6–7.  Plaintiff, on the other hand, contends that a "benchmark replacement" must be a "benchmark" only, and because a "benchmark" contemplates a floating rate tied to an index, then a "benchmark replacement" cannot encompass fixed rates. *See* Dkt. 37 at 11–14.

The district court, in finding both interpretations "plausible," declaring the statute "ambigu[ous]," and turning away from the text to legislative history, failed to wrestle with how Plaintiff's interpretation of the term "benchmark replacement" could be squared with the ordinary rules of statutory construction. Ex. A. at 16.  It cannot.

15

Plaintiff's effort to limit a "benchmark replacement" to only a "benchmark" "would in practical effect render" the second clause within the definition of "benchmark replacement" "entirely superfluous." *TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001). Plaintiff has acknowledged as much: "*Upon removing the appositive clause*, the statutory language reads: 'The term 'benchmark replacement' means a benchmark … to replace LIBOR or any interest rate or dividend rate based on LIBOR….'" Dkt. 37 at 13 (emphasis added) (citing 12 U.S.C. § 5802(3)).

"Removing" inconvenient clauses is not how statutory interpretation works. To the contrary, a "cardinal principle of interpretation" is that courts "must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (internal quotation marks omitted). Here, giving effect to "every clause and word" of the statutory provision is simple: a "benchmark replacement" can be a "benchmark," or "an interest rate or dividend rate"— regardless of whether that rate is fixed or variable. 12 U.S.C. § 5802(3). If the phrase "interest rate or dividend rate" added nothing to the definition, then Congress could have simply omitted it. It did not.

Plaintiff has argued that the clause "or an interest rate or dividend rate" serves as a clarifying, if not strictly necessary, provision—specifically, "an appositive clause intended to explain (not contradict) the term 'benchmark.'" Dkt. 37 at 13. Although "or" "can sometimes introduce an appositive—a word or phrase that is

16

synonymous with what precedes it … its ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings." *United States v. Woods*, 571 U.S. 31, 45–46 (2013) (internal quotation marks omitted).

Here, both the text and the structure of the statute support the ordinary use of "or" as a disjunctive term, not as introducing an appositive phrase that can be "remove[d]" from the statute. First, an interest rate or dividend rate (singular) is not "synonymous" with an index of rates (plural). If the two were actually the same, then the parties would not be having this debate. Second, the statute defines a "benchmark," and Plaintiff offers no reason why Congress would "explain" with an appositive phrase a statutory term that is already specifically defined with different (non-synonymous) words. Third, the definition of "benchmark replacement" uses the word "or" twice: "benchmark, *or* interest rate *or* dividend rate." 12 U.S.C. § 5802(3) (emphasis added). Plaintiff does not contest that the second "or" is disjunctive, and "when a term is repeated within a given sentence," there is a "vigorous" presumption that it "is used to mean the same thing." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

Considering these principles and precedent, reasonable jurists may disagree with the district court and conclude that the plain language of the Act makes clear that a "benchmark replacement" can include any interest rate or dividend rate, including fixed rates like PennyMac's. *See E.E.O.C. v. Luce, Forward, Hamilton &*

*Scripps*, 345 F.3d 742, 753 (9th Cir. 2003) ("Because the text … is unambiguous, we are precluded from considering legislative history").

### C. An Immediate Appeal May Materially Advance the Litigation.

Plaintiff agrees that interpretation of the LIBOR Act is the "main" and "key" issue presented in this case. Ex. C at 7. There can be no question that an answer on that question from this Court would materially advance the ultimate termination of the litigation.

As the district court explained, Plaintiff's "sole claim is premised on Defendants' purported violation of the LIBOR Act." Ex. B at 8. Thus, if this Court finds that PennyMac's contractual fallback rates are qualifying "benchmark replacements" that should be given effect, Plaintiff's UCL "unlawful" and "unfair" theories both fail and his UCL claim must be dismissed. *See supra* pp. 12–13. Further, even if Plaintiff's "unfair" theory somehow survived (which it should not), resolving the statutory interpretation question would "materially advance" resolution of this case, even if it did not "have a final, dispositive effect on the litigation." *Reese*, 643 F.3d at 688. Whether or not PennyMac's actions comply with the LIBOR Act "would likely have a critical impact on whether Plaintiff can establish that the actions were 'unfair' under the UCL." Ex. B at 8.

The parties—and holders of similar instruments more broadly—would all be best served by the earliest possible determination by this Court of the proper

interpretation of the statute. The case will rise or fall with it, and there is little point to proceeding with discovery, motions, and potentially trial when this Court can resolve this fundamental issue now.

## II. This Court Should Review Whether Maryland Law Governs this Dispute.

Plaintiff, a resident of New Jersey, is a shareholder in a Maryland REIT and agreed when purchasing his shares that disputes regarding his rights as a shareholder would be governed by Maryland law. *See* Compl. ¶ 27; Ex. F § 13.1. Courts applying California choice-of-law principles generally enforce contractual choice-of-law provisions where the chosen state bears "a substantial relationship to the parties or their transaction." *Wash. Mut. Bank, FA v. Superior Ct*., 24 Cal. 4th 906, 917 (2001). To avoid enforcement, the opponent of the clause must show "both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue." *Id.*

Here, the district court agreed with Defendants that Plaintiff's allegations fall within the scope of the Declaration of Trust's choice-of-law provision, and that the chosen state (Maryland) has a substantial relationship to the parties and their transaction. *See* Ex. A at 8–11. The district court nonetheless held the provision unenforceable because it "conflicts with a fundamental policy of California's consumer protection laws" in terms of the remedies available, and because California has a "greater interest" than Maryland in having its law applied to this

19

dispute. *Id.* at 12–13. In so holding, the district court improperly recast Plaintiff's claim for a different dividend rate—a quintessential dispute over shareholder rights—as a matter of consumer protection.

The district court repeatedly recognized the "difficult" nature of this choice-of-law issue, *see* Ex. A at 11, Ex. B at 5, and held that it meets each of Section 1292(b)'s criteria, *see* Ex. B at 4–6.

## A. This Issue Presents a Controlling Question of Law.

Whether "the district court erred when it concluded that [California] law, not [Maryland] law, applies is a question of law subject to de novo review." *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012). The district court's conclusion rested on its legal determination that Maryland law "conflicts with a fundamental policy of California's consumer protection laws" regarding available remedies. Ex. A at 12. The only facts necessary to resolving that question are basic and not in dispute: that PennyMac is a Maryland entity, Compl. ¶ 28, and that the Complaint seeks an equitable remedy, *id.* ¶ 83.

Further, the choice-of-law question is "controlling," because "[a] valid choice-of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL." *Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006); *see* Dkt. 34 at 9–10 (collecting cases). Thus, as the

district court explained, "if the Ninth Circuit determines that Maryland law should apply," then "Plaintiff's only claim would be dismissed." Ex. B at 4.

This Court has "often" "accepted certification" on choice-of-law "questions in the past." Ex. B at 4 (collecting cases). This makes sense. If this Court determines that the district court "erred in its decision regarding the choice of law, every order from [this point] forward would require reversal and the entirety of the matter would be relitigated." *Starr Indem. & Liab. Co. v. Rolls-Royce Corp*., 2016 WL 11603022, at \*1 (D. Ariz. Sept. 9, 2016).

### B. Substantial Grounds Exist For a Difference of Opinion.

A "substantial ground for difference of opinion" exists if "reasonable jurists might disagree on [the] issue's resolution." *Reese*, 643 F.3d at 688. Here, the district court determined that PennyMac's choice of Maryland law conflicts with California's consumer protection policies, namely that the UCL allows plaintiffs to seek injunctive relief, while the Maryland Consumer Protection Act ("MCPA") allows private citizens to sue only for damages. Ex. A at 12.

Nevertheless, the district court recognized that the question "presented a difficult issue that had not directly been decided by the Ninth Circuit." Ex. B at 5. The district court also acknowledged that "other courts have disagreed with the reasoning" in the case upon which it relied, *Walter v. Hughes Communications, Inc.*, 682 F. Supp. 2d 1031 (N.D. Cal. 2008), "and found that a difference in remedies

21

between two forums is insufficient to hold a choice-of-law provision unenforceable." Ex. B at 5; *see Palomino v. Facebook, Inc.*, 2017 WL 76901 (N.D. Cal. Jan. 9, 2017*) (application of another state's law does not violate California public policy simply because it "affords different rights and remedies"); *Irwin Nats. v. Securenet, LLC*, 2010 WL 11598030, at *2 (C.D. Cal. May 25, 2010*) (declining to find a fundamental conflict based on "the differences in remedies between Maryland law and the UCL"); *see also* Dkt. 53 at 9–10. That is particularly true here, where the injunctive relief Plaintiff seeks is the payment of money at a different rate. This "difficult" issue that the Ninth Circuit has not decided and on which district courts disagree easily satisfies Section 1292(b)'s requirement that a question present substantial grounds for disagreement. *See Muniz v. Sabol*, 517 F.3d 29, 32 (1st Cir. 2008).

Moreover, in relying on *Walter* and determining that the remedies available under consumer protection laws pose a conflict, the district court did not evaluate whether Plaintiff and the putative class may have other avenues to seek equitable relief beyond the MCPA. They do. The Preferred Shareholders' rights are governed by contract—the Articles and the Declaration of Trust—and they, like other aggrieved shareholders, can turn to black letter corporate and contractual law, rather than consumer protection law, for relief. *See Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 256, 260 (4th Cir. 2024). For example, Plaintiff here could attempt to secure

22

specific performance of the contract, an equitable remedy. *See, e.g., Namleb Corp. v. Garrett*, 814 A.2d 585, 591 (Md. Ct. Spec. App. 2002). The availability of equitable relief in Maryland provides a further basis to determine that there is no conflict over an issue of fundamental California policy, and therefore that PennyMac's choice-of-law provision should be enforced to apply Maryland law to a dispute between a Maryland entity and its shareholder.

### C. An Immediate Appeal May Materially Advance the Litigation.

Plaintiff's only claim arises under California law, which means that if California law does not apply, his claim must be dismissed. *See supra* pp. 20–21; Ex. B at 4. Thus, an immediate appeal could "conserve time and resources spent litigating an action potentially premised on a mistaken analysis of a threshold question," Ex. B at 6, and "materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b).

Without an appeal, this case will proceed through discovery and pre-trial briefing, and potentially through class certification, trial, and post-trial motions— and only then could the Court analyze, for the first time, the threshold legal question of whether California law applies at all. Plaintiff contends that, if California law does not apply, he may file a different claim grounded in Maryland law. *See* Dkt. 56 at 14–15. But that is all the more reason to decide this issue now and ensure the

parties are proceeding under the correct law, rather than risk litigating the matter to judgment, only to be sent back to square one.

## CONCLUSION

For these reasons, this Court should grant Defendants permission to appeal.

Respectfully submitted,

/s/ Matthew Donald Umhofer

STEVEN M. FARINA
MELISSA B. COLLINS
WILLIAMS & CONNOLLY, LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  sfarina@wc.com

Counsel for Defendant-Petitioner
PennyMac Mortgage Investment Trust

MATTHEW DONALD UMHOFER
JONAS P. MANN
UMHOFER, MITCHELL AND KING LLP
  767 South Alameda St., Ste. 270
  Los Angeles, CA 90021
  (213) 394-7979
  matthew@umklaw.com

Counsel for Defendants-Petitioners
PennyMac Mortgage Investment Trust
and PNMAC Capital Management, LLC

MAY 15, 2025

24

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Matthew Donald Umhofer, certify, pursuant to Federal Rule of Appellate Procedure 32(f) and Circuit Rules 5-2(b) and 32-3(2), that the attached Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b) is proportionately spaced, has a typeface of 14 points, and contains 5,588 words.

/s/ *Matthew Donald Umhofer*
MATTHEW DONALD UMHOFER

MAY 15, 2025

# Exhibit A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)          Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

Present:   The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

            Deputy Clerk:                     Court Reporter:
            Rita Sanchez                 Not Reported

            Attorneys Present for Plaintiff:      Attorneys Present for Defendants:
            None Present                 None Present

**Proceedings (In Chambers):**  ORDER RE: DEFENDANTS' MOTIONS TO
                                    DISMISS [34] [35]

Before the Court are two motions to dismiss:

The first Motion to Dismiss ("PennyMac MTD") was filed on August 20, 2024, by Defendant PennyMac Mortgage Investment Trust ("PennyMac").  (Docket No. 34). Plaintiff Roberto Verthelyi filed an Opposition on October 11, 2024 ("PennyMac Opp.").  (Docket No. 37).  PennyMac filed a Reply on November 4, 2024 ("PennyMac Reply").  (Docket No. 41).

The second Motion to Dismiss ("PNMAC MTD") (collectively, "Motions") was filed on August 20, 2024, by Defendant PNMAC Capital Management, LLC ("PNMAC").  (Docket No. 35).  Plaintiff filed an Opposition on October 11, 2024 ("PNMAC Opp.").  (Docket No. 38).  PNMAC filed a Reply on November 4, 2024 ("PNMAC Reply").  (Docket No. 42).

The Court has read and considered the Motions and held a hearing on **November 21**, **2024**.

The Motions are **DENIED.**  Plaintiff has plausibly alleged that Defendants violated the LIBOR Act when they failed to adopt an appropriate replacement benchmark under the Act.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)                    Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

## I.    **BACKGROUND**

Plaintiff brings this putative class action on behalf of himself individually and all others similarly situated against PennyMac and PNMAC (collectively, "Defendants"). (*See generally* Compliant (Docket No. 1)).  The Court summarizes the allegations in the Complaint in the light most favorable to Plaintiff as follows:

The putative class consists of all persons and entities who own or owned shares ("Preferred Shareholders") of Defendants' fixed-to-floating rate Series A Preferred Shares and/or Series B Preferred Shares (collectively, "Preferred Shares") at any time between August 25, 2023, and the conclusion of this action.  (*Id.* ¶ 1).  PennyMac is a mortgage real estate investment trust that invests primarily in residential mortgage loans and mortgage-related assets.  (*Id.* ¶ 2).  PennyMac is externally managed by PNMAC.  (*Id.*).

Defendants set out the terms for issuing dividends on the Preferred Shares in the governing documents authorizing those shares, the Articles Supplementary (the "Articles").  (*Id.* ¶ 3).  The Articles called for the Preferred Shares to transition from a fixed-rate to a floating-rate dividend based on the London Inter-Bank Offered Rate ("LIBOR") in 2024.  (*Id.*).

However, on March 5, 2021, the U.K. Financial Conduct Authority announced that LIBOR would permanently cease publication on June 30, 2023.  (*Id.* ¶ 46). Recognizing the need for a uniform, nationwide solution for replacing references to LIBOR in legacy contracts, Congress enacted the LIBOR Act, 12 U.S.C. §§ 5801 et seq., on March 15, 2022.  (*Id.* ¶ 47).

Section 5803 of the LIBOR Act states, in relevant part, that once LIBOR ceases to exist, the "Board-selected benchmark replacement shall be the benchmark replacement for any LIBOR contract that . . . (1) contains no fallback provisions; or (2) contains fallback provisions that identify neither—(A) a specific benchmark replacement; nor (B) a determining person."  12 U.S. Code § 5803(a).  The LIBOR Act, however, does not alter or impair "any LIBOR contract that contains fallback

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 24-05028-MWF (JCx)**          **Date:  February 26, 2025**
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

provisions that identify a benchmark replacement that is not based in any way on any
LIBOR value." *Id.* § 5803(f)(2).

The Articles provide that Preferred Shareholders are to be paid dividends at a
rate based off of the contractually-defined term "Three-Month LIBOR."  (PennyMac
Opp., Ex. A (Docket No. 36-2) ("Series A Articles") at ¶ 4(a)); (PennyMac Opp., Ex.
B (Docket No. 36-3) ("Series B Articles") (collectively, the "Articles") at ¶ 4(a)).
"Three-Month LIBOR," in turn, provides contingencies for how the dividend should be
calculated in a variety of circumstances.  (Articles at ¶ 4(g)).  Per the Articles' terms,
Three-Month LIBOR is set first at a LIBOR rate appearing on a Reuters page (the
"Screen Rate").  *Id.*  If the Screen Rate is unavailable, a series of "fallbacks" kick in.
*Id.*  First, Three-Month LIBOR will equal the average interest rate quoted to PennyMac
from individual banks on the London or New York City markets (the "Polling Rate").
*Id.*  If the Polling Rate is unavailable, then "the Three-Month LIBOR for the applicable
Dividend Period will be the same as for the immediately preceding Dividend Period."
*Id.*  Finally, "if there was no such Dividend Period"—that is, there was no immediately
preceding Dividend Period utilizing a "Three-Month LIBOR Rate"—then "the
dividend shall be calculated at the dividend rate in effect for the immediately preceding
Dividend Period."  (*Id.*).

On August 25, 2023, the Preferred Shareholders learned that Defendants would
issue dividends for its Preferred Shares at the fixed "dividend rate in effect for the
immediately preceding dividend period."  (Complaint ¶ 53).  As a result, owners of the
Series A Preferred Shares are being paid a flat 8.125% dividend and owners of the
Series B Preferred Shares are receiving a flat 8.00% dividend.  (*Id.* at ¶ 19).

Plaintiff alleges that Defendants, in choosing to pay a fixed rate in perpetuity,
violated the LIBOR Act.  (*Id.* at ¶ 57).  Moreover, following the announcement, the
prices of both the Series A and Series B Preferred Shares "fell precipitously, shedding
$40 million in collective market capitalization."  (*Id.* at ¶ 58).  In addition to the loss in
market value, Plaintiff alleges Preferred Shareholders have and will continue to earn
less than the interest promised on their investment.  (*Id.* at ¶ 60).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 24-05028-MWF (JCx)           Date:  February 26, 2025**
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

Based on the foregoing allegations, the Complaint alleges one claim for relief:
Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §
17200 et seq.  (*Id.* ¶¶ 69–87).  Defendants move to dismiss this action in its entirety
under Federal Rule of Civil Procedure 12(b)(6).  (*See generally* Motions).

## II.    **REQUESTS FOR JUDICIAL NOTICE**

Defendants filed two Requests for Judicial Notice on August 20, 2024, and
November 4, 2024, respectively.  (Docket Nos. 36, 43 ("Defendants' RJNs")).
Plaintiff filed one Request for Judicial Notice on October 11, 2024.  (Docket No. 39
("Plaintiff's RJN")).  Neither party filed Oppositions to the other's RJN(s).

The Court concludes that all of the documents referenced in Defendants' RJNs
and Plaintiff's RJN are appropriate for judicial notice.

Under Rule 12(d) of the Federal Rules of Civil Procedure, if the Court considers
matters outside the pleadings in ruling on a motion to dismiss that motion must be
converted into one for summary judgment.  Fed. R. Civ. P. 12(d).  As a general rule, "a
district court may not consider any material beyond the pleadings in ruling on a Rule
12(b)(6) motion."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  An
exception to this general rule exists for (1) materials that are attached to or necessarily
relied upon in the complaint, and (2) matters of public record.  *Id.* at 688–89; *see also
Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (in assessing
securities fraud claims, "courts must consider the complaint in its entirety, as well as
other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to
dismiss, in particular, documents incorporated into the complaint by reference, and
matters of which a court may take judicial notice.").

Plaintiff seeks judicial notice of the following documents:

- Ex. 1: Transcript of Congressional Hearing titled, *The End of LIBOR:
  Transitioning to an Alternative Interest Rate Calculation for Mortgages,
  Student Loans, Business Borrowing, and Other Financial Products,*

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)              Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

before the Subcommittee on Investor Protection, Entrepreneurship, and
Capital Markets of the Committee on Financial Services, U.S. House of
Representatives, 117th Congress, First Session (April 15, 2021);

- Ex. 2: Transcript of Congressional Hearing titled, *The LIBOR Transition: Protecting Consumers and Investors*, before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, 117th Congress, First Session on Examining How the Financial System Can Move on From the LIBOR System (Nov. 2, 2021);

- Ex. 3: Congressional Record (House), *Adjustable Interest Rate (LIBOR) Act of 2021*, 167 Cong. Rec. H7479-01 (Dec. 8, 2021);

- Ex. 4: Excerpted pages from PennyMac Mortgage Investment Trust's Annual Report on Form 10-K for the fiscal year ended December 31, 2023 ("2023 Form 10-K"), filed with the U.S. Securities and Exchange Commission ("SEC") on February 22, 2024;

- Ex. 5: Official list of PennyMac's filings from Maryland Department of Assessments and Taxation Maryland; and

- Ex. 6: Impac Mortgage Holdings, Inc.'s Articles Supplementary Designating the Company's 9.375% Series B Preferred Stock.

Because the six documents are public records not reasonably subject to dispute
under Federal Rule of Evidence 201(b), the Court grants Plaintiff's RJN.  *See
Anderson v. Holder*, 673 F.3d 1089, 1103 (9th Cir. 2012) ("Legislative history is
properly a subject of judicial notice."); *Maxon v. Fuller Theological Seminary*, 549 F.
Supp. 3d 1116, 1122 (C.D. Cal. 2020) ("Courts may take judicial notice of public
records and government documents available from reliable sources on the Internet such
as websites run by governmental agencies."); *In re Am. Apparel, Inc. S'holder
Derivative Litig.*, CV 10-06576-MMM (RCx), 2012 WL 9506072, at *18 (C.D. Cal.
July 31, 2012) (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 24-05028-MWF (JCx)                    Date: February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

1064 n.7 (9th Cir. 2008) ) ("Courts can consider securities offerings and corporate
disclosure documents that are publicly available.").

Defendants request judicial notice of the following documents:

- Ex. A: the Articles Supplementary for each of PennyMac Mortgage
  Investment Trust's Series A;

- Ex. B: the Articles Supplementary for each of PennyMac Mortgage
  Investment Trust's Series B Preferred Shares;

- Ex. C: PennyMac Mortgage Investment Trust's operative Declaration of
  Trust; and

- Ex. D: Adjustable Interest Rate (LIBOR) Act of 2021, H.R. Rep. No.
  117-206, pt.1 (2021).

The Court similarly grants both of Defendants' RJNs. Exhibits A through C are
incorporated by reference, as the Complaint discusses the terms of the Preferred
Shares contained in each Articles Supplementary. (*See e.g.*, Complaint ¶¶ 14, 30–38, 45).
And the Articles Supplementary form part of PennyMac's Declaration of Trust under
Maryland law, as discussed further below. Lastly, the Court takes judicial notice of
Exhibit D because it is a matter of public record not reasonably subject to dispute
under Federal Rule of Evidence 201(b).

## III. LEGAL STANDARD

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a
cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable
legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). "Federal Rule
of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim
showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice
of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)          Date:  February 26, 2025

Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

In ruling on the Motion under Rule 12(b)(6), the Court follows *Twombly*, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their Ninth Circuit progeny.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Court must disregard allegations that are legal conclusions, even when disguised as facts.  *See id.* at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014).  "Although 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable,' plaintiffs must include sufficient 'factual enhancement' to cross 'the line between possibility and plausibility.'"  *Eclectic Props.*, 751 F.3d at 995 (quoting *Twombly*, 550 U.S. at 556–57).

The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the complaint alleges a plausible claim for relief.  *See Iqbal*, 556 U.S. at 679; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011).  "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

## IV.  **DISCUSSION**

### A.  **PennyMac MTD**

PennyMac argues that the case should be dismissed for four reasons: (1) Plaintiff cannot bring a claim under the UCL because Maryland law governs; (2) PennyMac's actions complied with the LIBOR Act and were not "unlawful" under the UCL; (3) the UCL safe harbor provision applies; and (4) PennyMac's actions were not "unfair" under the UCL.  (PennyMac MTD at 8–21).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)              Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

### 1.  Choice-of-Law Provision

The parties dispute both the scope and enforceability of the relevant choice-of-law provision.

#### a.  Scope of the Provision

"[A] trial court should first examine the choice-of-law clause and ascertain whether the advocate of the clause has met its burden of establishing that various claims . . . fall within its scope."  *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 916, 103 Cal.Rptr.2d 320, 328 (2001).  "California, the forum state, ordinarily examines the scope of a choice-of-law provision in a contract under the law designated in that contract."  *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010).

PennyMac argues that Plaintiff's claim should be dismissed because the parties agreed by contract that Maryland law would be applied to resolve disputes over shareholder rights.  (PennyMac MTD at 14–16).  Specifically, PennyMac's operative charter document, the Declaration of Trust, provides:

> The Declaration of Trust is executed by the undersigned Trustees and delivered in the State of Maryland with reference to the laws thereof, and the rights of all parties and the validity, construction and effect of every provision hereof shall be subject to and construed according to the laws of the State of Maryland without regard to conflicts of laws provisions thereof.

(*Id.*, Ex. C. ("Declaration of Trust") (Docket No. 36-4) § 13.1).

First, PennyMac explains that the Articles "are, by operation of law, part of PennyMac's Declaration of Trust, and therefore are subject to the Declaration of Trust's choice of law provision."  (PennyMac MTD at 14).  PennyMac relies on the statutory definition of "declaration of trust" under Maryland law, which is defined as: "the declaration of trust filed with the Department . . . either as originally accepted for record or as amended, corrected, or supplemented by . . . articles supplementary[.]"

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)              Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

Md. Code, Corp. & Ass'ns § 8-101; *see also Impac Mortg. Holdings, Inc. v. Timm*, 255
A.3d 89, 94 (Md. 2021) (explaining "articles supplementary . . . are simply an
amendment of the corporate charter").

Plaintiff disputes that the choice-of-law provision applies to the Articles
because the statute cited by PennyMac merely stands for the proposition that a
declaration of trust can be amended through the articles supplementary.
(PennyMac Opp. at 24).  And the Articles themselves merely express this
possibility, as well.  (*Id.*) (citing Articles at 3) (The Articles, "upon any
restatement of the Declaration of Trust, may become part of . . . the Declaration
of Trust[.]").  However, Plaintiff argues that, because PennyMac never actually
filed a restatement to amend the Declaration of Trust, the Articles do not amend
it.  (PennyMac Opp. at 24).

The Court is not persuaded by Plaintiff's arguments that the Declaration
of Trust is simply "another irrelevant document."  (*See id.*).  The statutory
definition, as interpreted by the Maryland Supreme Court, reflects the common-
sense proposition that articles supplementary "are simply an amendment of the
corporate charter."  *Impac Mortg. Holdings*, 255 A.3d at 94.  Although Plaintiff
tries to distinguish *Impac Mortg. Holdings* because certain provisions of the
articles supplementary at issue there were different from those in the Articles
here, the supreme court was not interpreting or referring to the specific language
in the parties' articles supplementary.  *See id.*  Rather, the supreme court was
abstractly "describ[ing] some basic elements of corporate finance and basic
principles of contract interpretation under Maryland law."  *Id.* at 93.
Accordingly, the Court concludes the Articles are part of the Declaration of
Trust by operation of law.

Second, PennyMac explains the choice-of-law provision applies to
Plaintiff's allegations because, at bottom, the allegations amount to a
disagreement over shareholder rights, and the provision governs disputes about
the "validity, construction and effect" of the Articles and the "rights of all
parties" thereunder.  (PennyMac MTD at 15).  Plaintiff responds that the choice-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)                    Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

of-law provision only applies to disputes arising from the Declaration of Trust, and Plaintiff's claims arise out of the LIBOR Act, which was enacted thirteen years after the Declaration of Trust was filed.  (PennyMac Opp. at 25).

For reasons similar to those discussed above, the Court is not persuaded by Plaintiff's attempt to characterize the Declaration of Trust as wholly irrelevant to his allegations.  Plaintiff's claim boils down to a dispute regarding the rights of the Preferred Shareholders, as outlined in the Articles, which form part of the Declaration of Trust.  Therefore, the choice-of-law provision applies.

### b.  Enforceability of the Provision

A "federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013).  "This applies to actions brought under the Class Action Fairness Act [ ("CAFA"), 28 U.S.C. § 1332(d)(2),] as well, since CAFA is based upon diversity jurisdiction." *In re Facebook Biometric Info. Privacy Litig.*, 185 F.Supp.3d 1155, 1167–68 (N.D. Cal. 2016) (citation omitted); *see also Vrugtman v. It's Just Lunch Int'l LLC*, EDCV 20-2352-JGB (SPx), 2021 WL 4979443, at *3 (C.D. Cal. Sept. 24, 2021); *Woodard v. Boeing Emps. Credit Union*, 23-CV-00033, 2023 WL 4847126, at *2 (W.D. Wash. July 28, 2023).

California courts apply a two-pronged test to determine whether a choice-of-law clause is enforceable.  *Wash. Mut. Bank*, 24 Cal. 4th at 916.  The test considers: "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Id.*  "If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law." *Id.*  However, "[i]f either prong is met the choice of law will be enforced unless 'contrary to a fundamental policy' of the alternative state . . . and if the [alternative] state 'has a materially greater interest in the determination of the particular issue.'" *Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1056 (N.D. Cal. 2018) (quoting *Wash. Mut. Bank*, 24 Cal. 4th at 917). California law "reflects a strong public policy favoring enforcement of freely

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 24-05028-MWF (JCx)**          **Date:  February 26, 2025**
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

negotiated choice-of-law clauses." *Colaco v. Cavotec SA*, 25 Cal. App. 5th 1172, 1188 (Ct. App. 2018), reh'g denied (Aug. 10, 2018), review denied (Oct. 24, 2018).

To begin, PennyMac argues that Maryland has a substantial relationship to the parties or their transaction and there is a reasonable basis for the choice-of-law provision because PennyMac is organized under the laws of Maryland and the Articles are creatures of Maryland law.  (PennyMac MTD at 14–15).  Moreover, Plaintiff, who is a resident of New Jersey and has not alleged that he purchased PennyMac shares or was otherwise harmed in California, failed to prove California has a materially greater interest than Maryland in applying its law.  (PennyMac Reply at 10).

Plaintiff responds that, while PennyMac was formed under Maryland law and PNMAC under Delaware law, both Defendants have a personal place of business in California.  (PennyMac Opp. at 23) (citing Complaint ¶¶ 28–29).  Plaintiff further argues that the misconduct occurred in California.  (PennyMac Opp. at 23).  Plaintiff acknowledges that Maryland has an interest in the determination of this case but argues that the Maryland Consumer Protection Act ("MCPA")—Maryland's equivalent of the UCL— "conflicts with the fundamental California policy of allowing private parties to act on behalf of the Attorney General to hold California-based companies accountable and to seek equitable relief for the public." (*Id.* at 26).  Plaintiff then cites to *Walter v. Hughes Commc'ns, Inc*, in which a district court analyzed the MCPA and found that enforcing a choice-of-law provision would deprive a plaintiff the right to seek injunctive relief on behalf of the public under the UCL.  (*Id.*) (citing *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1042 (N.D. Cal. 2010)).

The hearing focused on this difficult issue.  Having considered the issue further, and despite the cogent arguments of Defendant, the Court still agrees with Plaintiff that the application of Maryland law is not appropriate here and finds *Walter* instructive.  As analyzed by the district court in *Walter*, "the greatest difference between California and Maryland law appears to be in the remedies available to plaintiffs."  682 F. Supp. 2d at 1039.  While the UCL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)           Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

permits a plaintiff to bring a claim for injunctive relief, as Plaintiff does here, the
MCPA allows only the attorney general to seek an injunction and limits
plaintiffs to recovering damages.  *See* MCPA §§ 13–406, 13-408 (allowing
attorney general to seek injunction; making no mention of private plaintiffs); *see
also Citaramanis v. Hallowell*, 328 Md. 142, 153 (1992) ("[T]he [M]CPA's
public enforcement mechanisms are set up to prevent potentially unfair or
deceptive trade practices from occurring, even before any consumer is injured,
whereas § 13–408(a) requires that actual 'injury or loss' be sustained by a
consumer before recovery of damages is permitted in a private cause of
action.").  Acknowledging California's policy favoring deterrence of harm to
consumers within the state, the *Walter* court reasoned that, "where a difference
in available remedies implicates a fundamental policy set out in California law,
the reviewing court must at least take pause before it allows the parties to
contract around those policies by choosing to apply foreign law." *Walter*, 682 F.
Supp. at 1041.

      Here, the Court similarly concludes that "the MCPA does not share the
same spirit of direct public action" as the UCL, which allows for plaintiffs to
pursue injunctive relief, at least in part, as "a deterrent and check on public
harm." *Id.* (discussing a different California statute but noting the UCL "raise[s]
similar policy concerns").  Because the MCPA limits plaintiff to compensatory
damages, the Court concludes the choice-of-law provision conflicts with a
fundamental policy of California's consumer protection laws.

      Having established the important difference between the UCL and MCPA,
the Court must now determine whether California has a "materially greater
interest" in imposing its laws to resolve the current dispute.  *Williams*, 384 F.
Supp. 3d at 1056.  Here,

            California has a stronger interest in protecting its consumers
      through its chosen mechanisms—a statutory scheme that permits its
      injured consumers not only to bring class actions to recover their losses,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)                Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

but also to seek . . .  injunctive relief in order to deter and prevent future
harm to other consumers located in the state.

*Walter*, 682 F. Supp. at 1041.

At the hearing, PennyMac argued that the emphasis in *Walter* on
protecting consumers or providing relief for the public was not similarly a
concern here—an action addressing the rights of shareholders vis-à-vis a
corporation.  But California does in fact have an interest in regulating and
holding accountable California-based companies that take actions within the
state to harm ordinary retail investors.  *See Ribbens Int'l, S.A. de C.V. v. Transp.
Int'l Pool, Inc.*, 47 F. Supp. 2d 1117, 1123 (C.D. Cal. 1999) (noting California
has "a significant regulatory interest" in applying its law "to its corporate
resident . . . with respect to [the corporation's] California business
transactions.").  And while Maryland of course maintains an interest in
interpreting contracts—like the Articles—that were created pursuant to its laws,
the Court concludes that California has a greater interest in offering protections
to both in-state and out-of-state investors who both contract with California-
based companies and also expect such companies to act in a manner consistent
with Congressional policy goals.

Accordingly, the Court determines that California law governs this action.

### 2.  UCL Claim

PennyMac next argues that Plaintiff fails to state a claim under the UCL.
(PennyMac MTD at 17–27).  The UCL prohibits "any unlawful, unfair or fraudulent
business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal.
Bus. & Prof. Code § 17200.  "[I]t establishes three varieties of unfair competition—
acts or practices which are unlawful, or unfair, or fraudulent."  *Cel-Tech Commc'ns,
Inc. v. L.A. Cellular Tel. Co.,* 20 Cal.4th 163, 180 (1999) (internal quotation marks
omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)                    Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

### a.  Whether PennyMac Complied with the LIBOR Act

"In prohibiting 'any unlawful' business practice, the UCL 'borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1130 (9th Cir. 2014) (quoting *Cel-Tech Commc'ns, Inc*, 20 Cal.4th at 180).

The crux of Plaintiff's claim is that PennyMac violated the LIBOR Act by issuing dividends at a fixed rate instead of adopting the Secured Overnight Financing Rate ("SOFR")—the appropriate replacement benchmark under the Act.  (PennyMac Opp. at 7).  Plaintiff argues that the Articles are "tough legacy contracts," which the Federal Reserve defines as: "contracts that reference USD LIBOR and will not mature by June 30, 2023, but which lack adequate fallback provisions providing for a clearly defined or practicable replacement benchmark following the cessation of USD LIBOR."  (*Id.* at 15) (citing 88 Fed. Reg. at 5205; 12 U.S.C. §5801(b)(1)).  Plaintiff contends that the Articles do not provide a clearly defined or practicable fallback provision, nor do they comport with the intent and understanding of the parties that dividends be issued at a floating rate.  (PennyMac Opp. at 15).  Moreover, the apparent legislative purpose supports the finding that PennyMac's decision to convert its floating-rate notes into fixed-rate notes is exactly what Congress sought to prevent with the LIBOR Act.  (*Id.* at 20).  Therefore, Plaintiff argues that PennyMac violated the LIBOR Act when it decided to issue dividends at a fixed rate in perpetuity, rather than adopting SOFR.  (*Id.*).

PennyMac disputes Plaintiff's characterization of the Articles as a "tough legacy contract" because Section 4(g) contains a clearly defined and workable fallback provision.  (PennyMac MTD at 18–20).  Relying on the text of the statute and the Articles, PennyMac argues that, because it paid dividends on the Preferred Shares in accordance with the fallback provision in Section 4(g), its acts were lawful.  (*Id.* at 21).

If the language of a statute is clear and unambiguous, a court need not look beyond the statute's provisions.  *In re Plant Insulation Co.*, 734 F.3d 900, 910 (9th Cir. 2013).  If, however, the language is subject to more than one interpretation, it is

---

**CIVIL MINUTES—GENERAL**                                        **14**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 24-05028-MWF (JCx)          Date: February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

ambiguous, and the court endeavors to resolve that ambiguity by looking to the
statute's legislative history, case law, statutory purpose, as well as the structure of the
statute. *Id.*; *see also In re Ferrell*, 539 F.3d 1186, 1191 (9th Cir. 2008).

Therefore, the Court begins by analyzing the text of the statute. In relevant part,
the LIBOR Act mandates as follows:

"On the LIBOR replacement date, the Board-selected benchmark
replacement shall be the benchmark replacement for any LIBOR contract
that, after giving any effect to subsection (b)—

(1) contains no fallback provisions; or

(2) contains fallback provisions that identify neither—

(A) a specific benchmark replacement; nor

(B) a determining person."

12 U.S.C. § 5803(a).

The statute defines a "benchmark replacement" as "a benchmark**, or an interest
rate or dividend rate (which may or may not be based in whole or in part on a prior
setting of LIBOR),** to replace LIBOR or any interest rate or dividend rate based on
LIBOR, whether on a temporary, permanent, or indefinite basis[.]" *Id.* § 5802(3)
(emphasis added). And a "benchmark" is defined as "an index of interest rates or
dividend rates that is used … as the basis of or as a reference for calculating or
determining any valuation, payment, or other measurement." *Id.* § 5802(1).

The parties primarily dispute the meaning and purpose of the clause set off by
boldface in the "benchmark replacement" definition. PennyMac reads the clause as
creating items in a series, such that a benchmark replacement, as defined in the statute,
may encompass either a benchmark, interest rate, or dividend rate. (PennyMac MTD
at 20–21). Plaintiff, on the other hand, contends that the clause is an appositive clause

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)              Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

intended to explain, not contradict, the term "benchmark."  (PennyMac Opp. at 18).
Plaintiff contends that PennyMac's interpretation of the clause misconstrues the
language, construction, and purpose of the Act, as the interpretation goes beyond the
legislative and ordinary meaning of "benchmark."  (*Id.*).

The Court is aware of no relevant authority analyzing the construction of § 5803.
The parties' divergent interpretations—both of which appear plausible from the plain
meaning of the text—indicate some level ambiguity within the statute.  As such, the
Court is not prepared at this stage to hold that PennyMac's actions comport with either
the purpose or overall structure of the LIBOR Act.  Rather, it appears that accepting
PennyMac's interpretation of its obligations under the Act would result in enforcement
of the exact type of contract Congress sought to reform.

Notably, Plaintiff has proffered sufficient evidence from the legislative history
indicating that a principal concern of the Act may have been to prevent floating-rate
instruments from unfairly converting into fixed-rate instruments.  (*See e.g.*, Docket No.
40-3 at 5) (referring to "adjustable rate" instruments); (Docket No. 40-1 at 61)
("Conversely, many floating-rate notes and securitizations have problematic fallback
language—generally, these contracts convert to fixed-rate instruments at the last
published value of LIBOR.").

That is precisely what has happened to the Articles here.  Section 4(g) is a
"waterfall centered on LIBOR, reflecting a series of steps . . . for when LIBOR is
unavailable on a particular date by a specified time[.]"  (PennyMac Opp. at 15).
Applying the Act to Section 4(g) of the Articles thus leaves operable only the final
clause, which directs the issuance of dividends based on "the dividend rate in effect for
the immediately preceding Dividend Period."  (*See id.*); (*see also* Articles at § 4(g)).
As such, PennyMac interprets its obligation under the Act and the Articles to allow it
to issue dividends at a fixed rate, pursuant to the final clause, in perpetuity.

PennyMac argues that this interpretation comports with another fundamental
purpose of the LIBOR Act, which seeks to limit interference or impairment of
contracts that do contain adequate benchmark replacements.  (PennyMac MTD at 21)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)                    Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

(citing 12 U.S.C. § 5803(f)(2)).  By continuing to issue dividends at fixed rates,
PennyMac contends that it is issuing dividends pursuant to the terms that the parties
agreed to.

The Court is not persuaded.  Plaintiff has sufficiently alleged that the parties
neither contemplated nor agreed that the Articles would convert into a fixed-rate
instrument at the last published value of LIBOR.  Section 4(a) of the Articles states
that PennyMac would issue dividends at an initial "Fixed Rate Period" that would last
from the initial date of issuance in 2017 through March or June 2024 for the Series A
and Series B Preferred Shareholders respectively.  (Articles at § 4(a)).  Following that
"Fixed Rate Period," however, would be a "Floating Rate Period" in which dividends
would issue at a specified floating rate.  (*Id.*).  In light of Section 4(a)'s designation of
the Preferred Shares as fixed-to-floating securities, Plaintiff has sufficiently established
that the parties did not agree to a fixed-rate instrument.  Thus, allowing PennyMac to
issue dividends according to its interpretation would not support the Act's apparent
goal of leaving intact "the contractual terms the parties had agreed to."  (PennyMac
MTD at 21).

Accordingly, Plaintiff has sufficiently alleged that PennyMac violated the
LIBOR Act when it issued dividends at a fixed rate.

### b. Safe Harbor

PennyMac also argues that Plaintiff's claim is barred in its entirety by the UCL's
safe harbor, which immunizes from UCL liability practices that are approved by the
government.  (PennyMac MTD at 23).  Specifically, where the government "has
permitted certain conduct or considered a situation and concluded no action should
lie," courts may not override that determination.  *Barber v. Nestle USA, Inc.*, 154 F.
Supp. 3d 954, 958 (C.D. Cal. 2015) (quoting *Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at
182).

PennyMac argues that, because the Articles "fall within the LIBOR contracts
that Congress expressly" permitted to operate, Plaintiff's claim fails.  (PennyMac MTD

---

**CIVIL MINUTES—GENERAL**                                                      17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 24-05028-MWF (JCx)                  Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

at 23). However, the Court concluded above that PennyMac's conduct was unlawful under the LIBOR Act, and the Articles fall within the type of contracts Congress was seeking to regulate through the Act.  Accordingly, PennyMac is not entitled to protection under the UCL's safe harbor.

### c.  Whether PennyMac's Actions were "Unfair"

Under the UCL's unfairness prong, courts consider either: (1) whether the challenged conduct is tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law; (2) whether the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; or (3) whether the practice's impact on the victim outweighs "the reasons, justifications and motives of the alleged wrongdoer.  *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020).

Plaintiff argues that PennyMac's conduct was unfair under all three tests.  First, the LIBOR Act provides a clear public policy mandate to prevent floating-rate instruments from unfairly converting into fixed-rate instruments.  (PennyMac Opp. at 20).  Second, PennyMac "took advantage of ordinary retail investors who have and will continue to lose dividend income from their retirement portfolios[.]"  (*Id.*).  Third, PennyMac has no policy justification that outweighs the significant harm imposed on the Preferred Shareholders.  (*Id.*)

PennyMac responds that its conduct fully complies with the LIBOR Act and thus, the challenged conduct is not tethered to any specific statutory provision. (PennyMac MTD at 26).  Moreover, if PennyMac transitioned to the SOFR, as Plaintiff requests, "PennyMac would have unjustly favored one class of shareholders over another."  (*Id.*).

The Court concludes Plaintiff has satisfied his burden under the first test because the challenged conduct is sufficiently tethered to a policy goal for which Congress enacted the LIBOR Act.  *See In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 24-05028-MWF (JCx)              Date:  February 26, 2025

Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

Supp. 3d 1051, 1116 (N.D. Cal. 2015) ("Plaintiffs need merely to show that the effects
of [defendants'] conduct 'are comparable to or the same as a violation of the law, or
otherwise significantly threaten[ ] or harm[ ] competition.'" (emphasis omitted)).

Accordingly, the PennyMac MTD is **DENIED.**

## B.    **PNMAC MTD**

PNMAC incorporated by reference the arguments in the PennyMac MTD and
raised one additional ground for dismissal.  (PNMAC MTD at 3).  PNMAC further
contends that Plaintiff fails to state a claim against it because Plaintiff does not
plausibly allege that PNMAC itself engaged in any wrongdoing.  (*Id.*).  PNMAC
argues that the Complaint alleges that the Articles require PennyMac, and not
PNMAC, to issue dividends at a different rate, but the Complaint does not allege that
PNMAC issues shares or dividends or that PNMAC is a party to the Articles.  (*Id.*)  As
such, PNMAC argues the Complaint fails to allege any basis for liability against
PNMAC under the UCL.

Plaintiff responds that the Complaint asserts that both Defendants committed the
same acts giving rise to this lawsuit and that PNMAC is PennyMac's California-based
external manager. (PNMAC Opp. at 3).  Plaintiff then explains that the PennyMac's
own filings with the U.S. Securities and Exchange Commission state that PNMAC is
responsible for administering PennyMac's day-to-day activities, including "making all
or substantially all of its investment, financing, and risk management decisions."  (*Id.*).

The Court agrees that the Complaint satisfies the requirement under Rule 8 to
provide a "short and plain statement" giving PNMAC fair notice of the claims against
it and the grounds upon which they rest.  Fed. R. Civ. P. 8.  Although the Complaint
predominantly refers to Defendants collectively, the parties do not dispute that
PennyMac, which is a mortgage real estate investment trust, is externally managed by
PNMAC.  (Complaint at ¶ 2); (PennyMac MTD at 9).  Nor do Defendants claim that
PennyMac internally manages itself.  The Court thus concludes Plaintiff has met its

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)                   Date:  February 26, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

burden because PNMAC's role as the external manager of the trust directly implicates
it in the misconduct alleged by Plaintiff.

Accordingly, both Motions are **DENIED**.  Defendants shall file an Answer to
the Complaint on or before **March 28, 2025**.

IT IS SO ORDERED.

# Exhibit B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 24-05028-MWF (JCx)                **Date:** May 5, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

Present:  The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

| | |
|---|---|
| Deputy Clerk: | Court Reporter: |
| Rita Sanchez | Not Reported |
| | |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: |
| None Present | None Present |

**Proceedings (In Chambers):**   ORDER GRANTING CERTIFICATION FOR
INTERLOCUTORY APPEAL AND STAYING
ACTION [53]

Before the Court is Defendants PennyMac Mortgage Investment Trust
("PennyMac") and PNMAC Capital Management, LLC's (collectively, "Defendants")
Motion to Certify For Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) and to
Stay Proceedings Pending Appeal (the "Motion"), filed on March 25, 2025.  (Docket
No. 53).  Plaintiff Roberto Verthelyi filed an Opposition on April 7, 2025.  (Docket
No. 56).  Defendants filed a Reply on April 14, 2025.  (Docket No. 57).

The Court has read and considered the papers on the Motion and held a hearing
on **April 28, 2025**.

For the reasons discussed below, the Motion is **GRANTED**.  The issues raised
by Defendants concern controlling questions of law with substantial grounds for
difference of opinion, and resolution of these questions will materially advance this
litigation.

## I.    BACKGROUND

The Court previously summarized the central facts of this action in its Order
Denying Defendants' Motions to Dismiss (the "Prior Order").  (Docket No. 52).  The
Court incorporates by reference the Background section of the Prior Order and limits
its recitation of the facts to those necessary for context.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 24-05028-MWF (JCx)**                    **Date:  May 5, 2025**
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

This action involves allegations that Defendants violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., when they issued dividends at a fixed rate instead of adopting an appropriate replacement benchmark. (*See generally* Complaint (Docket No. 1)).

On August 20, 2024, Defendants moved to dismiss arguing, in pertinent part, that Maryland law governs the parties' dispute and that Defendants' actions both complied with the LIBOR Act, 12 U.S.C. §§ 5801 et seq., and did not violate the UCL. (*See generally* Docket Nos. 34, 35 (collectively, the "Motions to Dismiss")).  On February 26, 2025, the Court denied the Motions to Dismiss, concluding California law governed the action and Plaintiff had stated a viable claim under the UCL.  (Prior Order at 1).

Through the present Motion, Defendants request the Court certify the Prior Order pursuant to 28 U.S.C. § 1292(b) and stay the action pending interlocutory appeal.

## II.   **LEGAL STANDARD**

Interlocutory appeals are governed by 28 U.S.C § 1292(b).  A district court may certify an interlocutory appeal if (1) the order involves a controlling question of law, (2) there is substantial ground for difference of opinion, and (3) an immediate appeal may materially advance the ultimate termination of the litigation.  *Id*.

The purpose of an interlocutory appeal is to "facilitate disposition of the action by getting a final decision on a controlling legal issue sooner, rather than later," to "save the courts and the litigants unnecessary trouble and expense." *John v. United States*, 247 F.3d 1032, 1051 (9th Cir. 2001) (en banc) (Rymer, J., special statement).  However, "Section 1292(b) is a departure from the normal rule that only final judgments are appealable and therefore must be construed narrowly." *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1068 (9th Cir. 2002).  The party pursuing the interlocutory appeal bears the burden of demonstrating that the requirements established by § 1292(b) are satisfied.  *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)                    Date:  May 5, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

Cir. 2010) (dismissing consolidated interlocutory appeals for lack of appellate
jurisdiction because there was not a substantial ground for difference of opinion).

### III.  DISCUSSION

Defendants seek to certify the following questions:

1. Whether, as a matter of law, the choice-of-law provision in PennyMac's
operative charter document (the "Declaration of Trust") compels the application of
Maryland law.

2. Whether, as a matter of law, PennyMac's fallback dividend rate is a
"qualifying benchmark" under the LIBOR Act, 12 U.S.C. § 5802(3), such that the use
of that rate complies with the Act.

(*See* Motion at 9).

At the hearing, Plaintiff argued that neither question should be certified or,
alternatively, only the LIBOR Act question should be.  Plaintiff noted that he is
primarily concerned with the delay that may result should the Ninth Circuit decide only
the choice-of-law question.  While the Court understands Plaintiff's concern, for the
reasons discussed below, the Court determines that both questions satisfy the
requirements established by Section 1292(b) and are thus appropriate issues to certify
for interlocutory appeal.

In addition, as Defendants correctly argued at the hearing, the entire order is
subject to review if there is an interlocutory appeal.  *Yamaha Motor Corp., U.S.A. v.
Calhoun*, 516 U.S. 199, 205 (1996); *see, generally,* 16 Charles A. Wright, Arthur
Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3929 (3rd ed.).  The
Ninth Circuit enjoys broad discretion under Section 1292(b) and "is free to decline to
hear some or all of the issues the parties raise on appeal", including "the question that
provided the basis for certification." *ICTSI Oregon, Inc. v. Int'l Longshore &
Warehouse Union*, 22 F.4th 1125, 1131 (9th Cir. 2022).  Plaintiff's suggestion of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 24-05028-MWF (JCx)**                          **Date:  May 5, 2025**
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

certifying one question over the other would, therefore, not have a dispositive effect
over the Ninth Circuit's potential review.

    **A.**    **Choice of Law**

        **1.  Controlling Question of Law**

    "A controlling question of law must be one of law—not fact—and its resolution
must 'materially affect the outcome of litigation in the district court.'"  *ICTSI Oregon,
Inc.*, 22 F.4th at 1130 (quoting *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th
Cir. 1982)).

    The choice-of-law question presented in this action is controlling.  Plaintiff's
sole claim arises under California law.  And, in the Prior Order, the Court held that the
choice-of-law provision applied to the parties' dispute but was ultimately
unenforceable because California had a materially greater interest in determination of
the issue.  (Prior Order 8–13).  If the Court had held otherwise—namely, that the
provision was enforceable—Plaintiff's only claim would be dismissed.  *See Pro Water
Sols., Inc. v. Angie's List, Inc.*, 2021 WL 124496, at *7 (C.D. Cal. Jan. 13, 2021) (A
"valid choice-of-law provision selecting another state's law is grounds to dismiss a
claim under California's UCL").  Therefore, if the Ninth Circuit determines Maryland
law should apply, that resolution "could materially affect the outcome of litigation in
the district court."  *In re Cement Antitrust Litig.*, 673 F.2d at 1026.

    Notably, district courts have often found choice-of-law determinations present
questions of law suitable for interlocutory appeal, and the Ninth Circuit has accepted
certification on these questions in the past.  *See, e.g.*, *Galilea, LLC v. AGCS Marine
Ins. Co.*, 879 F.3d 1052, 1056 (9th Cir. 2018) (deciding choice-of-law question after
district court granted motion to certify under Section 1292(b)); *Starr Indem. & Liab.
Co. v. Rolls-Royce Corp.*, 725 F. App'x 592, 593 (9th Cir. 2018) (reversing district
court's determination of choice-of-law question on interlocutory appeal); *Phillips v.
Amoco Trinidad Oil Co.*, 632 F.2d 82, 83 (9th Cir. 1980) (affirming choice-of-law
question after district court granted motion to certify under Section 1292(b)).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No. CV 24-05028-MWF (JCx)                    Date: May 5, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

## 2. Substantial Ground for Difference of Opinion

A substantial ground for a difference of opinion exists when "novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). The prong is satisfied if "the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Couch*, 611 F.3d at 633.

The Court concludes that a substantial ground for a difference opinion exists as to this issue. In its Prior Order, the Court indicated that the choice-of-law question presented a difficult issue that had not directly been decided by the Ninth Circuit. (Prior Order at 11). Ultimately, the Court agreed with Plaintiff and relied primarily on *Walter v. Hughes Commc'ns, Inc.*, a district court opinion finding a choice-of-law provision unenforceable because, in relevant part, Maryland law conflicted with fundamental California policy. (*Id.* at 12–13) (citing *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1042 (N.D. Cal. 2010)). However, other courts have disagreed with the reasoning in *Walter* and found that a difference in remedies between two forums is insufficient to hold a choice-of-law provision unenforceable. *See, e.g., Palomino v. Facebook, Inc.*, CV 16-04230-HSG, 2017 WL 76901, at *4 (N.D. Cal. Jan. 9, 2017); *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1112 (N.D. Cal. 2016).

Ultimately, however, the Court does not reach its conclusion simply because there is some conflict or uncertainty as to this question. Rather, the question also raises novel issues concerning comity and potentially competing interests of state law. Moreover, "[w]here proceedings that threaten to endure for several years depend on an initial question of jurisdiction . . . or the like, certification may be justified even if there is a relatively low level of uncertainty." *In re DirecTV Early Cancellation Fee Mktg.*, ML 09-2093-AG-(ANx), 2011 WL 13135572, at *2 (C.D. Cal. Oct. 24, 2011).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV 24-05028-MWF (JCx)                         Date:  May 5, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

### 3.  Material Advancement

To materially advance the termination of the litigation, interlocutory appeal need not "have a final, dispositive effect on the litigation[.]"  *Reese*, 643 F.3d at 688 (quoting 28 U.S.C. § 1292(b)).  The prong is "satisfied when the resolution of the question 'may appreciably shorten the time, effort, or expense of conducting' the district court proceedings.  *ICTSI Oregon*, 22 F.4th at 1131 (quoting *In re Cement*, 673 F.2d at 1027).

As indicated above, the Ninth Circuit's determination of this issue could result in dismissal of Plaintiff's only existing claim.  Interlocutory appeal could conserve time and resources spent litigating an action potentially premised on a mistaken analysis of a threshold question.

At the hearing, Plaintiff emphasized that a resolution of this issue would not necessarily terminate the litigation.  And the Court and the parties agree that the precise result of a determination in Defendants' favor is not clear—dismissal here and refiling in Maryland, litigating other claims here, transferring the action to Maryland—but certainly the status quo would be upended.  Moreover, as indicated above, the prong does not require that interlocutory appeal have a dispositive effect on the litigation.  Instead, this appropriately presents a situation "in which allowing an interlocutory appeal would avoid protracted and expensive litigation."  *In re Cement Antitrust Litig.*, 673 F.2d at 1026

### B.  LIBOR Act

### 1.  Controlling Question of Law

A controlling question of law "generally is a purely legal one that can be resolved quickly without delving into a particular case's facts."  *Henley v. Jacobs*, CV18-2244-SBA, 2019 WL 8333448, at *2 (N.D. Cal. Oct. 25, 2019).  "[T]he Ninth Circuit has found 'novel question[s] of statutory interpretation' to be particularly appropriate occasions for certification."  *Burton v. Prudential Ins. Co. of Am.,* 2014 WL 10537434, at *2 (C.D. Cal. Sept. 12, 2014) (quoting *Joffe v. Google, Inc.*, 746

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV 24-05028-MWF (JCx)**                    **Date:  May 5, 2025**
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

F.3d 920, 924 (9th Cir. 2013)); *see also San Antonio Winery, Inc. v. Jiaxing Micarose Trade Co*., 53 F.4th 1136, 1140 (9th Cir. 2022) (deciding statutory interpretation question after district court certified order under Section 1292(b)).

Here, the correct interpretation of a "qualifying benchmark" under the LIBOR Act is highly material to the outcome of Plaintiff's claim.  Should the Ninth Circuit agree with Defendants' interpretation of the Act, there would be no question that Defendants complied with the LIBOR Act, and Plaintiff's claim under the "unlawful" prong of the UCL would necessarily fail.  While Plaintiff also argues that Defendants' actions violated the "unfairness" prong of the UCL, there is a high likelihood that a resolution in Defendants' favor would result in Plaintiff's claim failing under both federal preemption and the UCL's safe-harbor doctrine.  *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999) (recognizing California Supreme Court has held liability under the UCL is precluded when "the Legislature has permitted certain conduct or considered a situation and concluded no action should lie").

While the question would require the Ninth Circuit to review a limited set of facts—namely, the Articles Supplementary and the text of the LIBOR Act—those facts remain undisputed.  The parties do not disagree about the text of the Articles Supplementary, the fallback provision contained therein, or the text of the LIBOR Act. Rather, as indicated in the Prior Order, the parties primarily dispute the meaning and purpose of Section 5802(3).  (Prior Order at 15).  Accordingly, the issue presents a controlling question of law.

## 2.  Substantial Grounds for Difference of Opinion

Courts will traditionally find that a substantial ground for difference of opinion exists "if novel and difficult questions of first impression are presented."  *Couch*, 611 F.3d at 633 (internal quotation marks and citation omitted).  Novel and difficult questions of first impression exist even if "there are no cases directly conflicting with the district court's construction of the law."  *Reese*, 643 F.3d at 688.  Indeed, "[the Ninth Circuit's] interlocutory appeal jurisdiction does not turn on a prior court's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 24-05028-MWF (JCx)                    **Date:** May 5, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

having reached a conclusion adverse to that from which appellants seek relief." *Id.*
The Ninth Circuit has elaborated that:

> A substantial ground for difference of opinion exists where reasonable
> jurists might disagree on an issue's resolution, not merely where they
> have already disagreed. Stated another way, when novel legal issues are
> presented, on which fair-minded jurists might reach contradictory
> conclusions, a novel issue may be certified for interlocutory appeal
> without first awaiting development of contradictory precedent.

*Id.*

To date, it does not appear that any other court has interpreted the LIBOR
Act, and, in its Prior Order, this Court noted that both parties' interpretations of
Section 5802(3) were plausible.  In light of the competing principles of statutory
interpretation, the ambiguity of the statute, and the differing—yet plausible—
interpretations of the parties, reasonable jurists could disagree with the Court's
analysis as to this issue.  Accordingly, the Court finds that substantial grounds
for a difference of opinion exists regarding this novel question of statutory
interpretation.

### 3.  Material Advancement

Plaintiff's sole claim is premised on Defendants' purported violation of the
LIBOR Act.  As noted above, a resolution in Defendants' favor would materially
advance the litigation in that it would preclude Plaintiff's claim that Defendants'
actions were "unlawful" and would likely have a critical impact on whether Plaintiff
can establish that the actions were "unfair" under the UCL.

Accordingly, Defendants' request for certification of an interlocutory appeal is
**GRANTED**.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.** CV 24-05028-MWF (JCx)                    **Date:** May 5, 2025
Title: Roberto Verthelyi v. PennyMac Mortgage Investment Trust, et al.

### C.    Stay

"Although the filing of an interlocutory appeal does not automatically stay proceedings in the district court, the district court has broad discretion to decide whether a stay is appropriate to 'promote economy of time and effort for itself, for counsel, and for litigants.'" *Association of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1094 (E.D. Cal. 2008) (quoting *Filtrol Corp. v. Kelleher*, 467 F.2d 242, 244 (9th Cir. 1972)).  "In such cases the court may order a stay of the action pursuant to its power to control its docket and calendar and to provide for a just determination of the cases pending before it." *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979).

The Court deems a stay to be appropriate both for management of its own docket and to ensure a just determination on issues central to this action.  Moreover, a stay would not result in undue prejudice to Plaintiff, as the action is in the early stages of litigation.

## IV.    CONCLUSION

For the reasons set forth above, the Motion is **GRANTED**.   Under 28 U.S.C. § 1292(b), Defendants have ten days to file a Petition for Permission to Appeal to the Ninth Circuit.  *See* Fed. R. App. P. 5.

This action is **STAYED** pending a decision by the Ninth Circuit.  The parties are **ORDERED** to file a joint status report every 90 days, with the first report due no later than August 4, 2025, or within ten days of any ruling by the Ninth Circuit.

IT IS SO ORDERED.

# Exhibit C

1

109:07:06              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

4

5

ROBERT VERTHELYI,                    )
6                                     )
              Plaintiff,              )
7                                     )
                   vs.               )
8                                     )   2:24-CV-5028-MWF
PENNYMAC MORTGAGE INVESTMENT         )
9    TRUST, et al.,                   )
                                      )
10              Defendants.            )
     _____

11

12

13                   REPORTER'S TRANSCRIPT OF HEARING

14                      Los Angeles, California

15                      Monday, April 28, 2025

16

17

18              _____

19

20

21

22

23              AMY DIAZ, RPR, CRR, FCRR
                Federal Official Reporter
                350 West 1st Street, #4455
24              Los Angeles, CA 90012

25

        *Please order court transcripts here:  www.amydiazfedreporter.com*


            AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

2

1     APPEARANCES OF COUNSEL:

2

     For the Plaintiff:

3

4              BERMAN TABACCO
              By:  Daniel Barenbaum, Attorney at Law
5                  Jeffrey Rocha, Attorney at Law
              425 California Street, Suite 2300
6              San Francisco, California 94104

7              DILWORTH PAXSON LLP
              By:  Catherine Pratsinakis, Attorney at Law
8                  Mariah Heinzerling, Attorney at Law
              1500 Market Street, Suite 3500E
9              Philadelphia, Pennsylvania 19102

10

11

12    For the Defendants:

13             WILLIAMS & CONNOLLY LLP
              By:  Steven Farina, Attorney at Law
14            680 Main Avenue SW
              Washington, D.C. 20024
15

              UMHOFER MITCHELL & KING LLP
16            By:  Jonas Mann, Attorney at Law
              767 South Alameda Street, Suite 270
17            Los Angeles, California 90021

18

19

20

21

22

23

24

25

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 09:07:08    THE CLERK:  Calling item number one, case number

2 09:07:12    CV-24-5028-MWF, Roberto Verthelyi vs. PennyMac Mortgage

3 09:07:19    Investment Trust, et al.

4 09:07:20       Counsel, please state your appearance for the

5 09:07:22    record, beginning with counsel for plaintiff.

6 09:07:26       MS. PRATSINAKIS:  Good morning, Your Honor.

7 09:07:29    Catherine Pratsinakis on behalf of the plaintiff.  And with

8 09:07:33    me I have my colleagues, Ira Richards, and Mariah

9 09:07:38    Heinzerling.

10 09:07:39       THE COURT:  All right.  Good morning, Counsel.

11 09:07:44       MS. PRATSINAKIS:  And I also have my cocounsel Dan

12 09:07:47    Barenbaum from -- I believe Dan is still on.

13 09:07:52       THE COURT:  Good morning, Counsel.

14 09:07:53       MR. BARENBAUM:  Daniel Barenbaum from Berman

15 09:07:57    Tabacco.  Good morning.

16 09:07:59       MS. PRATSINAKIS:  It helps to have your glasses on.

17 09:08:04       MR. FARINA:  Good morning, Your Honor.  Steven

18 09:08:07    Farina on behalf of PennyMac Mortgage Investment Trust.

19 09:08:10       MR. MANN:  Jonas Mann from Umhofer Mitchell & King

20 09:08:15    for defendants.

21 09:08:16       THE COURT:  Good morning, Counsel.  We are here on

22 09:08:17    the defendants' motion to certify two questions to the Ninth

23 09:08:24    Circuit.  And that raises, as well, then, the issue if the

24 09:08:28    motion were to be granted, on whether the case should be

25 09:08:31    stayed.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

4

1  09:08:32    You've received my tentative.  I am of the tentative

2  09:08:41    view that both questions should be certified, and that the

3  09:08:44    case should be stayed.

4  09:08:48    First, I want to congratulate both sides on the

5  09:08:51    quality of the briefing here.  This issue in particular I've

6  09:08:56    found, along with summary judgment, understandably invites

7  09:09:02    counsel to argue the merits of the underlying case instead of

8  09:09:06    the, you know, technical and strict standard that is actually

9  09:09:12    set forth.

10  09:09:13    And here, while inevitably dealing with the merits

11  09:09:19    of the prior order were -- and were scrupulous to put it in

12  09:09:27    the framework of the statute and not just make it a motion

13  09:09:29    for reconsideration.  I certainly appreciate that.

14  09:09:32    I think here the parties grasp what I -- what my

15  09:09:41    feelings are on this, which is that on the one hand, the

16  09:09:46    choice of law decision was certainly for me a much more

17  09:09:51    difficult one, as the defendants accurately summarized in the

18  09:09:58    reply.

19  09:09:59    The -- I feel much more confident in my decision

20  09:10:04    about the statute itself.  But just because I feel confident

21  09:10:10    about it isn't the same as saying that other reasonable

22  09:10:14    jurists could not agree; and clearly, it's simply fundamental

23  09:10:19    to the case on whether my interpretation of the statute is

24  09:10:24    correct.

25  09:10:24    On the choice of law, I'll say that something which

1  09:10:28  did influence me was just noting that the Ninth Circuit on

2  09:10:32  other occasions has accepted certifications dealing with the

3  09:10:36  rule of law.  The sort of decisive nature of that ruling

4  09:10:42  perhaps is not quite as clear right now.  We discussed that

5  09:10:46  at the last hearing, you know, what exactly would happen?

6  09:10:50  You know, certainly it would be unlikely that the California

7  09:10:59  statute could be employed in the manner the Complaint does

8  09:11:04  now, but would there be other claims?  Would those claims be

9  09:11:07  appropriately heard here?  Should they be heard in Maryland?

10 09:11:14  Those are all things that are murkier; but nonetheless, the

11 09:11:19  very fact that they are murky means -- it shows how

12 09:11:23  significant that ruling is to how the case would be

13 09:11:26  litigated.

14 09:11:27          And then that leads into the matter of the stay,

15 09:11:29  because here one could imagine that there is a very important

16 09:11:36  issue of law, not collateral to the overall litigation, but

17 09:11:40  certainly perhaps separate, and that something useful could

18 09:11:46  occur while the matter -- while the Ninth Circuit determined

19 09:11:51  whether to accept the certification or whether, for that

20 09:11:53  matter, the certified question was being considered on

21 09:11:58  appeal.

22 09:11:58          Here, I'm just not really seeing what that is.  I

23 09:12:01  mean, you know, plaintiffs could -- plaintiff can always, I

24 09:12:05  suppose, profit from discovery, but depending on certain

25 09:12:09  answers to the questions, there might -- perhaps there

1 09:12:12   shouldn't even be discovery.  And it just doesn't seem fair
2 09:12:16   to PennyMac to make the case go forward while either the
3 09:12:23   certification is being considered or the appeal would be
4 09:12:26   progressing after that.
5 09:12:27          So with those preliminary remarks, let me hear from
6 09:12:32   the plaintiff.
7 09:12:33          MS. PRATSINAKIS:  Sure.  Thank you, Your Honor.
8 09:12:36          Here is my concern:  My concern is that the record
9 09:12:41   is not as robust as it could be in order for the Ninth
10 09:12:46   Circuit to reach the sorts of decisions on the merits that
11 09:12:51   PennyMac's counsel claims can be reached, such as, did it
12 09:12:55   comply with LIBOR, and are there other prongs or claims that
13 09:13:00   could be asserted?
14 09:13:01         But my bigger concern, I think, is where if we were
15 09:13:05   to proceed with the interlocutory appeal, that the Ninth
16 09:13:12   Circuit doesn't even get to the LIBOR question, which is a
17 09:13:15   key question, as Your Honor has pointed out.
18 09:13:17         So it would be one thing if we had asserted in the
19 09:13:22   alternative some Maryland claims, so where the choice of law
20 09:13:25   issue is sort of rendered not as significant to whether the
21 09:13:31   litigation proceeds or not.
22 09:13:33         But the concern again is that, you know, the LIBOR
23 09:13:38   Act question is the key question, and we could end up not
24 09:13:42   getting there after some considerable delay.
25 09:13:48         THE COURT:  And in regards to that, does that

09:13:55 reasoning, in your view, suggest that neither question should

09:14:01 be certified, or only one or the other of the two questions

09:14:06 should be certified?

09:14:08     MS. PRATSINAKIS:  So I guess it's a -- neither

09:14:13 question being certified, I do think is the right approach

09:14:19 here, because I think, like Your Honor suggested a moment

09:14:23 ago, discovery in this case is extremely narrow.  Main facts

09:14:28 are not in dispute.  Parties could stipulate.  I do think the

09:14:32 record would benefit from an expert.  I do think the record

09:14:36 would benefit from the parties' expectations and intentions

09:14:42 when they purchased this investment, and how they reacted

09:14:46 when PennyMac changed course after LIBOR ceased publication.

09:14:53     So I guess what I'm saying is the choice of law to

09:14:56 me is not going to terminate the litigation; whereas, the

09:15:04 LIBOR Act issue, as Your Honor points out, is sort of the

09:15:10 main issue, and the key issue here.

09:15:17     And counsel for the defendant had said multiple

09:15:20 times in its papers, if we are relying on the LIBOR Act, if

09:15:27 that is what is required of us, we'll do it.  We may not even

09:15:30 get there.

09:15:30     And so I'm trying to kind of think about, well,

09:15:33 maybe the right answer, Your Honor, is what you suggested a

09:15:37 moment ago, which could be just to certify the LIBOR Act

09:15:40 question, because I think that really is the main issue here.

09:15:45 And we could get to liability under -- in various ways,

1 09:15:52 preferably the UCL, because of the strong remedy of public

2 09:15:56 injunction.

3 09:15:57 But again, the main issue here, the LIBOR Act,

4 09:15:59 PennyMac's counsel remarks on that over and over again very

5 09:16:03 strongly in its papers, almost conceding to the adoption of

6 09:16:09 SOFR if they are found to have misinterpreted the law.

7 09:16:13 So I ask Your Honor if you are going to certify any

8 09:16:17 issue, it would just be that one issue or no issue at all.

9 09:16:23 THE COURT: Thank you. And I'll give you a chance

10 09:16:25 to respond.

11 09:16:26 Let me hear from the defendants.

12 09:16:27 MR. FARINA: Your Honor, I'll address that specific

13 09:16:30 issue first off.

14 09:16:33 I believe the answer to the question you have posed,

15 09:16:37 or implicit in what you have said, is that when you certify

16 09:16:41 the order, the order is then appealable, and the Ninth

17 09:16:45 Circuit has the liberty to address whatever issues it wants

18 09:16:47 to address.

19 09:16:49 My -- so both issues would be before the Ninth

20 09:16:53 Circuit. The Ninth Circuit could take either one of them up.

21 09:16:55 We certainly would urge the Ninth Circuit to address both

22 09:16:59 issues. Certainly judicial efficiency would suggest that

23 09:17:03 they should address both issues. I suppose if they address

24 09:17:06 only one issue, it would be the LIBOR issue, because that

25 09:17:09 would be dispositive of the litigation regardless of whether

it's Maryland law or California law.

We believe there is an overwhelming likelihood that this interlocutory appeal will decide the case, and PennyMac will provide dividends to its shareholders either pursuant to the fixed rate that it's currently providing or pursuant to SOFR. We want to get to the correct answer. The shareholders would want to get to the correct answer. And as a practical matter, the Ninth Circuit is going to be the one to decide it whether it's now or a year from now.

And it's in everyone's interests, it's in PennyMac's interests, it's in the shareholders' interests, it's in the Court's interests that that be decided. And I'm very confident that the Ninth Circuit is going to decide the issue, and then that will end the litigation, and we will either be found to have been in compliance with the LIBOR Act, in which case the case is over, or we will be in violation of the LIBOR Act, in which case, frankly, the case is over.

So we think this is the right thing to do. I wish the plaintiffs would join us in the request, because I do think that everyone has an interest in certainty, but that's not for me to decide.

So, but I do think in answer to your question, I think they get the entire order. I would certainly argue to the Ninth Circuit that they should decide the LIBOR issue,

```
109:18:42  and not stop at the choice of law issue.

209:18:45         I can't imagine that the Ninth Circuit would --

309:18:48  there is no jurisdictional issue, I can't imagine why they

409:18:52  would decide the choice of law issue and not the LIBOR issue,

509:18:56  if that means the LIBOR issue may come back up to them in a

609:19:00  year.

709:19:00         THE COURT:  I certainly agree with you on that.

809:19:06         Where I'll disagree with you on whether it's in the

909:19:10  Court's interest to have the matter resolved promptly of

1009:19:13  course is always in the Court's interest.  I will say I have

1109:19:16  enjoyed this case.  I have enjoyed wrestling with the two

1209:19:19  questions.  The LIBOR is important, not as difficult it seems

1309:19:22  to me; the choice of law perhaps is more specialized, I

1409:19:25  thought was extremely interesting, and also very difficult.

1509:19:28         So in that sense, I regret the case going away.  And

1609:19:32  also, since the lawyers have been very good, I'm sure it will

1709:19:35  be replaced in someplace, but perhaps not so much.  But

1809:19:39  nonetheless, I certainly understand why you are saying what

1909:19:45  you are saying here.

2009:19:46         Anything else on behalf of the defendants?

2109:19:48         MR. FARINA:  No, Your Honor.

2209:19:49         THE COURT:  All right.  Let me hear from the

2309:19:50  plaintiff.

2409:19:51         MS. PRATSINAKIS:  Sure.  So whether the Ninth

2509:19:57  Circuit decides the LIBOR Act issue is still not a guarantee.
```

1 09:20:05 The Ninth Circuit could say Maryland law applies, but UCL
2 09:20:11 claims must be dismissed, and then send it back down.
3 09:20:15        And then at which point I would need to amend my
4 09:20:19 Complaint, add the Maryland claims, and then we are right
5 09:20:22 back to where we were.
6 09:20:23        And so one potential more efficient approach, Your
7 09:20:26 Honor, could be, well, what if we, you know, somehow either
8 09:20:34 certify just the LIBOR question or somehow -- you know, I
9 09:20:41 guess I just don't know -- we can't dictate to the Ninth
10 09:20:44 Circuit what will happen.  If you certify the entire order,
11 09:20:46 the Ninth Circuit may decide to decide both issues, they may
12 09:20:51 decide one of the issues, but either way, I think that this
13 09:20:54 could cost us a lot of time.
14 09:20:56        And I would like to have a little more certainty
15 09:21:01 around these efficiencies that PennyMac's counsel and Your
16 09:21:03 Honor have been, you know, focused on.  We also want
17 09:21:06 efficiency.  We also want to save time and investor -- you
18 09:21:11 know, cost to the investors and to the company.  We are on
19 09:21:15 the same page.  It's just a matter of -- that is my concern,
20 09:21:20 that it's going to cost us some delay and not ever get to the
21 09:21:24 main stage.
22 09:21:26        THE COURT:  All right.  Well, I certainly cannot
23 09:21:29 dictate to the Ninth Circuit what it will do, what it should
24 09:21:32 do.  I think though that we can make some educated guesses
25 09:21:37 here.

09:21:38    Thank you, Counsel.  Thank you for your briefs,

09:21:40    thank you for your arguments.  I think the competing issues

09:21:45    here have been laid out very clearly.  The motion is taken

09:21:50    under submission.

09:21:51    Thank you.

09:21:53    MR. FARINA:  Thank you, Your Honor.

09:21:54    MS. PRATSINAKIS:  Thank you, Your Honor.

    *****     *****     *****


I certify that the foregoing is a correct transcript from the

record of proceedings in the above-titled matter.




---------------------------


Amy C. Diaz, RPR, CRR          April 29, 2025

S/  Amy Diaz

# Exhibit D

# CORPORATE CHARTER APPROVAL SHEET

## ** EXPEDITED SERVICE **      ** KEEP WITH DOCUMENT **

DOCUMENT CODE __16__      BUSINESS CODE _____

# __D1305504__

|||||||||||||||||||||||||||||||||||||||||||||||||
1000362010146001

Close _____   Stock _____   Nonstock _____

P.A. _____   Religious _____

Merging (Transferor) _____

_____

ID # D13055041 ACK # 1000362010146001
PAGES: 0019
PENNYMAC MORTGAGE INVESTMENT TRUST

_____

Surviving (Transferee) _____

03/06/2017  AT 04:17 P WO # 0004740809

New Name _____

### FEES REMITTED

| | |
|---|---|
| Base Fee: | 100 |
| Org. & Cap. Fee: | |
| Expedite Fee: | 70 |
| Penalty: | |
| State Recordation Tax: | |
| State Transfer Tax: | |
| Certified Copies | |
| Copy Fee: | 29 |
| Certificates | |
| Certificate of Status Fee: | |
| Personal Property Filings: | |
| Mail Processing Fee: | |
| Other: | |
| **TOTAL FEES:** | **199** |

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
       and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name
_____

_____ Other Change(s)
_____
_____

Code __063__

Credit Card _____   Check _____   Cash _____

Attention: _____

Documents on _____ Checks

Mail: Names and Address

Approved By: __9_____

_____

Keyed By: _____

_____

COMMENT(S):

_____

_____

**Stamp Work Order and Customer Number HERE**

# PENNYMAC MORTGAGE INVESTMENT TRUST

## ARTICLES SUPPLEMENTARY

### 8.125% Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares of Beneficial Interest

PennyMac Mortgage Investment Trust, a Maryland real estate investment trust (the "Company"), hereby certifies to the State Department of Assessments and Taxation of Maryland that:

FIRST:   Under a power contained in Article VI of the Declaration of Trust of the Company (the "Declaration of Trust"), the Board of Trustees of the Company (the "Board"), by resolutions duly adopted on September 10, 2015, and the Pricing Committee of the Board (the "Pricing Committee"), by resolutions duly adopted on March 2, 2017, classified and designated 5,290,000 Preferred Shares (as defined in the Declaration of Trust) as a separate class of Preferred Shares to be known as the 8.125% Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares of Beneficial Interest, $0.01 par value per share (the "Series A Preferred Shares"), with the following preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends and other distributions, qualifications, and terms and conditions of redemption, which, upon any restatement of the Declaration of Trust, may become part of Article VI of the Declaration of Trust, with any necessary or appropriate renumbering or relettering of the sections or subsections hereof.

1.       Designation and Number.  A series of Preferred Shares, classified as the "8.125% Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares of Beneficial Interest" is hereby established.  The number of authorized Series A Preferred Shares shall be 5,290,000.

2.       Maturity.  The Series A Preferred Shares have no stated maturity and will not be subject to any sinking fund or mandatory redemption, and will remain outstanding indefinitely unless (i) the Company decides to redeem or otherwise repurchase the Series A Preferred Shares or (ii) the Series A Preferred Shares become convertible and are actually converted pursuant to Section 7 hereof.  The Company is not required to set apart for payment funds to redeem the Series A Preferred Shares.

3.       Ranking.  The Series A Preferred Shares shall rank, with respect to rights to the payment of dividends and the distribution of assets in the event of any liquidation, dissolution or winding up of the Company, (i) senior to all classes or series of Common Shares (as defined in the Declaration of Trust) and to all other equity securities issued by the Company other than equity securities referred to in clauses (ii) and (iii) of this Section 3; (ii) on a parity with all equity securities issued by the Company with terms specifically providing that those equity securities rank on a parity with the Series A Preferred Shares with respect to rights to the payment of dividends and the distribution of assets upon any liquidation, dissolution or winding up of the Company; and (iii) junior to all equity securities issued by the Company with terms specifically providing that those equity securities rank senior to the Series A Preferred Shares with respect to rights to the payment of dividends and the distribution of assets upon any

liquidation, dissolution or winding up of the Company. The term "equity securities" shall not include convertible or exchangeable debt securities.

4. Dividends.

(a) Holders of the Series A Preferred Shares are entitled to receive, when, as and if authorized by the Board and declared by the Company, out of funds of the Company legally available for the payment of dividends, cumulative cash dividends (i) from, and including, the date on which Series A Preferred Shares are first issued (the "Original Issuance Date") to, but not including, March 15, 2024 (the "Fixed Rate Period"), at a fixed rate equal to 8.125% per annum based on the Twenty-Five Dollars ($25.00) per share liquidation preference, or $2.03125 per share; and (ii) from, and including, March 15, 2024 and thereafter (the "Floating Rate Period"), at a floating rate equal to Three-Month LIBOR (as defined below) as calculated on each applicable Dividend Determination Date (as defined below) plus a spread of 5.831% per annum based on the Twenty-Five Dollars ($25.00) per share liquidation preference. Dividends on the Series A Preferred Shares shall accumulate daily and shall be cumulative from, and including, the Original Issuance Date or, if later, the most recent Dividend Payment Date (as defined below) to which cumulative dividends have been paid in full (or declared and a sum sufficient for the payment thereof has been set apart for payment), and shall be payable quarterly in arrears on the 15th day of each March, June, September and December (each, a "Dividend Payment Date") with respect to the immediately preceding Dividend Period (as defined below); provided, that if any Dividend Payment Date is not a Business Day (as defined below), then the dividend which would otherwise have been payable on that Dividend Payment Date may be paid on the next succeeding Business Day with the same force and effect as if paid on such Dividend Payment Date and no interest, additional dividends or other sums will accumulate on the amount so payable for the period from and after such Dividend Payment Date to such next succeeding Business Day. The first dividend on the Series A Preferred Shares is scheduled to be paid on June 15, 2017 in the amount of $0.54167 per share and will represent accrual for more than the full quarterly period, covering the period from, and including, the Original Issuance Date to, but not including, June 15, 2017. That dividend will be paid to the persons who are the holders of record of the Series A Preferred Shares at the close of business on the corresponding Dividend Record Date (as defined below), which will be June 1, 2017. Dividends payable on the Series A Preferred Shares during the Fixed Rate Period, including dividends payable for the first Dividend Period and any partial Dividend Period, will be computed on the basis of a 360-day year consisting of twelve 30-day months. Dividends payable on the Series A Preferred Shares during the Floating Rate Period, including dividends payable for any partial Dividend Period, will be computed based on the actual number of days and a 360-day year. Dividends will be payable to holders of record as they appear in the share transfer records of the Company for the Series A Preferred Shares at the close of business on the applicable Dividend Record Date, which shall be the 1st day of the calendar month, whether or not a Business Day, in which the applicable Dividend Payment Date occurs (each, a "Dividend Record Date"). The dividends payable on any Dividend Payment Date shall include dividends accumulated to, but not including, such Dividend Payment Date.

(b) No dividends on the Series A Preferred Shares shall be authorized by the Board or paid or set apart for payment by the Company at any time when the terms and provisions of any agreement of the Company, including any agreement relating to any indebtedness of the

2

Company, prohibit the authorization, payment or setting apart for payment thereof or provide that the authorization, payment or setting apart for payment thereof would constitute a breach of the agreement or a default under the agreement, or if the authorization, payment or setting apart for payment shall be restricted or prohibited by law.

(c)    Notwithstanding anything to the contrary contained herein, dividends on the Series A Preferred Shares shall accumulate whether or not the Company has earnings, whether or not there are funds legally available for the payment of those dividends and whether or not those dividends are declared. No interest, or sum in lieu of interest, will be payable in respect of any dividend payment or payments on the Series A Preferred Shares which may be in arrears, and holders of the Series A Preferred Shares will not be entitled to any dividends in excess of full cumulative dividends described in Section 4(a) hereof. Any dividend payment made on the Series A Preferred Shares shall first be credited against the earliest accumulated but unpaid dividend due with respect to the Series A Preferred Shares.

(d)    Except as provided in Section 4(e) hereof, unless full cumulative dividends on all Series A Preferred Shares have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof is set apart for payment for all past Dividend Periods, (i) no dividends (other than dividends paid in Common Shares or in any class or series of Preferred Shares ranking junior to the Series A Preferred Shares as to dividends and upon liquidation) shall be paid or declared and set apart for payment upon Common Shares or any class or series of Preferred Shares ranking junior to or on a parity with the Series A Preferred Shares as to dividends or upon liquidation, (ii) no other distribution (other than a repurchase that is considered a distribution as to which clause (iii) would apply) shall be paid or declared and set apart for payment upon Common Shares or any class or series of Preferred Shares ranking junior to or on a parity with the Series A Preferred Shares as to dividends or upon liquidation and (iii) no Common Shares or any class or series of Preferred Shares ranking junior to or on a parity with the Series A Preferred Shares as to dividends or upon liquidation shall be redeemed, purchased or otherwise acquired for any consideration (or any moneys be paid to or made available for a sinking fund for the redemption of any such shares) by the Company, except, in the case of clause (iii), by conversion into or exchange for Common Shares or any other class or series of Shares (as defined in the Declaration of Trust) of the Company ranking junior to the Series A Preferred Shares as to dividends and upon liquidation; *provided, however*, that none of the foregoing or the restriction described in Section 4(e) hereof shall prevent the purchase or acquisition by the Company of shares of any class or series of Shares pursuant to (A) the provisions of Article VII of the Declaration of Trust relating to restrictions on ownership and transfer of Shares in connection with the Company's status as a REIT (as defined in the Declaration of Trust) for U.S. federal income tax purposes or (B) a purchase or exchange offer made on the same terms to holders of all outstanding Series A Preferred Shares and holders of all outstanding shares of any class or series of preferred shares that we may issue ranking on parity with the Series A Preferred Shares as to dividends or upon liquidation, or a redemption, purchase or other acquisition of Common Shares made for purposes of and in compliance with the requirements of an employee incentive or benefit plan of the Company or any of its subsidiaries.

(e)    When dividends are not so paid in full (or declared and a sum sufficient for such full payment is not so set apart) upon the Series A Preferred Shares and any other class or series of Preferred Shares ranking on a parity as to dividends with the Series A Preferred

3

ACTIVE 209705784v.18

Shares, except as described in Section 4(d) hereof, all dividends declared upon the Series A Preferred Shares and such other class or series of Preferred Shares shall be declared *pro rata* so that the amount of dividends declared per Series A Preferred Share and per share on such other class or series of Preferred Shares shall in all cases bear to each other the same ratio that accumulated dividends per Series A Preferred Share and per share on such other class or series of Preferred Shares (which shall not include any accrual in respect of unpaid dividends for prior Dividend Periods if such Preferred Shares do not have a cumulative dividend) bear to each other. No interest, or sum of money in lieu of interest, shall be payable in respect of any dividend payment or payments on the Series A Preferred Shares which may be in arrears.

(f)     "Business Day" shall mean any day, other than a Saturday or Sunday, that is neither a legal holiday nor a day on which banking institutions in New York, New York are authorized or required by law, regulation or executive order to close.

(g)     The term "Three-Month LIBOR" shall be calculated for each Dividend Period during the Floating Rate Period and shall mean, on any Dividend Determination Date: (i) the rate (expressed as a percentage per year) for deposits in U.S. dollars having an index maturity of three months, in amounts of at least $1,000,000, as such rate appears on "Reuters Page LIBOR01" at approximately 11:00 a.m. (London time) on the relevant Dividend Determination Date; or if no such rate appears on "Reuters Page LIBOR01" or if the "Reuters Page LIBOR01" is not available at approximately 11:00 a.m. (London time) on the relevant Dividend Determination Date, then the Company will select four nationally-recognized banks in the London interbank market and request that the principal London offices of those four selected banks provide the Company with their offered quotation for deposits in U.S. dollars for a period of three months, commencing on the first day of the applicable Dividend Period, to prime banks in the London interbank market at approximately 11:00 a.m. (London time) on the Dividend Determination Date for the applicable Dividend Period. Offered quotations must be based on a principal amount equal to an amount that, in the Company's discretion, is representative of a single transaction in U.S. dollars in the London interbank market at that time. If at least two quotations are provided, the Three-Month LIBOR for such Dividend Period will be the arithmetic mean (rounded upward, if necessary, to the nearest 0.00001 of 1%) of those quotations. If fewer than two quotations are provided, the Three-Month LIBOR for such Dividend Period will be the arithmetic mean (rounded upward, if necessary, to the nearest 0.00001 of 1%) of the rates quoted at approximately 11:00 a.m. (New York City time) on the Dividend Determination Date for such Dividend Period by three nationally-recognized banks in New York, New York selected by the Company, for loans in U.S. dollars to nationally-recognized European banks (as selected by the Company), for a period of three months commencing on the first day of such Dividend Period. The rates quoted must be based on an amount that, in the Company's discretion, is representative of a single transaction in U.S. dollars in that market at that time. If fewer than three New York, New York banks selected by the Company quote rates in the manner described above, the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period, or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period.

4

(h)    The term "Dividend Determination Date" shall mean the London Business Day (as defined below) immediately preceding the first day of the applicable Dividend Period.

(i)    The term "Dividend Period" shall mean the period from, and including, a Dividend Payment Date to, but not including, the next succeeding Dividend Payment Date, except for the initial Dividend Period, which shall be the period from, and including, the Original Issuance Date to, but not including, June 15, 2017.

(j)    The term "London Business Day" shall mean any day on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

(k)    The term "Reuters Page LIBOR01" shall mean the display so designated on the Reuters 3000 Xtra (or such other page as may replace the LIBOR01 page on that service, or such other service as may be nominated by the ICE Benchmark Administration Limited ("ICE"), or its successor, or such other entity assuming the responsibility of ICE or its successor in the event ICE or its successor no longer does so, as the successor service, for the purpose of displaying London interbank offered rates for U.S. dollar deposits).

(l)    "Set apart for payment" shall be deemed to include, without any action other than the following, the recording by the Company in its accounting ledgers of any accounting or bookkeeping entry which indicates, pursuant to an authorization by the Board and a declaration of dividends or other distribution by the Company, the allocation of funds to be so paid on any class or series of Shares of the Company; provided, however, that if any funds for any class or series of Shares ranking junior to or on a parity with the Series A Preferred Shares as to the payment of dividends are placed in a separate account of the Company or are delivered to a disbursing, paying or other similar agent, then "set apart for payment" with respect to the Series A Preferred Shares shall mean placing such funds in a separate account or delivering such funds to a disbursing, paying or other similar agent.

5.    Liquidation Preference.

(a)    In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, the holders of the Series A Preferred Shares will be entitled to be paid out of the assets the Company has legally available for distribution to its shareholders, subject to the preferential rights of the holders of shares of any class or series of Shares of the Company ranking senior to the Series A Preferred Shares with respect to the distribution of assets upon liquidation, dissolution or winding up, a liquidation preference of Twenty-Five Dollars ($25.00) per share, plus an amount equal to any accumulated and unpaid dividends thereon (whether or not earned or declared) to, but not including, the date of payment, before any distribution of assets upon liquidation, dissolution or winding up is made to holders of Common Shares or any other class or series of Shares of the Company ranking junior to the Series A Preferred Shares as to liquidation rights.

(b)    In the event that, upon any such voluntary or involuntary liquidation, dissolution or winding up, the available assets of the Company are insufficient to pay the amount of the liquidating distributions on all outstanding Series A Preferred Shares and the

corresponding amounts payable on shares of all other classes or series of Shares of the Company ranking on a parity with the Series A Preferred Shares in the distribution of assets, then the holders of the Series A Preferred Shares and all other such classes or series of Shares shall share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

(c)     Holders of Series A Preferred Shares shall be entitled to written notice of any such payment upon the voluntary or involuntary liquidation, dissolution or winding up of the Company no fewer than 30 days and no more than 60 days prior to the payment date. After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series A Preferred Shares will have no right or claim to any of the remaining assets of the Company.

(d)     The consolidation or merger of the Company with or into any other real estate investment trust, corporation or entity or of any other entity with or into the Company, or the sale, lease, transfer or conveyance of all or substantially all of the property or business of the Company, shall not be deemed to constitute a liquidation, dissolution or winding up of the Company.

(e)     In determining whether a distribution (other than upon voluntary or involuntary liquidation), by dividend, redemption or other acquisition of Shares of the Company or otherwise, is permitted under Maryland law, no effect shall be given to amounts that would be needed, if the Company were to be dissolved at the time of distribution, to satisfy the preferential rights upon dissolution of holders of the Series A Preferred Shares whose prudential rights on dissolution are superior to those receiving the distribution.

6.     Redemption.

(a)     The Series A Preferred Shares are not redeemable by the Company prior to March 15, 2024, except as described in this Section 6 and except that, as provided in Article VII of the Declaration of Trust, the Company may purchase or redeem Series A Preferred Shares prior to that date in connection with its qualification as a REIT for U.S. federal income tax purposes.

(b)     Optional Redemption Right. On and after March 15, 2024, the Company may, at its option, upon not less than 30 nor more than 60 days' written notice, redeem the Series A Preferred Shares, in whole or in part, at any time or from time to time, for cash at a redemption price of Twenty-Five Dollars ($25.00) per share, plus any accumulated and unpaid dividends thereon to, but not including, the redemption date.

(c)     Special Optional Redemption Right. Notwithstanding anything to the contrary contained in Section 6(a) hereof, upon the occurrence of a Change of Control (as defined below), the Company may, at its option, upon not less than 30 nor more than 60 days' written notice, redeem the Series A Preferred Shares, in whole or in part, within 120 days after the first date on which such Change of Control occurred, for cash at a redemption price of Twenty-Five Dollars ($25.00) per share, plus any accumulated and unpaid dividends thereon to, but not including, the redemption date. If, prior to the Change of Control Conversion Date (as

6

ACTIVE 209705784v.18

defined below), the Company has provided notice of its election to redeem some or all of the
Series A Preferred Shares pursuant to this Section 6, the holders of Series A Preferred Shares
will not have the Change of Control Conversion Right (as defined below) with respect to the
Series A Preferred Shares called for redemption.

(d)    A "Change of Control" is deemed to occur when, after the Original
Issuance Date, the following have occurred and are continuing: (i) the acquisition by any person,
including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the
Securities Exchange Act of 1934, as amended (the "Exchange Act"), of beneficial ownership,
directly or indirectly, through a purchase, merger or other acquisition transaction or series of
purchases, mergers or other acquisition transactions of Shares of the Company entitling that
person to exercise more than 50% of the total voting power of all Shares of the Company entitled
to vote generally in the election of trustees of the Company (except that such person will be
deemed to have beneficial ownership of all securities that such person has the right to acquire,
whether such right is currently exercisable or is exercisable only upon the occurrence of a
subsequent condition); and (ii) following the closing of any transaction referred to in clause (i),
neither the Company nor the acquiring or surviving entity, including any parent of the Company
or such an acquiring or surviving entity, has a class of common securities (or American
Depositary Receipts representing such securities) listed on the New York Stock Exchange (the
"NYSE"), the NYSE MKT LLC (the "NYSE MKT") or the Nasdaq Stock Market ("Nasdaq"), or
listed or quoted on an exchange or quotation system that is a successor to the NYSE, the NYSE
MKT or Nasdaq.

(e)    In the event the Company elects to redeem Series A Preferred Shares
pursuant to this Section 6, the notice of redemption will be mailed, postage prepaid, not less than
30 nor more than 60 days prior to the redemption date, to each holder of record of Series A
Preferred Shares called for redemption at such holder's address as it appears on the share transfer
records of the Company and shall state:  (i) the redemption date; (ii) the number of Series A
Preferred Shares to be redeemed; (iii) the redemption price; (iv) the place or places where
certificates (if any) for the Series A Preferred Shares are to be surrendered for payment of the
redemption price; (v) that dividends on the Series A Preferred Shares to be redeemed will cease
to accumulate on the redemption date; (vi) whether such redemption is being made pursuant to
Section 6(b) or Section 6(c) hereof; (vii) if applicable, that such redemption is being made in
connection with a Change of Control and, in that case, a brief description of the transaction or
transactions constituting such Change of Control; and (viii) if such redemption is being made in
connection with a Change of Control, that the holders of Series A Preferred Shares being so
called for redemption will not be able to tender such Series A Preferred Shares for conversion in
connection with the Change of Control and that each Series A Preferred Share tendered for
conversion that is called, prior to the Change of Control Conversion Date, for redemption will be
redeemed on the related redemption date instead of converted on the Change of Control
Conversion Date.  If less than all of the Series A Preferred Shares held by any holder are to be
redeemed, the notice mailed to such holder shall also specify the number of Series A Preferred
Shares held by such holder to be redeemed.  No failure to give such notice or any defect thereto
or in the mailing thereof shall affect the validity of the proceedings for the redemption of any
Series A Preferred Shares, except as to the holder to whom notice was defective or not given.
Notwithstanding the foregoing, no notice of redemption will be required where the Company

7

elects to redeem Series A Preferred Shares pursuant to Section 6(a) hereof in connection with its qualification as a REIT for U.S. federal income tax purposes.

(f)     Holders of Series A Preferred Shares to be redeemed shall surrender the Series A Preferred Shares so called for redemption at the place designated in the notice of redemption and shall be entitled to the redemption price and any accumulated and unpaid dividends thereon payable upon the redemption following the surrender.

(g)     If notice of redemption of any Series A Preferred Shares has been given and if the Company has irrevocably set apart for payment the funds necessary for redemption in trust for the benefit of the holders of such Series A Preferred Shares so called for redemption, then, from and after the redemption date (unless the Company defaults in providing for the payment of the redemption price therefor plus accumulated and unpaid dividends thereon, if any), dividends will cease to accumulate on those Series A Preferred Shares, those Series A Preferred Shares shall no longer be deemed outstanding and all rights of the holders of those Series A Preferred Shares will terminate, except the right to receive the redemption price plus accumulated and unpaid dividends thereon, if any, payable upon redemption.

(h)     If any redemption date is not a Business Day, then the redemption price and accumulated and unpaid dividends thereon, if any, payable upon redemption may be paid on the next Business Day and no interest, additional dividends or other sums will accumulate on the amount payable for the period from and after that redemption date to that next Business Day.

(i)     If less than all of the outstanding Series A Preferred Shares are to be redeemed, the Series A Preferred Shares to be redeemed shall be selected *pro rata* (as nearly as may be practicable without creating fractional shares) or by lot. If such redemption is to be by lot and, as a result of such redemption, any holder of Shares (other than a holder of Shares that has received an exemption from the Aggregate Share Ownership Limit as defined in the Declaration of Trust, as applicable) would have actual or constructive ownership in excess of the Aggregate Share Ownership Limit or otherwise would violate Section 7.2.1(a) of the Declaration of Trust because a holder's Series A Preferred Shares were not redeemed, or were only redeemed in part, then, except as otherwise provided in the Declaration of Trust, the Company shall redeem the requisite number of shares of such holder such that no person will hold Shares in excess of the Aggregate Share Ownership Limit or otherwise in violation of Section 7.2.1(a) of the Declaration of Trust subsequent to such redemption.

(j)     Immediately prior to any redemption of Series A Preferred Shares, the Company shall pay, in cash, any accumulated and unpaid dividends thereon to, but not including, the redemption date, unless a redemption date falls after a Dividend Record Date and prior to the corresponding Dividend Payment Date, in which case, each holder of Series A Preferred Shares at the close of business on such Dividend Record Date shall be entitled to the dividend payable on such Series A Preferred Shares on the corresponding Dividend Payment Date notwithstanding the redemption of such Series A Preferred Shares before such Dividend Payment Date. Except as provided in this Section 6(j), the Company will make no payment or allowance for unpaid dividends, whether or not in arrears, on the Series A Preferred Shares to be redeemed.

(k)      Unless full cumulative dividends on all Series A Preferred Shares have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof has been or contemporaneously is set apart for payment for all past Dividend Periods, no Series A Preferred Shares shall be redeemed unless all outstanding Series A Preferred Shares are simultaneously redeemed, and the Company shall not purchase or otherwise acquire directly or indirectly any Series A Preferred Shares (except by converting them into or exchanging them for Common Shares or other Shares of the Company ranking junior to the Series A Preferred Shares as to dividends and upon liquidation); *provided, however*, that the foregoing shall not prevent the purchase or acquisition by the Company of Series A Preferred Shares pursuant to the provisions of Article VII of the Declaration of Trust relating to restrictions on ownership and transfer of Shares of the Company in connection with its status as a REIT or pursuant to a purchase or exchange offer made on the same terms to holders of all outstanding Series A Preferred Shares.

(l)      Subject to applicable law, the Company may purchase Series A Preferred Shares in the open market, by tender or by private agreement. Any Series A Preferred Shares that the Company acquires will be reclassified as authorized but unissued Preferred Shares, without further designation as to class or series, and may thereafter be classified, reclassified or issued as any class or series of Preferred Shares.

7.      <u>Conversion Rights</u>.  Series A Preferred Shares are not convertible into or exchangeable for any other property or securities of the Company, except as provided in this Section 7.

(a)      Upon the occurrence of a Change of Control, each holder of Series A Preferred Shares will have the right (unless, prior to the Change of Control Conversion Date, the Company has provided notice of its election to redeem some or all of the Series A Preferred Shares held by such holder pursuant to Section 6 hereof, in which case such holder will have the right only with respect to Series A Preferred Shares that are not called for redemption) to convert some or all of the Series A Preferred Shares held by such holder (the "Change of Control Conversion Right") on the Change of Control Conversion Date into a number of Common Shares per Series A Preferred Share to be converted (the "Common Share Conversion Consideration") equal to the lesser of: (i) the quotient obtained by dividing (x) the sum of the Twenty-Five Dollars ($25.00) liquidation preference per Series A Preferred Share plus the amount of any accumulated and unpaid dividends (whether or not earned or declared) thereon to, but not including, the Change of Control Conversion Date (unless the Change of Control Conversion Date is after a Dividend Record Date and prior to the corresponding Dividend Payment Date for the Series A Preferred Shares, in which case such amount for such accumulated and unpaid dividends will be included in this sum) by (y) the Common Share Price (as defined below) (such quotient, the "Conversion Rate"); and (ii) 2.95858 (the "Share Cap"), subject to adjustments provided in Section 7(b) below.

(b)      The Share Cap is subject to *pro rata* adjustments for any share splits (including those effected pursuant to a distribution of Common Shares to existing holders of Common Shares), subdivisions or combinations (in each case, a "Share Split") with respect to Common Shares as follows:  the adjusted Share Cap as the result of a Share Split will be the number of Common Shares that is equivalent to the product obtained by multiplying (i) the Share Cap in effect immediately prior to such Share Split by (ii) a fraction, the numerator of which is

9

the number of Common Shares outstanding immediately after giving effect to such Share Split
and the denominator of which is the number of Common Shares outstanding immediately prior
to such Share Split. For the avoidance of doubt, subject to the immediately succeeding sentence,
the aggregate number of Common Shares (or equivalent Alternative Conversion Consideration
(as defined below), as applicable) issuable or deliverable, as applicable, in connection with the
exercise of the Change of Control Conversion Right will not exceed the product of the Share Cap
multiplied by the aggregate number of Series A Preferred Shares issued and outstanding at the
Change of Control Conversion Date (or equivalent Alternative Conversion Consideration, as
applicable) (the "Exchange Cap"). The Exchange Cap is subject to *pro rata* adjustments for any
Share Splits on the same basis as the corresponding adjustment to the Share Cap.

(c)      The "Change of Control Conversion Date" is the date the Series A
Preferred Shares are to be converted, which will be a Business Day selected by the Company that
is no fewer than 20 days nor more than 35 days after the date on which it provides the notice
described in Section 7(h) to the holders of Series A Preferred Shares.

(d)      The "Common Share Price" is (i) if the consideration to be received in the
Change of Control by the holders of Common Shares is solely cash, the amount of cash
consideration per Common Share or (ii) if consideration to be received in the Change of
Control by holders of Common Shares is other than solely cash (x) the average of the closing
sale prices per Common Share (or, if no closing sale price is reported, the average of the closing
bid and ask prices per Common Share or, if more than one in either case, the average of the
average closing bid and the average closing ask prices per Common Share) for the ten
consecutive trading days immediately preceding, but not including, the date on which such
Change of Control occurred as reported on the principal U.S. securities exchange on which
Common Shares are then traded, or (y) the average of the last quoted bid prices for Common
Shares in the over-the-counter market as reported by Pink OTC Markets Inc. or similar
organization for the ten consecutive trading days immediately preceding, but not including, the
date on which such Change of Control occurred, if Common Shares are not then listed for
trading on a U.S. securities exchange.

(e)      In the case of a Change of Control pursuant to which Common Shares are
or will be converted into cash, securities or other property or assets (including any combination
thereof) (the "Alternative Form Consideration"), a holder of Series A Preferred Shares will
receive upon conversion of such Series A Preferred Shares the kind and amount of Alternative
Form Consideration which such holder would have owned or been entitled to receive upon the
Change of Control had such holder held a number of Common Shares equal to the Common
Share Conversion Consideration immediately prior to the effective time of the Change of Control
(the "Alternative Conversion Consideration"; the Common Share Conversion Consideration or
the Alternative Conversion Consideration, whichever shall be applicable to a Change of Control,
is referred to as the "Conversion Consideration").

(f)      If the holders of Common Shares have the opportunity to elect the form of
consideration to be received in the Change of Control, the Conversion Consideration in respect
of such Change of Control will be deemed to be the kind and amount of consideration actually
received by holders of a majority of the outstanding Common Shares that made or voted for such
an election (if electing between two types of consideration) or holders of a plurality of the

10

outstanding Common Shares that made or voted for such an election (if electing between more than two types of consideration), as the case may be, and will be subject to any limitations to which all holders of Common Shares are subject, including, without limitation, *pro rata* reductions applicable to any portion of the consideration payable in such Change of Control.

      (g)    No fractional Common Shares will be issued upon the conversion of the Series A Preferred Shares in connection with a Change of Control. Instead, the Company will make a cash payment equal to the value of such fractional Common Shares based upon the Common Share Price used in determining the Common Share Conversion Consideration for such Change of Control.

      (h)    Within 15 days following the occurrence of a Change of Control, *provided* that the Company has not then exercised its right to redeem all Series A Preferred Shares pursuant to Section 6 hereof, the Company will provide to holders of Series A Preferred Shares a notice of the occurrence of the Change of Control that describes the resulting Change of Control Conversion Right, which notice shall be delivered to the holders of record of the Series A Preferred Shares at their addresses as they appear on the share transfer records of the Company and shall state: (i) the events constituting the Change of Control; (ii) the date of the Change of Control; (iii) the last date on which the holders of Series A Preferred Shares may exercise their Change of Control Conversion Right; (iv) the method and period for calculating the Common Share Price; (v) the Change of Control Conversion Date; (vi) that if, prior to the Change of Control Conversion Date, the Company has provided notice of its election to redeem all or any Series A Preferred Shares, holders will not be able to convert the Series A Preferred Shares called for redemption and such Series A Preferred Shares will be redeemed on the related redemption date, even if such Series A Preferred Shares have already been tendered for conversion pursuant to the Change of Control Conversion Right; (vii) if applicable, the type and amount of Alternative Conversion Consideration entitled to be received per Series A Preferred Share; (viii) the name and address of the paying agent, transfer agent and conversion agent for the Series A Preferred Shares; (ix) the procedures that the holders of Series A Preferred Shares must follow to exercise the Change of Control Conversion Right (including procedures for surrendering Series A Preferred Shares for conversion through the facilities of a Depositary (as defined below)), including the form of conversion notice to be delivered by such holders as described below; and (x) the last date on which holders of Series A Preferred Shares may withdraw Series A Preferred Shares surrendered for conversion and the procedures that such holders must follow to effect such a withdrawal.

      (i)    The Company shall also issue a press release containing such notice provided for in Section 7(h) hereof for publication on Dow Jones & Company, Inc., Business Wire, PR Newswire or Bloomberg Business News (or, if these organizations are not in existence at the time of issuance of the press release, such other news or press organization as is reasonably calculated to broadly disseminate the relevant information to the public), and post a notice on its website, in any event prior to the opening of business on the first Business Day following any date on which it provides the notice provided for in Section 7(h) hereof to the holders of Series A Preferred Shares.

      (j)    To exercise the Change of Control Conversion Right, the holders of Series A Preferred Shares will be required to deliver, on or before the close of business on the Change

11

ACTIVE 209705784v.18

of Control Conversion Date, the certificates (if any) evidencing the Series A Preferred Shares to be converted, duly endorsed for transfer (or, in the case of any Series A Preferred Shares held through a Depositary, to deliver, on or before the close of business on the Change of Control Conversion Date, the Series A Preferred Shares to be converted through the facilities of such Depositary), together with a written conversion notice in the form provided by the Company, duly completed, to its transfer agent. The conversion notice must state: (i) the relevant Change of Control Conversion Date; (ii) the number of Series A Preferred Shares to be converted; and (iii) that the Series A Preferred Shares are to be converted pursuant to the applicable provisions of the Series A Preferred Shares.

(k)    Holders of Series A Preferred Shares may withdraw any notice of exercise of a Change of Control Conversion Right (in whole or in part) by a written notice of withdrawal delivered to the transfer agent of the Company prior to the close of business on the Business Day prior to the Change of Control Conversion Date. The notice of withdrawal delivered by any holder must state:  (i) the number of withdrawn Series A Preferred Shares; (ii) if certificated Series A Preferred Shares have been surrendered for conversion, the certificate numbers of the withdrawn Series A Preferred Shares; and (iii) the number of Series A Preferred Shares, if any, which remain subject to the holder's conversion notice.

(l)    Notwithstanding anything to the contrary contained in Sections 7(j) and (k) hereof, if any Series A Preferred Shares are held through The Depository Trust Company ("DTC") or a similar depositary (each, a "Depositary"), the conversion notice and/or the notice of withdrawal, as applicable, must comply with applicable procedures, if any, of the applicable Depositary.

(m)    Series A Preferred Shares as to which the Change of Control Conversion Right has been properly exercised and for which the conversion notice has not been properly withdrawn will be converted into the applicable Conversion Consideration in accordance with the Change of Control Conversion Right on the Change of Control Conversion Date, unless prior to the Change of Control Conversion Date the Company has provided notice of its election to redeem some or all of the Series A Preferred Shares pursuant to Section 6 hereof, in which case only the Series A Preferred Shares properly surrendered for conversion and not properly withdrawn that are not called for redemption will be converted as aforesaid.  If the Company elects to redeem Series A Preferred Shares that would otherwise be converted into the applicable Conversion Consideration on a Change of Control Conversion Date, such Series A Preferred Shares will not be so converted and the holders of such Series A Preferred Shares will be entitled to receive on the applicable redemption date the redemption price as provided in Section 6 hereof.

(n)    The Company shall deliver all securities, cash and any other property owing upon conversion no later than the third Business Day following the Change of Control Conversion Date.  Notwithstanding the foregoing, the persons entitled to receive any Common Shares or other securities delivered on conversion will be deemed to have become the holders of record thereof as of the Change of Control Conversion Date.

(o)    In connection with the exercise of any Change of Control Conversion Right, the Company shall comply with all applicable U.S. federal and state securities laws and

ACTIVE 209705784v.18

stock exchange rules in connection with any conversion of Series A Preferred Shares into
Common Shares or other securities or other property. Notwithstanding any other provision of
the Series A Preferred Shares, no holder of Series A Preferred Shares will be entitled to convert
such Series A Preferred Shares into Common Shares to the extent that receipt of such Common
Shares would cause such holder (or any other person) to violate the applicable restrictions on
ownership and transfer of the Common Shares and the Company's Shares contained in Article
VII of the Declaration of Trust, unless the Company provides an exemption from the applicable
limitation to such holder pursuant to Article VII of the Declaration of Trust.

(p)       Notwithstanding anything herein to the contrary and except as otherwise
required by law, the persons who are the holders of record of Series A Preferred Shares at the
close of business on a Dividend Record Date will be entitled to receive the dividend payable on
the corresponding Dividend Payment Date notwithstanding the conversion of those Series A
Preferred Shares after such Dividend Record Date and on or prior to such Dividend Payment
Date and, in such case, the full amount of such dividend shall be paid on such Dividend Payment
Date to the persons who were the holders of record at the close of business on such Dividend
Record Date. Except as provided in this Section 7(p), the Company will make no payment or
allowance for unpaid dividends, whether or not in arrears, on the Series A Preferred Shares to be
converted.

8.       Voting Rights.

(a)       Holders of the Series A Preferred Shares will not have any voting rights,
except as set forth in this Section 8. On each matter on which holders of Series A Preferred
Shares are entitled to vote, each Series A Preferred Share will entitle the holder thereof to cast
one vote, except that when the holders of shares of any other class or series of Preferred Shares
have the right to vote together with the holders of Series A Preferred Shares as a single class on
any matter, the holders of Series A Preferred Shares and the shares of each such other class or
series will be entitled to cast one vote for each Twenty-Five Dollars ($25.00) of liquidation
preference (excluding accumulated dividends).

(b)       Whenever dividends on any Series A Preferred Shares are in arrears for
six or more quarterly Dividend Periods, whether or not consecutive, the number of trustees
constituting the Board will be automatically increased by two (if not already increased by two by
reason of the election of trustees by the holders of shares of any other class or series of Preferred
Shares upon which like voting rights have been conferred and are exercisable and with which the
Series A Preferred Shares are entitled to vote together as a single class with respect to the
election of those two trustees) and the holders of Series A Preferred Shares and the holders of all
other classes and series of Preferred Shares upon which like voting rights have been conferred
and are exercisable and which are entitled to vote together as a single class with the Series A
Preferred Shares in the election of those two trustees, voting together as a single class, will be
entitled to vote for the election of those two additional trustees at a special meeting called by the
Company at the request of the holders of record of at least 25% of the outstanding Series A
Preferred Shares or by the holders of shares of any other class or series of Preferred Shares upon
which like voting rights have been conferred and are exercisable and which are entitled to vote
together as a single class with the Series A Preferred Shares in the election of those two trustees
(unless the request is received less than 90 days before the date fixed for the next annual or

special meeting of shareholders of the Company, in which case, such vote will be held at the earlier of the next annual or special meeting of shareholders of the Company), and at each subsequent annual meeting until all dividends accumulated on the Series A Preferred Shares for all past Dividend Periods and the then–current Dividend Period shall have been fully paid. In that case, the right of holders of the Series A Preferred Shares to elect any trustees will cease and, unless there are outstanding shares of any other class or series of Preferred Shares upon which like voting rights have been conferred and remain exercisable, the term of office of any trustees elected by holders of the Series A Preferred Shares shall immediately terminate and the number of trustees constituting the Board shall be reduced accordingly. If the rights of holders of Series A Preferred Shares to elect two trustees have terminated in accordance with this Section 8(b) after any record date for the determination of shareholders entitled to vote in the election of such trustees but before the closing of the polls in such election, holders of Series A Preferred Shares outstanding as of such record date shall not be entitled to vote in such election of trustees. For the avoidance of doubt, in no event shall the total number of trustees elected by holders of the Series A Preferred Shares and shares of all other classes and series of Preferred Shares upon which like voting rights have been conferred and are exercisable and which are entitled to vote together as a single class with the holders of Series A Preferred Shares in the election of such trustees pursuant to the voting rights granted under this Section 8 exceed two.

(c)    If a special meeting at a place within the United States designated by the Company is not called by the Company within 30 days after request from the holders of Series A Preferred Shares as described in Section 8(b) hereof, then the holders of record of at least 25% of the outstanding Series A Preferred Shares may designate a holder to call the meeting at the expense of the Company and such meeting may be called by the holder so designated in accordance with the procedures required for calling an annual or special meeting of shareholders, as applicable, set forth in the Declaration of Trust and the Company's bylaws and shall be held at the place within the United States designated by the holder calling such meeting. The Company shall pay all costs and expenses of calling and holding any meeting and of electing trustees pursuant to Section 8(b) hereof, including, without limitation, the cost of preparing, reproducing and mailing the notice of such meeting, the cost of renting a room for such meeting to be held, and the cost of collecting and tabulating votes. In no event shall a holder of Series A Preferred Shares be entitled to nominate or elect an individual for election as a trustee pursuant to Section 8(b) or Section 8(d), and no individual shall be qualified to be nominated for election pursuant to Section 8(b) or Section 8(d), or to serve as a trustee if so elected, if such individual's service as a trustee would cause the Company to fail to satisfy a requirement relating to trustee independence of any national securities exchange on which any class or series of the Company's Shares is listed.

(d)    At any time that holders of Series A Preferred Shares are entitled to vote in the election of two trustees pursuant to Section 8(b), holders of Series A Preferred Shares shall be entitled to vote in the election of a successor to fill a vacancy on the Board that results from the removal of such a trustee, or in the removal of any such trustee. If, at any time when the voting rights conferred upon the Series A Preferred Shares pursuant to this Section 8(d) are exercisable, any vacancy in the office of a trustee elected pursuant to Section 8(b) shall occur, then such vacancy may be filled only by the remaining such trustee or by the holders of the outstanding Series A Preferred Shares and shares of any other classes or series of Preferred Shares upon which like voting rights have been conferred and are exercisable and which are

entitled to vote together as a single class with the Series A Preferred Shares in the election of such trustees. Any trustee elected or appointed pursuant to Section 8(b) may be removed only by the affirmative vote of a majority of the votes entitled to be cast by the holders of outstanding Series A Preferred Shares and shares of any such other classes and series of Preferred Shares upon which like voting rights have been conferred and are exercisable and which are entitled to vote together as a single class with the Series A Preferred Shares in the election of such trustees, and may not be removed by the holders of the Common Shares.

(e)    So long as any Series A Preferred Shares remain outstanding, the Company will not, without the approval of the holders of at least two-thirds of the outstanding Series A Preferred Shares and shares of all other classes and series of Preferred Shares ranking on a parity with the Series A Preferred Shares upon which like voting rights have been conferred and are exercisable and which are entitled to vote together as a single class with the Series A Preferred Shares on such matters, voting together as a single class, (i) authorize or create, or increase the authorized or issued amount of, any class or series of Shares ranking senior to the Series A Preferred Shares with respect to payment of dividends or the distribution of assets upon liquidation, dissolution or winding up, or reclassify any of the authorized Shares of the Company into shares of such a class or series, or create, authorize or issue any obligation or security convertible into or evidencing the right to purchase any such shares of such a class or series; or (ii) amend, alter or repeal the provisions of the Declaration of Trust, whether by merger, consolidation or otherwise, so as to materially and adversely affect any right, preference, privilege or voting power of the Series A Preferred Shares (each, an "Event"); *provided, however*, with respect to the occurrence of any Event set forth in clause (ii), so long as the Series A Preferred Shares remain outstanding with the terms thereof materially unchanged, taking into account that, upon the occurrence of an Event, the Company may not be the surviving entity, the occurrence of any such Event shall not be deemed to materially and adversely affect such rights, preferences, privileges or voting powers of the Series A Preferred Shares; and, *provided, further*, that any increase in the amount of the authorized Common Shares or Preferred Shares, including the Series A Preferred Shares, or the creation or issuance of any additional Series A Preferred Shares or other class or series of Preferred Shares, or any increase in the amount of authorized shares of such class or series, in each case ranking on a parity with or junior to the Series A Preferred Shares with respect to payment of dividends or the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such rights, preferences, privileges or voting powers.

(f)    The voting rights provided for in this Section 8 will not apply if, at or prior to the time when the act with respect to which approval by holders of the Series A Preferred Shares would otherwise be required pursuant to this Section 8 shall be effected, all outstanding Series A Preferred Shares shall have been redeemed or called for redemption upon proper notice and sufficient funds shall have been deposited in trust to effect such redemption pursuant to Section 6 hereof.

(g)    Except as expressly stated in this Section 8, the Series A Preferred Shares will not have any relative, participating, optional or other special voting rights or powers and the consent of the holders thereof shall not be required for the taking of any trust action. The holders of Series A Preferred Shares shall have exclusive voting rights on any amendment to the

15

Declaration of Trust that would alter the contract rights, as expressly set forth in the Declaration of Trust, of only the Series A Preferred Shares.

(h)    Notwithstanding the foregoing, holders of any class or series of Preferred Shares ranking on a parity with the Series A Preferred Shares shall not be entitled to vote together as a single class with the holders of Series A Preferred Shares on any amendment, alteration or repeal of any provision of the Declaration of Trust unless such action affects the holders of the Series A Preferred Shares and such other class or series of Preferred Shares equally.

9.    <u>Information Rights</u>.  During any period in which the Company is not subject to Section 13 or 15(d) of the Exchange Act and any Series A Preferred Shares are outstanding, the Company will use its best efforts to (i) transmit by mail (or other permissible means under the Exchange Act) to all holders of Series A Preferred Shares, as their names and addresses appear on the record books of the Company and without cost to such holders, copies of the annual reports on Form 10-K and quarterly reports on Form 10-Q, respectively, that the Company would have been required to file with the Securities and Exchange Commission (the "SEC") pursuant to Section 13 or 15(d) of the Exchange Act if it were subject thereto (other than any exhibits that would have been required); and (ii) promptly, upon request, supply copies of such reports to any holders or prospective holder of Series A Preferred Shares.  The Company will use its best efforts to mail (or otherwise provide) the information to the holders of the Series A Preferred Shares within 15 days after the respective dates by which an annual report on Form 10-K or a quarterly report on Form 10-Q, as the case may be, in respect of such information would have been required to be filed with the SEC, if the Company were subject to Section 13 or 15(d) of the Exchange Act, in each case, based on the dates on which the Company would be required to file such periodic reports if it were a "non-accelerated filer" within the meaning of the Exchange Act.

10.    <u>Restrictions on Ownership and Transfer</u>.  The Series A Preferred Shares shall be subject to the restrictions on ownership and transfer set forth in Article VII of the Declaration of Trust.

11.    <u>Record Holders</u>.  The Company and the transfer agent for the Series A Preferred Shares may deem and treat the record holder of any Series A Preferred Shares as the true and lawful owner thereof for all purposes, and neither the Company nor the transfer agent shall be affected by any notice to the contrary.

12.    <u>Office or Agency</u>.  For so long as any Series A Preferred Shares are outstanding, the Company shall at all times maintain an office or agency in one of the 48 contiguous States of the United States of America where Series A Preferred Shares may be surrendered for payment (including upon redemption), conversion, registration of transfer or exchange.

13.    <u>No Preemptive Rights</u>.  No holder of Series A Preferred Shares will, as a holder of Series A Preferred Shares, have any preemptive rights to purchase or subscribe for Common Shares or any other security of the Company.

<u>SECOND</u>:  The Series A Preferred Shares have been classified and designated by the Board and the Pricing Committee under the authority contained in the Declaration of Trust.

16

These Articles Supplementary have been approved by the Board and the Pricing Committee in the manner and vote required by law.

THIRD:  The undersigned acknowledges these Articles Supplementary to be the trust act of the Company and as to all matters or facts required to be verified under oath, the undersigned acknowledges that to the best of his or her knowledge, information and belief, these matters and facts are true in all material respects and that this statement is made under the penalties for perjury.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Company has caused these Articles Supplementary to be executed in its name and on its behalf by its President and Chief Executive Officer and attested to by its Senior Managing Director, Chief Administrative and Legal Officer, and Secretary on this 6th day of March, 2017.

ATTEST:                                              PENNYMAC MORTGAGE INVESTMENT TRUST

By:                                                  By:
Name:  Jeffrey P. Grogin                             Name:     David A. Spector
Title:   Senior Managing Director, Chief             Title:    President and Chief Executive Officer
         Administrative and Legal Officer,
         and Secretary

*[Signature Page to the Articles Supplementary]*

ACTIVE 209705784v.18

# Exhibit E

# CORPORATE CHARTER APPROVAL SHEET
## ** EXPEDITED SERVICE ** ** KEEP WITH DOCUMENT **

DOCUMENT CODE _16_    BUSINESS CODE _____

\# _D13055041_

Close _____    Stock _____    Nonstock _____

P A _____    Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

_____

```
1000362010451633
```

Affix Barcode Label Here
```
ID # D13055041 ACK # 1000362010451633
PAGES  0019
PENNYMAC MORTGAGE INVESTMENT TRUST

06/30/2017  AT 11 12 A WO # 0004779927
```

New Name _____

_____

### FEES REMITTED

| | | |
|---|---|---|
| Base Fee | _100_ | |
| Org & Cap Fee | | |
| Expedite Fee | _70_ | |
| Penalty | | |
| State Recordation Tax | | |
| State Transfer Tax | | |
| Certified Copies | _1_ | |
| Copy Fee | _39_ | |
| Certificates | | |
| Certificate of Status Fee | | |
| Personal Property Filings | | |
| Mail Processing Fee | | |
| Other | | |
| TOTAL FEES | _209_ | |

Credit Card _____    Check ✓    Cash _____

_____ Documents on _____ Checks

Approved By _16_

Keyed By _____

COMMENT(S)

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
_____ and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name

_____ Other Change(s)
:

Code _663_

Attention _____

Mail Names and Address

```
VENABLE LLP
SUITE 900
750 E PRATT ST
BALTIMORE MD 21202-3142
```

### Stamp Work Order and Customer Number HERE

```
CUST ID 0003563350
WORK ORDER 0004779927
DATE 06-30-2017 11 12 AM
AMT  PAID $209 00
```

CERTIFIED
COPY MADE

# PENNYMAC MORTGAGE INVESTMENT TRUST

## ARTICLES SUPPLEMENTARY

### 8 00% Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares of Beneficial Interest

PennyMac Mortgage Investment Trust, a Maryland real estate investment trust (the "Company"), hereby certifies to the State Department of Assessments and Taxation of Maryland that

FIRST   Under a power contained in Article VI of the Declaration of Trust of the Company (the "Declaration of Trust"), the Board of Trustees of the Company (the "Board"), by resolutions duly adopted on June 26, 2017, and the Pricing Committee of the Board (the "Pricing Committee"), by resolutions duly adopted on June 27, 2017, classified and designated 8,050,000 Preferred Shares (as defined in the Declaration of Trust) as a separate class of Preferred Shares to be known as the 8 00% Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares of Beneficial Interest, $0 01 par value per share (the "Series B Preferred Shares"), with the following preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends and other distributions, qualifications, and terms and conditions of redemption, which, upon any restatement of the Declaration of Trust, may become part of Article VI of the Declaration of Trust, with any necessary or appropriate renumbering or relettering of the sections or subsections hereof

1   Designation and Number   A series of Preferred Shares, classified as the "8 00% Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares of Beneficial Interest" is hereby established   The number of authorized Series B Preferred Shares shall be 8,050,000

2   Maturity   The Series B Preferred Shares have no stated maturity and will not be subject to any sinking fund or mandatory redemption, and will remain outstanding indefinitely unless (i) the Company decides to redeem or otherwise repurchase the Series B Preferred Shares or (ii) the Series B Preferred Shares become convertible and are actually converted pursuant to Section 7 hereof   The Company is not required to set apart for payment funds to redeem the Series B Preferred Shares

3   Ranking   The Series B Preferred Shares shall rank, with respect to rights to the payment of dividends and the distribution of assets upon any liquidation, dissolution or winding up of the Company, (i) senior to all classes or series of Common Shares (as defined in the Declaration of Trust) and to all other equity securities issued by the Company other than equity securities referred to in clauses (ii) and (iii) of this Section 3, (ii) on a parity with the 8 125% Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares of Beneficial Interest, $0 01 par value per share (the "Series A Preferred Shares"), in the Company and all other equity securities issued by the Company with terms specifically providing that those equity securities rank on a parity with the Series B Preferred Shares with respect to rights to the payment of dividends and the distribution of assets upon any liquidation, dissolution or winding up of the Company, and (iii) junior to all equity securities issued by the Company with terms specifically providing that those equity securities rank senior to the Series B Preferred Shares with respect to rights to the payment of dividends and the distribution of assets upon any liquidation, dissolution

or winding up of the Company   The term "equity securities" shall not include convertible or exchangeable debt securities

4   Dividends

(a)      Holders of the Series B Preferred Shares are entitled to receive, when, as and if authorized by the Board and declared by the Company, out of funds of the Company legally available for the payment of dividends, cumulative cash dividends (i) from, and including, the date on which Series B Preferred Shares are first issued (the "Original Issuance Date") to, but not including, June 15, 2024 (the "Fixed Rate Period"), at a fixed rate equal to 8 00% per annum based on the Twenty-Five Dollars ($25 00) per share liquidation preference, or $2 00 per share, and (ii) from, and including, June 15, 2024 and thereafter (the "Floating Rate Period"), at a floating rate equal to Three-Month LIBOR (as defined below) as calculated on each applicable Dividend Determination Date (as defined below) plus a spread of 5 99% per annum based on the Twenty-Five Dollars ($25 00) per share liquidation preference   Dividends on the Series B Preferred Shares shall accumulate daily and shall be cumulative from, and including, the Original Issuance Date or, if later, the latest Dividend Payment Date (as defined below) to which cumulative dividends have been paid in full (or declared and the corresponding Dividend Record Date (as defined below) for determining shareholders entitled to payment thereof has passed), and shall be payable quarterly in arrears on the 15th day of each March, June, September and December (each, a "Dividend Payment Date") with respect to the immediately preceding Dividend Period (as defined below), *provided*, that if any Dividend Payment Date is not a Business Day (as defined below), then the dividend which would otherwise have been payable on that Dividend Payment Date may be paid on the next succeeding Business Day with the same force and effect as if paid on such Dividend Payment Date and no interest, additional dividends or other sums will accumulate on the amount so payable for the period from and after such Dividend Payment Date to such next succeeding Business Day   The first dividend on the Series B Preferred Shares is scheduled to be paid on September 15, 2017 in the amount of $0 38889 per share and will represent accrual for less than the full quarterly period, covering the period from, and including, the Original Issuance Date to, but not including, September 15, 2017   That dividend will be paid to the persons who are the holders of record of the Series B Preferred Shares at the close of business on the corresponding Dividend Record Date, which will be September 1, 2017   Dividends payable on the Series B Preferred Shares during the Fixed Rate Period, including dividends payable for the first Dividend Period and any partial Dividend Period, will be computed on the basis of a 360-day year consisting of twelve 30-day months   Dividends payable on the Series B Preferred Shares during the Floating Rate Period, including dividends payable for any partial Dividend Period, will be computed based on the actual number of days and a 360-day year   Dividends will be payable to holders of record as they appear in the share transfer records of the Company for the Series B Preferred Shares at the close of business on the applicable Dividend Record Date, which shall be the 1st day of the calendar month, whether or not a Business Day, in which the applicable Dividend Payment Date occurs (each, a "Dividend Record Date")   The dividends payable on any Dividend Payment Date shall include dividends accumulated to, but not including, such Dividend Payment Date

(b)      No dividends on the Series B Preferred Shares shall be authorized by the Board or paid or set apart for payment by the Company at any time when the terms and provisions of any agreement of the Company, including any agreement relating to any indebtedness of the Company,

prohibit the authorization, payment or setting apart for payment thereof or provide that the
authorization, payment or setting apart for payment thereof would constitute a breach of the
agreement or a default under the agreement, or if the authorization, payment or setting apart for
payment shall be restricted or prohibited by law

      (c)     Notwithstanding anything to the contrary contained herein, dividends on the
Series B Preferred Shares shall accumulate whether or not the Company has earnings, whether or
not there are funds legally available for the payment of those dividends and whether or not those
dividends are declared   No interest, or sum in lieu of interest, will be payable in respect of any
dividend payment or payments on the Series B Preferred Shares which may be in arrears, and
holders of the Series B Preferred Shares will not be entitled to any dividends in excess of full
cumulative dividends described in Section 4(a) hereof   Any dividend payment made on the Series
B Preferred Shares shall first be credited against the earliest accumulated but unpaid dividend due
with respect to the Series B Preferred Shares

      (d)     Except as provided in Section 4(e) hereof, unless full cumulative dividends
on all Series B Preferred Shares have been or contemporaneously are paid or declared and a sum
sufficient for the payment thereof is set apart for payment for all past Dividend Periods, (i) no
dividends (other than dividends paid in Common Shares or in any class or series of Preferred
Shares ranking junior to the Series B Preferred Shares as to dividends and upon liquidation) shall
be paid or declared and set apart for payment upon Common Shares, Series A Preferred Shares or
any other class or series of Preferred Shares ranking junior to or on a parity with the Series B
Preferred Shares as to dividends or upon liquidation, (ii) no other distribution (other than a
repurchase that is considered a distribution as to which clause (iii) would apply) shall be paid or
declared and set apart for payment upon Common Shares, Series A Preferred Shares or any other
class or series of Preferred Shares ranking junior to or on a parity with the Series B Preferred
Shares as to dividends or upon liquidation and (iii) no Common Shares, Series A Preferred Shares
or any other class or series of Preferred Shares ranking junior to or on a parity with the Series B
Preferred Shares as to dividends or upon liquidation shall be redeemed, purchased or otherwise
acquired for any consideration (or any moneys be paid to or made available for a sinking fund for
the redemption of any such shares) by the Company, except, in the case of clause (iii), by
conversion into or exchange for Common Shares or any other class or series of Shares (as defined
in the Declaration of Trust) of the Company ranking junior to the Series B Preferred Shares as to
dividends and upon liquidation, *provided, however,* that none of the foregoing or the restriction
described in Section 4(e) hereof shall prevent the purchase or acquisition by the Company of shares
of any class or series of Shares pursuant to (A) the provisions of Article VII of the Declaration of
Trust relating to restrictions on ownership and transfer of Shares in connection with the Company's
status as a REIT (as defined in the Declaration of Trust) for U S  federal income tax purposes or
(B) a purchase or exchange offer made on the same terms to holders of all outstanding Series B
Preferred Shares and Series A Preferred Shares and holders of all other outstanding shares of any
class or series of preferred shares that we may issue ranking on parity with the Series B Preferred
Shares as to dividends or upon liquidation, or a redemption, purchase or other acquisition of
Common Shares made for purposes of and in compliance with the requirements of an employee
incentive or benefit plan of the Company or any of its subsidiaries

3

(e)    When dividends are not so paid in full (or declared and a sum sufficient for such full payment is not so set apart) upon the Series B Preferred Shares, the Series A Preferred Shares and any other class or series of Preferred Shares ranking on a parity as to dividends with the Series B Preferred Shares, except as described in Section 4(d) hereof, all dividends declared upon the Series B Preferred Shares, the Series A Preferred Shares and such other class or series of Preferred Shares shall be declared *pro rata* so that the amount of dividends declared per Series B Preferred Share, per Series A Preferred Share and per share on such other class or series of Preferred Shares shall in all cases bear to each other the same ratio that accumulated dividends per Series B Preferred Share, per Series A Preferred Share and per share on such other class or series of Preferred Shares (which shall not include any accrual in respect of unpaid dividends for prior Dividend Periods if such Preferred Shares do not have a cumulative dividend) bear to each other No interest, or sum of money in lieu of interest, shall be payable in respect of any dividend payment or payments on the Series B Preferred Shares which may be in arrears

(f)    "Business Day" shall mean any day, other than a Saturday or Sunday, that is neither a legal holiday nor a day on which banking institutions in New York, New York are authorized or required by law, regulation or executive order to close

(g)    The term "Three-Month LIBOR" shall be calculated for each Dividend Period during the Floating Rate Period and shall mean, on any Dividend Determination Date (i) the rate (expressed as a percentage per year) for deposits in U S dollars having an index maturity of three months, in amounts of at least $1,000,000, as such rate appears on "Reuters Page LIBOR01" at approximately 11 00 a m (London time) on the relevant Dividend Determination Date, or if no such rate appears on "Reuters Page LIBOR01" or if the "Reuters Page LIBOR01" is not available at approximately 11 00 a m (London time) on the relevant Dividend Determination Date, then the Company will select four nationally-recognized banks in the London interbank market and request that the principal London offices of those four selected banks provide the Company with their offered quotation for deposits in U S dollars for a period of three months, commencing on the first day of the applicable Dividend Period, to prime banks in the London interbank market at approximately 11 00 a m (London time) on the Dividend Determination Date for the applicable Dividend Period Offered quotations must be based on a principal amount equal to an amount that, in the Company's discretion, is representative of a single transaction in U S dollars in the London interbank market at that time If at least two quotations are provided, the Three-Month LIBOR for such Dividend Period will be the arithmetic mean (rounded upward, if necessary, to the nearest 0 00001 of 1%) of those quotations If fewer than two quotations are provided, the Three-Month LIBOR for such Dividend Period will be the arithmetic mean (rounded upward, if necessary, to the nearest 0 00001 of 1%) of the rates quoted at approximately 11 00 a m (New York City time) on the Dividend Determination Date for such Dividend Period by three nationally-recognized banks in New York, New York selected by the Company, for loans in U S dollars to nationally-recognized European banks (as selected by the Company), for a period of three months commencing on the first day of such Dividend Period The rates quoted must be based on an amount that, in the Company's discretion, is representative of a single transaction in U S dollars in that market at that time If fewer than three New York, New York banks selected by the Company quote rates in the manner described above, the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period,

4

or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period

        (h)     The term "Dividend Determination Date" shall mean the London Business Day (as defined below) immediately preceding the first day of the applicable Dividend Period

        (i)     The term "Dividend Period" shall mean the period from, and including, a Dividend Payment Date to, but not including, the next succeeding Dividend Payment Date, except for the initial Dividend Period, which shall be the period from, and including, the Original Issuance Date to, but not including, September 15, 2017

        (j)     The term "London Business Day" shall mean any day on which dealings in deposits in U S dollars are transacted in the London interbank market

        (k)     The term "Reuters Page LIBOR01" shall mean the display so designated on the Reuters 3000 Xtra (or such other page as may replace the LIBOR01 page on that service, or such other service as may be nominated by the ICE Benchmark Administration Limited ("ICE"), or its successor, or such other entity assuming the responsibility of ICE or its successor in the event ICE or its successor no longer does so, as the successor service, for the purpose of displaying London interbank offered rates for U S dollar deposits)

        (l)     "Set apart for payment" shall be deemed to include, without any action other than the following, the recording by the Company in its accounting ledgers of any accounting or bookkeeping entry which indicates, pursuant to an authorization by the Board and a declaration of dividends or other distribution by the Company, the allocation of funds to be so paid on any class or series of Shares of the Company, provided, however, that if any funds for any class or series of Shares ranking junior to or on a parity with the Series B Preferred Shares as to the payment of dividends are placed in a separate account of the Company or are delivered to a disbursing, paying or other similar agent, then "set apart for payment" with respect to the Series B Preferred Shares shall mean placing such funds in a separate account or delivering such funds to a disbursing, paying or other similar agent

5     <u>Liquidation Preference</u>

        (a)     In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company, the holders of the Series B Preferred Shares will be entitled to be paid out of the assets the Company has legally available for distribution to its shareholders, subject to the preferential rights of the holders of shares of any class or series of Shares of the Company ranking senior to the Series B Preferred Shares with respect to the distribution of assets upon liquidation, dissolution or winding up, a liquidation preference of Twenty-Five Dollars ($25 00) per share, plus an amount equal to any accumulated and unpaid dividends thereon (whether or not earned or declared) to, but not including, the date of payment, before any distribution of assets upon liquidation, dissolution or winding up is made to holders of Common Shares or any other class or series of Shares of the Company ranking junior to the Series B Preferred Shares as to liquidation rights

(b)     In the event that, upon any such voluntary or involuntary liquidation, dissolution or winding up, the available assets of the Company are insufficient to pay the amount of the liquidating distributions on all outstanding Series B Preferred Shares and the corresponding amounts payable on shares of all other classes or series of Shares of the Company ranking on a parity with the Series B Preferred Shares in the distribution of assets, including the Series A Preferred Shares, then the holders of the Series B Preferred Shares, the Series A Preferred Shares and all other such classes or series of Shares shall share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled

(c)     Holders of Series B Preferred Shares shall be entitled to written notice of any such payment upon the voluntary or involuntary liquidation, dissolution or winding up of the Company no fewer than 30 days and no more than 60 days prior to the payment date   After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series B Preferred Shares will have no right or claim to any of the remaining assets of the Company

(d)     The consolidation or merger of the Company with or into any other real estate investment trust, corporation or entity or of any other entity with or into the Company, or the sale, lease, transfer or conveyance of all or substantially all of the property or business of the Company, shall not be deemed to constitute a liquidation, dissolution or winding up of the Company

(e)     In determining whether a distribution (other than upon voluntary or involuntary liquidation), by dividend, redemption or other acquisition of Shares of the Company or otherwise, is permitted under Maryland law, no effect shall be given to amounts that would be needed, if the Company were to be dissolved at the time of distribution, to satisfy the preferential rights upon dissolution of holders of the Series B Preferred Shares whose preferential rights on dissolution are superior to those receiving the distribution

6     Redemption

(a)     The Series B Preferred Shares are not redeemable by the Company prior to June 15, 2024, except as described in this Section 6 and except that, as provided in Article VII of the Declaration of Trust, the Company may purchase or redeem Series B Preferred Shares prior to that date in connection with its qualification as a REIT for U S federal income tax purposes

(b)     Optional Redemption Right   On and after June 15, 2024, the Company may, at its option, upon not less than 30 nor more than 60 days' written notice, redeem the Series B Preferred Shares, in whole or in part, at any time or from time to time, for cash at a redemption price of Twenty-Five Dollars ($25 00) per share, plus any accumulated and unpaid dividends thereon to, but not including, the redemption date

(c)     Special Optional Redemption Right   Notwithstanding anything to the contrary contained in Section 6(a) hereof, upon the occurrence of a Change of Control (as defined below), the Company may, at its option, upon not less than 30 nor more than 60 days' written notice, redeem the Series B Preferred Shares, in whole or in part, within 120 days after the first

6

date on which such Change of Control occurred, for cash at a redemption price of Twenty-Five
Dollars ($25 00) per share, plus any accumulated and unpaid dividends thereon to, but not
including, the redemption date  If, prior to the Change of Control Conversion Date (as defined
below), the Company has provided notice of its election to redeem some or all of the Series B
Preferred Shares pursuant to this Section 6, the holders of Series B Preferred Shares will not have
the Change of Control Conversion Right (as defined below) with respect to the Series B Preferred
Shares called for redemption

      (d) ⁻  A "Change of Control" is deemed to occur when, after the Original Issuance
Date, the following have occurred and are continuing  (i) the acquisition by any person, including
any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Securities Exchange
Act of 1934, as amended (the "Exchange Act"), of beneficial ownership, directly or indirectly,
through a purchase, merger or other acquisition transaction or series of purchases, mergers or other
acquisition transactions of Shares of the Company entitling that person to exercise more than 50%
of the total voting power of all Shares of the Company entitled to vote generally in the election of
trustees of the Company (except that such person will be deemed to have beneficial ownership of
all securities that such person has the right to acquire, whether such right is currently exercisable
or is exercisable only upon the occurrence of a subsequent condition), and (ii) following the closing
of any transaction referred to in clause (i), neither the Company nor the acquiring or surviving
entity, including any parent of the Company or such an acquiring or surviving entity, has a class
of common securities (or American Depositary Receipts representing such securities) listed on the
New York Stock Exchange (the "NYSE"), the NYSE MKT LLC (the "NYSE MKT") or the
Nasdaq Stock Market ("Nasdaq"), or listed or quoted on an exchange or quotation system that is a
successor to the NYSE, the NYSE MKT or Nasdaq

      (e)  In the event the Company elects to redeem Series B Preferred Shares
pursuant to this Section 6, the notice of redemption will be mailed, postage prepaid, not less than
30 nor more than 60 days prior to the redemption date, to each holder of record of Series B
Preferred Shares called for redemption at such holder's address as it appears on the share transfer
records of the Company and shall state  (i) the redemption date, (ii) the number of Series B
Preferred Shares to be redeemed, (iii) the redemption price, (iv) the place or places where
certificates (if any) for the Series B Preferred Shares are to be surrendered for payment of the
redemption price, (v) that dividends on the Series B Preferred Shares to be redeemed will cease to
accumulate on the redemption date, (vi) whether such redemption is being made pursuant to
Section 6(b) or Section 6(c) hereof, (vii) if applicable, that such redemption is being made in
connection with a Change of Control and, in that case, a brief description of the transaction or
transactions constituting such Change of Control, and (viii) if such redemption is being made in
connection with a Change of Control, that the holders of Series B Preferred Shares being so called
for redemption will not be able to tender such Series B Preferred Shares for conversion in
connection with the Change of Control and that each Series B Preferred Share tendered for
conversion that is called, prior to the Change of Control Conversion Date, for redemption will be
redeemed on the related redemption date instead of converted on the Change of Control
Conversion Date  If less than all of the Series B Preferred Shares held by any holder are to be
redeemed, the notice mailed to such holder shall also specify the number of Series B Preferred
Shares held by such holder to be redeemed  No failure to give such notice or any defect thereto or
in the mailing thereof shall affect the validity of the proceedings for the redemption of any Series

7

B Preferred Shares, except as to the holder to whom notice was defective or not given Notwithstanding the foregoing, no notice of redemption will be required where the Company elects to redeem Series B Preferred Shares pursuant to Section 6(a) hereof in connection with its qualification as a REIT for U S federal income tax purposes

(f)    Holders of Series B Preferred Shares to be redeemed shall surrender the Series B Preferred Shares so called for redemption at the place designated in the notice of redemption and shall be entitled to the redemption price and any accumulated and unpaid dividends thereon payable upon the redemption following the surrender

(g)    If notice of redemption of any Series B Preferred Shares has been given and if the Company has irrevocably set apart for payment the funds necessary for redemption in trust for the benefit of the holders of such Series B Preferred Shares so called for redemption, then, from and after the redemption date (unless the Company defaults in providing for the payment of the redemption price therefor plus accumulated and unpaid dividends thereon, if any), dividends will cease to accumulate on those Series B Preferred Shares, those Series B Preferred Shares shall no longer be deemed outstanding and all rights of the holders of those Series B Preferred Shares will terminate, except the right to receive the redemption price plus accumulated and unpaid dividends thereon, if any, payable upon redemption

(h)    If any redemption date is not a Business Day, then the redemption price and accumulated and unpaid dividends thereon, if any, payable upon redemption may be paid on the next Business Day and no interest, additional dividends or other sums will accumulate on the amount payable for the period from and after that redemption date to that next Business Day

(i)    If less than all of the outstanding Series B Preferred Shares are to be redeemed, the Series B Preferred Shares to be redeemed shall be selected *pro rata* (as nearly as may be practicable without creating fractional shares) or by lot   If such redemption is to be by lot and, as a result of such redemption, any holder of Shares (other than a holder of Shares that has received an exemption from the Aggregate Share Ownership Limit (as defined in the Declaration of Trust), as applicable) would have actual or constructive ownership in excess of the Aggregate Share Ownership Limit or otherwise would violate Section 7 2 1(a) of the Declaration of Trust because a holder's Series B Preferred Shares were not redeemed, or were only redeemed in part, then, except as otherwise provided in the Declaration of Trust, the Company shall redeem the requisite number of shares of such holder such that no person will hold Shares in excess of the Aggregate Share Ownership Limit or otherwise in violation of Section 7 2 1(a) of the Declaration of Trust subsequent to such redemption

(j)    Immediately prior to any redemption of Series B Preferred Shares, the Company shall pay, in cash, any accumulated and unpaid dividends thereon to, but not including, the redemption date, unless a redemption date falls after a Dividend Record Date and prior to the corresponding Dividend Payment Date, in which case, each holder of Series B Preferred Shares at the close of business on such Dividend Record Date shall be entitled to the dividend payable on such Series B Preferred Shares on the corresponding Dividend Payment Date notwithstanding the redemption of such Series B Preferred Shares before such Dividend Payment Date   Except as provided in this Section 6(j), the Company will make no payment or allowance for unpaid dividends, whether or not in arrears, on the Series B Preferred Shares to be redeemed

(k)    Unless full cumulative dividends on all Series B Preferred Shares have been or contemporaneously are paid or declared and a sum sufficient for the payment thereof has been or contemporaneously is set apart for payment for all past Dividend Periods, no Series B Preferred Shares shall be redeemed unless all outstanding Series B Preferred Shares are simultaneously redeemed, and the Company shall not purchase or otherwise acquire directly or indirectly any Series B Preferred Shares (except by converting them into or exchanging them for Common Shares or other Shares of the Company ranking junior to the Series B Preferred Shares as to dividends and upon liquidation), *provided, however*, that the foregoing shall not prevent the purchase or acquisition by the Company of Series B Preferred Shares pursuant to the provisions of Article VII of the Declaration of Trust relating to restrictions on ownership and transfer of Shares of the Company in connection with its status as a REIT or pursuant to a purchase or exchange offer made on the same terms to holders of all outstanding Series B Preferred Shares

(l)    Subject to applicable law, the Company may purchase Series B Preferred Shares in the open market, by tender or by private agreement  Any Series B Preferred Shares that the Company acquires will be reclassified as authorized but unissued Preferred Shares, without further designation as to class or series, and may thereafter be classified, reclassified or issued as any class or series of Preferred Shares

7    <u>Conversion Rights</u>  Series B Preferred Shares are not convertible into or exchangeable for any other property or securities of the Company, except as provided in this Section 7

(a)    Upon the occurrence of a Change of Control, each holder of Series B Preferred Shares will have the right (unless, prior to the Change of Control Conversion Date, the Company has provided notice of its election to redeem some or all of the Series B Preferred Shares held by such holder pursuant to Section 6 hereof, in which case such holder will have the right only with respect to Series B Preferred Shares that are not called for redemption) to convert some or all of the Series B Preferred Shares held by such holder (the "Change of Control Conversion Right") on the Change of Control Conversion Date into a number of Common Shares per Series B Preferred Share to be converted (the "Common Share Conversion Consideration") equal to the lesser of  (i) the quotient obtained by dividing (x) the sum of the Twenty-Five Dollars ($25 00) liquidation preference per Series B Preferred Share plus the amount of any accumulated and unpaid dividends (whether or not earned or declared) thereon to, but not including, the Change of Control Conversion Date (unless the Change of Control Conversion Date is after a Dividend Record Date and prior to the corresponding Dividend Payment Date for the Series B Preferred Shares, in which case no additional amount for such accumulated and unpaid dividends will be included in this sum) by (y) the Common Share Price (as defined below) (such quotient, the "Conversion Rate"), and (ii) 2 72777 (the "Share Cap"), subject to adjustments provided in Section 7(b) below

(b)    The Share Cap is subject to *pro rata* adjustments for any share splits (including those effected pursuant to a distribution of Common Shares to existing holders of Common Shares), subdivisions or combinations (in each case, a "Share Split") with respect to Common Shares as follows  the adjusted Share Cap as the result of a Share Split will be the number of Common Shares that is equivalent to the product obtained by multiplying (i) the Share Cap in effect immediately prior to such Share Split by (ii) a fraction, the numerator of which is the number of Common Shares outstanding immediately after giving effect to such Share Split and

the denominator of which is the number of Common Shares outstanding immediately prior to such Share Split. For the avoidance of doubt, subject to the immediately succeeding sentence, the aggregate number of Common Shares (or equivalent Alternative Conversion Consideration (as defined below), as applicable) issuable or deliverable, as applicable, in connection with the exercise of the Change of Control Conversion Right will not exceed the product of the Share Cap multiplied by the aggregate number of Series B Preferred Shares issued and outstanding at the Change of Control Conversion Date (or equivalent Alternative Conversion Consideration, as applicable) (the "Exchange Cap"). The Exchange Cap is subject to *pro rata* adjustments for any Share Splits on the same basis as the corresponding adjustment to the Share Cap.

(c)    The "Change of Control Conversion Date" is the date the Series B Preferred Shares are to be converted, which will be a Business Day selected by the Company that is no fewer than 20 days nor more than 35 days after the date on which it provides the notice described in Section 7(h) to the holders of Series B Preferred Shares.

(d)    The "Common Share Price" is (i) if the consideration to be received in the Change of Control by the holders of Common Shares is solely cash, the amount of cash consideration per Common Share or (ii) if the consideration to be received in the Change of Control by holders of Common Shares is other than solely cash (x) the average of the closing sale prices per Common Share (or, if no closing sale price is reported, the average of the closing bid and ask prices per Common Share or, if more than one in either case, the average of the average closing bid and the average closing ask prices per Common Share) for the ten consecutive trading days immediately preceding, but not including, the date on which such Change of Control occurred as reported on the principal U.S. securities exchange on which Common Shares are then traded, or (y) the average of the last quoted bid prices for Common Shares in the over-the-counter market as reported by Pink OTC Markets Inc. or similar organization for the ten consecutive trading days immediately preceding, but not including, the date on which such Change of Control occurred, if Common Shares are not then listed for trading on a U.S. securities exchange.

(e)    In the case of a Change of Control pursuant to which Common Shares are or will be converted into cash, securities or other property or assets (including any combination thereof) (the "Alternative Form Consideration"), a holder of Series B Preferred Shares will receive upon conversion of such Series B Preferred Shares the kind and amount of Alternative Form Consideration which such holder would have owned or been entitled to receive upon the Change of Control had such holder held a number of Common Shares equal to the Common Share Conversion Consideration immediately prior to the effective time of the Change of Control (the "Alternative Conversion Consideration", the Common Share Conversion Consideration or the Alternative Conversion Consideration, whichever shall be applicable to a Change of Control, is referred to as the "Conversion Consideration").

(f)    If the holders of Common Shares have the opportunity to elect the form of consideration to be received in the Change of Control, the Conversion Consideration in respect of such Change of Control will be deemed to be the kind and amount of consideration actually received by holders of a majority of the outstanding Common Shares that made or voted for such an election (if electing between two types of consideration) or holders of a plurality of the outstanding Common Shares that made or voted for such an election (if electing between more than two types of consideration), as the case may be, and will be subject to any limitations to which

10

all holders of Common Shares are subject, including, without limitation, *pro rata* reductions applicable to any portion of the consideration payable in such Change of Control

(g)    No fractional Common Shares will be issued upon the conversion of the Series B Preferred Shares in connection with a Change of Control  Instead, the Company will make a cash payment equal to the value of such fractional Common Shares based upon the Common Share Price used in determining the Common Share Conversion Consideration for such Change of Control

(h)    Within 15 days following the occurrence of a Change of Control, *provided* that the Company has not then exercised its right to redeem all Series B Preferred Shares pursuant to Section 6 hereof, the Company will provide to holders of Series B Preferred Shares a notice of the occurrence of the Change of Control that describes the resulting Change of Control Conversion Right, which notice shall be delivered to the holders of record of the Series B Preferred Shares at their addresses as they appear on the share transfer records of the Company and shall state  (i) the events constituting the Change of Control, (ii) the date of the Change of Control, (iii) the last date on which the holders of Series B Preferred Shares may exercise their Change of Control Conversion Right, (iv) the method and period for calculating the Common Share Price  (v) the Change of Control Conversion Date, (vi) that if, prior to the Change of Control Conversion Date, the Company has provided notice of its election to redeem all or any Series B Preferred Shares, holders will not be able to convert the Series B Preferred Shares called for redemption and such Series B Preferred Shares will be redeemed on the related redemption date, even if such Series B Preferred Shares have already been tendered for conversion pursuant to the Change of Control Conversion Right, (vii) if applicable, the type and amount of Alternative Conversion Consideration entitled to be received per Series B Preferred Share, (viii) the name and address of the paying agent, transfer agent and conversion agent for the Series B Preferred Shares, (ix) the procedures that the holders of Series B Preferred Shares must follow to exercise the Change of Control Conversion Right (including procedures for surrendering Series B Preferred Shares for conversion through the facilities of a Depositary (as defined below)), including the form of conversion notice to be delivered by such holders as described below, and (x) the last date on which holders of Series B Preferred Shares may withdraw Series B Preferred Shares surrendered for conversion and the procedures that such holders must follow to effect such a withdrawal

(i)    The Company shall also issue a press release containing such notice provided for in Section 7(h) hereof for publication on Dow Jones & Company, Inc , Business Wire, PR Newswire or Bloomberg Business News (or, if these organizations are not in existence at the time of issuance of the press release, such other news or press organization as is reasonably calculated to broadly disseminate the relevant information to the public), and post a notice on its website, in any event prior to the opening of business on the first Business Day following any date on which it provides the notice provided for in Section 7(h) hereof to the holders of Series B Preferred Shares

(j)    To exercise the Change of Control Conversion Right, the holders of Series B Preferred Shares will be required to deliver, on or before the close of business on the Change of Control Conversion Date, the certificates (if any) evidencing the Series B Preferred Shares to be converted, duly endorsed for transfer (or, in the case of any Series B Preferred Shares held through a Depositary, to deliver, on or before the close of business on the Change of Control Conversion

11

Date, the Series B Preferred Shares to be converted through the facilities of such Depositary), together with a written conversion notice in the form provided by the Company, duly completed, to its transfer agent. The conversion notice must state (i) the relevant Change of Control Conversion Date, (ii) the number of Series B Preferred Shares to be converted, and (iii) that the Series B Preferred Shares are to be converted pursuant to the applicable provisions of the Series B Preferred Shares.

(k)     Holders of Series B Preferred Shares may withdraw any notice of exercise of a Change of Control Conversion Right (in whole or in part) by a written notice of withdrawal delivered to the transfer agent of the Company prior to the close of business on the Business Day prior to the Change of Control Conversion Date. The notice of withdrawal delivered by any holder must state (i) the number of withdrawn Series B Preferred Shares, (ii) if certificated Series B Preferred Shares have been surrendered for conversion, the certificate numbers of the withdrawn Series B Preferred Shares, and (iii) the number of Series B Preferred Shares, if any, which remain subject to the holder's conversion notice.

(l)     Notwithstanding anything to the contrary contained in Sections 7(j) and (k) hereof, if any Series B Preferred Shares are held through The Depository Trust Company ("DTC") or a similar depositary (each, a "Depositary"), the conversion notice and/or the notice of withdrawal, as applicable, must comply with applicable procedures, if any, of the applicable Depositary.

(m)     Series B Preferred Shares as to which the Change of Control Conversion Right has been properly exercised and for which the conversion notice has not been properly withdrawn will be converted into the applicable Conversion Consideration in accordance with the Change of Control Conversion Right on the Change of Control Conversion Date, unless prior to the Change of Control Conversion Date the Company has provided notice of its election to redeem some or all of the Series B Preferred Shares pursuant to Section 6 hereof, in which case only the Series B Preferred Shares properly surrendered for conversion and not properly withdrawn that are not called for redemption will be converted as aforesaid. If the Company elects to redeem Series B Preferred Shares that would otherwise be converted into the applicable Conversion Consideration on a Change of Control Conversion Date, such Series B Preferred Shares will not be so converted and the holders of such Series B Preferred Shares will be entitled to receive on the applicable redemption date the redemption price as provided in Section 6 hereof.

(n)     The Company shall deliver all securities, cash and any other property owing upon conversion no later than the third Business Day following the Change of Control Conversion Date. Notwithstanding the foregoing, the persons entitled to receive any Common Shares or other securities delivered on conversion will be deemed to have become the holders of record thereof as of the Change of Control Conversion Date.

(o)     In connection with the exercise of any Change of Control Conversion Right, the Company shall comply with all applicable U.S. federal and state securities laws and stock exchange rules in connection with any conversion of Series B Preferred Shares into Common Shares or other securities or other property. Notwithstanding any other provision of the Series B Preferred Shares, no holder of Series B Preferred Shares will be entitled to convert such Series B Preferred Shares into Common Shares to the extent that receipt of such Common Shares would

12

cause such holder (or any other person) to violate the applicable restrictions on ownership and transfer of the Common Shares and the Company's Shares contained in Article VII of the Declaration of Trust, unless the Company provides an exemption from the applicable limitation to such holder pursuant to Article VII of the Declaration of Trust

(p)     Notwithstanding anything herein to the contrary and except as otherwise required by law, the persons who are the holders of record of Series B Preferred Shares at the close of business on a Dividend Record Date will be entitled to receive the dividend payable on the corresponding Dividend Payment Date notwithstanding the conversion of those Series B Preferred Shares after such Dividend Record Date and on or prior to such Dividend Payment Date and, in such case, the full amount of such dividend shall be paid on such Dividend Payment Date to the persons who were the holders of record at the close of business on such Dividend Record Date Except as provided in this Section 7(p), the Company will make no payment or allowance for unpaid dividends, whether or not in arrears, on the Series B Preferred Shares to be converted

8     Voting Rights

(a)     Holders of the Series B Preferred Shares will not have any voting rights, except as set forth in this Section 8   On each matter on which holders of Series B Preferred Shares are entitled to vote, each Series B Preferred Share will entitle the holder thereof to cast one vote, except that when the holders of shares of any other class or series of Preferred Shares have the right to vote together with the holders of Series B Preferred Shares as a single class on any matter, the holders of the Series B Preferred Shares and the shares of each such other class or series will be entitled to cast one vote for each Twenty-Five Dollars ($25 00) of liquidation preference (excluding accumulated dividends)

(b)     Whenever dividends on any Series B Preferred Shares are in arrears for six or more quarterly Dividend Periods, whether or not consecutive, the number of trustees constituting the Board will be automatically increased by two (if not already increased by two by reason of the election of trustees by the holders of Series A Preferred Shares or shares of any other class or series of Preferred Shares upon which like voting rights have been conferred and are exercisable and with which the Series B Preferred Shares are entitled to vote together as a single class with respect to the election of those two trustees) and the holders of outstanding Series B Preferred Shares and the holders of all other classes and series of Preferred Shares upon which like voting rights have been conferred and are exercisable and which are entitled to vote together as a single class with the Series B Preferred Shares in the election of those two trustees, voting together as a single class, will be entitled to vote for the election of those two additional trustees at a special meeting called by the Company at the request of the holders of record of at least 25% of the outstanding Series B Preferred Shares or by the holders of shares of any other class or series of Preferred Shares upon which like voting rights have been conferred and are exercisable and which are entitled to vote together as a single  class with the Series B Preferred Shares in the election of those two trustees (unless the request is received less than 90 days before the date fixed for the next annual or special meeting of shareholders of the Company, in which case, such vote will be held at the earlier of the next annual or special meeting of shareholders of the Company), and at each subsequent annual meeting until all dividends accumulated on the Series B Preferred Shares for all past Dividend Periods and the then–current Dividend Period shall have been fully paid   In that case, the right of holders of the Series B Preferred Shares to elect any trustees will cease and,

13

unless there are outstanding shares of any other class or series of Preferred Shares upon which like voting rights have been conferred and remain exercisable, the term of office of any trustees elected by holders of the Series B Preferred Shares shall immediately terminate and the number of trustees constituting the Board shall be reduced accordingly  If the rights of holders of Series B Preferred Shares to elect two trustees have terminated in accordance with this Section 8(b) after any record date for the determination of shareholders entitled to vote in the election of such trustees but before the closing of the polls in such election, holders of Series B Preferred Shares outstanding as of such record date shall not be entitled to vote in such election of trustees  For the avoidance of doubt, in no event shall the total number of trustees elected by holders of the Series B Preferred Shares and shares of all other classes and series of Preferred Shares upon which like voting rights have been conferred and are exercisable and which are entitled to vote together as a single class with the holders of Series B Preferred Shares in the election of such trustees pursuant to the voting rights granted under this Section 8 exceed two

(c)     If a special meeting at a place within the United States designated by the Company is not called by the Company within 30 days after request from the holders of Series B Preferred Shares as described in Section 8(b) hereof, then the holders of record of at least 25% of the outstanding Series B Preferred Shares may designate a holder to call the meeting at the expense of the Company and such meeting may be called by the holder so designated in accordance with the procedures required for calling an annual or special meeting of shareholders, as applicable, set forth in the Declaration of Trust and the Company's bylaws and shall be held at the place within the United States designated by the holder calling such meeting  The Company shall pay all costs and expenses of calling and holding any meeting and of electing trustees pursuant to Section 8(b) hereof, including, without limitation, the cost of preparing, reproducing and mailing the notice of such meeting, the cost of renting a room for such meeting to be held, and the cost of collecting and tabulating votes  In no event shall a holder of Series B Preferred Shares be entitled to nominate or elect an individual for election as a trustee pursuant to Section 8(b) or Section 8(d), and no individual shall be qualified to be nominated for election pursuant to Section 8(b) or Section 8(d), or to serve as a trustee if so elected, if such individual's service as a trustee would cause the Company to fail to satisfy a requirement relating to trustee independence of any national securities exchange on which any class or series of the Company's Shares is listed

(d)     At any time that holders of Series B Preferred Shares are entitled to vote in the election of two trustees pursuant to Section 8(b), holders of Series B Preferred Shares shall be entitled to vote in the election of a successor to fill a vacancy on the Board that results from the removal of such a trustee, or in the removal of any such trustee  If, at any time when the voting rights conferred upon the Series B Preferred Shares pursuant to this Section 8(d) are exercisable, any vacancy in the office of a trustee elected pursuant to Section 8(b) shall occur, then such vacancy may be filled only by the remaining such trustee or by the holders of the outstanding Series B Preferred Shares and shares of any other classes or series of Preferred Shares upon which like voting rights have been conferred and are exercisable and which are entitled to vote together as a single class with the Series B Preferred Shares in the election of such trustees, voting together as a single class  Any trustee elected or appointed pursuant to Section 8(b) may be removed only by the affirmative vote of a majority of the votes entitled to be cast by the holders of outstanding Series B Preferred Shares and shares of any such other classes and series of Preferred Shares upon which like voting rights have been conferred and are exercisable and which are entitled to vote

14

together as a single class with the Series B Preferred Shares in the election of such trustees, voting together as a single class, and may not be removed by the holders of the Common Shares

(e)     So long as any Series B Preferred Shares remain outstanding, the Company will not, without the approval of the holders of at least two-thirds of the outstanding Series B Preferred Shares and shares of all other classes and series of Preferred Shares ranking on a parity with the Series B Preferred Shares upon which like voting rights have been conferred and are exercisable and which are entitled to vote together as a single class with the Series B Preferred Shares on such matters, voting together as a single class, (i) authorize or create, or increase the authorized or issued amount of, any class or series of Shares ranking senior to the Series B Preferred Shares with respect to payment of dividends or the distribution of assets upon liquidation, dissolution or winding up, or reclassify any of the authorized Shares of the Company into shares of such a class or series, or create, authorize or issue any obligation or security convertible into or evidencing the right to purchase any such shares of such a class or series, or (ii) amend, alter or repeal the provisions of the Declaration of Trust, whether by merger, consolidation or otherwise, so as to materially and adversely affect any right, preference, privilege or voting power of the Series B Preferred Shares (each, an "Event"), *provided, however*, with respect to the occurrence of any Event set forth in clause (ii), so long as the Series B Preferred Shares remain outstanding with the terms thereof materially unchanged, taking into account that, upon the occurrence of an Event, the Company may not be the surviving entity, the occurrence of any such Event shall not be deemed to materially and adversely affect such rights, preferences, privileges or voting powers of the Series B Preferred Shares, and, *provided, further*, that any increase in the amount of the authorized Common Shares or Preferred Shares, including the Series B Preferred Shares, or the creation or issuance of any additional Series B Preferred Shares or other class or series of Preferred Shares, or any increase in the amount of authorized shares of such class or series, in each case ranking on a parity with or junior to the Series B Preferred Shares with respect to payment of dividends or the distribution of assets upon liquidation, dissolution or winding up, shall not be deemed to materially and adversely affect such rights, preferences, privileges or voting powers

(f)     The voting rights provided for in this Section 8 will not apply if, at or prior to the time when the act with respect to which approval by holders of the Series B Preferred Shares would otherwise be required pursuant to this Section 8 shall be effected, all outstanding Series B Preferred Shares shall have been redeemed or called for redemption upon proper notice and sufficient funds shall have been deposited in trust to effect such redemption pursuant to Section 6 hereof

(g)     Except as expressly stated in this Section 8, the Series B Preferred Shares will not have any relative, participating, optional or other special voting rights or powers and the consent of the holders thereof shall not be required for the taking of any trust action   The holders of Series B Preferred Shares shall have exclusive voting rights on any amendment to the Declaration of Trust that would alter the contract rights, as expressly set forth in the Declaration of Trust, of only the Series B Preferred Shares

(h)     Notwithstanding the foregoing, holders of Series A Preferred Shares or any other class or series of Preferred Shares ranking on a parity with the Series B Preferred Shares shall not be entitled to vote together as a single class with the holders of Series B Preferred Shares on any amendment, alteration or repeal of any provision of the Declaration of Trust unless such

15

action affects the holders of the Series B Preferred Shares, the Series A Preferred Shares and such other class or series of Preferred Shares equally

9    Information Rights   During any period in which the Company is not subject to Section 13 or 15(d) of the Exchange Act and any Series B Preferred Shares are outstanding, the Company will use its best efforts to (i) transmit by mail (or other permissible means under the Exchange Act) to all holders of Series B Preferred Shares, as their names and addresses appear on the record books of the Company and without cost to such holders, copies of the annual reports on Form 10-K and quarterly reports on Form 10-Q, respectively, that the Company would have been required to file with the Securities and Exchange Commission (the "SEC") pursuant to Section 13 or 15(d) of the Exchange Act if it were subject thereto (other than any exhibits that would have been required), and (ii) promptly, upon request, supply copies of such reports to any holders or prospective holder of Series B Preferred Shares   The Company will use its best efforts to mail (or otherwise provide) the information to the holders of the Series B Preferred Shares within 15 days after the respective dates by which an annual report on Form 10-K or a quarterly report on Form 10-Q, as the case may be, in respect of such information would have been required to be filed with the SEC, if the Company were subject to Section 13 or 15(d) of the Exchange Act, in each case, based on the dates on which the Company would be required to file such periodic reports if it were a "non-accelerated filer" within the meaning of the Exchange Act

10    Restrictions on Ownership and Transfer   The Series B Preferred Shares shall be subject to the restrictions on ownership and transfer set forth in Article VII of the Declaration of Trust

11    Record Holders   The Company and the transfer agent for the Series B Preferred Shares may deem and treat the record holder of any Series B Preferred Shares as the true and lawful owner thereof for all purposes, and neither the Company nor the transfer agent shall be affected by any notice to the contrary

12    Office or Agency   For so long as any Series B Preferred Shares are outstanding, the Company shall at all times maintain an office or agency in one of the 48 contiguous States of the United States of America where Series B Preferred Shares may be surrendered for payment (including upon redemption), conversion, registration of transfer or exchange

13    No Preemptive Rights   No holder of Series B Preferred Shares will, as a holder of Series B Preferred Shares, have any preemptive rights to purchase or subscribe for Common Shares or any other security of the Company

SECOND   The Series B Preferred Shares have been classified and designated by the Board and the Pricing Committee under the authority contained in the Declaration of Trust   These Articles Supplementary have been approved by the Board and the Pricing Committee in the manner and vote required by law

THIRD   The undersigned acknowledges these Articles Supplementary to be the trust act of the Company and as to all matters or facts required to be verified under oath, the undersigned acknowledges that to the best of his or her knowledge, information and belief, these matters and facts are true in all material respects and that this statement is made under the penalties for perjury

16

IN WITNESS WHEREOF, the Company has caused these Articles Supplementary to be executed in its name and on its behalf by its President and Chief Executive Officer and attested to by its Senior Managing Director, Chief Administrative and Legal Officer, and Secretary on this 30th day of June 2017

ATTEST                                          PENNYMAC MORTGAGE INVESTMENT TRUST

By                                              By
Name   Jeffrey P Grogin                         Name   David A Spector
Title   Senior Managing Director, Chief         Title   President and Chief Executive Officer
        Administrative and Legal Officer,
        and Secretary

```
CUST ID 0003563350
WORK ORDER 0004779927
DATE 06-30-2017 11 12 AM
AMT  PAID $209 00
```

# Exhibit F

# CORPORATE CHARTER APPROVAL SHEET
## **EXPEDITED SERVICE** ** KEEP WITH DOCUMENT **

DOCUMENT CODE __75__ BUSINESS CODE __13__

# D13055041

Close _____ Stock _____ Nonstock _____

P.A. _____ Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

Affix Barcode Label Here

1000361998378370

ID # D13055041 ACK # 1000361998378370
PAGES: 0024
PENNYMAC MORTGAGE INVESTMENT TRUST

07/24/2009  AT 12:18 P  WO # 0001751738

New Name _____

_____

_____

### FEES REMITTED

| | |
|---|---|
| Base Fee: | 110 |
| Org. & Cap. Fee: | 398 |
| Expedite Fee: | 90 |
| Penalty: | |
| State Recordation Tax: | |
| State Transfer Tax: | |
| Certified Copies | 43 |
| Copy Fee: | |
| Certificates | |
| Certificate of Status Fee: | |
| Personal Property Filings: | |
| Mail Processing Fee: | |
| Other: | |

TOTAL FEES: __603__

Credit Card _____ Check __✓__ Cash _____

_____ Documents __✓__ Checks

Approved By: __MW13__

Keyed By: _____

COMMENT(S):

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name
_____
_____

_____ Other Change(s)
_____
_____

Code __063__

Attention: Andrea Cohen

Mail: Name and Address

VENABLE LLP
ANDREA COHEN
SUITE 900
750 E PRATT ST
BALTIMORE MD 21202-3142

Stamp Work Order and Customer Number HERE

CUST ID:0002308700
WORK ORDER:0001751738
DATE:07-24-2009 12:18 PM
AMT. PAID:$603.00



# PENNYMAC MORTGAGE INVESTMENT TRUST

## ARTICLES OF AMENDMENT AND RESTATEMENT

FIRST:  PennyMac Mortgage Investment Trust, a Maryland real estate investment trust (the "Trust") formed under Title 8 of the Corporations and Associations Article of the Annotated Code of Maryland ("Title 8"), desires to amend and restate its Declaration of Trust as currently in effect and as hereinafter amended.

SECOND:  The following provisions are all the provisions of the Declaration of Trust currently in effect and as hereinafter amended:

## ARTICLE I

## FORMATION

The Trust is a real estate investment trust within the meaning of Title 8.  The Trust shall not be deemed to be a general partnership, limited partnership, joint venture, joint stock company or a corporation but nothing herein shall preclude the Trust from being treated for tax purposes as an association under the Internal Revenue Code of 1986, as amended (the "Code").

## ARTICLE II

## NAME

The name of the Trust is:

PennyMac Mortgage Investment Trust

Under circumstances in which the Board of Trustees of the Trust (the "Board of Trustees" or "Board") determines that the use of the name of the Trust is not practicable, the Trust may use any other designation or name for the Trust.

## ARTICLE III

## PURPOSES AND POWERS

Section 3.1     Purposes.  The purposes for which the Trust is formed are to engage in any businesses and activities that a trust formed under Title 8 may legally engage in,

including, without limitation or obligation, engaging in business as a real estate investment trust ("REIT") within the meaning of Section 856 of the Code.

Section 3.2    Powers.   The Trust shall have all of the powers granted to real estate investment trusts by Title 8 and all other powers set forth in the Declaration of Trust of the Trust, as it may be amended and supplemented and as in effect from time to time (the "Declaration of Trust") which are not inconsistent with law and are appropriate to promote and attain the purposes set forth in the Declaration of Trust.

## ARTICLE IV

## RESIDENT AGENT

The name and address of the resident agent of the Trust in the State of Maryland are The Corporation Trust Incorporated, 300 East Lombard Street, Baltimore, MD 21202.  The resident agent of the Trust is a Maryland corporation.  The Trust may have such offices or places of business within or outside the State of Maryland as the Board of Trustees may from time to time determine.

## ARTICLE V

## BOARD OF TRUSTEES

Section 5.1    Powers.    Subject to any express limitations contained in the Declaration of Trust or in the Bylaws, (a) the business and affairs of the Trust shall be managed under the direction of the Board of Trustees and (b) the Board shall have full, exclusive and absolute power, control and authority over any and all property of the Trust.  The Board may take any action as in its sole judgment and discretion is necessary or appropriate to conduct the business and affairs of the Trust.   The Declaration of Trust shall be construed with the presumption in favor of the grant of power and authority to the Board.  Any construction of the Declaration of Trust or determination made in good faith by the Board concerning its powers and authority hereunder shall be conclusive.  The enumeration and definition of particular powers of the Trustees included in the Declaration of Trust or in the Bylaws of the Trust, as amended from time to time (the "Bylaws"), shall in no way be limited or restricted by reference to or inference from the terms of this or any other provision of the Declaration of Trust or the Bylaws or construed or deemed by inference or otherwise in any manner to exclude or limit the powers conferred upon the Board or the Trustees under the general laws of the State of Maryland or any other applicable laws.

The Board, without any action by the shareholders of the Trust, shall have and may exercise, on behalf of the Trust, without limitation, the power to cause the Trust to terminate its status as a REIT under the Code; to determine that compliance with any restriction or limitation on ownership and transfers of shares of beneficial interest in the Trust set forth in Article VII of the Declaration of Trust is no longer required in order for the Trust to qualify as a REIT; to adopt, amend and repeal Bylaws; to elect officers in the manner prescribed in the Bylaws; to solicit proxies from holders of shares of beneficial interest in the Trust; and to do any other acts and deliver any other documents necessary or appropriate to the foregoing powers.

2

Section 5.2    Number and Classification.    The number of Trustees (hereinafter
the "Trustees") shall be two, which number may be increased or decreased pursuant to the
Bylaws of the Trust, but shall never be less than the minimum number required by Title 8, nor
more than 15.  Except as specified in the following paragraph, the Trustees shall be elected at
each annual meeting of shareholders in the manner provided in the Bylaws or, in order to fill any
vacancy on the Board of Trustees, in the manner provided in the Bylaws, to serve until the next
annual meeting of shareholders and until their successors are duly elected and qualify.

Beginning on the Initial Date (as hereinafter defined), the Trustees (other than any
Trustee elected solely by holders of one or more classes or series of Preferred Shares (as
hereinafter defined) entitled to elect such Trustee) shall be classified, with respect to the terms
for which they severally hold office, into three classes, one class to hold office initially for a term
expiring at the annual meeting of shareholders in 2010, another class to hold office initially for a
term expiring at the annual meeting of shareholders in 2011 and another class to hold office
initially for a term expiring at the annual meeting of shareholders in 2012, with the members of
each class to hold office until their successors are duly elected and qualify.  The Board of
Trustees shall designate by resolution, from among its members, Trustees to serve as Class I
Trustees, Class II Trustees, and Class III Trustees.  At each annual meeting of shareholders, the
successors to the class of Trustees whose term expires at such meeting shall be elected to hold
office for a term expiring at the annual meeting of shareholders held in the third year following
the year of their election and until their successors are duly elected and qualify.

The names of the Trustees who shall serve until their successors are duly elected
and qualify are:

David A. Spector

Stanford L. Kurland

The Board of Trustees may increase or decrease the number of Trustees in the
manner provided in the Bylaws.  Vacancies on the Board of Trustees, whether resulting from an
increase in the number of Trustees or otherwise, may be filled only by the Board of Trustees in
the manner provided in the Bylaws.  It shall not be necessary to list in the Declaration of Trust
the names and addresses of any Trustees hereinafter elected.

The Trust elects, at such time as it becomes eligible to make the election provided
for under Section 3-804(c) of the Maryland General Corporation Law that, except as may be
provided by the Board of Trustees in setting the terms of any class or series of Shares (as
hereinafter defined), any and all vacancies on the Board of Trustees may be filled only by the
affirmative vote of a majority of the remaining Trustees in office, even if the remaining Trustees
do not constitute a quorum, and any Trustee elected to fill a vacancy shall serve for the
remainder of the full term of the trusteeship in which such vacancy occurred.

Section 5.3    Resignation or Removal.    Any Trustee may resign by written
notice to the Board, effective upon execution and delivery to the Trust of such written notice or
upon any future date specified in the notice.  Subject to the rights of holders of one or more
classes or series of Preferred Shares to elect or remove one or more Trustees, a Trustee may be

3

removed at any time, but only for cause and then only by the affirmative vote of shareholders entitled to cast at least two-thirds of the votes entitled to be cast generally in the election of Trustees. For the purpose of this paragraph, "cause" shall mean, with respect to any particular trustee, conviction of a felony or a final judgment of a court of competent jurisdiction holding that such trustee caused demonstrable, material harm to the Trust through bad faith or active and deliberate dishonesty.

    Section 5.4 <u>Determinations by Board</u>. The determination as to any of the following matters, made in good faith by or pursuant to the direction of the Board of Trustees consistent with the Declaration of Trust, shall be final and conclusive and shall be binding upon the Trust and every holder of Shares: the amount of the net income of the Trust for any period and the amount of assets at any time legally available for the payment of dividends, redemption of Shares or the payment of other distributions on Shares; the amount of paid-in surplus, net assets, other surplus, annual or other cash flow, funds from operations, net profit, net assets in excess of capital, undivided profits or excess of profits over losses on sales of assets; the amount, purpose, time of creation, increase or decrease, alteration or cancellation of any reserves or charges and the propriety thereof (whether or not any obligation or liability for which such reserves or charges shall have been created shall have been paid or discharged); any interpretation of the terms, preferences, conversion or other rights, voting powers or rights, restrictions, limitations as to dividends or distributions, qualifications or terms or conditions of redemption of any class or series of Shares; the fair value, or any sale, bid or asked price to be applied in determining the fair value, of any asset owned or held by the Trust or of any Shares; the number of Shares of any class of the Trust; any matter relating to the acquisition, holding and disposition of any assets by the Trust; or any other matter relating to the business and affairs of the Trust or required or permitted by applicable law, the Declaration of Trust or Bylaws or otherwise to be determined by the Board of Trustees.

    Section 5.5 <u>REIT Qualification</u>. If the Trust elects to qualify for federal income tax treatment as a REIT, the Board of Trustees shall use its reasonable best efforts to take such actions as are necessary or appropriate to preserve the status of the Trust as a REIT; however, if the Board of Trustees determines that it is no longer in the best interests of the Trust to continue to be qualified as a REIT, the Board of Trustees may revoke or otherwise terminate the Trust's REIT election pursuant to Section 856(g) of the Code. The Board of Trustees also may determine that compliance with any restriction or limitation on share ownership and transfers set forth in Article VII is no longer required for REIT qualification.

    Section 5.6 <u>Advisor Agreements</u>. Subject to such approval of shareholders and other conditions, if any, as may be required by any applicable statute, rule or regulation, the Board of Trustees may authorize the execution and performance by the Trust of one or more agreements with any person, corporation, association, company, trust, limited liability company, partnership (limited or general) or other organization whereby, subject to the supervision and control of the Board of Trustees, any such other person, corporation, association, company, trust, limited liability company, partnership (limited or general) or other organization shall render or make available to the Trust managerial, investment, advisory and/or related services, office space and other services and facilities (including, if deemed advisable by the Board of Trustees, the management or supervision of the investments of the Trust) upon such terms and conditions as

4

may be provided in such agreement or agreements (including, if deemed fair and equitable by the Board of Trustees, the compensation payable thereunder by the Trust).

Section 5.7 <u>Tax on Disqualified Organizations</u>. To the extent that the Trust incurs any tax pursuant to Section 860E(e)(6) of the Code as the result of any "excess inclusion" income (within the meaning of Section 860E of the Code) of the Trust which is allocable to a shareholder that is a "disqualified organization" (as defined in Section 860E(e)(5) of the Code), the Board of Trustees may, in its sole discretion, cause the Trust to allocate such tax solely to the shares held by such disqualified organization in the manner described in Treasury Regulation Section 1.860E-2(b)(4) by reducing from one or more distributions paid to such shareholder the tax incurred by the Trust pursuant to Section 860E(e)(6) as a result of such shareholder's share ownership.

## ARTICLE VI

## SHARES OF BENEFICIAL INTEREST

Section 6.1 <u>Authorized Shares</u>. The beneficial interest of the Trust shall be divided into shares of beneficial interest (the "Shares"). The Trust has authority to issue 500,000,000 common shares of beneficial interest, $0.01 par value per share ("Common Shares"), and 100,000,000 preferred shares of beneficial interest, $0.01 par value per share ("Preferred Shares"). If shares of one class are classified or reclassified into shares of another class of shares pursuant to this Article VI, the number of authorized shares of the former class shall be automatically decreased and the number of shares of the latter class shall be automatically increased, in each case by the number of shares so classified or reclassified, so that the aggregate number of shares of beneficial interest of all classes that the Trust has authority to issue shall not be more than the total number of shares of beneficial interest set forth in the second sentence of this paragraph. The Board of Trustees, with the approval of a majority of the entire Board and without any action by the shareholders of the Trust, may amend the Declaration of Trust from time to time to increase or decrease the aggregate number of Shares or the number of Shares of any class or series that the Trust has authority to issue.

Section 6.2 <u>Common Shares</u>. Subject to the provisions of Article VII and except as may otherwise be specified in the terms of any class or series of Common Shares, each Common Share shall entitle the holder thereof to one vote on each matter upon which holders of Common Shares are entitled to vote. The Board of Trustees may reclassify any unissued Common Shares from time to time in one or more classes or series of Shares.

Section 6.3 <u>Preferred Shares</u>. The Board of Trustees may classify any unissued Preferred Shares and reclassify any previously classified but unissued Preferred Shares of any series from time to time, in one or more series of Shares.

Section 6.4 <u>Classified or Reclassified Shares</u>. Prior to issuance of classified or reclassified Shares of any class or series, the Board of Trustees by resolution shall (a) designate that class or series to distinguish it from all other classes and series of Shares; (b) specify the number of Shares to be included in the class or series; (c) set or change, subject to the provisions of Article VII and subject to the express terms of any class or series of Shares outstanding at the

time, the preferences, conversion or other rights, voting powers, restrictions, limitations as to dividends or other distributions, qualifications and terms and conditions of redemption for each class or series; and (d) cause the Trust to file articles supplementary with the State Department of Assessments and Taxation of Maryland (the "SDAT"). Any of the terms of any class or series of Shares set pursuant to clause (c) of this Section 6.4 may be made dependent upon facts ascertainable outside the Declaration of Trust (including the occurrence of any event, including a determination or action by the Trust or any other person or body or any other facts or events within the control of the Trust) and may vary among holders thereof, provided that the manner in which such facts or variations shall operate upon the terms of such class or series of Shares is clearly and expressly set forth in the articles supplementary filed with the SDAT.

Section 6.5    Authorization by Board of Share Issuance.  The Board of Trustees may authorize the issuance from time to time of Shares of any class or series, whether now or hereafter authorized, or securities or rights convertible into or exercisable for Shares of any class or series, whether now or hereafter authorized, for such consideration (whether in cash, property, past or future services, obligation for future payment or otherwise) as the Board of Trustees may deem advisable (or without consideration in the case of a Share split or Share dividend), subject to such restrictions or limitations, if any, as may be set forth in the Declaration of Trust or the Bylaws of the Trust.

Section 6.6    Dividends and Distributions.  The Board of Trustees may from time to time authorize and the Trust may declare to shareholders such dividends or distributions, in cash or other assets of the Trust or in securities of the Trust or from any other source as the Board of Trustees in its discretion shall determine.  The Board of Trustees shall endeavor to authorize and cause the Trust to declare and pay such dividends and distributions as shall be necessary for the Trust to qualify as a REIT under the Code; however, shareholders shall have no right to any dividend or distribution unless and until authorized by the Board of Trustees and declared by the Trust.  The exercise of the powers and rights of the Board of Trustees pursuant to this Section 6.6 shall be subject to the provisions of any class or series of Shares at the time outstanding.  Notwithstanding any other provision in the Declaration of Trust, no determination shall be made by the Board of Trustees nor shall any transaction be entered into by the Trust which would cause any Shares or other beneficial interest in the Trust not to constitute "transferable shares" or "transferable certificates of beneficial interest" under Section 856(a)(2) of the Code or which would cause any distribution to constitute a preferential dividend as described in Section 562(c) of the Code.

Section 6.7    General Nature of Shares.  All Shares shall be personal property entitling the shareholders only to those rights provided in the Declaration of Trust.  The shareholders shall have no interest in the property of the Trust and shall have no right to compel any partition, division, dividend or distribution of the Trust or of the property of the Trust.  The death of a shareholder shall not terminate the Trust.  The Trust is entitled to treat as shareholders only those persons in whose names Shares are registered as holders of Shares on the share ledger of the Trust.

Section 6.8    Fractional Shares.  The Trust may, without the consent or approval of any shareholder, issue fractional Shares, eliminate a fraction of a Share by rounding up or

down to a full Share, arrange for the disposition of a fraction of a Share by the person entitled to it, or pay cash for the fair value of a fraction of a Share.

Section 6.9 <u>Declaration and Bylaws</u>. The rights of all shareholders and the terms of all Shares are subject to the provisions of the Declaration of Trust and the Bylaws of the Trust.

Section 6.10 <u>Divisions and Combinations of Shares</u>. Subject to an express provision to the contrary in the terms of any class or series of beneficial interest hereafter authorized, the Board of Trustees shall have the power to divide or combine the outstanding shares of any class or series of beneficial interest, without a vote of shareholders, so long as the number of shares combined into one share in any such combination or series of combinations within any period of twelve months is not greater than ten.

## ARTICLE VII

## RESTRICTION ON TRANSFER AND OWNERSHIP OF SHARES

Section 7.1 <u>Definitions</u>. For the purpose of this Article VII, the following terms shall have the following meanings:

<u>Aggregate Share Ownership Limit</u>. The term "Aggregate Share Ownership Limit" shall mean not more than 9.8% by vote or value, whichever is more restrictive, of the aggregate of the outstanding Equity Shares.

<u>Beneficial Ownership</u>. The term "Beneficial Ownership" shall mean ownership of Equity Shares by a Person, whether the interest in Equity Shares is held directly or indirectly (including by a nominee), and shall include interests that would be treated as owned through the application of Section 544 of the Code, as modified by Section 856(h)(1)(B) of the Code. The terms "Beneficial Owner," "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.

<u>Business Day</u>. The term "Business Day" shall mean any day, other than a Saturday or Sunday, that is neither a legal holiday nor a day on which banking institutions in New York City are authorized or required by law, regulation or executive order to close.

<u>Charitable Beneficiary</u>. The term "Charitable Beneficiary" shall mean one or more beneficiaries of the Charitable Trust as determined pursuant to Section 7.3.6, provided that each such organization must be described in Section 501(c)(3) of the Code and contributions to each such organization must be eligible for deduction under each of Sections 170(b)(1)(A), 2055 and 2522 of the Code.

<u>Charitable Trust</u>. The term "Charitable Trust" shall mean any trust provided for in Section 7.3.1.

<u>Charitable Trustee</u>. The term "Charitable Trustee" shall mean the Person unaffiliated with the Trust and a Prohibited Owner that is appointed by the Trust to serve as trustee of the Charitable Trust.

NY1 6981277v.6

Common Share Ownership Limit. The term "Common Share Ownership Limit" shall mean not more than 9.8% by vote or value, whichever is more restrictive, of the aggregate outstanding Common Shares.

Constructive Ownership. The term "Constructive Ownership" shall mean ownership of Equity Shares by a Person, whether the interest in Equity Shares is held directly or indirectly (including by a nominee), and shall include interests that would be treated as owned through the application of Section 318(a) of the Code, as modified by Section 856(d)(5) of the Code. The terms "Constructive Owner," "Constructively Owns" and "Constructively Owned" shall have the correlative meanings.

Equity Shares. The term "Equity Shares" shall mean Shares of all classes or series, including, without limitation, Common Shares and Preferred Shares.

Excepted Holder. The term "Excepted Holder" shall mean a shareholder of the Trust for whom an Excepted Holder Limit is created by this Article VII or by the Board of Trustees pursuant to Section 7.2.7.

Excepted Holder Limit. The term "Excepted Holder Limit" shall mean, provided that the affected Excepted Holder agrees to comply with the requirements established by the Board of Trustees pursuant to Section 7.2.7 and subject to adjustment pursuant to Section 7.2.8, the percentage limit established by the Board of Trustees pursuant to Section 7.2.7.

Initial Date. The term "Initial Date" shall mean the date of the closing of the issuance of Common Shares pursuant to the registration statement on Form S-11 initially filed with the Securities and Exchange Commission on May 22, 2009.

Market Price. The term "Market Price" on any date shall mean, with respect to any class or series of outstanding Equity Shares, the Closing Price for such Equity Shares on such date. The "Closing Price" on any date shall mean the last sale price for such Equity Shares, regular way, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, for such Equity Shares, in either case as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the NYSE or, if such Equity Shares are not listed or admitted to trading on the NYSE, as reported on the principal consolidated transaction reporting system with respect to securities listed on the principal national securities exchange on which such Equity Shares are listed or admitted to trading or, if such Equity Shares are not listed or admitted to trading on any national securities exchange, the last quoted price, or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotation System or, if such system is no longer in use, the principal other automated quotation system that may then be in use or, if such Equity Shares are not quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in such Equity Shares selected by the Board of Trustees or, in the event that no trading price is available for such Equity Shares, the fair market value of Equity Shares, as determined in good faith by the Board of Trustees.

NYSE. The term "NYSE" shall mean the New York Stock Exchange, Inc.

8

Person.  The term "Person" shall mean an individual, corporation, partnership, estate, trust (including a trust qualified under Sections 401(a) or 501(c)(17) of the Code), a portion of a trust permanently set aside for or to be used exclusively for the purposes described in Section 642(c) of the Code, association, private foundation within the meaning of Section 509(a) of the Code, joint stock company, government, government subdivision, agency or instrumentality or other entity and also includes a group as that term is used for purposes of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, and a group to which an Excepted Holder Limit applies.

Prohibited Owner.  The term "Prohibited Owner" shall mean, with respect to any purported Transfer, any Person who, but for the provisions of Section 7.2.1(b), would Beneficially Own or Constructively Own Equity Shares in excess of the limitations set forth in Section 7.2.1(a), and if appropriate in the context, shall also mean any Person who would have been the record owner of Equity Shares that the Prohibited Owner would have so owned.

Restriction Termination Date.  The term "Restriction Termination Date" shall mean the first day after the Initial Date on which the Board of Trustees determines that it is no longer in the best interests of the Trust to attempt to, or continue to, qualify as a REIT or that compliance with the restrictions and limitations on Beneficial Ownership, Constructive Ownership and Transfers of Equity Shares set forth herein is no longer required in order for the Trust to qualify as a REIT.

SDAT.  The term "SDAT" shall mean the State Department of Assessments and Taxation of Maryland.

Transfer.  The term "Transfer" shall mean any issuance, sale, transfer, gift, assignment, devise or other disposition, as well as any other event that causes any Person to acquire Beneficial Ownership or Constructive Ownership, or any agreement to take any such actions or cause any such events, of Equity Shares or the right to vote or receive dividends on Equity Shares, including (a) the granting or exercise of any option (or any disposition of any option), pledge, security interest or similar right to acquire Equity Shares, (b) any disposition of any securities or rights convertible into or exchangeable for Equity Shares or any interest in Equity Shares or any exercise of any such conversion or exchange right and (c) Transfers of interests in other entities that result in changes in Beneficial Ownership or Constructive Ownership of Equity Shares; in each case, whether voluntary or involuntary, whether owned of record, Constructively Owned or Beneficially Owned and whether by operation of law or otherwise.  The terms "Transferring" and "Transferred" shall have the correlative meanings.

Section 7.2  Equity Shares.

Section 7.2.1  Ownership Limitations.  Except as otherwise provided in this Article VII, during the period commencing on the Initial Date and prior to the Restriction Termination Date:

(a)  Basic Restrictions.

(i)  (1) No Person, other than an Excepted Holder, shall Beneficially Own or Constructively Own Equity Shares in excess of the Aggregate Share

9

Ownership Limit, (2) no Person, other than an Excepted Holder, shall Beneficially Own or Constructively Own Common Shares in excess of the Common Share Ownership Limit and (3) no Excepted Holder shall Beneficially Own or Constructively Own Equity Shares in excess of the Excepted Holder Limit for such Excepted Holder.

(ii)     No Person shall Beneficially Own or Constructively Own Equity Shares to the extent that such Beneficial Ownership or Constructive Ownership of Equity Shares would result in the Trust being "closely held" within the meaning of Section 856(h) of the Code (without regard to whether the ownership interest is held during the last half of a taxable year), or otherwise failing to qualify as a REIT (including, but not limited to, Beneficial Ownership or Constructive Ownership that would result in the Trust owning (actually or Constructively) an interest in a tenant that is described in Section 856(d)(2)(B) of the Code if the income derived by the Trust from such tenant could cause the Trust to fail to satisfy any of the gross income requirements of Section 856(c) of the Code).

(iii)     Notwithstanding any other provisions contained herein, any Transfer of Equity Shares (whether or not such Transfer is the result of a transaction entered into through the facilities of the NYSE or any other national securities exchange or automated inter-dealer quotation system) that, if effective, would result in Equity Shares being Beneficially Owned by less than 100 Persons (determined under the principles of Section 856(a)(5) of the Code) on or after January 29, 2010 shall be void ab initio, and the intended transferee shall acquire no rights in such Equity Shares.

(b)     Transfer in Trust.  If any Transfer of Equity Shares (whether or not such Transfer is the result of a transaction entered into through the facilities of the NYSE or any other national securities exchange or automated inter-dealer quotation system) occurs which, if effective, would result in any Person Beneficially Owning or Constructively Owning Equity Shares in violation of Section 7.2.1(a)(i) or (ii),

(i)     then that number of Equity Shares the Beneficial Ownership or Constructive Ownership of which otherwise would cause such Person to violate Section 7.2.1(a)(i) or (ii) (rounded up to the nearest whole share) shall be regarded as having been transferred without further action by the Trust or any other party, to a Charitable Trust for the benefit of a Charitable Beneficiary, as described in Section 7.3, effective as of the close of business on the Business Day prior to the date of such Transfer, and such Person shall acquire no rights in such Equity Shares; or

(ii)     if the transfer to the Charitable Trust described in clause (i) of this sentence would not be effective for any reason to prevent the violation of Section 7.2.1(a)(i) or (ii), then the Transfer of that number of Equity Shares that otherwise would cause any Person to violate Section 7.2.1(a)(i) or (ii) shall be void ab initio, and the intended transferee shall acquire no rights in such Equity Shares.

Section 7.2.2   Remedies for Breach.  If the Board of Trustees or any duly authorized committee thereof shall at any time determine in good faith that a Transfer or other event has taken place that results in a violation of Section 7.2.1 or that a Person intends to acquire or has attempted to acquire Beneficial Ownership or Constructive Ownership of any

10

Equity Shares in violation of Section 7.2.1 (whether or not such violation is intended), the Board of Trustees or a committee thereof shall take such action as it deems advisable to refuse to give effect to or to prevent such Transfer or other event, including, without limitation, causing the Trust to redeem Equity Shares, refusing to give effect to such Transfer on the books of the Trust or instituting proceedings to enjoin such Transfer or other event; provided, however, that any Transfers or attempted Transfers or other events in violation of Section 7.2.1 shall be regarded as having been transferred to the Charitable Trust described above, and, where applicable, such Transfer (or other event) shall be void ab initio as provided above irrespective of any action (or non-action) by the Board of Trustees or a committee thereof.

        Section 7.2.3  <u>Notice of Restricted Transfer</u>.  Any Person who acquires or attempts or intends to acquire Beneficial Ownership or Constructive Ownership of Equity Shares that will or may violate Section 7.2.1(a), or any Person who would have owned Equity Shares that resulted in a transfer to the Charitable Trust pursuant to the provisions of Section 7.2.1(b), shall immediately give written notice to the Trust of such event or, in the case of such a proposed or attempted transaction, give at least 15 days prior written notice, and shall provide to the Trust such other information as the Trust may request in order to determine the effect, if any, of such Transfer on the Trust's status as a REIT.

        Section 7.2.4  <u>Owners Required To Provide Information</u>.  From the Initial Date and prior to the Restriction Termination Date:

        (a)  every owner of more than five percent (or such lower percentage as required by the Code or the Treasury Regulations promulgated thereunder) of the outstanding Equity Shares, within 30 days after the end of each taxable year, shall give written notice to the Trust stating the name and address of such owner, the number of Equity Shares of each class and/or series Beneficially Owned and a description of the manner in which such shares are held.  Each such owner shall provide to the Trust such additional information as the Trust may request in order to determine the effect, if any, of such Beneficial Ownership on the Trust's status as a REIT and to ensure compliance with Section 7.21(a).

        (b)  each Person who is a Beneficial Owner or Constructive Owner of Equity Shares and each Person (including the shareholder of record) who is holding Equity Shares for a Beneficial Owner or Constructive Owner shall provide to the Trust such information as the Trust may request, in good faith, in order to determine the Trust's status as a REIT and to comply with the requirements of any taxing authority or governmental authority or to determine such compliance.

        Section 7.2.5  <u>Remedies Not Limited</u>.   Subject to Section 5.1 of the Declaration of Trust, nothing contained in this Section 7.2 shall limit the authority of the Board of Trustees to take such other action as it deems necessary or advisable to protect the Trust and the interests of its shareholders in preserving the Trust's status as a REIT.

        Section 7.2.6  <u>Ambiguity</u>.  In the case of an ambiguity in the application of any of the provisions of this Section 7.2, Section 7.3 or any definition contained in Section 7.1, the Board of Trustees shall have the power to determine the application of the provisions of this Section 7.2 or Section 7.3 with respect to any situation based on the facts

11

known to it.  In the event Section 7.2 or 7.3 requires an action by the Board of Trustees and the
Declaration of Trust fails to provide specific guidance with respect to such action, the Board of
Trustees shall have the power to determine the action to be taken so long as such action is not
contrary to the provisions of Sections 7.1, 7.2 or 7.3.

Section 7.2.7    Exceptions.

(a)    Subject to Sections 7.2.1(a)(ii) and (iii), the Board of
Trustees, in its sole discretion, may exempt (prospectively or retroactively) a Person from the
Aggregate Share Ownership Limit and the Common Share Ownership Limit, as the case may be,
and may establish or increase an Excepted Holder Limit for such Person if:

(i)    the Board of Trustees obtains such representations
and undertakings from such Person as are reasonably necessary to ascertain that no individual's
Beneficial Ownership or Constructive Ownership of such Equity Shares will violate
Sections 7.2.1(a)(ii) or (iii);

(ii)    such Person does not and represents that it will not
own, actually or Constructively, an interest in a tenant of the Trust (or a tenant of any entity
owned or controlled by the Trust) that would cause the Trust to own, actually or Constructively,
more than a 9.9% interest (as set forth in Section 856(d)(2)(B) of the Code) in such tenant and
the Board of Trustees obtains such representations and undertakings from such Person as are
reasonably necessary to ascertain this fact (for this purpose, a tenant from whom the Trust (or an
entity owned or controlled by the Trust) derives (and is expected to continue to derive) a
sufficiently small amount of revenue such that, in the opinion of the Board of Trustees, rent from
such tenant would not adversely affect the Trust's ability to qualify as a REIT, shall not be
treated as a tenant of the Trust); and

(iii)    such Person agrees that any violation or attempted
violation of such representations or undertakings (or other action which is contrary to the
restrictions contained in Sections 7.2.1 through 7.2.6) will result in such Equity Shares being
regarded as having been transferred to a Charitable Trust in accordance with Sections 7.2.1(b)
and 7.3.

(b)    Prior    to    granting    any    exception    pursuant    to
Section 7.2.7(a), the Board of Trustees may require a ruling from the Internal Revenue Service, or
an opinion of counsel, in either case in form and substance satisfactory to the Board of
Trustees in its sole discretion, as it may deem necessary or advisable in order to determine or
ensure the Trust's status as a REIT. Notwithstanding the receipt of any ruling or opinion, the
Board of Trustees may impose such conditions or restrictions as it deems appropriate in
connection with granting such exception.

(c)    Subject to Sections 7.2.1(a)(ii) and (iii), an underwriter or
placement agent which participates in a public offering or a private placement of Equity Shares
(or securities convertible into or exchangeable for Equity Shares) may Beneficially Own or
Constructively Own Equity Shares (or securities convertible into or exchangeable for Equity
Shares) in excess of the Aggregate Share Ownership Limit, the Common Share Ownership Limit

12

or both such limits, but only to the extent necessary to facilitate such public offering or private placement.

(d)     The Board of Trustees may only reduce the Excepted Holder Limit for an Excepted Holder: (1) with the written consent of such Excepted Holder at any time, or (2) pursuant to the terms and conditions of the agreements and undertakings entered into with such Excepted Holder in connection with the establishment of the Excepted Holder Limit for that Excepted Holder. No Excepted Holder Limit shall be reduced to a percentage that is less than the then current Common Share Ownership Limit.

Section 7.2.8  <u>Increase or Decrease in Aggregate Share Ownership or Common Share Ownership Limits</u>.  The Board of Trustees may from time to time increase or decrease the Common Share Ownership Limit and/or the Aggregate Share Ownership Limit; provided, however, that:

(a)     any decreased Common Share Ownership Limit and/or Aggregate Share Ownership Limit will not be effective for any Person whose percentage ownership in Shares is in excess of such decreased Common Share Ownership Limit and/or Aggregate Share Ownership Limit until such time as such Person's percentage ownership of Shares equals or falls below the decreased Common Share Ownership Limit and/or Aggregate Share Ownership Limit (other than a decrease as a result of a retroactive change in existing law, in which case such decrease shall be effective immediately), but any further acquisition of Shares in excess of such percentage ownership of Shares will be in violation of the Common Share Ownership Limit and/or Aggregate Share Ownership Limit;

(b)     the Common Share Ownership Limit and/or Aggregate Share Ownership Limit may not be increased if, after giving effect to such increase, five or fewer Persons could Beneficially Own or Constructively Own, in the aggregate, more than 49.9% in value of the outstanding Shares; and

(c)     prior to any modification of the Common Share Ownership Limit and/or the Aggregate Share Ownership Limit pursuant to this Section 7.2.8, the Board of Trustees may require such opinions of counsel, affidavits, undertakings or agreements as it may deem necessary or advisable in order to determine and ensure the Trust's status as a REIT.

Section 7.2.9  <u>Legend</u>.    Any certificate for Equity Shares shall bear substantially the following legend:

The shares represented by this certificate are subject to restrictions on Beneficial Ownership and Constructive Ownership and Transfer for the purpose of the Trust's maintenance of its status as a Real Estate Investment Trust (a "REIT") under the Internal Revenue Code of 1986, as amended (the "Code").    Subject to certain further restrictions and except as expressly provided in the Trust's Declaration of Trust, (i) no Person may Beneficially Own or Constructively Own Common Shares of the Trust in excess of 9.8% by vote or value, whichever is more restrictive, of the

13

outstanding Common Shares of the Trust unless such Person is an
Excepted Holder (in which case the Excepted Holder Limit shall
be applicable); (ii) no Person may Beneficially Own or
Constructively Own Equity Shares of the Trust in excess of 9.8%
by vote or value, whichever is more restrictive, of the total
outstanding Equity Shares of the Trust, unless such Person is an
Excepted Holder (in which case the Excepted Holder Limit shall
be applicable); (iii) no Person may Beneficially Own or
Constructively Own Equity Shares that would result in the Trust
being "closely held" under Section 856(h) of the Code or otherwise
cause the Trust to fail to qualify as a REIT; and (iv) no Person may
Transfer Equity Shares if such Transfer would result in Equity
Shares of the Trust being Beneficially Owned by fewer than 100
Persons under Section 856(a)(5) of the Code on or after January
29, 2010.  If the restrictions on transfer or ownership described in
(i), (ii) or (iii) above are violated, the Equity Shares represented
hereby will be regarded as having been transferred to a Trustee of a
Charitable Trust for the benefit of one or more Charitable
Beneficiaries.  In addition, upon the occurrence of certain events
(including a transfer that would violate the restriction described in
(iv) above), attempted Transfers in violation of the restrictions
described above may be void ab initio.  All capitalized terms in
this legend have the meanings defined in the Trust's Declaration of
Trust, as the same may be amended from time to time, a copy of
which, including the restrictions on transfer and ownership, will be
furnished to each holder of Equity Shares of the Trust on request
and without charge.

Instead of the foregoing legend, the certificate may state that the Trust will furnish
a full statement about certain restrictions on transferability to a shareholder on request and
without charge.

Section 7.3    Transfer of Equity Shares in Trust.

Section 7.3.1    Ownership in Trust.  Upon any purported Transfer or other
event described in Section 7.2.1(b) that would result in a transfer of Equity Shares to a Charitable
Trust, such Equity Shares shall be deemed to have been transferred to the Charitable Trustee as
trustee of a Charitable Trust for the exclusive benefit of one or more Charitable Beneficiaries.
Such transfer to the Charitable Trustee shall be deemed to be effective as of the close of business
on the Business Day prior to the purported Transfer or other event that results in the transfer to
the Charitable Trust pursuant to Section 7.2.1(b).  The Charitable Trustee shall be appointed by
the Trust and shall be a Person unaffiliated with the Trust and any Prohibited Owner.  Each
Charitable Beneficiary shall be designated by the Trust as provided in Section 7.3.6.

Section 7.3.2    Status of Shares Held by the Charitable Trustee.  Equity
Shares held by the Charitable Trustee shall be issued and outstanding Equity Shares of the Trust.
The Prohibited Owner shall have no rights in the shares held by the Charitable Trustee.  The

14

Prohibited Owner shall not benefit economically from ownership of any shares held in trust by the Charitable Trustee, shall have no rights to dividends or other distributions and shall not possess any rights to vote or other rights attributable to the shares held in the Charitable Trust.

Section 7.3.3   Dividend and Voting Rights.  The Charitable Trustee shall have all voting rights and rights to dividends or other distributions with respect to Equity Shares held in the Charitable Trust, which rights shall be exercised for the exclusive benefit of the Charitable Beneficiary.  Any dividend or other distribution paid prior to the discovery by the Trust that Equity Shares have been transferred to the Charitable Trustee shall be paid with respect to such Equity Shares to the Charitable Trustee upon demand and any dividend or other distribution authorized but unpaid shall be paid when due to the Charitable Trustee.  Any dividends or distributions so paid over to the Charitable Trustee shall be held in trust for the Charitable Beneficiary.  The Prohibited Owner shall have no voting rights with respect to shares held in the Charitable Trust and, subject to Maryland law, effective as of the date that Equity Shares have been transferred to the Charitable Trust, the Charitable Trustee shall have the authority (at the Charitable Trustee's sole discretion) (i) to rescind as void any vote cast by a Prohibited Owner prior to the discovery by the Trust that Equity Shares have been transferred to the Charitable Trust and (ii) to recast such vote in accordance with the desires of the Charitable Trustee acting for the benefit of the Charitable Beneficiary; provided, however, that if the Trust has already taken irreversible trust action, then the Charitable Trustee shall not have the authority to rescind and recast such vote.  Notwithstanding the provisions of this Article VII, until the Trust has received notification that Equity Shares have been transferred into a Charitable Trust, the Trust shall be entitled to rely on its share transfer and other shareholder records for purposes of preparing lists of shareholders entitled to vote at meetings, determining the validity and authority of proxies and otherwise conducting votes of shareholders.

Section 7.3.4   Sale of Shares by Charitable Trustee.  Within 20 days of receiving notice from the Trust that Equity Shares have been transferred to the Charitable Trust, the Charitable Trustee of the Charitable Trust shall sell the shares held in the Charitable Trust to a Person, designated by the Charitable Trustee, whose ownership of the shares will not violate the ownership limitations set forth in Section 7.2.1(a).  Upon such sale, the interest of the Charitable Beneficiary in the shares sold shall terminate and the Charitable Trustee shall distribute the net proceeds of the sale to the Prohibited Owner and to the Charitable Beneficiary as provided in this Section 7.3.4.  The Prohibited Owner shall receive the lesser of (1) the price paid by the Prohibited Owner for the Shares in the transaction that resulted in such transfer to the Charitable Trust (or, if the event which resulted in the Transfer to the Charitable Trust did not involve a purchase of such Shares at Market Price, the Market Price of such Shares on the trading day immediately preceding the day of the event which resulted in the Transfer of such Shares to the Charitable Trust) and (2) the price per share received by the Charitable Trustee (net of any commissions and other expenses of sale) from the sale or other disposition of the shares held in the Charitable Trust.  The Charitable Trustee may reduce the amount payable to the Prohibited Owner by the amount of dividends and other distributions which have been paid to the Prohibited Owner and are owed by the Prohibited Owner to the Charitable Trustee pursuant to Section 7.3.3.  Any net sales proceeds in excess of the amount payable to the Prohibited Owner shall be immediately paid to the Charitable Beneficiary.  If, prior to the discovery by the Trust that Equity Shares have been transferred to the Charitable Trust, such shares are sold by a Prohibited Owner, then (i) such shares shall be deemed to have been sold on behalf of, or in

15

respect of, the Charitable Trust and (ii) to the extent that the Prohibited Owner received an amount for such shares that exceeds the amount that such Prohibited Owner was entitled to receive pursuant to this Section 7.3.4, such excess shall be paid to the Charitable Trustee upon demand.

Section 7.3.5  Purchase Right in Shares Transferred to the Charitable Trustee.  Equity Shares transferred to the Charitable Trust shall be deemed to have been offered for sale to the Trust, or its designee, at a price per share equal to the lesser of (i) the price per share in the transaction that resulted in such transfer to the Charitable Trust (or, if the event which resulted in the Transfer to the Charitable Trust did not involve a purchase of such Shares at Market Price, the Market Price of such Shares on the trading day immediately preceding the day of the event which resulted in the Transfer of such Shares to the Charitable Trust) and (ii) the Market Price on the date the Trust, or its designee, accepts such offer.  The Trust shall have the right to accept such offer until the Charitable Trustee has sold the shares held in the Charitable Trust pursuant to Section 7.3.4.  Upon such a sale to the Trust, the interest of the Charitable Beneficiary in the shares sold shall terminate and the Charitable Trustee shall distribute the net proceeds of the sale to the Prohibited Owner and to the Charitable Beneficiary in accordance with Section 7.3.4.

Section 7.3.6  Designation of Charitable Beneficiaries.  By written notice to the Charitable Trustee, the Trust shall designate one or more nonprofit organizations to be the Charitable Beneficiary of the interest in the Charitable Trust such that Equity Shares held in the Charitable Trust would not violate the restrictions set forth in Section 7.2.1(a) in the hands of such Charitable Beneficiary.

Section 7.4  NYSE Transactions.  Nothing in this Article VII shall preclude the settlement of any transaction entered into through the facilities of the NYSE or any other national securities exchange or automated inter-dealer quotation system.  The fact that the settlement of any transaction occurs shall not negate the effect of any other provision of this Article VII and any transferee in such a transaction shall be subject to all of the provisions and limitations set forth in this Article VII.

Section 7.5  Enforcement.  The Trust is authorized specifically to seek equitable relief, including injunctive relief, to enforce the provisions of this Article VII.

Section 7.6  Non-Waiver.  No delay or failure on the part of the Trust or the Board of Trustees in exercising any right hereunder shall operate as a waiver of any right of the Trust or the Board of Trustees, as the case may be, except to the extent specifically waived in writing.

## ARTICLE VIII

## SHAREHOLDERS

Section 8.1  Meetings.  There shall be an annual meeting of the shareholders, to be held on proper notice at such time (after the delivery of the annual report) and convenient location as shall be determined by or in the manner prescribed in the Bylaws, for the election of

the Trustees, if required, and for the transaction of any other business within the powers of the Trust. Except as otherwise provided in the Declaration of Trust, special meetings of shareholders may be called only in the manner provided in the Bylaws. If there are no Trustees, the officers of the Trust shall promptly call a special meeting of the shareholders entitled to vote for the election of successor Trustees. Any meeting may be adjourned and reconvened as the Trustees determine or as provided in the Bylaws.

Section 8.2    Voting Rights. Subject to the provisions of any class or series of Shares then outstanding, the shareholders shall be entitled to vote only on the following matters: (a) election of Trustees as provided in Section 5.2 and the removal of Trustees as provided in Section 5.3; (b) amendment of the Declaration of Trust as provided in Article X; (c) termination of the Trust as provided in Section 12.2; (d) merger or consolidation of the Trust, or the sale or disposition of substantially all of the Trust Property, as provided in Article XI; (e) such other matters with respect to which the Board of Trustees has adopted a resolution declaring that a proposed action is advisable and directing that the matter be submitted to the shareholders for approval or ratification; and (f) such other matters as may be properly brought before a meeting of shareholders pursuant to the Bylaws. Except with respect to the matters described in clauses (a) through (e) above, no action taken by the shareholders at any meeting shall in any way bind the Board of Trustees.

Section 8.3    Preemptive and Appraisal Rights. Except as may be provided by the Board of Trustees in setting the terms of classified or reclassified Shares pursuant to Section 6.4, or as may otherwise be provided by contract approved by the Board of Trustees, no holder of Shares shall, as such holder, have any preemptive right to purchase or subscribe for any additional Shares of the Trust or any other security of the Trust which it may issue or sell. Holders of shares of beneficial interest shall not be entitled to exercise any rights of an objecting shareholder provided for under Title 8 and Title 3, Subtitle 2 of the Maryland General Corporation Law or any successor statute unless the Board of Trustees, upon the affirmative vote of a majority of the Board of Trustees, shall determine that such rights apply, with respect to all or any classes or series of shares of beneficial interest, to one or more transactions occurring after the date of such determination in connection with which holders of such shares would otherwise be entitled to exercise such rights.

Section 8.4    Extraordinary Actions. Except as specifically provided in Section 5.3 (relating to removal of Trustees) and in Section 10.3 (relating to certain amendments to the Declaration of Trust), notwithstanding any provision of law permitting or requiring any action to be taken or authorized by the affirmative vote of the holders of a greater number of votes, any such action shall be effective and valid if advised by the Board of Trustees and taken or approved by the affirmative vote of holders of Shares entitled to cast a majority of all the votes entitled to be cast on the matter.

Section 8.5    Board Approval. The submission of any action of the Trust to the shareholders for their consideration shall first be approved by the Board of Trustees.

Section 8.6    Action By Shareholders without a Meeting. The Bylaws of the Trust may provide that any action required or permitted to be taken by the shareholders may be taken without a meeting by the consent, in writing or by electronic transmission, in any manner

17

permitted by the Bylaws of the shareholders entitled to cast a sufficient number of votes to approve the matter as required by statute, the Declaration of Trust or the Bylaws of the Trust, as the case may be.

## ARTICLE IX

## LIABILITY LIMITATION, INDEMNIFICATION

## AND TRANSACTIONS WITH THE TRUST

Section 9.1    Limitation of Shareholder Liability.  No shareholder shall be liable for any debt, claim, demand, judgment or obligation of any kind of, against or with respect to the Trust by reason of his or her being a shareholder, nor shall any shareholder be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the property or the affairs of the Trust by reason of his or her being a shareholder.

Section 9.2    Limitation of Trustee and Officer Liability.   To the maximum extent that Maryland law in effect from time to time permits limitation of the liability of trustees and officers of a real estate investment trust, no present or former Trustee or officer of the Trust shall be liable to the Trust or to any shareholder for money damages.  Neither the amendment nor repeal of this Section 9.2, nor the adoption or amendment of any other provision of the Declaration of Trust inconsistent with this Section 9.2, shall apply to or affect in any respect the applicability of the preceding sentence with respect to any act or failure to act which occurred prior to such amendment, repeal or adoption.

Section 9.3    Indemnification.  The Trust shall have the power, to the maximum extent permitted by Maryland law in effect from time to time, to obligate itself to indemnify, and to pay or reimburse reasonable expenses in advance of final disposition of a proceeding to, (a) any individual who is a present or former Trustee or officer of the Trust or (b) any individual who, while a Trustee or officer of the Trust and at the request of the Trust, serves or has served as a trustee, director, officer, partner, member, manager, employee or agent of another real estate investment trust, corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or any other enterprise from and against any claim or liability to which such person may become subject or which such person may incur by reason of his or her service in such capacity or capacities.  The Trust shall have the power, with the approval of its Board of Trustees, to provide such indemnification and advancement of expenses to a person who served a predecessor of the Trust in any of the capacities described in (a) or (b) above and to any employee or agent of the Trust or a predecessor of the Trust.

Section 9.4    Transactions Between the Trust and its Trustees, Officers, Employees and Agents.  Subject to any express restrictions in the Declaration of Trust or adopted by the Trustees in the Bylaws or by resolution, the Trust may enter into any contract or transaction of any kind with any person, including any Trustee, officer, employee or agent of the Trust or any person affiliated with a Trustee, officer, employee or agent of the Trust, whether or not any of them has a financial interest in such transaction.

18

# ARTICLE X

# AMENDMENTS

Section 10.1   <u>General</u>.  The Trust reserves the right from time to time to make any amendment to the Declaration of Trust, now or hereafter authorized by law, including any amendment altering the terms or contract rights, as expressly set forth in the Declaration of Trust, of any Shares.  All rights and powers conferred by the Declaration of Trust on shareholders, Trustees and officers are granted subject to this reservation.  An amendment to the Declaration of Trust shall be signed, acknowledged and filed as required by Maryland law.  All references to the Declaration of Trust shall include all amendments thereto.

Section 10.2   <u>By Trustees</u>.  The Trustees may amend the Declaration of Trust from time to time, in the manner provided by Title 8, without any action by the shareholders, (i) to qualify as a REIT under the Code or under Title 8, (ii) in any respect in which the charter of a corporation may be amended in accordance with Section 2-605 of the Corporations and Associations Article of the Annotated Code of Maryland and (iii) as otherwise provided in the Declaration of Trust.

Section 10.3   <u>By Shareholders</u>.  Except as otherwise provided in the Declaration of Trust, any amendment to the Declaration of Trust shall be valid only if advised by the Board of Trustees and approved by the affirmative vote of a majority of all the votes entitled to be cast on the matter.  Any amendment to Section 5.3 or to this sentence of the Declaration of Trust shall be valid only if advised by the Board of Trustees and approved by the affirmative vote of two-thirds of all the votes entitled to be cast on the matter.

# ARTICLE XI

# MERGER, CONSOLIDATION OR SALE OF TRUST PROPERTY

Subject to the provisions of any class or series of Shares at the time outstanding, the Trust may (a) merge the Trust into another entity, (b) consolidate the Trust with one or more other entities into a new entity or (c) sell, lease, exchange or otherwise transfer all or substantially all of the Trust Property. Any such action must be advised by the Board of Trustees and, after notice to all shareholders entitled to vote on the matter, by the affirmative vote of a majority of all the votes entitled to be cast on the matter.

# ARTICLE XII

# DURATION AND TERMINATION OF TRUST

Section 12.1   Duration.  The Trust shall continue perpetually unless terminated pursuant to Section 12.2 or pursuant to any applicable provision of Title 8.

Section 12.2   Termination.

(a)    Subject to the provisions of any class or series of Shares at the time outstanding, after approval by a majority of the entire Board of Trustees, the Trust may be terminated at any meeting of shareholders by the affirmative vote of a majority of all the votes entitled to be cast on the matter. Upon the termination of the Trust:

(i)    The Trust shall carry on no business except for the purpose of winding up its affairs.

(ii)    The Trustees shall proceed to wind up the affairs of the Trust and all of the powers of the Trustees under the Declaration of Trust shall continue, including the powers to fulfill or discharge the Trust's contracts, collect its assets, sell, convey, assign, exchange, transfer or otherwise dispose of all or any part of the remaining property of the Trust to one or more persons at public or private sale for consideration which may consist in whole or in part of cash, securities or other property of any kind, discharge or pay its liabilities and do all other acts appropriate to liquidate its business. The Trustees may appoint any officer of the Trust or any other person to supervise the winding up of the affairs of the Trust and delegate to such officer or such person any or all powers of the Trustees in this regard.

(iii)    After paying or adequately providing for the payment of all liabilities, and upon receipt of such releases, indemnities and agreements as they deem necessary for their protection, the Trust may distribute the remaining property of the Trust among the shareholders so that after payment in full or the setting apart for payment of such preferential amounts, if any, to which the holders of any Shares at the time outstanding shall be entitled, the remaining property of the Trust shall, subject to any participating or similar rights of Shares at the time outstanding, be distributed ratably among the holders of Common Shares at the time outstanding.

(b)    After termination of the Trust, the liquidation of its business and the distribution to the shareholders as herein provided, a majority of the Trustees shall execute and file with the Trust's records a document certifying that the Trust has been duly terminated, and the Trustees shall be discharged from all liabilities and duties hereunder, and the rights and interests of all shareholders shall cease.

## ARTICLE XIII

## MISCELLANEOUS

Section 13.1    <u>Governing Law</u>.    The Declaration of Trust is executed by the undersigned Trustees and delivered in the State of Maryland with reference to the laws thereof, and the rights of all parties and the validity, construction and effect of every provision hereof shall be subject to and construed according to the laws of the State of Maryland without regard to conflicts of laws provisions thereof.

Section 13.2    <u>Reliance by Third Parties</u>.    Any certificate shall be final and conclusive as to any person dealing with the Trust if executed by the Secretary or an Assistant Secretary of the Trust or a Trustee, and if certifying to: (a) the number or identity of Trustees, officers of the Trust or shareholders; (b) the due authorization of the execution of any document;

20

(c) the action or vote taken, and the existence of a quorum, at a meeting of the Board of Trustees or shareholders; (d) a copy of the Declaration of Trust or of the Bylaws as a true and complete copy as then in force; (e) an amendment to the Declaration of Trust; (f) the termination of the Trust; or (g) the existence of any fact relating to the affairs of the Trust. No purchaser, lender, transfer agent or other person shall be bound to make any inquiry concerning the validity of any transaction purporting to be made by the Trust on its behalf or by any officer, employee or agent of the Trust.

Section 13.3    Severability.

(a)    The provisions of the Declaration of Trust are severable, and if the Board of Trustees shall determine, with the advice of counsel, that any one or more of such provisions (the "Conflicting Provisions") are in conflict with the Code, Title 8 or other applicable federal or state laws, the Conflicting Provisions, to the extent of the conflict, shall be deemed never to have constituted a part of the Declaration of Trust, even without any amendment of the Declaration of Trust pursuant to Article X and without affecting or impairing any of the remaining provisions of the Declaration of Trust or rendering invalid or improper any action taken or omitted prior to such determination. No Trustee shall be liable for making or failing to make such a determination. In the event of any such determination by the Board of Trustees, the Board shall amend the Declaration of Trust in the manner provided in Section 10.2.

(b)    If any provision of the Declaration of Trust shall be held invalid or unenforceable in any jurisdiction, such holding shall apply only to the extent of any such invalidity or unenforceability and shall not in any manner affect, impair or render invalid or unenforceable such provision in any other jurisdiction or any other provision of the Declaration of Trust in any jurisdiction.

Section 13.4    Construction.    In the Declaration of Trust, unless the context otherwise requires, words used in the singular or in the plural include both the plural and singular and words denoting any gender include all genders. The title and headings of different parts are inserted for convenience and shall not affect the meaning, construction or effect of the Declaration of Trust. In defining or interpreting the powers and duties of the Trust and its Trustees and officers, reference shall be made, to the extent appropriate and not inconsistent with the Code or Title 8, to Titles 1 through 3 of the Corporations and Associations Article of the Annotated Code of Maryland. In furtherance and not in limitation of the foregoing, in accordance with the provisions of Title 3, Subtitles 6 and 7, of the Corporations and Associations Article of the Annotated Code of Maryland, the Trust shall be included within the definition of "corporation" for purposes of such provisions.

Section 13.5    Recordation.    The Declaration of Trust and any amendment hereto shall be filed for record with the SDAT and may also be filed or recorded in such other places as the Trustees deem appropriate, but failure to file for record the Declaration of Trust or any amendment hereto in any office other than in the State of Maryland shall not affect or impair the validity or effectiveness of the Declaration of Trust or any amendment hereto. A restated Declaration of Trust shall, upon filing, be conclusive evidence of all amendments contained therein and may thereafter be referred to in lieu of the original Declaration of Trust and the various amendments thereto.

21

THIRD:  The amendment to and restatement of the Declaration of Trust of the Trust as hereinabove set forth have been duly advised by the Board of Trustees and approved by the shareholders of the Trust as required by law.

FOURTH:  The total number of shares of beneficial interest which the Trust had authority to issue immediately prior to this amendment and restatement was 5,000,000, consisting of 5,000,000 Common Shares, $0.01 par value per share.  The aggregate par value of all shares of beneficial interest having par value was $50,000.

FIFTH:  The total number of shares of beneficial interest which the Trust has authority to issue pursuant to the foregoing amendment and restatement of the Declaration of Trust is 600,000,000 consisting of 500,000,000 Common Shares, $0.01 par value per share, and 100,000,000 Preferred Shares, $0.01 par value per share.  The aggregate par value of all authorized shares of beneficial interest having par value is $6,000,000.

The undersigned Chief Executive Officer acknowledges these Articles of Amendment and Restatement to be the trust act of the Trust and as to all matters or facts required to be verified under oath, the undersigned Chief Executive Officer acknowledges that to the best of his knowledge, information and belief, these matters and facts are true in all material respects and that this statement is made under the penalties for perjury.

NY1 6981277v.6

IN WITNESS WHEREOF, the Trust has caused these Articles of Amendment
and Restatement to be signed in its name and on its behalf by its Chief Executive Officer and
attested to by its Secretary on this 24th day of July, 2009.

ATTEST:

PENNYMAC MORTGAGE
INVESTMENT TRUST

Secretary

Chief Executive Officer

```
CUST ID:0002308700
WORK ORDER:0001751738
DATE:07-24-2009 12:18 PM
AMT. PAID:$603.00
```

23

NY1 6781277

## CERTIFICATE OF SERVICE

I, Jon E. Powell, certify that, on May 15, 2025, a copy of the attached Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b) was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's electronic filing system. I further certify that true copies of the foregoing document were served by email and by commercial carrier on opposing counsel as follows:

Catherine Pratsinakis
Mariah Heinzerling
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7013
Email: cpratsinakis@dilworthlaw.com
mheinzerling@dilworthlaw.com

Daniel Goldman
**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Email: dgoldman@bkllaw.com

Nicole Lavallee
Daniel Barenbaum
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com

I certify under penalty of perjury that the foregoing is true and correct.

MAY 15, 2025

_____
JON E. POWELL

26