**No. 25-3140**

# In the United States Court of Appeals for the Ninth Circuit

ROBERTO VERTHELYI
*on behalf of himself and all others similarly situated*

*Plaintiff-Respondent,*

*v.*

PENNYMAC MORTGAGE INVESTMENT TRUST;
PNMAC CAPITAL MANAGEMENT, LLC,

*Defendants-Petitioners.*

*On Petition for Permission to Appeal from the United States District Court for the Central District of California, No. 2:24-cv-05028-MWF-JC, Hon. Michael W. Fitzgerald*

**PLAINTIFF'S-RESPONDENT'S ANSWER IN OPPOSITION TO PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(B)**

NICOLE LAVALLEE (SBN 165755)
DANIEL E. BARENBAUM (SBN 209261)
BERMAN TABACCO
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com

CATHERINE PRATSINAKIS
DILWORTH PAXSON, LLP
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7000
*cpratsinakis@dilworthlaw.com*

*Counsel for Plaintiff-Respondent Roberto Verthelyi*

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. QUESTION PRESENTED ..... 5

III. STATEMENT OF THE CASE ..... 5

A. Factual Background ..... 5

B. Procedural Background ..... 8

IV. THE COURT SHOULD DENY PENNYMAC'S PETITION ..... 12

A. No "exceptional circumstances" justify interlocutory review. ..... 13

1. Key factual issues should be resolved before this Court decides the LIBOR Act issue. ..... 13

2. There is no confusion in the industry; PennyMac is an outlier. ..... 14

3. The Court would benefit from a complete fact record. ..... 15

B. Defendants have not met the requirements of Section 1292(b) with respect to the LIBOR Act issue. ..... 16

C. Defendants have not met the requirements of Section 1292(b) with respect to the choice of law issue. ..... 19

V. CONCLUSION ..... 22

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Super. Ct. of Orange Cty.*,
9 Cal. 5th 642 (2020) ........................................................................21

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978), *superseded by rule on other grounds as stated in Microsoft Corp. v. Baker*, 582 U.S. 23 (2017) ............................................ 12, 13

*Couch v. Telescope Inc.*,
611 F.3d 629 (9th Cir. 2010) ........................................................................18

*Galilea, LLC v. AGCS Marine Ins. Co*.,
879 F.3d 1052 (9th Cir. 2018) .................................................................. 19, 20

*ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*,
22 F.4th 1125 (9th Cir. 2022) ........................................................................12

*In re Cement Antitrust Litig*.,
673 F.2d 1020 (9th Cir. 1982) .................................................................. 12, 16

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig*.,
753 F. Supp. 3d 849 (N.D. Cal. 2024), *appeal dismissed sub nom. Fla. Off. of Att'y Gen. v. Meta Platforms, Inc*., No. 24-7019, 2024 WL 5443167 (9th Cir. Dec. 16, 2024), and *motion to certify appeal denied*, No. 4:22-MD-3047-YGR, 2025 WL 1182578 (N.D. Cal. Mar. 11, 2025) ................................18

*In re Tobacco II Cases*,
41 Cal. 4th 298 (2009) ........................................................................21

*Int'l Soc'y for Krishna Consciousness, Inc. v Air Canada*,
727 F.2d 253 (2d. Cir. 1984) ........................................................................16

*James v. Price Stern Sloan, Inc*.,
283 F.3d 1064 (9th Cir. 2002) ........................................................................12

*Phillips v. Amoco Trinidad Oil Co*.,
632 F.2d 82 (9th Cir. 1980) .................................................................. 19, 20

*Reese v. BP Expl. (Alaska) Inc*.,
643 F.3d 681 (9th Cir. 2011) ........................................................................16

*Republican Nat'l Comm. v. Google LLC*,
742 F. Supp. 3d 1099 (E.D. Cal. 2024) ....................................................21

*Rodriguez v. Sony Computer Entm't Am., LLC*,
801 F.3d 1045 (9th Cir. 2015) ...............................................................17

*Rubin v. Green*,
4 Cal. 4th 1187 (1993) ..........................................................................21

*S.B.L. v. Evans*,
80 F.3d 307 (8th Cir. 1996) ....................................................................15

*Starr Indem. & Liab. Co. v. Rolls-Royce Corp.*,
725 F. App'x 592 (9th Cir. 2018) ................................................... 19, 20

*Union Cty., Iowa v. Piper Jaffray & Co., Inc.*,
525 F.3d 643 (8th Cir. 2008) ..................................................................18

**Statutes**

12 U.S.C. § 5801 ........................................................................................2

12 U.S.C. § 5802 ........................................................................................7

12 U.S.C. § 5803 ........................................................................................2

12 U.S.C. § 5803(a) ....................................................................................7

28 U.S.C. § 1292(b) ............................................................................ passim

Cal. Bus. & Profs. Code § 17200 *et seq.* ....................................................4

**Regulations**

12 C.F.R. pt. 253 .........................................................................................2

12 C.F.R. § 253.4(b) ....................................................................................8

Regulations Implementing the Adjustable Interest Rate (LIBOR) Act,
88 Fed. Reg. 5204-01 (Jan. 26, 2023) (codified at 12 C.F.R. pt. 253)..................6

**Rules**

Fed. R. Civ. P. 12(b)(1) .......... 20

Fed. R. Civ. P. 12(b)(6) .......... 22

**Docketed**

*Starr Indem. & Liab. Co. v. Rolls-Royce Corp.*,
No. 16-80128 (9th Cir. Sept. 19, 2016) .......... 20

## I. INTRODUCTION

Plaintiff-Respondent Roberto Verthelyi ("Plaintiff"), on behalf of himself and similarly-situated investors, respectfully submits this opposition to Defendants-Petitioners PennyMac Mortgage Investment Trust ("PMIT") and PNMAC Capital Management, LLC's ("PMC") (collectively, "PennyMac" or "Defendants") petition to this Court pursuant to 28 U.S.C. § 1292(b) (or "Section 1292(b)") for permission to appeal the district court's decision denying Defendants' motions to dismiss. *See* Petition, Ex. A (Dkt. 52, the "Order").[1]

Plaintiff brought this class action on behalf of himself and other investors who own or owned shares ("Preferred Shareholders") of PennyMac's Fixed-to-Floating Rate Series A Preferred Shares and/or Series B Preferred Shares between August 25, 2023 through the conclusion of this action. Ex. 1 (Dkt. 1, Complaint) ¶ 1. The dividend rates paid on the Preferred Shares are set by the operative Articles Supplementary ("Articles"). Ex. 1, ¶ 3. Preferred Shareholders expected to receive a fixed dividend rate during the initial fixed rate term and then, upon the expiration of the initial fixed rate term in 2024, to receive a floating dividend rate ***plus a premium***. Ex. 1, ¶¶ 3, 32, 36. A floating dividend rate is an adjustable rate pegged to a benchmark that fluctuates over time. Ex. 1, ¶ 4 n.2. The Articles specified that

---

[1] Citations to "Dkt." refer to the district court's docket in *Verthelyi v. PennyMac Mortgage Investment Trust, et al.*, No. 24-cv-05028-MWF-JC (C.D. Cal.). Citations to "Ex. __" refer to documents attached hereto.

the benchmark was to be the London Inter-Bank Offered Rate ("LIBOR"), but LIBOR ceased publication on June 30, 2023. Ex. 1, ¶¶ 3, 7, 12, 32, 36.

Recognizing the need for a uniform, nationwide solution for replacing references to LIBOR in legacy contracts, in 2022—the year prior to LIBOR's cessation—Congress enacted the Adjustable Interest Rate (LIBOR) Act, 12 U.S.C. § 5801 *et seq.* (the "LIBOR Act"), and the Federal Reserve thereafter enacted the final rule implementing the LIBOR Act (the "LIBOR Rule") (*see* 12 C.F.R. pt. 253). Ex. 1, ¶ 47; Order at 2. Section 5803 of the LIBOR Act requires companies to replace LIBOR with the comparable Secured Overnight Financing Rate ("SOFR") benchmark in legacy contracts that contain no adequate fallback provision because they fail, in relevant part, to identify a "benchmark replacement." Order at 2-3.

After the LIBOR Act was enacted, numerous financial institutions adopted SOFR as required by the statute, including similarly situated competitors of Defendants. Ex. 1, ¶ 50. It was a near forgone conclusion that PennyMac would adopt SOFR because PennyMac's Articles do not identify a benchmark replacement for LIBOR in the event of its permanent cessation. *See* Ex. 1, ¶¶ 15-16, 51-54.

But on August 25, 2023, Defendants sent shockwaves through the market when they announced that, unlike other competitors, they were going to adopt the prior fixed rate in lieu of adopting SOFR, and dispense with both the promise of a floating rate and the promise of a substantial premium of 5.831% for Series A and

5.99% for Series B over that floating rate. For example, using SOFR, the Series A Preferred Shareholders would have received 11.18884% instead of the 8.125% that PennyMac announced, and Series B Preferred Shareholders would have received 11.34784% instead of 8.000%. Ex. 1, ¶ 18. By adopting the lower fixed rates in lieu of floating rates and dispensing with the promised premium over the rate, Defendants paid a significantly lower dividend payment, and they will continue to underpay in this high-interest-rate environment unless and until Defendants decide to redeem the Preferred Shares.

After Defendants announced that they were adopting a lower fixed rate as its replacement for LIBOR and the premium, the value of the Preferred Shares trading on the market dropped from the liquidation preference price of $25.00 per share, both series trading at steep discounts from the par value and liquidation preference—$22.77 and $20.11 for Series A and Series B, respectively—creating a loss of $40 million in market capitalization. Ex. 1, ¶¶ 17, 20, 58, 77. Given Defendants' large base of retail investors, one market professional described Defendants' behavior as "particularly nasty, even exploitative, to investors. … [¶] I don't think they would have had the sheer chutzpah to treat institutional investors that badly." Ex. 1, ¶ 20.

In denying Defendants' motions to dismiss, the district court held that the Complaint adequately alleged that PennyMac violated the LIBOR Act and California's Unfair Competition Law, Cal. Bus. & Profs. Code § 17200 *et seq.*

("UCL"), by misinterpreting the language, construction, and purpose of the LIBOR Act. The court held that "PennyMac's interpretation of its obligations under the Act would result in enforcement of the exact type of contract Congress sought to reform." Order at 16. The court further held that California law applied despite the existence of a Maryland choice of law provision in a corporate formation document entitled the Declaration of Trust.

Against this backdrop, Defendants seek an extraordinary remedy: immediate appellate intervention to override the district court's well-reasoned denial of their motions to dismiss based on their dissatisfaction with that district court's rejection of their interpretation of the LIBOR Act.

Defendants claim that an industry of financial institutions needs clarity on how to apply the LIBOR Act, but this argument falls short because (1) the outcome is about how the LIBOR Act applies to PennyMac's specific Articles; (2) Plaintiff has alleged that the industry largely adopted SOFR, including Defendants' competitors with similarly antiquated legacy contracts; and (3) the case would still proceed under the *unfairness* prong of the UCL even if Defendants prevail on an appeal here, which would touch on the *unlawful* prong only. Defendants are industry outliers. That a few other financial companies might hypothetically desire to similarly shortchange their investors through a misreading and misuse of the LIBOR Act is not an adequate basis for appellate review at the pleading stage. Because no

exceptional circumstance warrants deviation from the customary review of the record following judgment, the Court should deny Defendants' petition for permission to appeal under 28 U.S.C. § 1292(b).

## II. QUESTION PRESENTED

Whether the Court should deviate from its customary practice of avoiding review until final judgment and grant interlocutory review at the pleading stage under 28 U.S.C. § 1292(b), before a factual record has been developed, in order to resolve: (1) whether Defendants violated the LIBOR Act when they failed to adopt SOFR; and (2) whether California law applies to this action.

## III. STATEMENT OF THE CASE

### A. Factual Background

PennyMac is a real estate investment trust based in and operating out of Westlake Village, California. In 2017, PennyMac issues two series of preferred stocks: the Series A and Series B Fixed-to-Floating Preferred Shares ("Preferred Shares").

The dividend terms are set forth in Section 4(a)-(l) of the Articles, which reflect older legacy contracts—contracts that reference LIBOR for rate-setting and do not contemplate its permanent cessation. Section 4(a) of the Articles requires PennyMac to transition from an initial 84-month fixed-rate to floating-rate dividend pegged to LIBOR, a benchmark then widely used by investors around the globe to

calculate adjustable or floating interest rates, ***plus a substantial premium of 5.831%*** for Series A and 5.99% for Series B. Ex. 1, ¶¶ 31-32, 35-36.

On March 5, 2021, the U.K. Financial Conduct Authority announced that LIBOR would permanently cease publication on June 30, 2023. Ex. 1, ¶¶ 7, 46. Concerned about ensuing turmoil, Congress and the Federal Reserve sought to pass legislation to address the U.S. market's heavy reliance on the LIBOR benchmark. Ex. 1, ¶¶ 11, 47.

According to the Federal Reserve: "Of particular concern are so-called 'tough legacy contracts,' which are contracts that reference USD LIBOR and will not mature by June 30, 2023, but which lack ***adequate fallback provisions*** providing for a ***clearly defined or practicable replacement benchmark*** following the cessation of USD LIBOR." *See* LIBOR Rule (Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01, 5205 (Jan. 26, 2023) (codified at 12 C.F.R. pt. 253)). Congress, therefore, set out to address contracts (like the Articles here) that did not contemplate the permanent cessation of LIBOR. Ex. 2 (Dkt. 37, Pl.'s Opp. to Motion to Dismiss), at 1-2, 10-11 & n.13; *see generally* Ex.1, ¶¶ 16 n.6, 45.

According to the Federal Reserve, "many floating-rate notes and securitizations have problematic fallback language—generally, these contracts convert to fixed-rate instruments at the last published value of LIBOR." As Senator

Patrick Toomey stated during hearings, "any legislation that addresses tough legacy contracts must be narrowly tailored, not change the equities of these contracts…." Ex. 2 at 2.

To avoid chaos and litigation stemming from such concerns, Congress passed legislation that "establish[ed] a clear and uniform framework, on a nationwide basis, for replacing LIBOR in legacy contracts. . . [, which] should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks, ***or that effectively convert to fixed-rate instruments***." Ex. 2 at 3. By contrast, Congress did not seek to interfere with "legacy contracts with fallbacks to another ***floating rate***." *Id*. at 3. To this end, on March 15, 2022, Congress enacted the LIBOR Act, and on February 27, 2023, the Federal Reserve enacted the final rule implementing the LIBOR Act: the LIBOR Rule. *Id.*

The LIBOR Act mandates that "[o]n the LIBOR replacement date [June 30, 2023], the Board-selected benchmark replacement [Secured Overnight Financing Rate, or SOFR] ***shall be the benchmark replacement for any LIBOR contract*** that, after giving any effect to subsection (b)– (1) contains no fallback provisions; or (2) contains fallback provisions that identify neither– (A) a specific benchmark replacement; nor (B) a determining person." 12 U.S.C. §§ 5803(a) & 5802; Ex. 1, ¶ 13; Ex. 2 at 3. In December 2022, the Federal Reserve issued the LIBOR Rule,

adopting SOFR as the LIBOR benchmark replacement. 12 C.F.R. § 253.4(b); Ex. 1, ¶¶ 12, 47; Ex. 2 at 7.

Given that PennyMac's Articles contain no adequate fallback provision nor reference a benchmark to replace LIBOR, on August 25, 2023, PennyMac shocked investors and the market by announcing that it would rely on certain legacy language to pay a fixed rate in perpetuity instead of adopting SOFR. Ex. 1, ¶¶15, 53. PennyMac had misconstrued the LIBOR Act and its obligations under the Articles to the detriment of Preferred Shareholders. And the market reacted accordingly—and significantly—with both series of Preferred Shares trading at steep discounts—creating a loss of $40 million in market capitalization. Ex. 1, ¶¶ 17, 20.

### B. Procedural Background

On June 14, 2024, Plaintiff initiated this class action alleging that Defendants' adoption, in violation of the LIBOR Act, of a fixed dividend rate in perpetuity to replace its fixed-to-floating (with a premium) Series A and Series B Preferred Shares is both unlawful and unfair under the UCL's *unlawful* and *unfair* prongs. Ex. 1, ¶¶ 1-21. The *unlawful* prong component was based on PennyMac's alleged violations of the LIBOR Act, at issue in this petition. Ex. 1; *see, e.g.*, *id.* at ¶¶ 73-79. The *unfairness* prong component was based on the fact that PennyMac thwarted

the policy goals of the LIBOR Act and lessons from its legislative history, unfairly harming those investors. Ex. 1, ¶¶ 80-82; Ex. 2 at 15-17.[2]

The LIBOR Act requires that "tough legacy contracts" (LIBOR contracts that do not provide adequate fallback provisions that contain a clearly defined or practicable "replacement benchmark" following the cessation of LIBOR) shall use the Federal-Reserve-Board-selected LIBOR replacement benchmark, SOFR, as the benchmark replacement. Here, the Articles do not provide for permanent fixed-rate dividends, do not provide an adequate fallback provision for the permanent cessation of LIBOR, and do not provide a benchmark replacement, nor could a fixed rate be a benchmark or benchmark replacement. Nonetheless, PennyMac adopted a legacy fixed rate instead of SOFR (which would have resulted in significantly higher premium-based interest rate), in violation of the LIBOR Act.

On August 20, 2024, Defendants moved to dismiss the Complaint on multiple grounds, including for the grounds at issue in their current petition for permission to appeal. Ex. 3 (Dkt. 34, PMIT Motion to Dismiss).[3] First, Defendants argued that a Maryland choice-of-law provision governed the claims, thus prohibiting Plaintiff's

---

[2] Even if the Court were to grant Defendants' Petition and find that the conduct that Plaintiff alleged did not violate the LIBOR Act by failing to adopt SOFR, the litigation would nonetheless continue. Defendants could and should still be held liable under the *unfairness* prong of the UCL, which the "*Questions Presented*" in Defendants' Petition do not address.

[3] Defendant PMC does not seek certification of this Court's denial of its motion to dismiss. Petition, Ex. B (Dkt. 64), at 19-20.

claim under the UCL. *Id*. at 8-10. Second, Defendants argued that their use of a fixed rate, instead of the floating rate with added premium that they had promised, did not violate the LIBOR Act. *Id*. at 10-21. Thereafter, Plaintiff opposed the motions, and after the motions were fully briefed, the district court held a hearing.

Subsequently, on February 26, 2025, the district court issued an order denying Defendants' motions on both grounds. *See* Order. In a thorough, detailed opinion, the court conducted a conflict of laws analysis under California's choice-of-law rules to determine whether the Maryland choice-of-law provision was enforceable. Order at 10-13. The Court determined that California has a materially greater interest in protecting consumers through its statutory scheme, which permits injured consumers not only to bring class actions to recover their losses but also to seek a public injunction to deter and prevent future harm to other consumers located in the state, such that its law applies in this litigation. Order at 12-13. The court further concluded that California has a greater interest in offering protections to both in-state and out-of-state investors who both contract with California-based companies and expect such California companies to act in a manner consistent with Congressional policy goals. Order at 13.

After determining that California law applied, as part of considering the UCL arguments, the district court turned to the question of whether Defendants' conduct violated the LIBOR Act. Order at 14-17. The court first determined that the LIBOR

Act's definition of "benchmark replacement" was ambiguous. *Id*. at 15-16. After determining that the statutory language was ambiguous, the court determined that it appears that Defendants' proffered interpretation conflicted with the legislative purpose driving the LIBOR Act. *Id.* at 16.

The district court found that Plaintiff sufficiently alleged that the parties did not agree to a simple fixed-rate instrument and "allowing PennyMac to issue dividends according to its interpretation would not support the Act's apparent goal of leaving intact 'the contractual terms the parties had agreed to'" and that Plaintiff has sufficiently alleged that Defendants "violated the LIBOR Act when it issued dividends at a fixed rate." Order at 17. The court found that Plaintiff has sufficiently stated claims against Defendants under both the *unlawful* and *unfair* prongs of the UCL, the latter of which Defendants do not seek to appeal. *Id*. at 17, 19.

On March 25, 2025, Defendants filed a motion seeking to certify the district court's Order for interlocutory appeal. Ex. 4 (Dkt. 53, Defs.' Motion to Certify Order for Interlocutory Appeal). On May 5, 2025, after holding a hearing on April 28, 2025 (*see* Petition, Ex. C (4/28/2025 Hrg. Tr.)), the district court granted Defendants' motion for certification (Petition, Ex. B). Defendants petition this Court for permission to appeal at the pleading stage, continuing their effort to avoid discovery and prevent Plaintiffs from developing a complete record.

## IV. THE COURT SHOULD DENY PENNYMAC'S PETITION

Section 1292(b) provides "a departure from the normal rule that only final judgments are appealable," *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1067 n.6 (9th Cir. 2002), and so it is "to be used only in exceptional situations," *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982) (citations omitted). The party seeking permission to file an interlocutory appeal—here, Defendants—has the burden of persuading this Court that "exceptional circumstances" exist sufficient to "justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978) (citation omitted), *superseded by rule on other grounds as stated in Microsoft Corp. v. Baker*, 582 U.S. 23 (2017). Defendants have not met their burden.

Moreover, the party seeking interlocutory review also has the burden of demonstrating each of the legal requirements of Section 1292(b), being: "[1] a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

Finally, even where the moving party satisfies the requirements of Section 1292(b), this Court "enjoys broad discretion to refuse to accept it." *ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1131 (9th Cir. 2022); *see also* 28 U.S.C. § 1292(b).

### A. No "exceptional circumstances" justify interlocutory review.

Defendants have failed to meet their burden of demonstrating that "exceptional circumstances" exist sufficient to "justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Coopers & Lybrand*, 437 U.S. at 475 (citation omitted).

#### 1. Key factual issues should be resolved before this Court decides the LIBOR Act issue.

Defendants contend that the LIBOR Act is "appropriately teed up now" and discovery "will neither moot, nor shed new light on the issue." Petition at 9. On the contrary, the LIBOR Act does not operate in a vacuum but depends on document-specific language contained within PennyMac's Articles. The parties, currently in the pleading stage, have vastly different interpretations of Defendants' obligations under *their* Articles.

For example, there is a dispute over whether the Articles even provide for the ongoing payment of fixed rates beyond the initial fixed rate period. Plaintiff contends that Section 4(a) requires Defendants to commence paying a floating rate dividend upon the expiration of the fixed rate period. Ex. 2 at 7-9; *see generally*, Ex. 1, ¶¶ 50-57. Plaintiff further contends that the Articles contain no alternative benchmark replacement to LIBOR. Ex. 1, ¶ 14. Defendants, on the other hand, contend that they may ignore Section 4(a) of the Articles and adopt a fixed rate in perpetuity because contingencies within the definition of "Three-Month LIBOR"

permit them to do so. Ex. 1 ¶¶ 53-56. But Defendants' interpretation is fundamentally in dispute and should be resolved prior to this Court reaching a merits decision on the LIBOR Act issue. Plaintiff will demonstrate that the Articles are the precise type of "legacy contract" that Congress sought to remedy, and that the Articles fail to identify a non-LIBOR benchmark replacement in the event of LIBOR's permanent cessation.

If this appeal were to proceed now at the pleading stage, the Court would need to adopt PennyMac's disputed factual contention—that the Articles call for a permanent fixed rate once LIBOR ceases to exist—to even get to the merits of whether a fixed rate can be a "benchmark replacement" under the LIBOR Act. Defendants simply ignore the interplay between the language in the Articles themselves, the LIBOR Act, and the financial industry context in which these securities operate. The more prudent approach here is for the case to proceed in the district court so that the parties may complete the record.

#### 2. There is no confusion in the industry; PennyMac is an outlier.

PennyMac's proffer of another contested factual assertion—that "scores of commercial actors" need clarity on the LIBOR Act, Petition at 9—lacks evidentiary support and is contrary to the factual allegations in Plaintiff's Complaint, which sets forth in detail how PennyMac veered away from the industry consensus and became an industry outlier. Ex. 1, ¶¶ 50-57.

Plaintiff's allegations assert that the Articles were legacy contacts that never contemplated the permanent cessation of LIBOR, Ex. 1, ¶¶ 14, 45, and that the Board knew it was adopting a risky (wrong) interpretation of its obligations under the Articles and LIBOR Act when it adopted a fixed rate dividend. *See generally* Ex. 1, ¶¶ 15-20, 50-57. Plaintiff's Complaint further alleges that similarly situated competitors adopted SOFR, Ex. 1, ¶ 50, and that by their conduct Defendants upset the market for preferred securities. *See generally*, Ex. 1, ¶¶ 20, 58-60, 74-79. That other companies might hypothetically contemplate PennyMac's outlier position is no basis for early consideration.

**3. The Court would benefit from a complete fact record.**

Even if this case raised an all-important industry issue as Defendants claim (and it does not), then it is all the more important that it be considered after final judgment has issued, with the benefit of a fully developed record. There have been no findings of fact, nor a stipulation of facts, in this case. The Court, the parties, and the industry itself, therefore, would benefit from a fixed factual posture upon which to ground its opinion rather than being forced to rely on a party-driven hypotheticals and assertions lacking evidentiary support.

No exceptional circumstance warrants deviation from the norm where key factual issues exist. *See, e.g., S.B.L. v. Evans*, 80 F.3d 307, 311 (8th Cir. 1996) (citation omitted) (concluding that permission to appeal under Section 1292(b)

should not have been given where "there are a 'number of unresolved factual issues bearing on the framing and formulation of the legal questions … [,] to answer the legal questions presented would require an exposition sufficiently broad to cover the various factual ramifications that may occur'"); *Int'l Soc'y for Krishna Consciousness, Inc. v Air Canada*, 727 F.2d 253, 256 (2d. Cir. 1984) (citation omitted) (same).

A full record will ensure this Court avoids issuing an advisory opinion based on hypotheticals or factual premises that are simply wrong. And it should take the parties less than nine months to complete the record needed to advance this litigation to trial and final judgment. Instead of arguing about this premature appeal, the parties could have been midway through discovery by now.

### B. Defendants have not met the requirements of Section 1292(b) with respect to the LIBOR Act issue.

Defendants failed to meet their burden under Section 1292(b) because, even if this Court were to set aside the key factual disputes raised above, there is no "substantial ground" for a difference of opinion as to the LIBOR Act issue and this early appeal will not "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 687-88 (9th Cir. 2011); *In re Cement Antitrust Litig.*, 673 F.2d at 1026.

Upon considering the LIBOR Act's plain language and structure, well-established canons of statutory construction, and the legislative purpose, history and

context, there is no genuine uncertainty in the law or substantial ground for disagreement on whether an outdated fixed interest rate could be deemed a replacement to the LIBOR benchmark. A fixed rate is not (and can never be) a benchmark or benchmark replacement. Ex. 2 at 4-5, 11-14.

Defendants' interpretation of the LIBOR Act does not rest on its plain language; it rests on an opportunistic *misreading* of the plain language of the LIBOR Act (a/k/a, the *Adjustable Rate* Act) by inferring that a benchmark replacement could ever be a *fixed rate*. A self-serving outlier interpretation is not a substantial ground for the difference of opinion that Section 1292(b) requires. Because the Articles do not reference a benchmark other than LIBOR, PennyMac must adopt LIBOR's statutorily mandated substitute, SOFR.

The district court agreed with Plaintiff that Defendants' reading of the statute does "not comport with either the ***purpose or overall structure*** of the LIBOR Act" and instead "would result in enforcement of the exact type of conduct Congress sought to reform." Order at 16; *see Rodriguez v. Sony Computer Entm't Am., LLC*, 801 F.3d 1045, 1051 (9th Cir. 2015).

That this is the first and only litigation arising out of the LIBOR Act speaks to how much of an outlier PennyMac is in the industry, not the difficulty of the issue. PennyMac's competitors adopted SOFR as a matter of course as the statute requires. *See* Ex. 1, ¶ 50. Nor does a matter of first impression, by itself, establish

a substantial ground for a difference of opinion. *Couch v. Telescope Inc.*, 611 F.3d 629, 634 (9th Cir. 2010) (citations omitted) ("[T]he mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion."); *see also Union Cty., Iowa v. Piper Jaffray & Co., Inc.*, 525 F.3d 643, 647 (8th Cir. 2008) ("[A] dearth of cases does not constitute substantial ground for difference of opinion." (citation and internal quotation marks omitted)).

Moreover, this appeal would not resolve the litigation because, in addition to the *unlawful* claim arising out of the LIBOR Act, Plaintiff asserts an *unfairness* claim. Conduct may be deemed "unfair" even if it does not violate a specific law. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 901 (N.D. Cal. 2024) (finding UCL *unfairness* claim was sufficiently tethered to legislatively declared policy even if it did not constitute prohibited activity), *appeal dismissed sub nom. Fla. Off. of Att'y Gen. v. Meta Platforms, Inc.*, No. 24-7019, 2024 WL 5443167 (9th Cir. Dec. 16, 2024), and *motion to certify appeal denied*, No. 4:22-MD-3047-YGR, 2025 WL 1182578 (N.D. Cal. Mar. 11, 2025). Plaintiff adequately pled that Defendants acted unfairly when they harmed investors by converting their floating-rate securities into fixed-rate securities in contravention of the Articles and legislatively declared policy of the LIBOR Act. Ex. 1, ¶¶ 80-82; Ex. 2 at 15-17.

Finally, in seeking certification, Defendants asserted that the LIBOR issue will materially advance the ultimate termination of the litigation because if this Court affirms the district court's decision on the LIBOR issue (or otherwise rules in Plaintiff's favor), PennyMac will adopt SOFR, effectively ending the litigation. PennyMac's Petition to this Court, however, omits a similar concession. Petition, Ex. C, at 8:23-9:1, 9:12-18.

### C. Defendants have not met the requirements of Section 1292(b) with respect to the choice of law issue.

During the hearing on April 28, 2025, PennyMac asserted that the LIBOR Act issue would be "dispositive of the litigation *regardless of whether Maryland law or California law applied*," and that depending on how the LIBOR Act issue is decided, "PennyMac will provide dividends to its shareholders either pursuant to the fixed rate that it's currently providing or pursuant to SOFR." Petition, Ex. C, at 8:23-9:1, 9:12-18. Defendants implicitly acknowledge that there are alternative liability theories under Maryland law and that the district court could freely grant Plaintiff the opportunity to amend his Complaint. Thus, Defendants expressly concede that an early determination of the choice-of-law issue will not materially advance the termination of the litigation. Citing to *Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052, 1056 (9th Cir. 2018), *Phillips v. Amoco Trinidad Oil Co.*, 632 F.2d 82, 83 (9th Cir. 1980), and *Starr Indemnity & Liability Co. v. Rolls-Royce Corp.*, 725 F. App'x 592, 593 (9th Cir. 2018), the district court noted that this Court has

previously accepted similar issues on interlocutory appeal. Petition, Ex. B, at 4-5. But *Galilea* involved a jurisdictional question related to arbitration, 879 F.3d at 1056, and *Phillips* involved the right of a foreign national to seek the benefits of American law for an offshore incident at sea, 632 F.2d at 89. The issues in both *Galilea* and *Phillips terminated* the litigations in *any* federal court, which is not the case here. Meanwhile, *Starr Indemnity* involved an *unopposed* petition that addressed the question of whether the district court applied the *correct legal test*. *See Starr Indem.,* 725 F. App'x at 593; *Starr Indem. & Liab. Co. v. Rolls-Royce Corp.*, No. 16-80128 (9th Cir. Sept. 19, 2016) (no response to petition filed). Here, Defendants do not dispute that the district court applied the correct legal test; they only dispute the bases upon which they lost.

Here, the district court noted that an early determination of choice of law may inform venue. But that an early appeal may assist in some potential future venue motion is not a sufficient basis for interlocutory relief under Section 1292(b). Nor would any attempt to transfer venue succeed because (a) Plaintiff filed in *both Defendants' backyard* where nearly all discovery and witnesses are located; (b) Defendants have conceded that venue is proper as they did not make a Rule 12(b)(1) motion under the Federal Rules of Civil Procedure; (c) federal courts sitting in diversity jurisdiction regularly decide claims arising out of other state's laws; (d) this case is about the violation of federal law by two California-based

companies; and (e) the misconduct took place in California. No state has a stronger interest than California in ensuring that entities within California's borders comply with the law. Plaintiff does not reside in Maryland; that one of the two Defendants is registered under Maryland law does necessitate that venue be in Maryland federal court.

Finally, Defendants' choice of law arguments lack merit for serval reasons. First, the Articles *do not* contain a Maryland choice-of-law provision. Second, Defendants borrow a narrow choice-of-law clause from the Declaration of Trust, which bears no relevance to this case. Third, even if the Declaration of Trust's clause applied to this case, the district court correctly held that Maryland law conflicts with California's strong public policy in favor of private citizens having the right to seek public injunctions. "The purpose of the UCL is to prevent unfair competitive conduct which harms both business competitors and the public." *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099, 1112 (E.D. Cal. 2024) (citing *Rubin v. Green*, 4 Cal. 4th 1187, 1200 (1993)). "The purpose of [injunctive] relief, in the context of a UCL action, is to protect California's consumers against unfair business practices by stopping such practices in their tracks." *Abbott Labs. v. Super. Ct. of Orange Cty.*, 9 Cal. 5th 642, 655 (2020) (quoting *In re Tobacco II Cases*, 41 Cal. 4th 298, 320 (2009)). Maryland law strictly reserves public injunctions for its State Attorney General. Order at 11-12. As such, Maryland law conflicts with a

fundamental California policy, rendering the choice of law clause unenforceable. *Id.* at 11-13.

## V. **CONCLUSION**

Interlocutory appeals are the narrow exception to the rule favoring the resolution of all issues in a single post-judgment appeal. Defendants fail to justify deviating from that principle because the circumstances here are far from exceptional. Allowing the case to proceed to discovery, like the vast majority of complex class action cases that survive motions to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, will not threaten the industry but rather preserve its integrity because resolution of these issues would be based on a complete record. Following the normal rule that only final judgments are appealable will simply ensure that the parties develop a complete record, and that any future appellate review proceeds on firm factual and legal footing. Plaintiff respectfully requests denial of the petition for permission to appeal.

Dated: May 27, 2025

Respectfully submitted,

**BERMAN TABACCO**

By: *_/s/ Daniel E. Barenbaum_*
Daniel E. Barenbaum (SBN 209261)

Nicole Lavallee (SBN 165755)
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com

Catherine Pratsinakis
**DILWORTH PAXSON, LLP**
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Telephone: (215) 575-7000
*cpratsinakis@dilworthlaw.com*

*Counsel for Plaintiff-Respondent Roberto Verthelyi*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(f) and Circuit Rules 5-2(b) and 32-3(2), I certify under penalty of perjury that the forgoing **Plaintiff's-Respondent's Answer in Opposition to Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b)** complies with the page/word count limitation of Circuit Rules 5-2(b) and 32-3(2) because this document is proportionately spaced, has a typeface of 14 points, and contains 5,197 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

I further certify that the forgoing opposition complies with typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point size Times New Roman font.

Dated: May 27, 2025 By: */s/ Daniel E. Barenbaum*
Daniel E. Barenbaum

# Exhibit 1

Nicole Lavallee (SBN 165755)
Email: nlavallee@bermantabacco.com
Daniel E. Barenbaum (SBN 209261)
Email: dbarenbaum@bermantabacco.com
Jeffrey Rocha (SBN 304852)
Email: jrocha@bermantabacco.com
Pierce Stanley (SBN 352152)
Email: pstanley@bermantabacco.com
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

Catherine Pratsinakis (*pro hac vice forthcoming*)
Email: cpratsinakis@dilworthlaw.com
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7013

*Attorneys for Plaintiff Roberto Verthelyi and the Putative Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERTO VERTHELYI, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC,<br><br>Defendants. | No.<br><br><u>CLASS ACTION</u><br><br>**CLASS ACTION COMPLAINT FOR RESTITUTION AND INJUNCTIVE RELIEF FOR VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Roberto Verthelyi ("Plaintiff"), by and through his undersigned attorneys, brings this class action on behalf of himself individually and all others similarly situated, against Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC (together, "PennyMac," the "Company," or "Defendants").

Plaintiff brings claims for violations of California's Unfair Competition Law, California Business and Professions Code § 17200 *et seq.* ("UCL"). The allegations below are based upon personal knowledge as to Plaintiff and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included, among other things, (i) a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by PennyMac, (ii) a review and analysis of press releases and other public statements, and (iii) a review and analysis of reports, including media reports, about the Company.

## I. SUMMARY OF THE ACTION

1. This is a class action for restitution and injunctive relief brought against PennyMac on behalf of a class consisting of all persons and entities who own or owned shares of PennyMac's fixed-to-floating rate Series A Preferred Shares (NYSE: PMT-PA) and/or Series B (NYSE: PMT-PB) Preferred Shares (together, "Preferred Shares" or "Series A and B," respectively) at any time between August 25, 2023 and the conclusion of this action (the "Class").

2. Defendant PennyMac Mortgage Investment Trust is a mortgage real estate investment trust ("REIT") that invests primarily in residential mortgage loans and mortgage-related assets. It is externally managed by PNMAC Capital Management, LLC, a wholly-owned subsidiary of PennyMac Financial Services, Inc. (NYSE: PFSI).

3. As offered in 2017, PennyMac's Series A and B Articles Supplementary called for these instruments to transition in 2024 from a fixed-rate

to floating-rate dividend pegged to the three-month London Interbank Offered Rate ("LIBOR").

4. LIBOR was a key benchmark interest rate between major global banks, published daily by the Intercontinental Exchange.[1] For decades, LIBOR was used as a benchmark[2] for setting interest rates on debt instruments such as mortgages, corporate loans, and credit cards, as well as for financial products such as derivatives and preferred stock. As of the end of 2020, the value of financial products referencing USD LIBOR was $223 ***trillion***.[3]

5. It was standard industry practice to peg interest rates on loans sold in the United States to LIBOR denominated in U.S. Dollars ("USD"). However, by 2012, banks were accused by various regulatory agencies of manipulating LIBOR rates.

6. In 2014, as a response to concerns about the reliability and robustness of LIBOR and other term wholesale unsecured bank borrowing rates, the United

---

[1] *See* Julia Kagan, *LIBOR: What was the London Interbank Offered Rate, and How Was it Used*, Investopedia (June 10, 2024), https://www.investopedia.com/terms/l/libor.asp.

[2] "Benchmark" rates set global interest levels for various transactions and have traditionally been used in finance to calculate floating interest rates for numerous financial instruments worldwide and are typically "calculated by an independent body, most often to reflect the cost of borrowing money in different markets." *See* Bloomberg, *Finance, Overview – Benchmark Rates*, *https://www.bloomberglaw.com/external/document/X2M5PMDO000000/finance-overview-benchmark-rates* (last visited June 12, 2024); European Central Bank, *What are benchmark rates, why are they important and why are they being reformed?* (July 11, 2019), https://www.ecb.europa.eu/ecb-and-you/explainers/tell-me-more/html/benchmark_rates_qa.en.html#:~:text=Interest%20rate%20benchmarks%20%E2%80%93%20also%20known,other%20more%20complex%20financial%20transactions.

[3] Board of Governors of the Federal Reserve System, *Final Regulation Implementing the Adjustable Interest Rate (LIBOR) Act*, at 2 n.3 (Dec. 2, 2022), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20221216a2.pdf.

States Department of the Treasury Financial Stability Oversight Council called for the development of alternative interest rate benchmarks. Later that year, the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York created the *Alternative Reference Rates Committee* ("ARRC") to help ensure a successful transition from USD LIBOR to a more robust reference rate—its recommended alternative, the Secured Overnight Financing Rate ("SOFR").

7. By late 2017, as a result of price manipulation, the LIBOR panel banks announced that they would stop publishing LIBOR at the end of 2021 (later extended to June 2023 for USD LIBOR only) to enable time for the market to move away from LIBOR.

8. In 2018, the ARRC was reconstituted with expanded membership to, among other things, coordinate with the cash and derivatives markets on the risk that LIBOR might not exist beyond 2021. Additionally, it aimed to develop guiding principles for transitioning various financial products, including floating rate products, from LIBOR to SOFR.

9. By 2019, the ARRC published guidance on suggested fallback provisions to reduce market disruption in the event of LIBOR's cessation. This included recommendations for fallback provisions on floating rate notes, bilateral business loans, syndicated loans, securitizations, and residential adjustable-rate mortgages. The ARRC considered international standards from the International Swaps and Derivatives Association ("ISDA").

10. Among the aims of the ARRC's published guiding principles were to encourage robust fallback provisions to replace LIBOR with SOFR or a SOFR-like equivalent, minimize ambiguity, and reduce litigation and regulatory risk. The ARRC sought to ensure that LIBOR fallback language resembled language used in other classes and liabilities where feasible; to ensure that LIBOR fallback language was feasible, practicable, and fair; and to encourage the use of fallback

provisions that did not advantage any market participant to the disadvantage of another. Since their release, the ARRC's fallback language recommendations have been subject to numerous public consultations and have received widespread adoption by a multitude of market participants.

11. In 2022, because a significant number of financial contracts in the United States referenced LIBOR and contained no procedure for replacing LIBOR in the event of its cessation, Congress adopted the Adjustable Interest Rate (LIBOR) Act (the "LIBOR Act"), 12 U.S.C. § 5801 *et seq*.

12. The LIBOR Act mandates that for certain securities contracts that reference or use a LIBOR-based rate after June 30, 2023, including those governing the Preferred Shares at issue here, financial institutions must replace LIBOR with the Federal Reserve Bank's benchmark created in 2017 as an alternative to LIBOR: SOFR. In December 2022, pursuant to authority granted to it under the LIBOR Act, the Board of Governors of the Federal Reserve System issued a final rule (the "LIBOR Rule") adopting SOFR as a replacement for LIBOR. *See* Regulations Implementing the Adjustable Interest Rate (LIBOR) Act (Regulation ZZ), 12 C.F.R. § 253.4(b) (2023).

13. Section 5803 of the LIBOR Act states that once LIBOR ceases to exist on June 30, 2023, the "Board-selected benchmark replacement *shall* be the benchmark replacement for any LIBOR contract that . . . contains no fallback provisions; or contains fallback provisions that identify neither—(A) a specific benchmark replacement; nor (B) a determining person" (emphasis added). *See* 12 C.F.R. § 253.3(a).

14. The Articles Supplementary for PennyMac's Series A and B Preferred Shares contains no fallback provisions accounting for the permanent cessation of LIBOR. There is no specific benchmark replacement, nor a designated "determining person." As such, the LIBOR Act and LIBOR Rule

***required*** and require PennyMac to use SOFR to calculate the floating rates for the Preferred Shares.

15. On August 25, 2023, instead of complying with the law and adopting a floating rate pegged to the three-month SOFR (LIBOR's replacement), PennyMac shocked investors by announcing that it would continue paying the lower ***existing fixed rate*** in perpetuity on each of the Preferred Shares.[4] PennyMac claimed that it was contractually allowed to convert this floating rate instrument into a lower yielding fixed rate instrument by adopting in perpetuity the "dividend rate[s] in effect for the immediately preceding dividend period[s]."[5]

16. PennyMac's interpretation has no legal basis and contorts the most basic underlying nature of this security—that its variable rate be pegged to a "clearly defined" and "practicable" market rate.[6]

17. The market agreed. Upon PennyMac making its announcement, the value of the Preferred Shares trading on the market dropped from the liquidation preference price of $25.00 per share, both trading at steep discounts from the par value and liquidation preference. At close on August 28, 2023, the Series A Preferred Shares had dropped to $22.77 and have since plunged as low as $20.11.

---

[4] *See* Matt Levine, *Some Floating Rates Won't Float*, Bloomberg (Sept. 11, 2023), https://www.bloomberg.com/opinion/articles/2023-09-11/some-floating-rates-won-t-float; PennyMac, *PennyMac Mortgage Investment Trust Announces LIBOR Replacement Rate for its Series A and Series B Preferred Shares* (Aug. 25, 2023), https://pmt.pennymac.com/news-events/press-releases/news-details/2023/PennyMac-Mortgage-Investment-Trust-Announces-LIBOR-Replacement-Rate-for-its-Series-A-and-Series-B-Preferred-Shares/default.aspx.

[5] PennyMac, *PennyMac Mortgage Investment Trust Announces LIBOR Replacement Rate for its Series A and Series B Preferred Shares*, *supra* note 4.

[6] *See* 12 U.S.C. § 5801(b)(1); 12 C.F.R. § 253.1(c); *see also* ARRC, *Second Report—The Alternative Reference Rate Committee*, at 25, 27 (Mar. 2018), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2018/ARRC-Second-report (also noting that most contracts referencing LIBOR do not appear to have envisioned a permanent or indefinite cessation of LIBOR and have fallbacks that would not be economically appropriate if this event occurred).

At close on August 28, 2023, the Series B Preferred Shares had dropped to $22.40 and have since plunged as low as $19.80.

18. Had PennyMac complied with the LIBOR Act and LIBOR Rule and adopted the three-month SOFR, as many of its competitors had done, the Series A and B Preferred Shareholders would be paid a floating rate appreciably higher than the illegally, improperly, and unfairly adopted fixed rates.

19. For example, the Series A Preferred Shareholders would have received 11.18884% on March 15, 2024—not the 8.125% fixed rate that PennyMac announced. And the Series B Preferred Shareholders would be receiving 11.34784% as of June 15, 2024—not the 8.000% that PennyMac announced.

20. PennyMac's Preferred Shares are, on information and belief, held in significant part by retail investors who have and will continue to suffer losses in amounts that will be proven at trial. Further, the substantial drop in the market price of the Preferred Shares following the August 25, 2023 PennyMac announcement created a loss of $40 million in market capitalization. Given that retail investors have significant exposure to the Preferred Shares, at least one market professional is reported to have described PennyMac's behavior as "particularly nasty, even exploitative, to investors. … [¶] I don't think they would have had the sheer *chutzpah* to treat institutional investors that badly."[7]

21. As a California-based entity, PennyMac is subject to California's UCL, Business and Professions Code Section 17200 *et seq.* The UCL prohibits unlawful, unfair, or fraudulent business acts or practices. Thus, when PennyMac explicitly violated the LIBOR Act and LIBOR Rule, it engaged in an unlawful

---

[7] Randall W. Forsyth, *Investors in This REIT Got a 'Nasty' Surprise. Why It Pays to Read the Fine Print*, BARRON'S (Sept. 8, 2023), https://www.barrons.com/articles/reit-preferred-share-investors-nasty-surprise-2bd5153b (emphasis added).

(and unfair) business practice under California law, giving rise to the present action.

22. As alleged herein, Plaintiff seeks to enjoin and seek restitution in relation to PennyMac's conduct under California's UCL, which embodies California's fundamental policy of providing private parties with injunctive relief and restitution as forms of redress from unlawful and/or unfair business practices committed within the State of California. As further provided under the UCL, Plaintiff seeks payment of restitution of all amounts which PennyMac was obligated to provide to Plaintiff and which, through the unfair and unlawful practices alleged herein, PennyMac did not pay to Plaintiff.

23. The State of California has a material interest in applying its consumer protection laws to enjoin PennyMac's conduct, require it to pay restitution, and deter and prevent continuing and future harm to Plaintiff and those similarly situated.[8]

## II. <u>JURISDICTION AND VENUE</u>

24. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) of the Class Action Fairness Act ("CAFA") because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the proposed Class includes more than one hundred (100) Class members, with at least one member of the proposed Class being a citizen of a different state than at least one Defendant.

25. This Court has personal jurisdiction over Defendants because each Defendant has sufficient minimum contacts with this district, particularly because

---

[8] In an effort to resolve this matter and seek redress, on May 10, 2024, a notice and demand letter was sent on behalf of Plaintiff to PennyMac outlining the injuries and claims alleged herein and requesting corrective measures to resolve the dispute. In response, PennyMac stated bases for its erroneous position and took no corrective measures.

they conduct business in and are "at home" in this district, as their principal places of business are in Westlake Village, California.

26. Venue is appropriate in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Defendants' principal places of business are within the County of Los Angeles, State of California, which is within this judicial district; (ii) Defendants are subject to personal jurisdiction in this judicial district; (iii) the injury to Plaintiff occurred within this judicial district; and (iv) many of the acts and transactions giving rise to this action occurred in this judicial district.

## III. PARTIES

27. Plaintiff Roberto Verthelyi ("Plaintiff" or "Verthelyi") is a natural person and a resident of the State of New Jersey. He holds 20 shares of PennyMac's Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares, which he has held since June 27, 2023. Verthelyi also holds 60 shares of PennyMac's Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares, which he has held since at least prior to June 30, 2023. As a result of Defendants' conduct alleged herein, Verthelyi has incurred injuries and will continue to incur additional injuries.

28. Defendant PennyMac Mortgage Investment Trust is a REIT that invests primarily in residential mortgage loans and mortgage-related assets. It is externally managed by PNMAC Capital Management, LLC and organized and existing under the laws of Maryland, with a principal place of business at 3043 Townsgate Road, Westlake Village, California.

29. Defendant PNMAC Capital Management, LLC is a limited liability company organized and existing under the laws of Delaware, with a principal place of business at 3043 Townsgate Road, Westlake Village, California.

## IV. FACTUAL ALLEGATIONS

### A. PennyMac Issues Fixed-to-Floating Rate Preferred Shares

30. In 2017, PennyMac issued two series of Preferred Shares, raising over $310 million: (i) the Series A Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares; and (ii) the Series B Fixed-to-Floating Rate Cumulative Redeemable Preferred Shares.

#### 1. Series A Preferred Shares

31. PennyMac has 4,600,000 Series A Preferred Shares that were issued and are still outstanding. From, and including, the date of original issuance of the Series A Preferred Shares in March 2017 to, but not including, March 15, 2024 only, holders of the Series A Preferred Shares were entitled to receive cumulative dividends on the Series A Preferred Shares at a fixed rate of 8.125% per annum based on the $25.00 per share liquidation preference.

32. Then, from, and including, March 15, 2024 and thereafter, holders of the Series A Preferred Shares were and will continue to be entitled to receive cumulative dividends on the Series A Preferred Shares at a floating rate equal to three-month LIBOR as calculated on each applicable dividend determination date plus a spread of 5.831% per annum based on the $25.00 per share liquidation preference. Dividends are payable quarterly in arrears on the 15th day of each March, June, September and December.

33. Series A Preferred Shares rank senior to the common shares and on parity with the Series B Preferred Shares with respect to payments of dividends or amounts upon the liquidation, dissolution, or winding up. Moreover, Series A Preferred Shares were not redeemable before March 15, 2024, except in connection with the qualification as a REIT and in certain other circumstances related to a change of control (as defined in the Declaration of Trust).

34. Series A Preferred Shares have no stated maturity date and are not subject to any sinking fund or mandatory redemption. On or after March 15,

2024, or within 120 days of the occurrence of a change in control, PennyMac may redeem any or all of the Series A Preferred Shares at $25.00 per share plus any accumulated and unpaid dividends thereon to, but not including, the redemption date.

**2. Series B Preferred Shares**

35. PennyMac has 7,800,000 Series B Preferred Shares that were issued and are still outstanding. From, and including, the date of original issuance of the Series B Preferred Shares in July 2017 to, but not including, June 15, 2024 only, holders of the Series B Preferred Shares were and are entitled to receive cumulative dividends on the Series B Preferred Shares at a fixed rate of 8.00% per annum based on the $25.00 per share liquidation preference.

36. Then, from, and including, June 15, 2024, and thereafter, holders of the Series B Preferred Shares will be entitled to receive cumulative dividends on the Series B Preferred Shares at a floating rate equal to three-month LIBOR as calculated on each applicable dividend determination date plus a spread of 5.99% per annum based on the $25.00 per share liquidation preference. Dividends are payable quarterly in arrears on the 15th day of each March, June, September, and December.

37. The Series B Preferred Shares are not redeemable before June 15, 2024, except in connection with the qualification as a REIT and in certain other circumstances related to a change of control (as defined in the Declaration of Trust).

38. As with Series A, the Series B Preferred Shares have no stated maturity and are not subject to any sinking fund or mandatory redemption. On or after June 15, 2024, or within 120 days of the occurrence of a change of control, PennyMac may redeem any or all the Series B Preferred Shares at $25.00 per share plus any accumulated and unpaid dividends thereon to, but not including the redemption date.

**B. SOFR is Created as an Alternative to LIBOR**

39. For decades it was standard industry practice to peg interest rates on loans sold in the United States to LIBOR denominated in USD. LIBOR was a basic rate of interest used in lending between banks on the London interbank market and served as a reference for setting the interest rate on loans and instruments such as preferred stock. However, by 2012, banks were accused by various governmental agencies of manipulating LIBOR rates.

40. In 2014, the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York created the ARRC, which developed SOFR as an alternative to LIBOR. SOFR has been published on an overnight basis since 2018 and is a broad measure of the cost of borrowing cash overnight, collateralized by Treasury securities in the overnight Treasury repurchase agreement market.

41. In 2018, the ARRC developed a set of guiding principles for transitioning various financial products, including floating rate products, from LIBOR to SOFR. By 2019, the ARRC published guidance on suggested fallback provisions for use in the event of LIBOR's cessation to reduce market disruption. Among the aims of the ARRC's published guiding principles were to encourage robust fallback provisions that replaced LIBOR with SOFR or a SOFR equivalent; minimize ambiguity; reduce litigation and regulatory risk; ensure LIBOR fallback language resembled language used in other classes and liabilities where feasible; ensure that fallback language was feasible, practicable, and fair; and encourage the use of fallback provisions that did not advantage any market participant to the disadvantage of another. All of the ARRC's suggested benchmark replacements for LIBOR contemplated using either SOFR with certain spread adjustments, or replacements chosen by a relevant governmental body or the ISDA. For its part,

the ISDA has also published guidance encouraging the replacement of LIBOR in floating rate contracts with SOFR.[9]

42. While one of the ARRC's guiding principles on benchmark replacements allowed for issuers to choose their own replacement rate, this guidance stipulated that the chosen replacement rate must include a "spread adjustment," which could be positive, negative, or zero, to accommodate variances from the then current benchmark rate. None of ARRC's suggested guiding principles on benchmark replacements endorse the use of an existing fixed rate as a replacement to LIBOR.

43. Similar to LIBOR, SOFR publishes one-, three-, six- and twelve-month forward-looking rates and is considered by experts to be the more accurate and secure interest rate pricing benchmark.

44. Since their release, the ARRC's fallback language recommendations have been subject to numerous public consultations and have received widespread adoption by a multitude of market participants. Indeed, the ARRC's findings are specifically cited by the Board of Governors of the Federal Reserve in the Board's final memorandum implementing the LIBOR Act, as well as part of the Supplementary Information published as part of the LIBOR Rule.[10]

45. PennyMac's Series A and Series B Preferred Shares contracts *do not contain* a fallback provision for calculating dividend rates during the floating rate period *in the event that LIBOR ceases to exist*, nor any procedures for designating a calculation agent. The Articles Supplementary for Series A and B Preferred Shares do provide a mechanism for determining the dividend on the "Dividend

[9] *See* 12 C.F.R. § 253, App. A.

[10] Board of Governors of the Federal Reserve System, *Final Regulation Implementing the Adjustable Interest Rate (LIBOR) Act*, at 2 n.3, *supra* note 3; Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01, 5205 n.15 (Jan. 26, 2023).

Determination Date" in the event that the then-current LIBOR rate is temporarily unavailable—where "no such [LIBOR] rate appears on 'Reuters Page LIBOR01' or if the 'Reuters Page LIBOR01' is not available at approximately 11:00 a.m. (London time)."[11] PennyMac has publicly pointed to this provision as its fallback provision for assessment in accordance with the LIBOR Rule. However, this provision does not comply with the LIBOR Rule's requirements, as it neither addresses the permanent cessation of LIBOR, nor specifies a replacement benchmark or rate if LIBOR is permanently discontinued.

### C. Congress Adopts the LIBOR Act and the Federal Reserve Issues the LIBOR Rule

46. In March 2021, the United Kingdom Financial Conduct Authority announced that LIBOR would cease publication and set forth a plan for transition. Banks and financial institutions stopped using USD LIBOR for new loans in the United States by January 1, 2022, and all remaining USD LIBOR rate publications were discontinued by June 30, 2023.

47. Recognizing the need for a uniform, nationwide solution for replacing references to USD LIBOR in legacy contracts, on March 15, 2022, Congress enacted the LIBOR Act. Moreover, pursuant to authority granted to it under the LIBOR Act, the Federal Reserve issued the LIBOR Rule in December 2022 adopting SOFR as the default replacement for LIBOR. *See* 12 C.F.R. § 253.4(b).

48. The LIBOR Act broadly defines "LIBOR contract" to include any obligation or asset that, by its terms, uses the overnight, one-month, three-month, six-month, or twelve-month tenors of USD LIBOR as a benchmark. Broadly, for LIBOR-based contracts (a) without fallback provisions for its discontinuation of

[11] *See* Art. Supp. Series A, ¶4(g); Art. Supp. Series B, ¶4(g).

LIBOR or (b) with LIBOR-based fallback provisions, it requires that SOFR be substituted for LIBOR.

49. The LIBOR Act and LIBOR Rule were adopted to address the exact deficiencies present in PennyMac's outdated, legacy Articles Supplementary, which have no clearly defined, practicable replacement benchmark rate or fallback procedures for replacing LIBOR in the event of its discontinuation.

**D. PennyMac Acts in Contravention of the LIBOR Act and the LIBOR Rule**

50. By 2023, banks, REITS, and financial institutions that had previously issued loans or preferred stock pegged to LIBOR began transitioning to SOFR. For example, Bank of America—which had issued similar LIBOR-based variable rate investments governed by legacy fallback provisions similar to those used by PennyMac, *i.e.*, contemplating a fixed rate replacement only if LIBOR was temporarily available and only after obtaining quotes from banks—announced a replacement of the three-month LIBOR rate with the three-month SOFR rate as adjusted pursuant to the LIBOR Act and the Federal Reserve's LIBOR Rule on comparable floating-rate Preferred Shares.

51. Holders of PennyMac's Series A and B Preferred Shares were entitled to the same treatment, as evidenced by market reaction to the announcement. Specifically, commencing on March 15, 2024, PennyMac should have paid Series A Preferred Shareholders a floating rate dividend equal to three-month SOFR plus certain tenor spread adjustments set forth in the LIBOR Rule plus a spread of 5.831% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.

52. Similarly, commencing on June 15, 2024, PennyMac should have paid Series B Preferred Shareholders a floating rate dividend equal to three-month SOFR as adjusted plus a spread of 5.99% per annum based on the Twenty-Five Dollars ($25.00) per share liquidation preference.

53. On August 25, 2023, PennyMac's Preferred Shareholders learned that instead of adopting the three-month SOFR rate, PennyMac unilaterally decided to replace its floating Three-Month LIBOR interest rate obligation for Series A and Series B Preferred Shares with the existing fixed rate, stating:

> In accordance with the Articles Supplementary for each of the Series . . . and disregarding the Polling Provisions contained therein, the applicable dividend rate for dividend periods from and after March 15, 2024, in the case of the Series A Preferred Shares, or June 15, 2024, in the case of the Series B Preferred Shares, shall be calculated at the dividend rate in effect for the immediately preceding dividend period.[12]

54. Contrary to PennyMac's contention, the Articles Supplementary, which contain no fallback provision for when LIBOR is discontinued, do not permit PennyMac to convert a floating-rate dividend stock into a fixed-rate dividend preferred stock.

55. PennyMac sought to justify its decision by claiming that:

> The LIBOR Rule provides with respect to any reference in the terms of a security requiring a poll or inquiries for quotes or information related to USD LIBOR ("Polling Provisions") contained in so called "fallback provisions" applicable in the event USD LIBOR is not published, such Polling Provisions shall be disregarded and deemed null and void and without any force or effect.[13]

56. In doing so, PennyMac relied upon a legacy LIBOR-based fallback provision used in similar form throughout the industry that was clearly created to be used in the event of *a temporary delay in the reporting of LIBOR rates*. Pursuant to that provision, were a temporary delay in the reporting of LIBOR to occur, PennyMac first would try to obtain quotes from London banks and, if no

---

[12] PennyMac, *PennyMac Mortgage Investment Trust Announces LIBOR Replacement Rate for its Series A and Series B Preferred Shares*, *supra* note 4.

[13] *Id.*

suitable quotes could be obtained, PennyMac would then be required to obtain quotes from three New York banks. If no suitable quotes could be obtained from New York banks, then PennyMac would revert to the dividend rate paid in the previous period. PennyMac claimed that, absent LIBOR, the already-existing fixed rate should continue to be used because that was the last dividend rate paid on the first date that PennyMac would seek to calculate a LIBOR-based floating rate.

57. In so acting, PennyMac violated the LIBOR Act and LIBOR Rule when attempted to rely on that inapplicable language in the Articles Supplementary.

**E. Preferred Shareholders' Present and Future Harm**

58. Following PennyMac's announcement, the prices of both the Series A and Series B Preferred Shares fell precipitously, shedding $40 million in collective market capitalization. Specifically, prior to PennyMac's announcement, Series A Preferred Shares (NYSE: PMT-PA) were trading at or near $24 per share, or a 4% discount to par value ($25). After the market learned of PennyMac's adoption of a fixed rate, the shares traded at approximately $22 per share, a 15% discount to par.

59. Prior to PennyMac's announcement, Series B Preferred Shares (NYSE: PMT-PB) traded at or near $24.00 per share, or 4% discount to par. After the market learned of PennyMac's adoption of a fixed rate, the shares traded at approximately $20 per share, or an 18% discount to par.

60. In addition to the loss in market value, Preferred Shareholders have and will continue to earn less than the interest promised on their investment, in an amount to be proven at trial.

## V. <u>CLASS ACTION ALLEGATIONS</u>

61. Plaintiff brings this action as a class action individually and on behalf of all others similarly situated pursuant to Rule 23(a), (b)(2), and (b)(3) of the

Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who own or owned shares of PennyMac's Series A Preferred Shares and/or Series B Preferred Shares at any time between August 25, 2023 and the conclusion of this action. Excluded from the Class are (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who is an officer, director, or controlling person of Defendants; (e) any entity in which any person or entity excluded from the Class has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors, or assigns of any such excluded party.

62. The members of the Class are so numerous and geographically dispersed throughout the country that joinder of all members is impracticable. While the exact number and location of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class located nationwide. Indeed, as of February 22, 2024, PennyMac had 4,600,000 outstanding shares of Series A Preferred Shares and 7,800,000 outstanding shares of Series B Preferred Shares.

63. Members of the Class may be identified from records maintained by PennyMac, its transfer agent, or other brokers and nominees and, as necessary, may be notified of the pendency of this action by mail, using a form of notice customarily used in class action lawsuits.

64. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

(a) whether Defendants were required to comply with the LIBOR Act as set forth in 12 U.S.C. § 5801 *et seq.*;

(b) whether Defendants' conduct as alleged herein violated the Adjustable Interest Rate (LIBOR) Act, 12 U.S.C. § 5801 *et seq.*;

(c) whether Defendants were required to comply with the LIBOR Rule as set forth in 12 C.F.R. § 253 *et seq.*;

(d) whether Defendants' conduct as alleged herein violated the LIBOR Rule, 12 C.F.R. § 253 *et seq.*;

(e) whether Defendants' conduct as alleged herein amounts to unfair or unlawful acts or practices within the meaning of the UCL, California Business and Professions Code § 17200 *et seq.*; and

(f) whether Plaintiff and the putative Class members are entitled to relief, including restitution and injunctive relief, as sought herein.

65. Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class suffered economic injury and will continue to suffer economic injury as a result of Defendants' wrongful conduct in violation of state law as alleged in this Complaint.

66. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

67. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the money and/or property lost by the individual Class members as well as the future harm to them may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress those wrongs. There will be no difficulty in the management of this action as a class action.

68. Further, the Class should be certified pursuant to Federal Rule of Civil Procedure 23(b)(2) because:

(a) The prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for PennyMac;

(b) The prosecution of individual actions could result in adjudications that, as a practical matter, would be dispositive of the interests of non-party Class members or that would substantially impair their ability to protect their interests; and

(c) PennyMac has acted or refused to act on grounds generally applicable to the proposed Class, thereby making final injunctive and other equitable relief appropriate with respect to the members of the proposed Class as a whole.

## VI. CLAIM FOR RELIEF

### COUNT ONE
### Violation of California's Unfair Competition Law (UCL) Cal. Bus. & Prof. Code § 17200 *et seq.*

69. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70. Plaintiff and Defendants are each a "person" as defined by California Business and Professions Code § 17201. California Business and Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

71. "Unfair competition" is defined by California Business and Professions Code § 17200 as encompassing several types of business "wrongs," including: (a) an "unlawful" business act or practice; (b) an "unfair" business act or practice; (c) a "fraudulent" business act or practice; and (d) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

72. By and through Defendants' conduct alleged herein, Defendants engaged in conduct which constitutes unlawful and/or unfair business practices as prohibited by California's UCL.

**A. "Unlawful" Prong**

73. California Business and Professions Code § 17200 *et seq.*, treats violations of other laws, when committed pursuant to a business activity, as independently actionable unlawful practices.

74. Defendants have violated the LIBOR Act, 12 U.S.C. 5801 *et seq.*, and the LIBOR Rule, 12 C.F.R. § 253 *et seq.*, and thus, pursuant to California Business and Professions Code § 17200 *et seq.*, have engaged in a pattern of "unlawful" business practices within the meaning of California's UCL.

75. As alleged herein, pursuant to the LIBOR Act and LIBOR Rule and their provisions amending existing LIBOR-based contracts, including those governing Defendants' conduct here, commencing on March 15, 2024, holders of PennyMac Series A Preferred Shares were required by law to be paid a floating rate dividend equal to the three-month SOFR plus certain adjustments set forth in the LIBOR Rule plus a spread of 5.831% per annum based on a twenty-five dollars ($25.00) per share liquidation preference. Similarly, pursuant to the LIBOR Rule, commencing on June 15, 2024, holders of PennyMac Series B Preferred Shares are required by law to be paid a floating rate dividend equal to the three-month SOFR plus certain adjustments set forth in the LIBOR Rule plus a spread of 5.99% per annum based on a twenty-five dollars ($25.00) per share liquidation preference.

76. Beginning on or about August 25, 2023, Defendants committed and have been committing unlawful and unfair acts, including those described herein, by engaging in a pattern of "unlawful" business practices within the meaning of California Business and Professions Code § 17200 *et seq.*, by replacing its floating three-month LIBOR dividend rate for Series A and Series B Preferred Shares with

a fixed rate, in violation of the LIBOR Act, 12 U.S.C. § 5801 *et seq.*, and the LIBOR Rule, 12 C.F.R. § 253 *et seq.*

77. When Defendants announced their intention to replace the floating rate dividend in Series A and Series B Preferred Shares in violation of the LIBOR Act and the provisions set forth under the LIBOR Rule, the price of Series A and Series B Preferred Shares dropped precipitously in the secondary market, translating to a loss of value of $40 million in collective market capitalization and causing Plaintiff's and the putative Class's investments to lose substantial value.

78. Further, as a result of Defendants' decision to replace the floating rate dividend on Series A and Series B Preferred Shares with an already-existing fixed rate dividend in violation of the LIBOR Act and the LIBOR Rule, Preferred Shareholders are expected to receive dividends at an interest rate materially lower than the SOFR three-month rate and will thus lose many millions of dollars in dividend payments on their investments.

79. Therefore, as a direct and proximate result of Defendants' prohibited unfair and unlawful business practices that took place in California, as alleged herein, Plaintiff and the putative Class have suffered injury in fact and have lost and will continue to lose substantial value and sums of money in an amount to be proven at trial.

**B. "Unfair" Prong**

80. Beginning as of approximately August 25, 2023, as alleged herein, Defendants also committed unfair acts as prohibited by California Business and Professions Code § 17200 *et seq.*

81. A business act or practice is "unfair" under the UCL if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, where that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

82. As alleged herein, Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct. Furthermore, neither Plaintiff nor the putative Class could reasonably have avoided being injured by Defendants' conduct as alleged herein, and there were reasonably available alternatives to further Defendants' legitimate business interests other than the unfair and unlawful interference with Plaintiff's ownership interests in their Preferred Shares as described herein.

**C. Remedies Provided For Under the UCL**

83. The UCL provides that any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. Plaintiff and the Class pray for relief as set forth below and are entitled to restitution and injunctive relief as set forth herein.

84. Through its unfair and unlawful acts and practices, PennyMac has improperly obtained and will continue to obtain money from Plaintiff and the Class. As such, Plaintiff requests that this Court cause PennyMac to restore this money to Plaintiff and all Class members, and to enjoin PennyMac from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Plaintiff and the Class will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

85. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees, a reward which is available to a prevailing Plaintiff in a class action such as this, whether statutorily, from a common fund recovered for the benefit of others, or as otherwise provided by law or equity.

86. Absent an award for injunctive relief and restitution as alleged and requested herein, Plaintiff and the putative Class would not otherwise have an adequate remedy at law given that Defendants' unfair and unlawful conduct in

violating the LIBOR Act and the LIBOR Rule is continuing and will not cease until Defendants are forced to come into compliance with the law.

87. Plaintiff reserves the right to allege further conduct that constitutes other unlawful and/or unfair business acts or practices.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff's counsel as Class Counsel;

B. Declaring that Defendants must implement the applicable Board-selected benchmark replacement, SOFR, as a replacement to the three-month LIBOR rate set forth in the Articles Supplementary for PennyMac Series A and Series B Preferred Shares pursuant to 12 C.F.R. § 253.5 *et seq.*;

C. Granting injunctive relief as permitted by law and in equity;

D. Ordering that Defendants pay all amounts owed to the Plaintiff and the Class arising out of the actions complained of herein, including restitution, interest, disgorgement of any ill-gotten gains, and any other relief as allowed in law or equity;

E. Awarding Plaintiff and the Class their reasonable fees and expenses incurred in this action, including counsel fees and expert fees; and

F. Awarding such other and further relief as the Court may deem just and proper.

## VIII. DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury.

///

///

DATED: June 14, 2024

**BERMAN TABACCO**

By: /s/ Daniel E. Barenbaum
Daniel E. Barenbaum

Nicole Lavallee
Jeffrey Rocha
Pierce Stanley
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com
jrocha@bermantabacco.com
pstanley@bermantabacco.com

Catherine Pratsinakis (*pro hac vice forthcoming*)
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7013
Email: cpratsinakis@dilworthlaw.com

*Attorneys for Plaintiff Roberto Verthelyi and the Putative Class*

# Exhibit 2

Nicole Lavallee (SBN 165755)
Email: nlavallee@bermantabacco.com
Daniel E. Barenbaum (SBN 209261)
Email: dbarenbaum@bermantabacco.com
Jeffrey Rocha (SBN 304852)
Email: jrocha@bermantabacco.com
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

Catherine Pratsinakis (Admitted *pro hac vice*)
Email: cpratsinakis@dilworthlaw.com
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7013

*Attorneys for Plaintiff Roberto Verthelyi and the Putative Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERTO VERTHELYI, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC,<br><br>Defendants. | No. 2:24-cv-05028-MWF-JC<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT PENNYMAC MORTGAGE INVESTMENT TRUST'S MOTION TO DISMISS**<br><br>Date: November 18, 2024<br>Time: 10:00 a.m.<br>Ctrm: 5A<br>Judge: Michael W. Fitzgerald |

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 6

A. LIBOR Overview ..... 6

B. The LIBOR Act and Rule ..... 7

C. PennyMac's Articles Require Payment of a Floating Rate ..... 7

III. ARGUMENT ..... 9

A. PennyMac Violated the "Unlawful" and "Unfair" Prongs of the UCL When It (1) Violated the LIBOR Act and Rule and (2) Disregarded Legislative Intent and Public Policy Underlying the LIBOR Act ..... 9

1. The Articles are Tough Legacy Contracts that Do Not Contemplate the Permanent End to LIBOR ..... 10

2. A Fixed Interest Rate Is Neither a Benchmark Nor Benchmark Replacement ..... 11

3. The LIBOR Act Was Enacted to Prevent Adjustable-Rate Securities from Unfairly Converting into Permanent Fixed-Rate Instruments ..... 14

B. PennyMac's Misconduct Violated the UCL's Unfairness Prong ..... 15

C. PennyMac is Not Shielded by Federal Preemption or the UCL's Safe Harbor ..... 17

D. California Law Applies to this Dispute ..... 18

1. The Articles Contain No Choice-of-Law Provision ..... 18

2. This Dispute Falls Outside the Scope of the Declaration's Choice-of-Law Provision ..... 19

3. Enforcing the Declaration's Maryland Choice-of-Law Provision Violates a Fundamental California Policy ..... 20

IV. CONCLUSION ..... 22

# TABLE OF AUTHORITIES

## Cases

*Abeyta v. DMCG, Inc.*, No. 22-CV-07089-SI, 2023 WL 3047054 (N.D. Cal. Apr. 20, 2023) ... 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ... 9

*BBBB Bonding Corp. v. Caldwell*, 73 Cal. App. 5th 349 (2021) ... 17

*Bermudez v. PrimeLending*, No. LA-CV12-00987-JAK-Ex, 2012 WL 12893080 (C.D. Cal. Aug. 14, 2012) ... 22

*Century 21 Real Est. LLC v. All Prof. Realty, Inc.*, 889 F. Supp. 2d 1198 (E.D. Cal. 2012), *aff'd*, 600 F. App'x 502 (9th Cir. 2015) ... 22

*Century 21 Real Estate LLC v. All Prof. Realty, Inc.*, 600 F. App'x 502 (9th Cir. 2015) ... 22

*Collins v. Unum Life Ins. Co. of Am.*, 185 F. Supp. 3d 860 (E.D. Va. 2016), *aff'd*, 700 F. App'x 205 (4th Cir. 2017) ... 13

*E.H. v. Meta Platforms, Inc.*, No. 23-CV-04784-WHO, 2024 WL 557728 (N.D. Cal. Feb. 12, 2024) ... 16

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003) ... 22

*Florida v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288 (S.D. Fla. 2005) ... 19

*Graham Oil Co. v. ARCO Prods. Co.*, 43 F.3d 1244 (9th Cir. 1994), as amended (Mar. 13, 1995) ... 11

*Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89 (Md. 2021) ... 19

*In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953 (N.D. Cal. 2016) ... 16

*Jialu Wu v. iTalk Glob. Commc'ns, Inc.*, No. CV20-7150-PSG-PJWx, 2020 WL 8461696 (C.D. Cal. Oct. 21, 2020) ... 21

*Lee v. CarMax Auto Superstores Cal., LLC*, No. CV-13-7648-MWF-VBKx, 2013 WL 12473808 (C.D. Cal. Dec. 2, 2013) ... 14

*Mazza v. Am. Honda Motor Co., Inc.*,
666 F.3d 581 (9th. Cir. 2012) ..... 18

*McKell v. Wash. Mut., Inc.*,
142 Cal. App. 4th 1457 (2006) ..... 9, 18

*Nedlloyd Lines B.V. v. Super. Ct.*,
3 Cal. 4th 459 (1992) ..... 20

*Ochoa v. Zeroo Gravity Games LLC*,
No. CV22-5896-GW-ASx, 2023 WL 4291650 (C.D. Cal. May 24, 2023) ..... 20

*Ribbens Int'l., S.A. de C.V. v. Transport Int'l. Pool, Inc.*,
47 F. Supp. 2d 1117 (C.D. Cal. 1999) ..... 22

*Rodriguez v. Sony Computer Entm't Am., LLC*,
801 F.3d 1045 (9th Cir. 2015) ..... 13

*Rose v. Bank of Am., N.A.*,
57 Cal.4th 390 (2013) ..... 9

*Turner v. Porsche Cars N. Am., Inc.*,
No. CV23-6465-MWF-BFMx, 2024 WL 3533834 (C.D. Cal. June 19, 2024) ..... 16

*Urica, Inc. v. Pharmaplast, S.A.E.*,
No. CV11-02467-MMM-RZx, 2013 WL 12123305 (C.D. Cal. Jan. 10, 2013) ..... 20

*Vrugtman v. It's Just Lunch Int'l LLC*,
No. 20-2352-JGB-SPx, 2021 WL 4979443 (C.D. Cal. Sept. 24, 2021) ..... 18, 21

*Walter v. Hughes Commc'ns, Inc.*,
682 F. Supp. 2d 1031 (N.D. Cal. 2010) ..... 21, 22

*Zuniga v. Bank of Am. N.A.*,
No. CV14-06471, 2014 WL 7156403 (C.D. Cal. Dec. 9, 2014) ..... 16

**Statutes**

12 C.F.R. §253.4(b) ..... 7

12 C.F.R. pt. 253 ..... 2, 3

12 U.S.C. §5801 ..... 3

12 U.S.C. §5801(a)(2) ..... 4, 7

12 U.S.C. §5801(b)(1) ..... 10

12 U.S.C. §5802 ..... 3

12 U.S.C. §5802(1) ..... 5, 7, 12

12 U.S.C. §5802(11) ..... 5, 7

12 U.S.C. §5802(3) ........ 12, 13

12 U.S.C. §5803(a) ........ 3, 7

12 U.S.C. §5803(a)-(b) ........ 5

12 U.S.C. §5803(b) ........ 7

12 U.S.C. §5803(f)(2) ........ 5, 12

Cal. Bus. & Prof. Code §17200 ........ 5, 9

Md. Code Ann., Com. Law § 13-406 ........ 21

Md. Code Ann., Com. Law § 13-408 ........ 21

Md. Code Ann., Corps. & Ass'ns §8-101(b) ........ 19

**Rules**

Fed. R. Civ. P. 15(a)(2) ........ 22

**Legislative History**

Congressional Record (House), *Adjustable Interest Rate (LIBOR) Act of 2021*, 167 Cong. Rec. H7479-01 (Dec. 8, 2021) ........ 14

Regulations Implement the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01 (Jan. 26, 2023) ........ 2, 10

*The End of LIBOR: Transitioning to an Alt. Interest Rate Cacl. for Mortgs., Student Loans, Bus. Borrowing, and Other Fin. Prods.: Hrg. Before H. Comm. on Fin. Servs.*, 117th Cong. 17 (Apr. 15, 2021) ........ passim

*The LIBOR Transition: Protecting Consumers and Investors*, 117th Cong. 357 (Nov. 2, 2021) ........ 2, 12

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ........ 12

The Chicago Manual of Style §6.23 (16th ed. 2010) ........ 13

Plaintiff submits this memorandum of law in opposition[1] to the motion to dismiss filed by PennyMac Mortgage Investment Trust (the "Trust") (ECF 34) and adopted in its entirety by PNMAC Capital Management, LLC ("PCM") (ECF 35) (collectively, "PennyMac" or "Defendants").[2]

## I. INTRODUCTION

Plaintiff brought this class action for restitution of dividends owed and injunctive relief against PennyMac on behalf of himself and all persons and entities who own or owned shares of PennyMac's fixed-to-floating rate Series A and/or Series B Preferred Shares on or after August 25, 2023.

The dividend terms are in the governing documents—the 2017 Articles Supplementary ("Articles")—at Section 4(a)-(l). Section 4(a) of the Articles require PennyMac to transition from a fixed-rate to floating-rate dividend pegged to the London Interbank Offering Rate ("LIBOR"), a benchmark then widely used by investors around the globe to calculate adjustable or floating interest rates.[3] As of March 15, 2024, the Articles promised Series A preferred stockholders a floating rate equal to Three-Month LIBOR plus 5.831%. ¶32; Ex. A §4(a). As of June 15, 2024, the Articles promised to pay Series B preferred stockholders a floating rate equal to Three-Month LIBOR plus 5.99%. ¶36; Ex. B §4(a).

On March 5, 2021, the U.K. Financial Conduct Authority announced that LIBOR would permanently cease publication on June 30, 2023. ¶46. Concerned

---

[1] Plaintiff herein refers to: the Complaint (ECF 1) as "¶__"; the Declaration of Catherine Pratsinakis, filed concurrently herewith, as "Pratsinakis Decl."; the Trust's motion to dismiss (ECF 34) as "Mem."; and Exhibits attached to the Declaration of Matthew Donald Umhofer (ECF 36-1) as "Ex. __." Unless otherwise indicated, all emphasis is added and all alterations, internal quotation marks and citations are omitted.

[2] Plaintiff responds to PCM's motion to dismiss (ECF 35) in a separate, concurrently filed opposition.

[3] ¶4 & nn.1-2 (referring to articles that provide further explanation).

about ensuing turmoil, Congress and the Federal Reserve sought to pass legislation to address the U.S. market's heavy reliance on the LIBOR benchmark. ¶¶46-49.

The Federal Reserve explained: "Of particular concern are so-called 'tough legacy contracts,' which are contracts that reference USD LIBOR and will not mature by June 30, 2023, but which lack adequate fallback provisions providing for a ***clearly defined or practicable replacement benchmark*** following the cessation of USD LIBOR." *See* Regulations Implement the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01, 5205 (Jan. 26, 2023) (codified at 12 C.F.R. pt. 253). Congress, therefore, set out to address contracts (like the Articles here) that did not "contemplate the permanent cessation of LIBOR."[4] According to the Federal Reserve, "many floating-rate notes and securitizations have problematic fallback language—generally, these contracts convert to fixed-rate instruments at the last published value of LIBOR."[5] As Senator Patrick Toomey stated during hearings, "any legislation that addresses tough legacy contracts must be narrowly tailored, not change the equities of these contracts…."[6]

---

[4] Pratsinakis Decl. Ex. 1 (*The End of LIBOR: Transitioning to an Alt. Interest Rate Cacl. for Mortgs., Student Loans, Bus. Borrowing, and Other Fin. Prods.*: *Hrg. Before H. Comm. on Fin. Servs.*, 117th Cong. 17, at 14 (Apr. 15, 2021) ("House Hrg.") (statement of Daniel E. Coates, Senior Associate Director, Office of Risk Analysis and Modeling, Federal Housing Finance Agency)).

[5] *Id*. Ex. 1 (House Hrg.) 62 (statement of Mark Van Der Weide, General Counsel, Bd. of Govs. Fed. Reserve); *see also id*. Ex. 2 (*The LIBOR Transition: Protecting Consumers and Investors*, 117th Cong. 357, at 114 (Nov. 2, 2021) ("Senate Hrg.") (statement of Thomas Wipf, Chair of the Alternative Reference Rates Committee and Managing Director, Morgan Stanley) ("For many existing legacy contracts that reference LIBOR, however, things are much less simple. . . effectively converting what were ***floating-rate instruments into fixed-rate instruments***."); *id.* at 137 (same); *id.* at 138 (same); *id.* at 145-146 (statement of J. Christopher Giancarlo, Senior Counsel, Willkie Farr & Gallagher LLP, and Former Chair, U.S. Commodity Futures Trading Commission) ("The legislation makes clear that all LIBOR contracts ***must be converted to an alternative benchmark*** before June 30, 2023.").

[6] Pratsinakis Decl. Ex. 2 (Senate Hrg.) 135; *see also id*. Ex. 1 (House Hrg.) 62.

To avoid chaos and litigation stemming from such concerns, Congress sought to pass legislation that "establish[ed] a clear and uniform framework, on a nationwide basis, for replacing LIBOR in legacy contracts ... [, which] should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks, ***or that effectively convert to fixed-rate instruments***."[7] Congress did not seek to interfere with "legacy contracts with fallbacks to another ***floating rate***."[8]

To this end, on March 15, 2022, Congress enacted the Adjustable Interest Rate (LIBOR) Act, 12 U.S.C. §5801 *et seq*. (the "LIBOR Act"). On February 27, 2023, the Federal Reserve enacted the final rule implementing the LIBOR Act. *See* 12 C.F.R. pt. 253 (the "LIBOR Rule"). The LIBOR Act and Rule mandated that "[o]n the LIBOR replacement date [June 30, 2023], the Board-selected benchmark replacement [Secured Overnight Financing Rate, or SOFR] ***shall be the benchmark replacement for any LIBOR contract*** that, after giving any effect to subsection (b)– (1) contains no fallback provisions; or (2) contains fallback provisions that identify neither—(A) a specific benchmark replacement; nor (B) a determining person." 12 U.S.C. §§5803(a) & 5802.

Given that the Articles have no adequate fallback provision nor reference a benchmark to replace LIBOR, on August 25, 2023, PennyMac shocked investors and the market by announcing that it would rely on certain legacy language to pay a fixed rate in perpetuity instead of adopting SOFR. ¶¶15, 53. PennyMac misconstrues the LIBOR Act and its Articles, disadvantaging its preferred stockholders and undermining the LIBOR Act's core objective—to protect all parties to LIBOR contracts from being unfairly disadvantaged by LIBOR's permanent cessation.

[7] *Id*. Ex. 1 (House Hrg.) 63 (Mark Van Der Weide).

[8] *Id*. at 19, 39 (same).

PennyMac moves to dismiss this action by asserting that: (1) it did not violate the LIBOR Act by converting its floating-rate notes into permanent fixed-rate notes, and, thus, did not violate the UCL; and (2) the Maryland choice-of-law provision in the Declaration of Trust[9] ("Declaration") precludes Plaintiff's UCL claim. PennyMac is wrong on both fronts.

The fundamental disagreement here is whether the Articles contain a permissible and workable fallback provision or benchmark to replace LIBOR or whether instead PennyMac was required to transition to SOFR.

*First*, the Articles are "tough legacy contracts" that did not contemplate the permanent cessation of LIBOR, reflecting the type of contract that requires adoption of the SOFR index under the LIBOR Act and Rule. Section 4(g) of the Articles is not a clearly defined, practicable, or "workable" fallback provision,[10] but a temporary fix for when LIBOR is unavailable on a particular date by a specified time (11:00 a.m.). PennyMac claims that a final clause in a waterfall at Section 4(g) calls for a fixed rate when LIBOR is unavailable, rendering it an adequate fallback. On the contrary, PennyMac's obligation to pay a floating rate and the lack of an alternative benchmark in the Articles demonstrate that the parties (and the Articles) did not anticipate the permanent cessation of LIBOR. Indeed, the floating-rate provision in Section 4(a) in the Articles requires PennyMac to pay a premium over LIBOR—a clear and separate indication that neither party contemplated using a fixed rate as a replacement for LIBOR in perpetuity.

*Second*, Section 4(g) does not reference any **benchmark** other than LIBOR and a fixed interest rate is not a benchmark or benchmark replacement for LIBOR.

[9] *See* Ex. C (Trust's Articles of Amendment and Restatement of its Declaration of Trust, dated July 24, 2009).

[10] The LIBOR Act requires a "clearly defined or practicable replacement benchmark rate [*i.e.,* index] when LIBOR is discontinued." 12 U.S.C. §5801(a)(2). PennyMac, however, uses the term "workable." Mem. 5, 6, 10, 13, 17.

The statutory phrase "benchmark replacement" builds on the statutory definition of "benchmark"— "an index of interest rates or dividend rates." 12 U.S.C. §5802(1). Fixed rates are disassociated from an index, and differ from rates that rely on a benchmark, such as the "prime rate or the effective Federal funds rate." *Id.* §5803(f)(2) (statute provides examples of *benchmark replacements*; concept of *fixed rates* is not referenced). Because the Articles do not identify a benchmark to replace LIBOR, PennyMac was required to adopt the SOFR index.

While the statutory language is clear, the legislative record also supports a finding that PennyMac had to adopt SOFR, and that Congress sought to prohibit legacy contracts from "***convert[ing] to fixed-rate instruments.***" Pratsinakis Decl. Ex. 1 (House Hrg.) 63. Nothing in the legislative record supports finding that a fixed rate is an adequate benchmark replacement for LIBOR. Plaintiff will demonstrate: (a) PennyMac was required to adopt SOFR; (b) the Articles do not anticipate the permanent end to LIBOR; (c) the Articles contain no clearly defined or practicable fallback or benchmark; (d) PennyMac knew it was not complying with the LIBOR Act when it adopted a fixed-rate in place of LIBOR; and (e) PennyMac's competitors with similar legacy contracts adopted SOFR in compliance with the LIBOR Act and Rule.

PennyMac's Articles are the ***exact*** tough legacy contracts Congress sought to reform. Since Section 4(g) does not provide an adequate fallback and the Articles do not reference an alternative benchmark to LIBOR, PennyMac had to adopt SOFR in place of LIBOR. 12 U.S.C. §§5802(11), 5803(a)-(b). By violating the LIBOR Act, Defendants (both California-based) violated California's Unfair Competition Law, California Business and Professions Code §17200 *et seq.* ("UCL"), broadly prohibiting "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

Finally, the Maryland choice-of-law provision does not apply because the Articles were not adopted into PennyMac's Declaration of Trust. Even assuming it applied, the choice-of-law provision does not cover extra-contractual violations of the LIBOR Act, and its enforcement would interfere with California's strong policy favoring public injunctions.

## II. FACTUAL BACKGROUND

### A. LIBOR Overview

LIBOR was a key benchmark used by major banks worldwide for decades as the benchmark for setting interest rates in fixed-to-floating notes, mortgages, credit cards, and other financial products. ¶¶4, 39. By the end of 2020, the value of financial products referencing LIBOR was $223 trillion. ¶4.

In 2014, after allegations of LIBOR manipulation arose, the U.S. Treasury's Financial Stability Oversight Council advocated for alternative benchmarks, leading to the creation of the SOFR. ¶¶6, 40. The Federal Reserve and the Federal Reserve Bank of New York created the *Alternative Reference Rates Committee* ("ARRC") to help ensure a successful transition from LIBOR to a more robust reference rate—its recommended alternative was SOFR. *Id*.

By late 2017, the LIBOR panel banks announced that they would cease publishing LIBOR by the end of 2021—later extended through June 2023 for USD LIBOR. ¶¶7, 46. In 2018, ARRC was reconstituted to develop guiding principles for transitioning floating-rate notes from LIBOR to SOFR. ¶¶8, 41. By 2019, ARRC published guidance on fallback provisions to reduce market disruption in the event of LIBOR's cessation. ¶41. By 2021, ARRC's guidance encouraged replacing LIBOR with SOFR (or a SOFR-like index) to reduce litigation and regulatory risk. *Id*. ARRC recommended that fallback language be feasible, practicable, and fair (i.e., not advantage one market participant to the disadvantage of another). *Id*.

### B. The LIBOR Act and Rule

In enacting the LIBOR Act on March 15, 2022, Congress found that "a significant number of existing contracts that reference LIBOR" do not provide a "clearly defined or practicable replacement benchmark rate when LIBOR is discontinued." 12 U.S.C. §5801(a)(2). A "fallback provision" means terms in a LIBOR contract for determining a benchmark replacement. *Id.* §5802(11). A "benchmark" is "an index of interest rates or dividend rates that is used … as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." *Id.* §5802(1).

Section 5803(a) of the LIBOR Act provides that "[o]n the LIBOR replacement date [June 30, 2023], the Board-selected benchmark replacement [SOFR] ***shall be*** the benchmark replacement for any LIBOR contract that, after giving any effect to subsection (b)– (1) contains no fallback provisions; or (2) contains fallback provisions that identify neither—(A) a specific benchmark replacement nor (B) a determining person." 12 U.S.C. §5803(a). Subsection (b) further states that any reference in the fallback provision to either (1) a benchmark replacement that references LIBOR or (2) a requirement that a poll be conducted to obtain quotes "concerning interbank lending or deposit rates … shall be disregarded as if not included in the fallback provisions…." 12 U.S.C. §5803(b). In December 2022, the Federal Reserve issued the LIBOR Rule, 12 C.F.R. §253.4(b), adopting SOFR as the LIBOR benchmark replacement. ¶¶12, 47.

### C. PennyMac's Articles Require Payment of a Floating Rate

Defendant PennyMac Mortgage Investment Trust is a Maryland real estate investment trust that invests primarily in residential mortgage loans and mortgage-related assets. ¶¶2, 28. Defendant PCM is a Delaware entity that externally manages

the Trust, overseeing all aspects. *Id.* Defendants are based in and operate out of California. ¶¶28-29.

PennyMac issued two preferred share series, Series A and Series B Fixed-to-Floating Preferred Shares, in March and July 2017, respectively. ¶¶30-31, 34-35. These Floating-Rate-Shares are governed by the Articles. ¶3; Mem. 3. PennyMac raised ***over $310 million*** selling them by promising investors floating-rate dividends. ¶30. In Section 4(a) of the Series A Articles, PennyMac promised dividends equal to an initial fixed rate of 8.125% from the date of issuance in 2017 through March 14, 2024 (a "Fixed Rate Period") followed by "a floating rate equal to Three-Month LIBOR … ***plus a spread of 5.831%***" from "March 15, 2024 and thereafter." ¶¶31-32, 35-36; Ex. A §4(a); Ex. B §4(a). In Section 4(a) of the Series B Articles, PennyMac promised dividends equal to an initial fixed rate of 8.00% from issuance in 2017 through June 14, 2024, followed by "a floating rate equal to Three-Month LIBOR… ***plus a spread of 5.99%***" from "June 15, 2024 and thereafter." *Id.*

On August 25, 2023, well after LIBOR's cessation, rather than complying with the LIBOR Act and Rule as many of its competitors had done (¶¶18, 50), and despite the Preferred Shares' designation as "Fixed-to-Floating" securities, PennyMac claimed that it had a workable fallback and benchmark replacement that permitted the Preferred Shares to remain fixed-rate instruments in perpetuity, beyond the Fixed Rate Periods defined in Section 4(a) of the Articles. ¶¶15, 53. PennyMac claims that the LIBOR Act permitted it to use its outdated legacy definition of "Three-Month LIBOR" based on Section 4(g) of the Articles, which addresses only temporary LIBOR unavailability and includes the final sentence: "or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." Mem. 14. Thus, despite the language in Section 4(a), according to PennyMac, the Articles direct it to pay "the dividend rate in effect for the immediately preceding Dividend

Period…: the fixed rates." *Id*. As a result, Series A Preferred Shareholders are being paid a flat 8.125% dividend when they should be receiving 11.19%, and Series B Preferred Shareholders are receiving 8.00% instead of 11.35%. ¶19.

## III. ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing a complaint's allegations, courts must "assume the[] veracity" of all well-pleaded factual allegations, draw all reasonable inferences from them, and "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

### A. PennyMac Violated the "Unlawful" and "Unfair" Prongs of the UCL When It (1) Violated the LIBOR Act and Rule and (2) Disregarded Legislative Intent and Public Policy Underlying the LIBOR Act

Plaintiff alleges that Defendants' conduct, in violation of the LIBOR Act and Rule and their underlying policies, amounts to unlawful and unfair conduct under California's UCL. ¶¶69-87. California's UCL broadly prohibits any unlawful, unfair, or fraudulent business act or practice, with each category establishing distinct grounds for liability. *See* Cal. Bus. & Prof. Code §17200; *Rose v. Bank of Am., N.A.*, 57 Cal.4th 390, 394 (2013); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1471 (2006).

By proscribing "any unlawful" business practice, "section 17200 'borrows' violations of other laws and treats them as unlawful practices [that the unfair competition law makes] *independently* actionable." *Rose*, 57 Cal.4th at 396; *McKell*, 142 Cal. App. 4th at 1474. "Violations of federal statutes, including those governing the financial industry, may serve as the predicate for a UCL cause of action." *Rose*, 57 Cal.4th at 396. Thus, under the UCL's borrowing principle,

Defendants' violations of the LIBOR Act and Rule also constitute violations of the UCL's unlawful prong. "[T]he UCL does not serve as a mere enforcement mechanism. It provides its own distinct and limited equitable remedies for unlawful business practices, using other laws only to define what is 'unlawful.'" *Id.* at 397. PennyMac concedes that if the Court finds that Plaintiff has adequately pled a violation of the LIBOR Act and Rule, Plaintiff's UCL *unlawful* prong claim must be sustained.

**1. The Articles are Tough Legacy Contracts that Do Not Contemplate the Permanent End to LIBOR**

The Articles are "tough legacy contracts" that did not contemplate the permanent cessation of LIBOR. The Federal Reserve defines "tough legacy contracts" as "contracts that reference USD LIBOR and will not mature by June 30, 2023, but which lack adequate fallback provisions providing for a clearly defined or practicable replacement benchmark following the cessation of USD LIBOR." 88 Fed. Reg. at 5205; 12 U.S.C. §5801(b)(1).

The Articles do not contemplate the end of LIBOR and predate news of LIBOR ending by ***four years*** and its cessation by over ***ten years***. Rather, Section 4(g) is a waterfall centered on LIBOR, reflecting a series of steps (in preferential order) for when LIBOR is unavailable on a particular date by a specified time (11:00 a.m.).[11] These steps are systematic, going from polling banks, to using the LIBOR quote from the "immediately preceding Dividend Period" or "if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." This final clause does not state that PennyMac can revert to its initial fixed rate in perpetuity. But even if this final

[11] Section 4(g) of the Articles states that Three-Month LIBOR must be calculated "for each Dividend Period during the Floating Rate Period," providing a series of steps for how to calculate "Three-Month LIBOR" when a LIBOR quote is unavailable at "11:00 am (London time) on the relevant Dividend Determination Date." *See* Ex. A §4(g); Ex. B §4(g).

clause means what PennyMac claims it means, it is part of a highly integrated clause that cannot be severed. *Graham Oil Co. v. ARCO Prods. Co*., 43 F.3d 1244, 1248-49 (9th Cir. 1994), as amended (Mar. 13, 1995) (striking entire arbitration clause though only portions violated federal law because it was not severable).[12] Nor is Section 4(g) workable given the language in Section 4(a) requires a spread of 5.831% or 5.99% *over LIBOR* (i.e., a floating rate) during the floating-rate period. That obligation is a clear, separate indication that neither party contemplated using a fixed rate in perpetuity. Section 4(a) does not simply vanish.

As such, Section 4(g) does not provide a clearly defined or practicable fallback provision. And to the extent there is ambiguity as to the adequacy of Section 4(g), the legislative history makes clear that this is the exact type of contract the LIBOR Act sought to reform by mandating the adoption of SOFR.[13]

**2. A Fixed Interest Rate Is Neither a Benchmark Nor Benchmark Replacement**

Additionally, the Articles do not reference an alternative benchmark to replace LIBOR. PennyMac erroneously asserts that the definition of "benchmark

[12] The Articles similarly do not have a severability or survival clause.

[13] The legislative record is filled with references to this problem of waterfalls in floating rate instruments referring only to LIBOR and not contemplating LIBOR's demise. For example, as Mr. Coates explained, many contracts simply "did not contemplate the permanent cessation of LIBOR[,]" for an orderly transition away from LIBOR. Pratsinakis Decl. Ex. 1 (House Hrg.) at 14. Similarly, Mark Van Der Weide, General Counsel for the Federal Reserve, affirmed that the LIBOR Act was designed to address such permanent cessation scenarios not contemplated by contracts. *Id.* at 62-63. The Securities Industry and Financial Markets Assoc. (SIFMA) testified that tough legacy contracts "executed prior to LIBOR cessation and in many cases prior to the development/adoption of robust fallback language (e.g., 2019-2020) … were not designed at the time of issuance with a permanent cessation, of LIBOR in mind." *Id.* at 95, 97; *see also* ARRC, *Second Report—The Alternative Reference Rate Committee*, at 25, 27 (Mar. 2018), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2018/ARRC-Second-report (most contracts referencing LIBOR "do not envision the possibility that LIBOR might permanently cease and have fallbacks that would not be economically appropriate if such an event occurred"). *See, infra,* Section A.3.

replacement" in the LIBOR Act encompasses ***fixed interest rates***. But investors were promised ***floating rates*** and never warned of even the possibility of a permanent fixed rate.

PennyMac cannot escape the LIBOR Act's definition of "***benchmark***"—an "index of interest rates or dividend rates that is used … as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." 12 U.S.C. §5802(1). A fixed rate is disassociated from an index.[14] A "fixed interest rate" is "[a]n interest rate that is specified and is not subject to change," and a "floating rate" is "a varying interest rate that is tied to a financial index such as the prime rate." Black's Law Dictionary (12th ed. 2024). The LIBOR Act identifies prime rate and Federal funds rate as example benchmark replacements. *Id.* §5803(f)(2).

The term "benchmark replacement" incorporates the meaning of "benchmark" and builds on it:

> The term "benchmark replacement" means a benchmark, **or an interest rate or dividend rate (which may or may not be based in whole or in part on a prior setting of LIBOR)**, to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract.

*Id.* §5802(3).

[14] Pratsinakis Decl. Ex. 1 (House Hrg.) 62 ("[A] contract converts to a fixed rate when LIBOR ends, a party [is] disadvantaged by that conversion [and] might request that a court reform the contract by substituting an alternative floating rate for LIBOR."); Pratsinakis Decl. Ex. 2 (Senate Hrg.) 120 (statement of Andrew Pizor, Staff Attorney, National Consumer Law Center) ("People have had expectations about what LIBOR would do, what their rates would be like in the future. And so it is appropriate that ***whatever index*** replaces that should be as close as possible to the LIBOR to match those expectations, and that will be the SOFR.").

PennyMac contends that the **red clause** creates items in a series, but this misconstrues the language, construction, and purpose of the Act, going well beyond the legislative and ordinary meaning of "benchmark." *Rodriguez v. Sony Computer Entm't Am., LLC*, 801 F.3d 1045, 1051 (9th Cir. 2015) (holding "phrases must be construed in light of the overall purpose and structure of the whole statutory scheme").

The **red clause** ***does not*** convey items in a series. This is made plain by the lack of an Oxford comma and use of "**, or**" immediately after "benchmark" instead of the "next to-last item only." *See* House Legislative Counsel's Manual on Drafting Style (Dec. 2020), https://legcounsel.house.gov/sites/evo-subsites/legcounsel-evo.house.gov/files/documents/ManualDraftStyle_2022.pdf, at 44 ("(iii) each item (other than the last item) ends with a comma ... (iv) the conjunction 'and' or 'or' appears at the end of the next to-last item only"). Moreover, Section 5802(3) uses an Oxford comma for a series within the same definition ("on a temporary, permanent**,** or indefinite basis"), which further supports that the **red clause** is not a series. 12 U.S.C. §5802(3).

The only logical reading is that the **red** clause is an appositive clause intended to explain (not contradict) the term "benchmark." *See Collins v. Unum Life Ins. Co. of Am.*, 185 F. Supp. 3d 860, 874 (E.D. Va. 2016) (holding that "appositive clauses contained within commas are said to be 'nonrestrictive'... A nonrestrictive clause 'can be omitted without obscuring the identity of the noun to which it refers'" (citing The Chicago Manual of Style §6.23 (16th ed. 2010))), *aff'd*, 700 F. App'x 205 (4th Cir. 2017). Upon removing the appositive clause, the statutory language reads: "The term 'benchmark replacement' means a benchmark … to replace LIBOR or any interest rate or dividend rate based on LIBOR.…" *Id.*

Contrary to its contention, the Articles do not reference an alternative benchmark to LIBOR. The final clause at the end of the waterfall in Section 4(g)

points to a fixed rate which is not a benchmark rate. Nor does inclusion of the word "temporary" in the definition of "benchmark replacement" render Section 4(g) workable. Mem. 15-16. PennyMac was required to adopt SOFR, as many of its competitors had done. By failing to do so, PennyMac violated the LIBOR Act and the UCL.

### 3. The LIBOR Act Was Enacted to Prevent Adjustable-Rate Securities from Unfairly Converting into Permanent Fixed-Rate Instruments

While the LIBOR Act (and PennyMac's violation if it) is clear, the Court may refer to legislative history if the statutory language is unclear or ambiguous. *See, e.g., Lee v. CarMax Auto Superstores Cal., LLC*, No. CV-13-7648-MWF-VBKx, 2013 WL 12473808, at *6-7 (C.D. Cal. Dec. 2, 2013).

Nowhere in the hundreds of pages of historical legislative records does *anyone* suggest that a fixed rate qualifies as a benchmark replacement or adequate fallback provision. The legislative record demonstrates the ***opposite***—stating that a goal is to prevent floating-rate instruments from unfairly converting into fixed-rate instruments.

Congressman Brad Sherman urged Congress to pass the LIBOR Act, stating: "trillions of outstanding loans [] have adjustable interest rates … tied to… [LIBOR,] the most important interest rate in the world. We are dealing here with ***adjustable rate*** mortgages, business loans and securities, … [and] [f]or many years LIBOR was the index." Pratsinakis Decl. Ex. 3 (Congressional Record (House), *Adjustable Interest Rate (LIBOR) Act of 2021*, 167 Cong. Rec. H7479-01 (Dec. 8, 2021)). In his congressional testimony, Mark Van Der Weide, the General Counsel of the Federal Reserve, explained the dilemma:

> A key question is whether existing LIBOR-based contracts (legacy contracts) can seamlessly transition to alternative reference rates when

> LIBOR ends. … [M]ost business loans have workable fallback language—by their terms, business loans generally fall back to an alternative floating rate, such as the prime rate .... ***Conversely, many floating-rate notes and securitizations have problematic fallback language—generally, these contracts convert to fixed-rate instruments at the last published value of LIBOR****....* [I]f a legacy contract converts to a fixed rate when LIBOR ends, a party disadvantaged by that conversion might request that a court reform the contract by substituting an alternative floating rate for LIBOR.

Pratsinakis Decl. Ex. 1 (House Hrg.) 62. Van Der Weide further testified:

> Federal legislation should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks***, or that convert to fixed-rate instruments***.

*Id.* at 63.

Thus, the legislative record supports the finding that PennyMac's decision to convert its floating-rate notes into fixed-rate notes is what Congress sought to prevent with the LIBOR Act. PennyMac's alleged misconduct, therefore, violates the unlawful prong of the UCL. ¶¶21-23, 69-87. The Class was, and will continue to be, denied the dividends promised and owed, unless this action proceeds.

**B. PennyMac's Misconduct Violated the UCL's Unfairness Prong**

"Under the UCL's unfairness prong, courts consider either: (1) whether the challenged conduct is tethered to any underlying constitutional, statutory or regulatory provision ... [the "tethering test"]; (2) whether the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers [the "balancing test"]; or (3) whether the practice's impact on the victim outweighs the reasons, justifications and motives of the alleged wrongdoer [the "FTC test"]."

*Turner v. Porsche Cars N. Am., Inc.*, No. CV23-6465-MWF-BFMx, 2024 WL 3533834, at *4 (C.D. Cal. June 19, 2024) (Fitzgerald, J.). The Court only needs to find Plaintiff's allegations meet one of these tests for PennyMac's motion to be denied. *E.H. v. Meta Platforms, Inc.*, No. 23-CV-04784-WHO, 2024 WL 557728, at *6 (N.D. Cal. Feb. 12, 2024).

PennyMac allegedly took advantage of ordinary retail investors who have and will continue to lose dividend income from their retirement portfolios and otherwise. (¶20). Series A investors should have received 11.19% interest instead of 8.13%, and Series B investors should have received 11.35% instead of 8.00%. ¶¶9-10, 12-21, 41-45, 49-60, 73-82.

Even if the Court were to find that this practice is not explicitly prohibited by the LIBOR Act, its legislative history and policy goals make clear that it was unethical and significantly harmful to consumers, thus satisfying the balancing test. *Zuniga v. Bank of Am. N.A.*, No. CV14-06471, 2014 WL 7156403, at *9 (C.D. Cal. Dec. 9, 2014) (Fitzgerald, J.) (legislative history may contribute to a finding of unfairness). For the same reasons, this conduct also satisfies the FTC test, as PennyMac has no policy justification that outweighs the significant harm here. Additionally, the LIBOR Act provides a clear public policy mandate to transition to SOFR under these circumstances, which supports Plaintiff's claim under the tethering test. *See In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 989-90 (N.D. Cal. 2016).

PennyMac's claim that transitioning to SOFR would unfairly favor preferred shareholders over common stockholders (Mem. 20-21) overlooks the mandate of the LIBOR Act and the obligations under the Articles. PennyMac does not owe common stockholders a duty to violate the law and its contractual obligations when it is economically advantageous for them.

PennyMac's assertion that fixed rates may hypothetically surpass floating rates is unavailing. Mem. 20-21. PennyMac's decision to violate the LIBOR Act to avoid higher payouts in today's high-interest-rate environment is a tangible harm. ¶¶18, 78. PennyMac's alleged misconduct, therefore, violates the unlawful prong of the UCL.

**C. PennyMac is Not Shielded by Federal Preemption or the UCL's Safe Harbor**

PennyMac's attempts to invoke federal preemption and UCL safe harbor defenses are unavailing.

PennyMac raises these defenses primarily in the context of Plaintiff's unfairness prong UCL claim; it assumes that its actions were lawful under the LIBOR Act and Rule and then argues (a) that, as a result, the UCL Safe Harbor precludes bringing a UCL claim against its lawful compliance, and (b) Plaintiff is pre-empted by the federal LIBOR Act and Rule from asserting state law claims. Neither are correct.

**UCL Safe Harbor.** To qualify for protection under the UCL's safe harbor, a statute must either explicitly prohibit liability or expressly preclude an action based on the alleged conduct. *See BBBB Bonding Corp. v. Caldwell*, 73 Cal. App. 5th 349, 377 (2021); *Abeyta v. DMCG, Inc.*, No. 22-CV-07089-SI, 2023 WL 3047054, at *2 (N.D. Cal. Apr. 20, 2023). As the UCL claim here is not one based on a lawful act, the statute's safe harbor provision does bar Plaintiff's UCL claims. And even if PennyMac's actions were found to not be expressly barred by the LIBOR Act and Rule, that does not preclude Plaintiff's unfairness prong claim as to whether the fixed rate selected by PennyMac was fair to investors.

**Federal Preemption.** Contrary to PennyMac's contention (Mem. 10, 18-19), Plaintiff is not arguing that state law should override federal law to impose an alternative reference rate. Simply put, Plaintiff asserts that Defendants violated

federal law, and that this violation in turn constitutes a violation of the UCL, which borrows violations of other laws and makes them independently actionable under the UCL's unlawful prong. *See, e.g.*, *McKell* 142 Cal. App. 4th at 1485 (plaintiffs were not using the UCL to impose state law on a federal savings association, but rather to demonstrate that the defendant violated federal law). As the *McKell* court found, using the UCL as described does not "interfere in any way with the operation of the federal law," as the UCL "only provides a means of enforcing federal requirements." *Id*. at 1485-86. Federal preemption does not apply.

**D. California Law Applies to this Dispute**

**1. The Articles Contain No Choice-of-Law Provision**

"A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." *Vrugtman v. It's Just Lunch Int'l LLC*, No. 20-2352-JGB-SPx, 2021 WL 4979443, at *3 (C.D. Cal. Sept. 24, 2021). Moreover, the law of the state in which a court sits determines the enforceability of a choice-of-law clause. *Id*. "This applies to actions brought under the Class Action Fairness Act as well, since CAFA is based upon diversity jurisdiction." *Id.*

At the center of this dispute is the LIBOR Act and its interplay with the Articles, which have no choice-of-law provision. California-based entities violated federal law to the detriment of retail investors located in California and nationwide. While the PennyMac Trust was formed under Maryland law, and its external manager PCM under Delaware law, both Defendants are based in and operate out of California. ¶¶28-29. The misconduct occurred in California (¶26), and one can readily infer that responsible employees, officers, and directors reside in California, and that PennyMac's statements and public filings emanated from California (¶¶21, 25-26, 28-29). Under similar circumstances, California courts apply California law. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 594 (9th. Cir. 2012) (applying California law to out-of-state parties when the misconduct occurred in California);

*see also Florida v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1312 (S.D. Fla. 2005) (same).

Despite California's strong connection to this action and overarching interest in deterring corporate misconduct that takes place within its borders, PennyMac asserts that Maryland law applies because of a choice-of-law clause in another completely irrelevant document—the Declaration of Trust. As PennyMac acknowledges, the "governing documents" at issue here are the Articles (Mem. 1), and those have no choice-of-law provision (*see* Exs. A & B).

PennyMac asserts *multiple times* that the Articles are incorporated into the Declaration by operation of law. Mem. 3, 8, 9. PennyMac is overreaching. The Articles state that they ***"may"*** become part of Article VI of the Declaration upon a restatement, expressing a possibility and not a certainty. *See* Ex. A at 1; Ex. B at 1 ("upon any restatement of the Declaration of Trust, [the Articles Supplementary] may become part of Article IV of the Declaration of Trust...."). That a declaration of trust can be amended through articles supplementary under Maryland law does not negate the language here. Md. Code Ann., Corps. & Ass'ns §8-101(b). PennyMac could have filed a restatement, but never did. *See* Pratsinakis Decl. Ex. 5 (official list of PennyMac filings from Maryland Dept. of Assessments and Taxation). Defendants' reliance on *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94 (Md. 2021) (Mem. 8 n.6), is misplaced because there, unlike here, the issue of whether the articles amended the declaration was not raised and Impac's articles provide greater certainty. Pratsinakis Decl. Ex. 6, at 187 (Impac's Articles) ("upon any restatement of the Charter, [the Articles] ***shall*** become part of… the Charter").

### 2. This Dispute Falls Outside the Scope of the Declaration's Choice-of-Law Provision

Even if the choice-of-law provision applied, this dispute falls outside its narrow scope:

> [T]he rights of all parties and the validity, construction and effect of every provision hereof shall be subject to and construed according to the laws of the State of Maryland without regard to conflicts of laws provisions thereof.

Ex. C, §13.1, at 20. The narrow clause applies to provisions of the Declaration, which are extraneous to this Action. Courts refuse to apply narrow choice-of-law provisions to extra-contractual claims where, as here, the contract containing the clause is not at issue. *Ochoa v. Zeroo Gravity Games LLC*, No. CV22-5896-GW-ASx, 2023 WL 4291650, at *11 (C.D. Cal. May 24, 2023) (false advertising, fraud, and consumer protection statutory claims did not sound in contract); *Urica, Inc. v. Pharmaplast, S.A.E.*, No. CV11-02467-MMM-RZx, 2013 WL 12123305, at *11 (C.D. Cal. Jan. 10, 2013) (contract language of "construed and enforced in accordance with the laws of Illinois" narrowly applied to contract claims, not related tort claims). This is not a dispute arising from the Declaration. It is a dispute over whether PennyMac violated the LIBOR Act, enacted ***thirteen years*** after the Declaration was filed.

### 3. Enforcing the Declaration's Maryland Choice-of-Law Provision Violates a Fundamental California Policy

Even if the Maryland choice-of-law provision in the Declaration applied to the instant dispute, the Court *still* should not enforce it.

Courts apply a multi-factor test in deciding whether it should enforce a choice-of-law clause. *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 466 (1992). The court first considers "whether the chosen state has a substantial relationship to the parties or their transaction" and/or "whether there is any other reasonable basis for the parties' choice of law." *Id*. If either test is met, "the court must next determine whether the chosen state's law is contrary to a fundamental policy of California." *Id*. If "there is a fundamental conflict with California law," the court must then

determine whether California has a materially greater interest than the chosen state in the determination of the particular issue." *Id*. Finally, "[i]f California has a materially greater interest than the chosen state, the choice of law shall not be enforced" as "contrary to this state's fundamental policy." *Id*.

While Maryland has an interest because one of two Defendants is incorporated there,[15] the Maryland Consumer Protection Act ("CPA"), which is California's UCL equivalent, conflicts with the fundamental California policy of allowing private parties to act on behalf of the Attorney General to hold California-based companies accountable and to seek equitable relief for the public. *See, e.g.*, *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031, 1042 (N.D. Cal. 2010). The *Walter* court compared California's UCL to Maryland's CPA and found that enforcing the Maryland choice-of-clause would deprive the plaintiff of the right to seek injunctive relief on behalf of the public. *Id.* at 1041-42.[16] That conflict still exists today. Md. Code Ann., Com. Law § 13-406 & § 13-408 (authorizing only its Attorney General to seek injunctive relief and consumers the right to seek damages only). As in *Walter*, enforcing a Maryland choice-of-law provision here would be "contrary to a fundamental policy of California" because it will deprive Plaintiff the ability to secure injunctive relief for the public. 682 F. Supp. 2d at 1041 ("[w]here a difference in available remedies implicates a fundamental policy set out in California law, the reviewing court must at least take pause before it allows the parties to contract around those policies by choosing to apply foreign law.").

PennyMac's reliance on *Century 21 Real Estate LLC v. All Prof. Realty, Inc.*,

[15] *Jialu Wu v. iTalk Glob. Commc'ns, Inc.*, No. CV20-7150-PSG-PJWx, 2020 WL 8461696, at *4 (C.D. Cal. Oct. 21, 2020) (Texas has a substantial relationship because the defendant is incorporated there).

[16] *See Vrugtman*, 2021 WL 4979443, at *8-9 (refusing to enforce Nevada choice-of-law clause that conflicted with California policy); *Jialu Wu,* 2020 WL 8461696, at *6 (refusing to enforce Texas choice-of-law clause where the defendant could not demonstrate that the plaintiff would be able to seek a public injunction under Texas' Deceptive Trade Practices Act).

600 F. App'x 502, 504 (9th Cir. 2015), is entirely misplaced. In *Century*, enforcement of the choice-of-law provision did not actually interfere with a fundamental California policy because the agreement contained the same rights and protections as the California statute. *See Century 21 Real Est. LLC v. All Prof. Realty, Inc.*, 889 F. Supp. 2d 1198, 1217 (E.D. Cal. 2012), *aff'd*, 600 F. App'x 502 (9th Cir. 2015). The *Century* court noted there was no actual interference with a fundamental California policy. *Id.* at 1217 nn.14-15 ("The mere fact that the chosen law provides greater or lesser protection than California law would" is insufficient). Here, the Articles do not cure the conflict by affording Plaintiff the right to seek injunctive relief on behalf of the public. Thus, enforcing the Maryland choice-of-law clause ***actually*** interferes with this fundamental California policy.

Finally, California has a materially greater interest than Maryland in applying its laws to this dispute. *Walter*, 682 F. Supp. 2d at 1042. Both Defendants are based in California, the principal bad actors are based in California, and the misconduct occurred there, while only one Defendant is incorporated in Maryland. *See Ribbens Int'l., S.A. de C.V. v. Transport Int'l. Pool, Inc.*, 47 F. Supp. 2d 1117, 1123 (C.D. Cal. 1999) (finding California had a materially greater interest over Pennsylvania where transaction took place in California and business dealings were concentrated there); *see also Bermudez v. PrimeLending*, No. LA-CV12-00987-JAK-Ex, 2012 WL 12893080, at *6 (C.D. Cal. Aug. 14, 2012) (same). The Court should not enforce the Maryland choice-of-law clause.

## IV. <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court deny PennyMac's motion to dismiss or, in the alterative, grant Plaintiff leave to amend his Complaint under Rule 15(a)(2), which is "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) ("This policy [in Rule 15(a)(2)] is to be applied with extreme liberality.").

Dated: October 11, 2024

**BERMAN TABACCO**

By: */s/ Daniel E. Barenbaum*
Daniel E. Barenbaum

Nicole Lavallee
Jeffrey Rocha
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
dbarenbaum@bermantabacco.com
jrocha@bermantabacco.com

Catherine Pratsinakis (*pro hac vice*)
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7013
Email: cpratsinakis@dilworthlaw.com

*Attorneys for Plaintiff Roberto Verthelyi and the Putative Class*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Roberto Verthelyi, certifies that this brief contains 6,892 words, which complies with the word limit of L.R. 11-6.1.

*/s/ Daniel E. Barenbaum*
Daniel E. Barenbaum

*Attorney for Plaintiff Roberto Verthelyi and the Putative Class*

# Exhibit 3

UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Jonas P. Mann (SBN 263314)
767 S. Alameda St., Suite 270
Los Angeles, California 90021
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com
jonas@umklaw.com

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)
sfarina@wc.com
mcollins@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Telephone: 202-434-5000
Facsimile: 202-434-5029

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ROBERTO VERTHELYI, on behalf of himself and all others similarly situated,

Plaintiff,

v.

PENNYMAC MORTGAGE INVESTMENT TRUST; PNMAC CAPITAL MANAGEMENT, LLC,

Defendants.

Case No. 2:24-cv-05028-MWF

**PENNYMAC MORTGAGE INVESTMENT TRUST'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Hearing Date: Nov. 18, 2024
Time: 10:00 a.m.
Place: Courtroom 5A
Judge: Michael W. Fitzgerald

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on November 18, 2024, at 10:00 a.m., or such other date ordered by the Court, in Courtroom 5A of this Court, located at First Street Courthouse, 350 W. First Street, Los Angeles, California, Defendant PennyMac Mortgage Investment Trust ("PennyMac") will and hereby does move the Court for an order dismissing Plaintiff's Complaint and each claim therein without leave to amend.

This Motion is made pursuant to Federal Rules of Civil Procedure 12(b)(6) on the grounds that the Complaint fails to state a claim. PennyMac's Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, any reply memorandum, the pleadings and filings in this action, and such other matters as may be presented at or before the hearing. PennyMac respectfully requests oral argument on this Motion.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on August 13, 2024.

Dated: August 20, 2024 Respectfully submitted,

*/s/ Matthew Donald Umhofer*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Jonas P. Mann

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

WILLIAMS & CONNOLLY LLP
Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ... 1
II. BACKGROUND ... 3
A. The Parties and the Preferred Shares ... 3
B. The Discontinuation of LIBOR and the LIBOR Act ... 4
C. The Impact of LIBOR's Cessation and the LIBOR Act on the Preferred Shares ... 7
III. LEGAL STANDARD ... 7
IV. ARGUMENT ... 8
A. Plaintiff Cannot State a Claim Under California's Unfair Competition Law Because Maryland Law Governs. ... 8
B. Plaintiff Fails to State a Claim Under the UCL. ... 10
1. PennyMac's Actions Complied with the LIBOR Act and Were Not "Unlawful" Under the UCL. ... 11
2. PennyMac's Interpretation is Protected by the UCL's Safe Harbor. ... 17
3. Plaintiff Fails To State a Claim that PennyMac's Lawful Interpretation of its Articles Pursuant to the LIBOR Act Is "Unfair" Under the UCL. ... 18
V. CONCLUSION ... 21

## TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE(S)**

*Aliya Medcare Fin., LLC v. Nickell*, 2015 WL 4163088 (C.D. Cal. July 9, 2015) ....... 10

*Alvarez v. Chevron Corp.*, 656 F.3d 925 (9th Cir. 2011) ....... 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....... 7

*Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d 954 (C.D. Cal. 2015) ....... 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....... 7

*Bresler v. Wilmington Tr. Co.*, 348 F. Supp.3d 473 (D. Md. 2018) ....... 9

*Century 21 Real Estate LLC v. All Prof. Realty, Inc.*, 600 F. App'x 502 (9th Cir. 2015) ....... 10

*Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) ....... 19

*Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059 (E.D. Cal. 2006) . 10

*Crosby v. California Physicians' Serv.*, 279 F. Supp. 3d 1074 (C.D. Cal. 2018) ....... 19

*Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152 (9th Cir. 2012) ....... 19

*Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149 (2018) ....... 12

*Fleming v. Charles Schwab Corp.*, 878 F.3d 1146 (9th Cir. 2017) ....... 18

*Flores v. Wells Fargo Bank, N.A.*, 2012 WL2427227 (N.D. Cal. June 26, 2012) ....... 20

*Hadley v. Kellogg Sales Co.*, 243 F. Supp.3d 1074 (N.D. Cal. 2017) ....... 18

*Holland v. Gen. Motors LLC*, 2024 WL 1680062 (C.D. Cal. Jan. 25, 2024) ....... 19, 20

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) ....... 10

*Kim v. Cedar Realty Tr., Inc.*, 2023 WL 4896635 (D. Md. Aug. 1, 2023) ....... 20

*Krasner v. Cedar Realty Tr., Inc.*, 86 F.4th 522 (2d Cir. 2023) ....... 9

*Levitt v. Yelp! Inc.*, 765 F.3d 1123 (9th Cir. 2014) ....... 11

*Lozano v. AT&T Wireless Servs.*, Inc., 504 F.3d 718 (9th Cir. 2007) ....... 19

*Melt Franchising, LLC v. PMI Enters., Inc.*, 2009 WL 32587 (C.D. Cal. Jan. 2, 2009) ....... 10

*Millam v. Energizer Brands, LLC*, 2022 WL 19001330 (C.D. Cal. Dec. 9, 2022) ....... 18

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ....... 19

*Pac. Recovery Sols. v. United Behav. Health*, 508 F. Supp. 3d 606 (N.D. Cal. 2020) . 19

*Pro Water Sols., Inc. v. Angie's List, Inc.*, 2021 WL 124496 (C.D. Cal. Jan. 13, 2021) ........ 9

*Rice v. Sunbeam Prods., Inc.*, 2013 WL 146270 (C.D. Cal. Jan. 7, 2013) ........ 20

*Steckman v. Hart Brewing, Inc.*,143 F.3d 1293 (9th Cir. 1998) ........ 7

*Stender v. Archstone-Smith Operating Tr.*, 2014 WL 5152002 (D. Colo. Oct. 14, 2014) ........ 8

*United States v. 1.377 Acres of Land*, 352 F.3d 1259 (9th Cir. 2003) ........ 16

*Vitek v. Bank of America, N.A.*, 2014 WL 1042397 (C.D. Cal. Jan. 23, 2014) ........ 10

*Webb v. Smart Documents Solutions, LLC*, 499 F.3d 1078 (9th Cir. 2007) ..... 11, 16, 17

**STATE CASES** **PAGE(S)**

*Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal. App. 4th 1134 (2003) ........ 17

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ... 17

*Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247 (2010) ........ 19, 20

*Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89 (Md. 2021) ........ 8

*Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459 (1992) ........ 9

*People ex rel. Harris v. Delta Air Lines, Inc.*, 247 Cal. App. 4th 884 (2016) ........ 19

*Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906 (2001) ........ 9

*Wildewood Operating Co., LLC v. WRV Holdings, LLC*, 303 A.3d 1273 (Md. App. Ct. 2023) ........ 16

**STATUTES** **PAGE(S)**

12 U.S.C. § 5801 ........ 5, 13, 17, 18

12 U.S.C. § 5802 ........ *passim*

12 U.S.C. § 5803 ........ *passim*

12 U.S.C. § 5804 ........ 13

12 U.S.C. § 5806 ........ 6, 19

12 U.S.C. § 5807 ........ 5

15 U.S.C. § 78bb ........ 18

Cal. Bus. & Prof. Code § 17200 .......... 1, 10
Md. Code Ann., Corps. & Ass'ns § 2-105.......... 8
Md. Code Ann., Corps. & Ass'ns § 2-208.......... 8
Md. Code Ann., Corps. & Ass'ns § 8-101.......... 3, 8
Md. Code Ann., Corps. & Ass'ns § 8-102.......... 9
Md. Code Ann., Corps. & Ass'ns § 8-201.......... 3, 8, 9
Md. Code Ann., Corps. & Ass'ns § 8-203.......... 3, 9

**REGULATIONS** **PAGE(S)**

Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204 (Jan. 26, 2023) (codified at 12 C.F.R. part 253).......... 5, 7, 13

**OTHER AUTHORITIES** **PAGE(S)**

Alt. Ref. Rates Comm., *Proposed Legislative Solution to Minimize Legal Uncertainty and Adverse Economic Impact Associated with LIBOR Transition* (2020), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2020/ARRC-Proposed-Legislative-Solution.pdf .......... 16
Black's Law Dictionary (11th ed. 2019) .......... 14
*SOFR Averages and Index Data*, Fed. Rsrv. Bank of New York (last accessed Aug. 14, 2024), https://www.newyorkfed.org/markets/reference-rates/sofr-averages-and-index.......... 21
Julia Kagan, *LIBOR: What was the London Interbank Offered Rate, and How Was It Used?*, Investopedia (June 21, 2024), https://www.investopedia.com/terms/l/libor.asp#citation-1.......... 5

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Roberto Verthelyi brings this putative class action pursuant to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, erroneously contending that a 2021 statute enacted by Congress, the Adjustable Interest Rate (LIBOR) Act, overrides the contractual terms he and others agreed to when they purchased preferred shares of PennyMac Mortgage Investment Trust ("PennyMac"). It does not.

PennyMac set out the terms for issuing dividends on its preferred shares in the governing documents authorizing those shares, the Articles Supplementary (the "Articles"). Although the Articles envision that the dividends will transition from a fixed rate to a floating rate based on the London Inter-Bank Offered Rate ("LIBOR"), they also contain provisions the parties agreed would apply if the LIBOR rate were unavailable.

When LIBOR was discontinued in 2023, PennyMac applied the fallback provisions in the Articles. After disregarding any LIBOR- and polling-based provisions as directed by the LIBOR Act and its implementing regulations, the Articles provide that dividends be issued at the dividend rate in effect during the prior period. Following these clear terms, PennyMac has continued to issue dividends for the preferred shares at their respective initial fixed rates. Plaintiff, however, contends that the LIBOR Act required PennyMac to transition to a floating dividend rate based on the Secured Overnight Financing Rate ("SOFR").

Plaintiff's claim fails. The LIBOR Act fills gaps in financial instruments that had no practicable fallback provisions and would effectively cease to function without LIBOR, by directing such instruments to use a SOFR-based rate instead. The Act, however, does not override contractual language that provides a functional fallback, expressly stating that the statute does not "alter or impair" terms calling for the use of replacement rates not based on LIBOR. 12 U.S.C. § 5803(f)(2).

Plaintiff nonetheless contends that PennyMac's contractual fallback should be disregarded, arguing that the preferred shares' fallback provisions are directed at temporary LIBOR unavailability, while only provisions "accounting for the permanent cessation of LIBOR" survive the LIBOR Act. Class Action Complaint, ECF No. 1 (June 14, 2024) ("Compl.") ¶ 14; *see id.* ¶¶ 45, 56. But this supposed distinction between temporary and permanent replacements—the basis for Plaintiff's entire Complaint—is pulled from thin air, with no grounding in either the Articles or the LIBOR Act. The Articles' fallback provisions are not limited to "temporary delay[s] in the reporting of LIBOR rates," *id.* ¶ 56 (emphasis omitted), but even if they were, the LIBOR Act makes clear that specific, non-LIBOR based fallback rates—whether temporary or permanent—remain in effect.

Fundamentally, none of this forms the basis for a claim under the UCL. As an initial matter, disputes over shareholders' rights under the Articles are governed by Maryland law, not California law, so the UCL does not apply and Plaintiff's claim must be dismissed. But even if the UCL did apply, Plaintiff has not stated a claim. PennyMac's adherence to the Articles complies with the LIBOR Act, which expressly permits contracts like PennyMac's to continue using their contractual replacement rates. PennyMac's conduct is therefore not "unlawful" under the UCL, and it is protected by the UCL's safe harbor.

Any effort to extend the UCL's "unfair" prong to impose liability on actions that are in accordance with the LIBOR Act fares no better. The LIBOR Act preempts state laws relating to the selection of replacement rates, precluding a court from finding that a state law like the UCL imposes requirements on rates beyond those in the LIBOR Act. And, importantly, there is nothing unfair here. The Articles and the LIBOR Act govern, and PennyMac is simply applying their terms.

Indeed, if anything is unfair, it would be Plaintiff's reading. Plaintiff seeks to impose a requirement that does not exist in the statute and disregard agreed-upon contractual language, in a way that Plaintiff believes would be to his and other preferred

shareholders' advantage. *See* Compl. ¶ 78. But Plaintiff's approach ignores PennyMac's duties to its common shareholders, whose equity would be improperly diminished by distributing company assets to the preferred shareholders where not required. Fairness requires that PennyMac honor the terms of its agreements, and issue dividends pursuant to its contractual terms and the LIBOR Act. That is exactly what PennyMac has done here. Accordingly, Plaintiff's claim should be dismissed with prejudice.

## II. BACKGROUND

### A. The Parties and the Preferred Shares

PennyMac is a Real Estate Investment Trust ("REIT") organized under Maryland law. Compl. ¶ 28. Its operations are managed by PNMAC Capital Management, LLC ("PCM"), a Delaware limited liability company. *Id.* ¶¶ 28–29. PennyMac has two classes of stock: common and preferred. *See id.* ¶ 33.

At issue here are the terms of two series of PennyMac's preferred stock: the Series A and Series B Fixed-to-Floating Preferred Shares ("Preferred Shares"), which were issued in March 2017 and July 2017, respectively (attached as Exhibit A and Exhibit B).[1] Compl. ¶¶ 31, 35. Each series was issued pursuant to its Articles, *id.* ¶ 3, which are Maryland corporate documents that authorize a REIT to issue additional shares and are incorporated into the REIT's charter document, the declaration of trust, *see* Md. Code Ann., Corps. & Ass'ns §§ 8-101(b), 8-201, 8-203(b).

The Articles provide that purchasers of the Preferred Shares ("Preferred Shareholders") receive quarterly dividends at a fixed rate for the first several years after the shares were issued. Compl. ¶¶ 31, 35; Ex. A ¶ 4(a); Ex. B ¶ 4(a). After a certain date—March 15, 2024 for the Series A and June 15, 2024 for the Series B—the dividend

[1] Both of PennyMac's Articles Supplementary and its Declaration of Trust referenced herein are attached as exhibits A–C, respectively, to the accompanying Declaration of Matthew Donald Umhofer in Support of Defendants' Request for Judicial Notice, and the Court may take judicial notice of their contents for purposes of deciding this Motion to Dismiss. *See* Request for Judicial Notice ("RJN").

rate is then set according to further contractual terms, which direct PennyMac through a waterfall of steps to determine the applicable dividend rate. Compl. ¶¶ 32, 36; Ex. A ¶¶ 4(a), (g); Ex. B ¶¶ 4(a), (g).

Specifically, the Articles provide that Preferred Shareholders are to be paid dividends at a rate based off of the contractually-defined term "Three-Month LIBOR." *See* Ex. A ¶ 4(a); Ex. B ¶ 4(a). "Three-Month LIBOR," in turn, provides contingencies for how the dividend should be calculated in a variety of circumstances. *See* Ex. A ¶ 4(g); Ex. B ¶ 4(g). Per the Articles' terms, Three-Month LIBOR is set first at a LIBOR rate appearing on a Reuters page (the "Screen Rate"). *Id.* If the Screen Rate is unavailable, a series of "fallbacks" kick in: first, Three-Month LIBOR will equal the average interest rate quoted to PennyMac from individual banks on the London or New York City markets (the "Polling Rate"). *Id.* If the Polling Rate is unavailable, then "the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period." *Id.* Finally, "if there was no such Dividend Period"—that is, there was no immediately preceding Dividend Period utilizing a Three-Month LIBOR Rate—then the Articles set the dividend rate outright: "***the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period.***" *Id.*[2]

The Articles do not limit the use of these fallback provisions to any particular circumstances; by their terms, they are applicable whenever the Screen Rate is unavailable.

**B. The Discontinuation of LIBOR and the LIBOR Act**

In June 2023—after PennyMac issued the Preferred Shares, but before the dates on which the dividend rates were set to float—the applicable LIBOR rate was discontinued. Compl. ¶ 7. The change was announced in late 2017, but did not become effective for USD LIBOR until 2023. *Id.*

---

[2] All emphases are added unless otherwise noted.

LIBOR had long been a cornerstone of global financial markets. It represented the average interest rate at which major banks could borrow funds from one another in the London interbank market and served as a key benchmark for interest rates across various financial products.[3] Although new contracts could account for the transition away from LIBOR by benchmarking to a different rate, many outstanding financial instruments already relied on USD LIBOR and, by their own terms, would not function after LIBOR was discontinued—so-called "tough legacy" instruments. *See* Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204, 5205 (Jan. 26, 2023) (codified at 12 C.F.R. Part 253).[4] These instruments were held by countless counterparties around the world, precluding as a practical matter any renegotiation of terms prior to LIBOR's cessation.

To address these otherwise non-functioning contracts, Congress passed the Adjustable Interest Rate (LIBOR) Act of 2021 ("LIBOR Act" or "Act"). *See* 12 U.S.C. §§ 5801–5807. Congress sought to create a "clear and uniform" "nationwide" process to replace LIBOR in contracts that did not otherwise provide for a replacement rate with a reference rate based on SOFR, *id.* §§ 5801(b)(1), 5802(6), 5803. At the same time, Congress expressly intended "to ***allow existing contracts that reference LIBOR but provide for the use of a clearly defined and practicable replacement rate, to operate according to their terms.***" *Id.* § 5801(b)(3). In other words, the LIBOR Act does not override contracts in which the parties had already agreed to a workable replacement as

[3]Julia Kagan, *LIBOR: What was the London Interbank Offered Rate, and How Was It Used?*, Investopedia (June 21, 2024), https://www.investopedia.com/terms/l/libor.asp#citation-1, *cited in* Compl. ¶ 4 n.1.

[4] Congress delegated regulatory responsibilities to the Federal Reserve Board, 12 U.S.C. § 5807, which published its final rule in 2023, *see* 12 C.F.R. Part 253. Although the implementing regulations provide more detail on the Board-selected replacement rate when one is required, they largely mirror the Act in terms of determining whether a switch to a SOFR-based rate is mandatory. *Compare*, *e.g.*, 12 U.S.C. § 5803(a)–(b) *with* 12 C.F.R. § 253.3(a).

a fallback. In line with these goals, the LIBOR Act also expressly preempts state law "relating to the selection and use of a benchmark replacement" rate. *Id.* § 5806(1).

The Act serves as a gap-filler for tough legacy contracts—contracts that would not, by their own terms, function after the cessation of LIBOR—by requiring those instruments to transition to a SOFR-based benchmark replacement rate. *Id.* § 5803(a)–(b). It requires parties to evaluate instruments benchmarked to LIBOR and their "fallback provisions" to determine whether a switch to SOFR is mandatory. *Id.* "Fallback provisions" are "terms in a LIBOR contract for determining a benchmark replacement…." *Id.* § 5802(11). A "benchmark replacement," in turn, is "a benchmark" (*i.e.*, an index or reference rate), "or an interest rate or dividend rate … to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis…." *Id.* § 5802(3).

Specifically, on the first business day after June 30, 2023, parties were to "disregard[]" "reference[s]" in contracts' "fallback provisions" to (1) "benchmark replacements" based on LIBOR, such as those which require use of the last-published LIBOR value, and to (2) requirements that parties "poll" banks, *i.e.*, ask banks to quote their estimate of LIBOR to the parties directly. *Id.* §§ 5802(17), 5803(b). If, after disregarding those two references, an instrument does not include another "specific benchmark replacement" or a "determining person,"[5] the LIBOR Act directs the instrument to switch to the Federal Reserve Board-selected, SOFR-based benchmark replacement rate. *Id.* § 5803(a).

Contracts that provide for non-LIBOR-based fallbacks, and therefore are workable by their own terms after LIBOR's cessation, remain in effect and are not directed to switch to the SOFR-based rate:

[5] A "determining person" is a person who has the authority to determine an appropriate benchmark replacement. 12 U.S.C. § 5802(10). PennyMac's Articles do not reference a "determining person," so this provision is not at issue. *See* Ex. A ¶ 4(g); Ex. B ¶ 4(g).

> Nothing in this chapter may be construed to alter or impair … (2) except as provided in subsection (b) [described above], any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value….

*Id.* § 5803(f)(2); *see also* 12 C.F.R. § 253.3(b)(2).

### C. The Impact of LIBOR's Cessation and the LIBOR Act on the Preferred Shares

Applying the plain language of the LIBOR Act to the Articles, the fallback provisions in each of the Articles contain a "specific benchmark replacement" not based on LIBOR: the dividend rate from the prior period, which is the initial fixed rate for each offering. *See* Section IV.B.1.b, *infra*. Accordingly, PennyMac informed its shareholders in August 2023 that it would continue issuing the dividends for its Preferred Shares at the initial fixed rates, and it has done so. Compl. ¶¶ 19, 53. This lawsuit followed.

## III. <u>LEGAL STANDARD</u>

When evaluating a Rule 12(b)(6) motion to dismiss, the court takes well-pleaded factual allegations as true, but need not credit legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive the motion, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible only when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court may dismiss a complaint without leave to amend and with prejudice where "any amendment would be an exercise in futility." *Steckman v. Hart Brewing, Inc.*,143 F.3d 1293, 1298 (9th Cir. 1998).

# IV. ARGUMENT

## A. Plaintiff Cannot State a Claim Under California's Unfair Competition Law Because Maryland Law Governs.

Plaintiff relies on California's Unfair Competition Law to bring a putative nationwide class action, Compl. ¶¶ 1, 21–22, but this dispute is not subject to the UCL because PennyMac's operative charter document (the "Declaration of Trust") compels the application of Maryland law. Ex. C § 13.1; *see also* Md. Code Ann., Corps. & Ass'ns § 8-201. The Declaration of Trust expressly provides that the parties' rights and the effects of its provisions are "subject to and construed according to" Maryland law:

> The Declaration of Trust is executed by the undersigned Trustees and delivered in the State of Maryland with reference to the laws thereof, and ***the rights of all parties and the validity, construction and effect of every provision hereof shall be subject to and construed according to the laws of the State of Maryland without regard to conflicts of laws provisions thereof***.

Ex. C. § 13.1.

This choice-of-law provision governs the dispute here. PennyMac issued the Preferred Shares pursuant to Articles Supplementary. Compl. ¶ 3. The Articles Supplementary are, by operation of law, part of PennyMac's Declaration of Trust, and therefore are subject to the Declaration of Trust's choice of law provision. *See* Md. Code Ann., Corps. & Ass'ns § 8-101(b) (a "declaration of trust" is "either as originally accepted for record or as amended, corrected, or supplemented by … articles supplementary").[6] Given that PennyMac is a Maryland legal entity and the Articles are

[6] Maryland's highest court has recognized that articles supplementary "are simply an amendment of the corporate charter" under the analogous provisions of Maryland law governing corporations. *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94 (Md. 2021) (citing Md. Code Ann., Corps. & Ass'ns §§ 2-105(a)(13), 2-208); *see also Stender v. Archstone-Smith Operating Tr.*, 2014 WL 5152002, at *4 (D. Colo. Oct. 14, 2014) (noting "Maryland courts consistently apply Maryland corporate law to issues involving REITs" and citing cases).

a creature of Maryland law, *id.* §§ 8-102, 8-201, 8-203, Maryland "has a substantial relationship to the parties or their transaction" and there is a "reasonable basis for the parties' choice of law," *Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 916 (2001).

The choice-of-law provision applies to the allegations here, which boil down to a disagreement over shareholder rights. *See* Compl. ¶¶ 18–19, 51–52, 57; *see also Krasner v. Cedar Realty Tr., Inc.*, 86 F.4th 522, 525 (2d Cir. 2023) (articles supplementary are "a contract between [a Maryland legal entity] and its preferred stockholders under Maryland law that defines the rights of these stockholders in connection with their securities"). There can be no question that this dispute centers on the "validity, construction and effect" of the Articles Supplementary, which are part of PennyMac's Declaration of Trust, and the "rights of all parties" thereunder. *See Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 470 (1992) ("[A] valid choice-of-law clause" in the parties' agreement "encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized[.]"); *see also Bresler v. Wilmington Tr. Co.*, 348 F. Supp.3d 473, 488 n.10 (D. Md. 2018) (applying a contractual choice-of-law provision to non-contractual claims where the underlying language is "sufficiently broad to encompass" other claims (citation omitted) (internal quotation marks omitted)).

This is fatal to Plaintiff's claims. California courts routinely recognize that UCL claims are not cognizable when a dispute is governed by another state's law, and dismiss claims just like these. For example, in *Pro Water Solutions, Inc. v. Angie's List, Inc.*, the court dismissed UCL claims where a user agreement stated that the agreement and the parties' relationship would be governed by Indiana law. 2021 WL 124496, at *4–7 (C.D. Cal. Jan. 13, 2021). The *Pro Water* court held that this clause was broad enough to encompass the UCL claims, and that "[a] valid choice of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL." *Id.* at *7 (citation omitted) (internal quotation marks omitted). *See also Aliya Medcare Fin., LLC*

*v. Nickell*, 2015 WL 4163088, at *18–20 (C.D. Cal. July 9, 2015) (dismissing UCL claim on choice-of-law grounds); *Vitek v. Bank of America, N.A.*, 2014 WL 1042397, at *6–8 (C.D. Cal. Jan. 23, 2014) (same); *Melt Franchising, LLC v. PMI Enters., Inc.*, 2009 WL 32587, at *2–3 (C.D. Cal. Jan. 2, 2009) (same); *Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1063–65, 1070 (E.D. Cal. 2006) (same).

This court should follow suit, and dismiss with prejudice Plaintiff's California state law claims, because Maryland law governs.[7]

**B. Plaintiff Fails to State a Claim Under the UCL.**

The UCL defines "unfair competition" as including "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong of the UCL is a separate theory of liability, *see Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009), and Plaintiff purports to bring claims under the "unlawful" and "unfair" prongs, *see* Compl. ¶¶ 72–82. Both fail.

The Complaint should be dismissed with prejudice because PennyMac has paid dividends on the Preferred Shares in accordance with their terms, pursuant to the plain language of the LIBOR Act, which explicitly allows contracts like PennyMac's to continue relying on their original, workable fallback provisions. Its actions are therefore not "unlawful" under the UCL, and also fall within the UCL's safe harbor for actions expressly permitted by law. Nor are they otherwise "unfair." To the extent that Plaintiff argues the UCL compels PennyMac to issue dividends benchmarked to SOFR even though the plain text of the Articles and the LIBOR Act do not direct such issuance, the LIBOR Act itself preempts such an argument. And PennyMac's decision to give effect to the plain meaning of its agreements with shareholders is not "unfair" under the UCL.

---

[7] Nor is there any reason to discard the choice of law provision as contrary to California policy. "[T]he mere fact" that Maryland law may "provide[] greater or lesser protection than California law would, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Century 21 Real Estate LLC v. All Prof. Realty, Inc.*, 600 F. App'x 502, 504 (9th Cir. 2015) (citation omitted) (internal quotation marks omitted).

### 1. PennyMac's Actions Complied with the LIBOR Act and Were Not "Unlawful" Under the UCL.

As relevant here, the "unlawful" prong of the UCL essentially provides a cause of action under California law for violations of other laws. *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1130 (9th Cir. 2014). Here, Plaintiff brings a UCL claim grounded in alleged violations of the LIBOR Act and its implementing regulations, arguing that the LIBOR Act requires that PennyMac pay the Preferred Shareholders dividends calculated using a SOFR-based rate. Compl. ¶¶ 74–75. This allegation fails because the LIBOR Act imposes no such requirement. Indeed, applying the plain statutory text to the four corners of the contract makes clear that PennyMac has complied with the LIBOR Act in interpreting and applying the fallback provisions set out in the Articles Supplementary and continuing to issue dividends at the initial fixed rates. Accordingly, Plaintiff fails to state a claim that PennyMac's conduct is "unlawful" under the UCL. *See Webb v. Smart Documents Solutions, LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007) (noting that defendant's conduct "must violate a law … in order for [p]laintiffs to state a claim for relief under Section 17200's 'unlawful' prong").

#### a. The LIBOR Act and Its Regulations Direct Parties How To Interpret and Apply LIBOR Contracts.

The statutory provisions governing which contracts must transition to the Board-selected, SOFR-based rate are set out at 12 U.S.C. § 5803(a)–(b).

Subsection (a) provides:

> On the LIBOR replacement date, the Board-selected benchmark replacement shall be the benchmark replacement for any LIBOR contract that, after giving effect to subsection (b)—
>
> (1) contains no fallback provisions; or
>
> (2) contains fallback provisions that identify neither—
>
> (A) a specific benchmark replacement; nor
>
> (B) a determining person.

12 U.S.C. § 5803(a). Subsection (b) further provides that:

> On the LIBOR replacement date, any reference in the fallback provisions of a LIBOR contract to—
>
> > (1) a benchmark replacement that is based in any way on any LIBOR value…; or
> >
> > (2) a requirement that a person (other than a benchmark administrator) conduct a poll, survey, or inquiries for quotes or information concerning interbank lending or deposit rates;
>
> shall be disregarded as if not included in the fallback provisions of such LIBOR contract and shall be deemed null and void and without any force or effect.

*Id.* § 5803(b).[8]

Reading these two provisions together directs parties as follows: First, evaluate the contract's "fallback provisions," that is, the "terms in a LIBOR contract for determining a benchmark replacement []" to be used if LIBOR is unavailable. *Id.* § 5802(11). If any language within the fallback provisions relies on LIBOR, or requires polling, disregard it, as the LIBOR Act deems such language "null and void and without any force or effect." *Id.* § 5803(b). Second, once any such LIBOR- or polling-based references have been disregarded, evaluate any remaining fallback provisions. If (1) there are no such fallback provisions, or (2) the remaining fallback provisions do not identify either a "specific benchmark replacement" or a "determining person," then the LIBOR Act directs that the contract apply the Board-selected, SOFR-based rate as a replacement for the LIBOR-based rate. *Id.* § 5803(a).

---

[8] "LIBOR replacement date," "Board-selected benchmark replacement," "benchmark replacement," "determining person," "LIBOR contract," and "fallback provisions" are all statutorily-defined terms which govern this Court's interpretation of the Act. *See Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018). The definitions are codified at 12 U.S.C. § 5802 and will be discussed herein as relevant.

Other contracts—*i.e.*, contracts that, after striking any LIBOR- or polling-based references, still provide for either a "specific benchmark replacement" or a "determining person" fallback—are not required to transition to the SOFR-based rate, and instead continue to operate according to their terms (save for the stricken LIBOR- or polling-based provisions). *See id.* This is confirmed by the statute's savings clause: "Nothing in this chapter may be construed to alter or impair," after striking LIBOR-based and polling fallbacks, "any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value…." *Id.* § 5803(f)(2).

This commitment to leaving untouched the non-LIBOR, non-polling provisions of contracts with workable LIBOR replacements is reflected across the statute, from the statutory purposes to its safe harbor section. Through the LIBOR Act, Congress sought to provide an avenue for unworkable contracts to navigate LIBOR cessation and preclude inevitable litigation that would arise when contracts could not operate according to their terms. *See id.* § 5801(b). But another key purpose was "to allow existing contracts that reference LIBOR but provide for the use of a clearly defined and practicable replacement rate, ***to operate according to their terms***." *Id.* § 5801(b)(3).

Further, the statute explicitly states that "nothing in this chapter may be construed to create any negative inference or negative presumption regarding the validity or enforceability of—any benchmark replacement … that is not a Board-selected benchmark replacement." 12 U.S.C. § 5804(e)(1). The Federal Reserve Board's implementing regulations are more of the same, recognizing that they do not apply to "any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value … after disregarding any LIBOR- or poll-based fallback provisions." 88 Fed. Reg. at 5209.

The statute is plain: tough legacy contracts must switch to SOFR, but those contracts that provide a workable fallback are given effect.

**b. After Applying the LIBOR Act, the Articles Provide for Dividends at the Initial Fixed Rates.**

PennyMac applied these governing statutory provisions to its Articles to determine the dividend rates owed on the Preferred Shares after LIBOR's cessation. When the initial fixed terms expired, the fallback provisions kicked in, subject to the LIBOR Act's guidance on which provisions to disregard. After disregarding from the "Three-Month LIBOR" definition the provisions relying on LIBOR-as-published (the Screen Rate) and bank polling (the Polling Rate) pursuant to the Act, the final sentence remains. It instructs: "the Three-Month LIBOR for the applicable Dividend Period will be the same as for the immediately preceding Dividend Period, or, if there was no such Dividend Period, the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." *See* Ex. A ¶ 4(g); Ex. B ¶ 4(g).

The first half of the sentence directs that the Three-Month LIBOR rate from the immediately preceding Dividend Period be employed. But if the immediately preceding Dividend Period did not use a Three-Month LIBOR rate—*i.e.*, "there was no such Dividend Period"—then the final clause applies: "the dividend shall be calculated at the dividend rate in effect for the immediately preceding Dividend Period." *Id.*

Here, the relevant "immediately preceding Dividend Period[s]" were the periods before each Series was set to float: (1) the period from December 15, 2024 to, but excluding, March 15, 2024 for the Series A shares; and (2) the period from March 15, 2024 to, but excluding, June 15, 2024 for the Series B shares. Ex. A ¶¶ 4(a), (i); Ex. B ¶¶ 4(a), (i). There were no Three-Month LIBOR rates in effect during those periods; LIBOR was no longer being published, and the shares were still paying their fixed rates. *See* Compl. ¶ 7; Ex. A ¶ 4(a); Ex. B ¶ 4(a). Because there was "no such Dividend Period" employing a Three-Month LIBOR rate, the Articles direct that "the dividend rate in effect for the immediately preceding Dividend Period" applies: the fixed rates.

As particular, defined dividend rates, the fixed rates each are a "specific benchmark replacement." *See* 12 U.S.C. § 5802(3) (defining "benchmark replacement"

to include a "dividend rate"); *Specific*, Black's Law Dictionary (11th ed. 2019) ("specific" defined as "[o]f, relating to, or designating a particular or defined thing"). And the fixed rates do not rely on LIBOR in any way. Therefore, they are exactly the types of fallback rates that the LIBOR Act confirms should be given effect: "Nothing in this chapter may be construed to alter or impair," after striking LIBOR-based and polling fallbacks, "any LIBOR contract that contains fallback provisions that identify a benchmark replacement that is not based in any way on any LIBOR value…." 12 U.S.C. § 5803(f)(2).

By continuing to issue dividends to the Preferred Shareholders at the fixed rates, PennyMac is doing precisely what the LIBOR Act instructs it to do: apply the contractual terms the parties had agreed to when they provide for a specific fallback dividend rate.

**c. Plaintiff's Argument that a Fallback Must Have Envisioned the Permanent Cessation of LIBOR Fails.**

In an effort to get around this straightforward application of the LIBOR Act to the Articles, the Complaint invents from whole cloth an additional statutory "requirement" that is found nowhere in the Act itself. The Complaint contends that, to be given effect, fallback provisions must contemplate LIBOR's permanent cessation, alleging that the LIBOR Act requires SOFR substitution in contracts that do not provide fallback provisions specifically "***for [the] discontinuation of LIBOR***." Compl. ¶ 48; *see also id.* ¶¶ 14, 45. Because PennyMac's fallbacks were allegedly "created to be used in the event of a temporary delay in the reporting of LIBOR rates," rather than the permanent discontinuation of LIBOR, Plaintiff would read them out of the Articles and give them no effect. *Id.* ¶ 56 (emphasis omitted).

The Complaint tellingly cites to no support in the statute for this supposed additional requirement, and a plain reading of the Act proves it incorrect. The statute does not impose any temporal or duration-based prerequisites on whether a specific rate in a fallback provision may survive. Indeed, it says just the opposite, expressly defining a "benchmark replacement" as encompassing rates "to replace LIBOR or any interest

rate or dividend rate based on LIBOR, whether on a ***temporary***, permanent, or indefinite basis." 12 U.S.C. § 5802(3).[9] And any fallback provision, after striking LIBOR- and polling-based language, with a "specific benchmark replacement" not based on LIBOR is given effect. *Id.* § 5803(f)(2).

So long as the benchmark replacement meets the other statutory requirements, whether the fallback provision was envisioned to be temporary or permanent is of no import in the statutory scheme. This makes sense, because the reason for, and the duration of, LIBOR's unavailability makes no difference to whether the contract can continue to work without LIBOR. And the statute makes clear—from its purpose to its definitions to its operative provisions to its savings clauses—that its goal was to fix broken contracts that could no longer feasibly operate, not override the terms parties had agreed to if those terms could still function.

Plaintiff attempts to force a transition to SOFR by reading out the last sentence of the Preferred Shares' fallback provisions, with no justification in either the contract or the statutory text. *See Wildewood Operating Co., LLC v. WRV Holdings, LLC*, 303 A.3d 1273, 1284–85 (Md. App. Ct. 2023) (all contractual clauses should be given effect); *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1265 (9th Cir. 2003) (same). Since PennyMac's interpretation of its Preferred Shares complied with the LIBOR Act, its actions are not "unlawful" under the UCL. *See Webb*, 499 F.3d at 1082.

---

[9] This is consistent with other provisions in the statute as well. *See, e.g.*, 12 U.S.C. § 5802(10) (a "determining person" may have authority to determine a benchmark replacement "***on a temporary basis***"). And the inclusion of "temporary" fallback rates as sufficient benchmark replacements differed from earlier proposed guidance, indicating that it was a conscious decision by Congress. *See* Alt. Ref. Rates Comm., *Proposed Legislative Solution to Minimize Legal Uncertainty and Adverse Economic Impact Associated with LIBOR Transition* 19 (2020), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2020/ARRC-Proposed-Legislative-Solution.pdf.

### 2. PennyMac's Interpretation is Protected by the UCL's Safe Harbor.

For essentially the same reasons that PennyMac's conduct is not "unlawful," Plaintiff's claim is barred in its entirety by the UCL's safe harbor, which immunizes from UCL liability practices that are approved by the government. Where the government "has permitted certain conduct or considered a situation and concluded no action should lie," courts may not override that determination. *Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d 954, 958 (C.D. Cal. 2015) (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999)); *see also Webb*, 499 F.3d at 1082 (UCL safe harbor for practices legislature and implementing agency "intended to permit"). Therefore, "[a] business practice that might otherwise be considered unfair or deceptive cannot be the basis of a [UCL] cause of action if the conduct has been deemed lawful" by another source of law. *Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal. App. 4th 1134, 1147 (2003); *see also Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 (9th Cir. 2011) (affirming dismissal of a UCL claim for "unlawful" business practices under the safe harbor rule).

As discussed, one of Congress's primary purposes was to allow workable contracts "to operate according to their terms." 12 U.S.C. § 5801(b)(3). The statutory definitions and operative provisions bear out that purpose, directing that only certain, specific contractual language (based on LIBOR or polling) be disregarded, *id.* § 5803(b); substituting SOFR for LIBOR only when contracts have no surviving fallbacks including a specific benchmark replacement or a determining person, *id.* § 5803(a); and expressly not "alter[ing] or impair[ing]" surviving contractual provisions relying on non-LIBOR-based fallback rates, *id.* § 5803(f)(2).

As described above, *see* Section IV.B.1.b, PennyMac's Preferred Shares fall within the LIBOR contracts that Congress expressly "permitted" to operate according to their own terms. Congress's decision to "unequivocally permit[]" the conduct challenged here "afford[s a] safe harbor from UCL liability." *Alvarez*, 656 F.3d at 933.

**3. Plaintiff Fails To State a Claim that PennyMac's Lawful Interpretation of its Articles Pursuant to the LIBOR Act Is "Unfair" Under the UCL.**

The Complaint's conclusory allegations that PennyMac's actions were "unfair" under the UCL in addition to being "unlawful" fail on their own terms as well. *See* Compl. ¶¶ 80–82. The Complaint relies entirely on PennyMac's alleged violation of the LIBOR Act, and makes no effort to explain what about PennyMac's compliance with the Act would possibly be unfair. *See, e.g., id.* ¶¶ 21, 72, 80–82. The Court's inquiry can and should end there: "where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs … do not survive." *Millam v. Energizer Brands, LLC*, 2022 WL 19001330, at *7 (C.D. Cal. Dec. 9, 2022) (quoting *Hadley v. Kellogg Sales Co.*, 243 F. Supp.3d 1074, 1104–05 (N.D. Cal. 2017)). Since Plaintiff's unlawful claim fails, so too must his unfair claim.[10]

To the extent Plaintiff now attempts to argue that, even if PennyMac's actions comply with the LIBOR Act, they nonetheless avoid the safe harbor and are "unfair," such a claim would be entirely unsupported by the Complaint, and also fail under both the LIBOR Act and the UCL.

**a. The LIBOR Act Preempts Any Claim Seeking To Impose a SOFR-Based Rate Where the LIBOR Act Does Not Require One.**

The LIBOR Act reflects Congress's intention that LIBOR contracts be treated uniformly nationwide after LIBOR's discontinuation. 12 U.S.C. § 5801(b)(1). To this

[10] The Complaint does not purport to allege any fraudulent conduct or deceptive practices by PennyMac in connection with its Preferred Shares. In any event, such claims would be subject to the jurisdictional bar of the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1). *See Fleming v. Charles Schwab Corp.*, 878 F.3d 1146, 1152–56 (9th Cir. 2017).

end, the LIBOR Act expressly preempts "any provision of any State … law … relating to the selection or use of a benchmark replacement[.]" *Id.* § 5806(1); *see Chae v. SLM Corp.*, 593 F.3d 936, 942 (9th Cir. 2010) (express preemption occurs when Congress "indicate[s] its intent to displace state law through express language"). It is the LIBOR Act and its implementing regulations that determine what rate applies, not any individual state's law. Plaintiff accordingly cannot turn to California law to impose a benchmark replacement rate different than what is dictated by the LIBOR Act.[11]

**b. PennyMac's Actions Are Not Otherwise Unfair.**

Even if the Court were to look past the Complaint's wholesale reliance on an alleged LIBOR Act violation and the Act's express preemption provision to consider Plaintiff's unfair claim further, the claim fails on its own terms.

"[T]he proper definition of 'unfair' conduct against consumers 'is currently in flux' among California courts." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (quoting *Lozano v. AT&T Wireless Servs.*, Inc., 504 F.3d 718, 735 (9th Cir. 2007)). "In the absence of further clarification by the California Supreme Court," federal courts may apply either a "tethering" or a "balancing" test. *Lozano*, 504 F.3d at 736. The Complaint fails to state a claim under either test.

Under the "tethering" test, a plaintiff must plead facts sufficient to show that the public policy allegedly rendering the defendant's actions unfair is "tethered to specific constitutional, statutory, or regulatory provisions." *Holland v. Gen. Motors LLC*, 2024 WL 1680062, at *2 (C.D. Cal. Jan. 25, 2024) (Fitzgerald, J.) (quoting *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010)). But the only statutory

[11] California courts and courts within the Ninth Circuit have repeatedly found UCL claims preempted under statutes with similarly broad preemption provisions. *E.g., Crosby v. California Physicians' Serv.*, 279 F. Supp. 3d 1074, 1082–83 (C.D. Cal. 2018) (UCL claim expressly preempted by ERISA); *Pac. Recovery Sols. v. United Behav. Health*, 508 F. Supp. 3d 606, 619–21 (N.D. Cal. 2020) (dismissing a UCL claim with prejudice due to express ERISA preemption); *People ex rel. Harris v. Delta Air Lines, Inc.*, 247 Cal. App. 4th 884, 901–02 (2016) (UCL claim expressly preempted by the Airline Deregulation Act); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992) (finding that Congress's use of the phrase "relating to" denotes broad preemptive effect). There is no reason to reach a different result here.

and regulatory regimes mentioned in the Complaint are the LIBOR Act and its implementing regulations, and as described above, PennyMac's conduct fully complies with them. Accordingly, the Complaint does not allege any "unfairness" tethered to any "specific constitutional, statutory, or regulatory provisions." *Holland*, 2024 WL 1680062, at *2; *see Flores v. Wells Fargo Bank, N.A.*, 2012 WL2427227, at *8 (N.D. Cal. June 26, 2012) (dismissing UCL "unfair" claim where no legislative policy allegedly violated).

Under the traditional "balancing" test, a plaintiff must plead facts showing that "the challenged business practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Holland*, 2024 WL 1680062, at *2 (quoting *Drum*, 182 Cal. App. 4th at 257). Plaintiff rotely recites this standard, Compl. ¶ 82, but that is insufficient, *see Rice v. Sunbeam Prods., Inc.*, 2013 WL 146270, at *9 (C.D. Cal. Jan. 7, 2013) (dismissing claim alleging in conclusory fashion that harm of allegedly unfair business practices "greatly outweighs any benefits" (internal quotation marks omitted)).

More fundamentally, applying the terms of the Articles pursuant to statutory guidance is not unfair. PennyMac's trustees owe fiduciary duties to its Preferred Shareholders, like Plaintiff, "where the right claimed by the [P]referred is not to a preference as against the common stock but rather a right shared equally with the common." *Kim v. Cedar Realty Tr., Inc.*, 2023 WL 4896635, at *5 (D. Md. Aug. 1, 2023) (citation omitted). Though Preferred Shareholders are entitled to the contractual protections explicitly set out in their agreements, "additional preferences and limitations will not be presumed or implied." *Id.* (citation omitted) (internal quotation marks omitted). If PennyMac were to transition to a floating dividend based on SOFR despite the fact that neither the LIBOR Act nor the text of the Articles compel it to do so, PennyMac would have unjustly favored one class of shareholders over another. *See id.* (noting that "when the interests of the preferred and common stockholders are at odds,

the board must typically honor its obligations to the common stockholders"). The "fair" action, therefore, is the one PennyMac took: enforcing the plain terms of the Preferred Shares as written, pursuant to the LIBOR Act, and not selecting a different benchmark rate to the detriment of its common shareholders.

Nor are the fixed rates inherently unfavorable to the Preferred Shareholders. The Articles' fallback provision was put into effect without knowing what the market conditions would be if and when the fallback was invoked, or what the supposed alternatives may be at that point. And as applied here, whether dividends at the fixed rates are lower or higher than dividends based on the SOFR benchmark depends entirely on what SOFR is, which varies over time as interest rates rise and fall. Throughout the life of these securities, the fixed rate can surpass a floating rate based on SOFR—indeed, the fixed rate would have exceeded a floating rate based on SOFR for several of the years after the Preferred Shares were issued, and may well do so again in the future.[12]

PennyMac treats all of its shareholders—including the Preferred Shareholders—fairly by honoring the contractual language to which all parties agreed, as interpreted pursuant to the LIBOR Act, as it has done here.

## V. CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's claim with prejudice.

Dated: August 20, 2024

Respectfully submitted,

*/s/ Matthew Donald Umhofer*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Jonas P. Mann

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

[12] *See SOFR Averages and Index Data*, Fed. Rsrv. Bank of New York (last visited Aug. 14, 2024), https://www.newyorkfed.org/markets/reference-rates/sofr-averages-and-index.

WILLIAMS & CONNOLLY LLP
Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for PennyMac Mortgage Investment Trust, certifies the brief contains 6,958 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 20, 2024

Respectfully submitted,

*/s/ Matthew Donald Umhofer*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Jonas P. Mann

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

WILLIAMS & CONNOLLY LLP
Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

# Exhibit 4

UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Jonas P. Mann (SBN 263314)
767 S. Alameda St., Suite 270
Los Angeles, California 90021
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com
jonas@umklaw.com

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management LLC*

Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)
sfarina@wc.com
mcollins@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Telephone: 202-434-5000
Facsimile: 202-434-5029

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ROBERTO VERTHELYI, on behalf of himself and all others similarly situated,

Plaintiff,

v.

PENNYMAC MORTGAGE INVESTMENT TRUST; PNMAC CAPITAL MANAGEMENT, LLC,

Defendants.

Case No. 2:24-cv-05028-MWF

**DEFENDANTS' MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b) AND TO STAY PROCEEDINGS PENDING APPEAL**

Hearing Date: April 28, 2025
Time: 10:00 a.m.
Place: Courtroom 5A
Judge: Michael W. Fitzgerald

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on April 28, 2025, at 10:00 a.m., or such other date ordered by the Court, in Courtroom 5A of this Court, located at First Street Courthouse, 350 W. First Street, Los Angeles, California, Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC will and hereby do move to certify this Court's February 26, 2025 Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and for a stay of proceedings pending resolution of the appeal.

This Motion is based upon the Memorandum of Points and Authorities submitted herewith, any reply memorandum or other papers submitted in connection with this Motion, all other pleadings and filings in this action, and such other matters as may be presented at or before the hearing. Defendants respectfully request oral argument on this Motion.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on March 17, 2025.

Dated: March 25, 2025

Respectfully submitted,

*/s/ Matthew Donald Umhofer*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Jonas P. Mann

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

WILLIAMS & CONNOLLY LLP
Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ... 1

II. BACKGROUND ... 2

III. ARGUMENT ... 4

A. This Court Should Certify For Immediate Appeal The Question of Whether Maryland Law Governs This Dispute. ... 4

1. This Issue Presents a Controlling Question of Law. ... 5

2. Substantial Grounds Exist for a Difference of Opinion. ... 6

3. Permitting Immediate Appeal Would Materially Advance the Termination of the Litigation. ... 11

B. This Court Should Certify For Immediate Appeal The Question of Whether PennyMac's Fallback Dividend Rates Are Qualifying "Benchmark Replacements" Under The LIBOR Act. ... 11

1. This Issue Presents a Controlling Question of Law. ... 13

a. This Issue is Purely Legal. ... 13

b. This Issue is Controlling. ... 14

2. Substantial Grounds Exist for a Difference of Opinion. ... 15

3. Permitting Immediate Appeal Would Materially Advance the Termination of the Litigation. ... 17

C. The Court Should Stay Further Litigation Pending Resolution of the Appeal. ... 18

IV. CONCLUSION ... 20

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434 (Del. Ch. 2023) .......... 9

*Aliya Medcare Fin., LLC v. Nickell*, 2015 WL 4163088 (C.D. Cal. July 9, 2015) .......... 5

*Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 2015 WL 10791930 (C.D. Cal. Nov. 5, 2015) .......... 19

*In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953 (N.D. Cal. 2016) .......... 18

*Ass'n of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081 (E.D. Cal. 2008) .......... 17, 18

*Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d 954 (C.D. Cal. 2015) .......... 15

*Bernal v. Zumiez, Inc.*, 2017 WL 4542950 (E.D. Cal. Oct. 11, 2017) .......... 18

*Blue Chip Cap. Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827 (Del. Ch. 2006) .......... 8

*Burton v. Prudential Ins. Co. of Am.*, 2014 WL 10537434 (C.D. Cal. Sept. 12, 2014) .......... 13

*Cal Pure Pistachios, Inc. v. Primex Farms, LLC*, 2010 WL 11523707 (C.D. Cal. Apr. 29, 2010) .......... 2

*California Dep't of Toxic Substances Control v. Hearthside Residential Corp.*, 2008 WL 8050005 (C.D. Cal. Dec. 8, 2008) .......... 20

*Casas v. Victoria's Secret Stores, LLC*, 2015 WL 13446989 (C.D. Cal. Apr. 9, 2015) .......... 18

*In re Cement Antitrust Litig.*, 673 F.2d 1020 (9th Cir. 1981) .......... 2, 14

*City of Los Angeles v. Citigroup Inc.*, 2014 WL 3942457 (C.D. Cal. Aug. 12, 2014) .......... 6

*Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059 (E.D. Cal. 2006) .......... 6

*Czuchaj v. Conair Corp.*, 2014 WL 1664235 (S.D. Cal. Apr. 18, 2014) .......... 5

*Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*, 854 F. Supp. 2d 756 (C.D. Cal. 2011) .......... 15

*In re DirecTV Early Cancellation Fee Mktg.*,
2011 WL 13135572 (C.D. Cal. Oct. 24, 2011) ....................6, 7

*Doe 1 v. Github, Inc.*,
2024 WL 4336532 (N.D. Cal. Sept. 27, 2024) ....................14

*Douglas v. Xerox Bus. Servs., LLC*,
875 F.3d 884 (9th Cir. 2017) ....................13

*Dupree v. Younger*,
598 U.S. 729 (2023) ....................13

*Dynacorp Ltd. v. Aramtel Ltd.*,
56 A.3d 631 (Md. Ct. Spec. App. 2012) ....................10

*E.E.O.C. v. Luce, Forward, Hamilton & Scripps*,
345 F.3d 742 (9th Cir. 2003) ....................17

*EB Holdings II, Inc. v. Illinois Nat'l Ins. Co.*,
108 F.4th 1211 (9th Cir. 2024) ....................5

*Ehart v. Lahaina Divers, Inc.*,
92 F.4th 844 (9th Cir. 2024) ....................13

*Exxon Mobil Corp. v. Allapattah Services, Inc.*,
545 U.S. 546 (2005) ....................17

*Feld v. Am. Exp. Co.*,
2010 WL 9593386 (C.D. Cal. Jan. 25, 2010) ....................9

*Filtrol Corp. v. Kelleher*,
467 F.2d 242 (9th Cir. 1972) ....................18

*Finder v. Leprino Foods Co.*,
2017 WL 1355104 (E.D. Cal. Jan. 20, 2017) ....................19, 20

*Flintkote Co. v. Aviva PLC*,
177 F. Supp. 3d 1165 (N.D. Cal. 2016) ....................5

*Gale v. Bershad*,
1998 WL 118022 (Del. Ch. Mar. 4, 1998) ....................8

*Galilea, LLC v. AGCS Marine Ins. Co.*,
879 F.3d 1052 (9th Cir. 2018) ....................6

*In re Google Inc. St. View Elec. Commc'ns Litig.*,
2011 WL 13257346 (N.D. Cal. July 18, 2011) ....................15

*Hamby v. Ohio Nat. Life Assur. Corp.*,
2012 WL 2568149 (D. Haw. June 29, 2012) ....................5

*Hoffman v. Citibank (S. Dakota), N.A.*,
546 F.3d 1078 (9th Cir. 2008) ....................6

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
22 F.4th 1125 (9th Cir. 2022) .......... 4, 5

*Irwin Nats. v. Securenet, LLC*,
2010 WL 11598030 (C.D. Cal. May 25, 2010) .......... 9

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) .......... 11

*Kim v. Cedar Realty Tr., Inc.*,
116 F.4th 252 (4th Cir. 2024) .......... 8

*Kloeckner v. Solis*,
568 U.S. 41 (2012) .......... 17

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......... 13

*Manes v. City of Santa Ana*,
2023 WL 8115865 (C.D. Cal. Sept. 5, 2023) .......... 18

*McGill v. Citibank, N.A.*,
2 Cal. 5th 945 (2017) .......... 7

*Mehedi v. View, Inc.*,
2024 WL 3748012 (N.D. Cal. Aug. 8, 2024) .......... 20

*Melt Franchising, LLC v. PMI Enters., Inc.*,
2009 WL 32587 (C.D. Cal. Jan. 2, 2009) .......... 5

*Moriarty v. Am. Gen. Life Ins. Co.*,
2021 WL 9563310 (S.D. Cal. Jan. 26, 2021) .......... 19

*Mothershead v. Wofford*,
2022 WL 2755929 (W.D. Wash. July 14, 2022) .......... 15

*Namleb Corp. v. Garrett*,
814 A.2d 585 (Md. Ct. Spec. App. 2002) .......... 9

*Nat'l Credit Union Admin. Bd. v. Goldman Sachs & Co.*,
2013 WL 12306438 (C.D. Cal. July 11, 2013) .......... 14

*Palomino v. Facebook, Inc.*,
2017 WL 76901 (N.D. Cal. Jan. 9, 2017) .......... 9

*Poling v. CapLease, Inc.*,
2016 WL 1749803 (Md. Ct. Spec. App. May 3, 2016) .......... 8

*Pro Water Sols., Inc. v. Angie's List, Inc.*,
2021 WL 124496 (C.D. Cal. Jan. 13, 2021) .......... 5

*Reese v. BP Expl. (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) .......... 2, 6, 11, 17

*Regal Stone Ltd. v. Longs Drug Stores California, L.L.C.*, 881 F. Supp. 2d 1123 (N.D. Cal. 2012) ..... 18

*Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856 (C.D. Cal. 2012) ..... 6

*Rollins v. Dignity Health*, 2014 WL 6693891 (N.D. Cal. Nov. 26, 2014) ..... 10

*In re SFPP Right-of-Way Claims*, 2016 WL 11744979 (C.D. Cal. Dec. 5, 2016) ..... 19

*San Antonio Winery, Inc. v. Jiaxing Micarose Trade Co.*, 53 F.4th 1136 (9th Cir. 2022) ..... 13

*Shiguago v. Occidental Petroleum Corp.*, 2009 WL 10672734 (C.D. Cal. Nov. 23, 2009) ..... 11

*Shintom Co. v. Audiovox Corp.*, 888 A.2d 225 (Del. 2005) ..... 8

*Starr Indem. & Liab. Co. v. Rolls-Royce Corp.*, 725 F. App'x 592 (9th Cir. 2018) ..... 6

*Starr Indem. & Liab. Co. v. Rolls-Royce Corp.*, 2016 WL 11603022 (D. Ariz. Sept. 9, 2016) ..... 6

*Travelers Indem. Co. v. MTS Transp., LLC*, 2012 WL 3929810 (W.D. Pa. Sept. 7, 2012) ..... 10

*United States v. Woods*, 571 U.S. 31 (2013) ..... 16

*Vitek v. Bank of America, N.A.*, 2014 WL 1042397 (C.D. Cal. Jan. 23, 2014) ..... 5

*Walter v. Hughes Communications, Inc.*, 682 F. Supp. 2d 1031 (N.D. Cal. 2008) ..... 9

*Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202 (1997) ..... 16

*Wang Lab'ys, Inc. v. Kagan*, 990 F.2d 1126 (9th Cir. 1993) ..... 11

*Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906 (2001) ..... 4

**STATUTES**

12 U.S.C. § 5802(1) ..... 16

12 U.S.C. § 5802(3) ..... *passim*

12 U.S.C. § 5803(a)(2), (f)(2) ..... 13

12 U.S.C. §§ 5801–5807 .......... 3
28 U.S.C. § 1292(b) .......... *passim*
Cal. Bus. & Prof. Code § 17200 .......... 1, 11
Md. Code Ann., Corps. & Ass'ns § 8-101(b) .......... 10

**RULES**

Fed. R. App. P. 5(a)(3) .......... 2

# I. <u>INTRODUCTION</u>

Pursuant to 28 U.S.C. § 1292(b), Defendants PennyMac Mortgage Investment Trust ("PennyMac") and PNMAC Capital Management, LLC ("PCM") respectfully request that this Court certify its February 26, 2025 Order, ECF No. 52 ("Order"), for interlocutory appeal and stay further proceedings pending resolution of the appeal. Section 1292(b) permits the Court to certify for interlocutory appeal an order that "involves a controlling question of law as to which there is substantial ground for difference of opinion" when "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

The Court's February 26 Order presents two issues meeting these criteria:

1. Whether, as a matter of law, the choice-of-law provision in PennyMac's operative charter document (the "Declaration of Trust") compels the application of Maryland law.
2. Whether, as a matter of law, PennyMac's fallback dividend rate is a qualifying "benchmark replacement" under the LIBOR Act, 12 U.S.C. § 5802(3), such that the use of that rate complies with the Act.

First, whether Maryland law governs this dispute is a "controlling" question of law because Plaintiff relies on California law to assert his only claim, which arises under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*. If Maryland law applies, Plaintiff cannot state a UCL claim, and his complaint must be dismissed. Moreover, substantial grounds exist for a difference of opinion. Reasonable jurists could conclude that applying Maryland law is not contrary to a fundamental policy of California; nor does California have a materially greater interest than Maryland in the resolution of this dispute about the terms of a Maryland entity's governing documents. As this Court recognized during oral argument and expressly stated in its Order, the choice-of-law issue is a "difficult" one, Order 11, on which reasonable jurists could disagree.

Second, whether PennyMac's fallback dividend rates are "benchmark replacements" under the LIBOR Act is a "controlling" question of law because Plaintiff's UCL claim is grounded in PennyMac's alleged violation of that Act. If the Ninth Circuit agrees that PennyMac's fallback dividend rates comprise "benchmark replacements" under the Act, there is no dispute that PennyMac's use of those rates complies with the statute, and Plaintiff's complaint should be dismissed with prejudice. Substantial grounds exist for difference of opinion on this issue as well: as the Court noted, this is the first case to construe the relevant provisions of the LIBOR Act. *See* Order 16. This case-dispositive question of first impression is precisely the sort of "novel issue" appropriate for interlocutory appeal. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011).

Reversal on either of these issues would result in dismissal of the only claim asserted here, ending the litigation. Which state's law to apply and how to interpret the LIBOR Act are issues fundamental to the case. As a practical matter, these legal questions likely will be appealed by the non-prevailing party at some point, whether it is now, or after a final judgment. Allowing the parties to seek resolution now, prior to the start of discovery or entry of any case schedule, may save the parties and this Court needless expenditure of time, effort, and money. *See In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981).

Defendants therefore request that this Court amend its Order to include the certification language required by § 1292(b), and stay further proceedings.[1]

## II. BACKGROUND

In June 2024, Plaintiff Roberto Verthelyi brought this putative class action against Defendants, asserting a claim under California's UCL that their business practices were

[1] If the original order does not identify a question of law suitable for interlocutory appeal, it may be amended to include the requisite language. *See* Fed. R. App. P. 5(a)(3) (calling for the district court to "amend its order, either on its own or in response to a party's motion, to include the required permission or statement"); *Cal Pure Pistachios, Inc. v. Primex Farms, LLC*, 2010 WL 11523707, at *3 (C.D. Cal. Apr. 29, 2010).

"unlawful" and "unfair." *See* ECF No. 1 ("Compl."). Plaintiff grounds his UCL claim in PennyMac's alleged violation of a 2022 federal statute, the Adjustable Interest Rate (LIBOR) Act, 12 U.S.C. §§ 5801–5807. The LIBOR Act provides guidance for how to interpret contracts that had relied on the discontinued London Inter-Bank Offered Rate ("LIBOR"), which were no longer workable according to their terms. The Act directs that contracts without a qualifying "benchmark replacement" rate transfer to a rate based on the Secured Overnight Financing Rate ("SOFR"); it also provides that contracts that include a "benchmark replacement" ***not*** based on LIBOR continue to operate using the benchmark replacement rate found in the contract. Plaintiff alleges that PennyMac violated the LIBOR Act by continuing to issue dividends for its Series A and B Preferred Shares at fixed rates pursuant to fallback provisions in its Articles Supplementary, rather than implementing a dividend rate based on SOFR. Compl. ¶¶ 50–52.

Defendants moved to dismiss the complaint for failure to state a claim. ECF No. 34 ("MTD"); ECF No. 35. Defendants contended that (1) Plaintiff's UCL claim is not cognizable because PennyMac's operative charter document (the "Declaration of Trust") provides that Maryland law governs the dispute, MTD 8–10; and (2) even if the UCL applies, PennyMac's application of the terms set forth in the Articles Supplementary, in light of the LIBOR Act, complies with the Act, which expressly permits contracts like PennyMac's to continue using their contractual replacement rates. *See id.* 10–21.

On February 26, 2025, this Court denied the motions to dismiss. The Court held that, although the choice-of-law provision in the Declaration of Trust applied to the dispute at hand, the provision was unenforceable as contradicting California policy, so "California law governs this action." Order 8–13. The Court also disagreed that PennyMac complied with the LIBOR Act as a matter of law, holding that the Act is "ambigu[ous]" and that Plaintiff had pled that PennyMac's actions do not "comport" with the Act's "purpose or overall structure." *Id.* at 16.

Defendants now seek to certify the Court's Order for immediate appeal.

## III. ARGUMENT

Under 28 U.S.C. § 1292(b), the Court may certify for immediate appeal an interlocutory order when (1) the order involves a controlling question of law; (2) there is a substantial ground for difference of opinion as to that question; and (3) an immediate appeal from that order may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b); *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1130 (9th Cir. 2022). Each question that Defendants seek to certify for immediate appeal readily meets those requirements.

### A. This Court Should Certify For Immediate Appeal The Question of Whether Maryland Law Governs This Dispute.

Courts applying California choice-of-law principles generally enforce contractual choice-of-law provisions where the claims fall within the scope of the provision and the chosen state bears "a substantial relationship to the parties or the transaction, or [] a reasonable basis otherwise exists for the choice of law." *Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 917 (2001). If those conditions are satisfied, the opponent of the clause bears the burden of showing "both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue." *Id.*

This Court agreed with PennyMac that Plaintiff's allegations fall within the scope of the Declaration of Trust's choice-of-law provision, and that the chosen state (Maryland) has a substantial relationship to the parties and their transaction. *See* Order 8–11. The Court further held, however, that the choice-of-law provision is nonetheless unenforceable because it "conflicts with a fundamental policy of California's consumer protection laws" in terms of the remedies purportedly available, and because California has a "greater interest" than Maryland in having its law applied to this dispute. *Id.* at 12–13.

The question whether, as a matter of law, the Maryland choice-of-law provision is enforceable meets each of Section 1292(b)'s three criteria, and Defendants respectfully request that it be certified for appeal.

**1. This Issue Presents a Controlling Question of Law.**

A "controlling question of law must be one of law—not fact—and its resolution must materially affect the outcome of litigation in the district court." *ICTSI Oregon, Inc.*, 22 F.4th at 1130 (internal quotation marks omitted).

Here, whether PennyMac's Maryland choice-of-law provision is enforceable presents a "pure legal question" that is reviewed de novo on appeal. *Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1172 (N.D. Cal. 2016); *see EB Holdings II, Inc. v. Illinois Nat'l Ins. Co.*, 108 F.4th 1211, 1218 (9th Cir. 2024) ("We review choice-of-law questions de novo."). No facts are in dispute here; the Court took judicial notice of the Declaration of Trust as incorporated by reference into the complaint, Order 6, and the only question is the legal one of whether the choice-of-law provision within that Declaration of Trust governs the dispute. District courts often resolve choice-of-law disputes at the motion to dismiss stage where, as here, "the pleadings, construed in plaintiff's favor, contain all necessary facts." *Hamby v. Ohio Nat. Life Assur. Corp.*, 2012 WL 2568149, at *2 (D. Haw. June 29, 2012); *see Czuchaj v. Conair Corp.*, 2014 WL 1664235, at *9 (S.D. Cal. Apr. 18, 2014) (citing *Hamby*).

This question is also "controlling." California courts regularly dismiss UCL claims under Rule 12(b)(6) when a dispute is governed by another state's law, and application of Maryland law here would undisputedly require the same. *See Pro Water Sols., Inc. v. Angie's List, Inc.*, 2021 WL 124496, at *7 (C.D. Cal. Jan. 13, 2021) ("[a] valid choice-of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL"); *Aliya Medcare Fin., LLC v. Nickell*, 2015 WL 4163088, at *18–20 (C.D. Cal. July 9, 2015) (dismissing UCL claim on choice-of-law grounds); *Vitek v. Bank of America, N.A.*, 2014 WL 1042397, at *6–8 (C.D. Cal. Jan. 23, 2014) (same); *Melt Franchising, LLC v. PMI Enters., Inc.*, 2009 WL 32587, at *2–3 (C.D. Cal.

Jan. 2, 2009) (same); *Cont'l Airlines, Inc. v. Mundo Travel Corp*., 412 F. Supp. 2d 1059, 1063–65, 1070 (E.D. Cal. 2006) (same); *see* MTD 9–10.

The Ninth Circuit routinely accepts certification under Section 1292(b) to review the district court's choice of law determination when, as here, the facts are not in dispute. *See, e.g., Galilea, LLC v. AGCS Marine Ins. Co*., 879 F.3d 1052, 1056 (9th Cir. 2018); *Starr Indem. & Liab. Co. v. Rolls-Royce Corp.,* 725 F. App'x 592, 594 (9th Cir. 2018); *Hoffman v. Citibank (S. Dakota), N.A.*, 546 F.3d 1078, 1080, 1082 (9th Cir. 2008). This makes sense. If the Ninth Circuit determines that the district court "erred in its decision regarding the choice of law, every order from [this point] forward would require reversal and the entirety of the matter would be relitigated." *Starr Indem. & Liab. Co. v. Rolls-Royce Corp*., 2016 WL 11603022, at *1 (D. Ariz. Sept. 9, 2016). The same is true here. If the choice-of-law dispute is resolved in Defendants' favor, it would "put a stop to [the plaintiff's] litigation before substantial discovery and additional motion practice occurs." *City of Los Angeles v. Citigroup Inc*., 2014 WL 3942457, at *2 (C.D. Cal. Aug. 12, 2014).

**2. Substantial Grounds Exist for a Difference of Opinion.**

A substantial ground for difference of opinion exists where "reasonable jurists ***might*** disagree on an issue's resolution." *Reese*, 643 F.3d at 688 (emphasis added). The primary consideration is the "the strength of the arguments in opposition to the challenged ruling." *Rieve v. Coventry Health Care, Inc*., 870 F. Supp. 2d 856, 880 (C.D. Cal. 2012) (citation omitted). Moreover, "where proceedings that threaten to endure for several years depend on an initial question of jurisdiction or the like, certification may be justified even if there is a relatively low level of uncertainty." *In re DirecTV Early Cancellation Fee Mktg*., 2011 WL 13135572, at *2 (C.D. Cal. Oct. 24, 2011) (alteration and citation omitted).

The choice-of-law question easily clears this threshold. The Court's decision not to enforce the provision was based on its conclusion that "the choice-of-law provision conflicts with a fundamental policy of California's consumer protection laws" regarding

available remedies, Order 12, which the Court expressly noted was a "difficult issue," *id.* at 11. As described below, a reasonable jurist can—and should—conclude that there is no conflict regarding the remedies available under Maryland law, let alone a conflict with a "fundamental policy of California."

The Court centered its analysis on the fact that the Maryland corollary to the UCL, the Maryland Consumer Protection Act ("MCPA"), allows private citizens to sue for damages, but only the attorney general may seek an injunction. Order 12. This, in the Court's view, conflicts with a California public policy of deterring harm to consumers. *Id.* But the focus on the MCPA and the relief available under it overlooks the rest of the vast body of Maryland law, which offers Plaintiff other avenues to seek effectively the same relief: PennyMac issuing dividends in compliance with Plaintiff's interpretation of the Articles Supplementary and the LIBOR Act.

The parties' original briefing addressed the issue of whether the MCPA allows a plaintiff to "seek injunctive relief on behalf of the public." ECF No. 37 ("Opp. to MTD") 21. As PennyMac responded, that is of no matter, because Plaintiff does not seek "relief for the public," ECF No. 41 ("MTD Reply") 4; he is seeking relief on behalf of Preferred Shareholders, all of whom have a contractual relationship with PennyMac.[2] However, in concluding that applying Maryland law would conflict with an issue of fundamental California policy, the Court stretched Plaintiff's argument beyond its terms about "public" relief, and appears to have concluded that this Plaintiff, and the putative class, would have no opportunity to seek equitable relief at all in Maryland. That is simply not the case.

---

[2] As the California Supreme Court explained in a similar context, "public injunctive relief" is "relief that has the primary purpose and effect of prohibiting unlawful acts that threaten injury to the general public," whereas private injunctive relief is "relief that primarily resolves a private dispute between the parties and rectifies individual wrongs and that benefits the public, if at all, only incidentally." *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017) (alterations omitted) (internal quotation marks omitted). Here, the only people who stand to benefit are the Preferred Shareholders, who have a private relationship with PennyMac, not the public at large.

PennyMac's Preferred Shareholders are not consumers in the typical sense, purchasing a product from a company in a one-time transaction, or being exposed to company advertisements. As Preferred Shareholders, their rights vis-à-vis PennyMac and other shareholders are governed by contract through the Declaration of Trust and Articles Supplementary. *See, e.g.*, *Kim v. Cedar Realty Tr., Inc.,* 116 F.4th 252, 260 (4th Cir. 2024) ("Claims that arise from the duties listed in the Articles [Supplementary] are . . . treated as breach-of-contract claims.") (applying Maryland law); *Poling v. CapLease, Inc*., 2016 WL 1749803, at *3 (Md. Ct. Spec. App. May 3, 2016) (rights of preferred shareholders "are defined by contract"); *Shintom Co. v. Audiovox Corp.,* 888 A.2d 225, 228 (Del. 2005) ("the rights of the preferred shareholders, vis-à-vis other shareholders, are fixed by the contractual terms agreed upon between the private parties").

Consumer protection laws are not the only—or even the most natural—way to enforce those rights. Rather, because directors and officers are "contractually bound to honor preferred stockholders' preferential rights," aggrieved shareholders routinely turn to black letter corporate and contractual law for relief. *Kim*, 116 F.4th at 256 (internal quotation marks omitted) (lawsuit alleging that Maryland REIT "breached the contractual and fiduciary duties they owe preferred stockholders by structuring the transactions to rob them of their preferential rights"); *Blue Chip Cap. Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 834 (Del. Ch. 2006) (lawsuit alleging that corporation breached both contractual and fiduciary duties owed to preferred stockholders when it distributed "an inflated amount" of money to a different class of shareholders); *Gale v. Bershad*, 1998 WL 118022, at *1 (Del. Ch. Mar. 4, 1998) (lawsuit alleging that corporation and its directors breached contractual terms in certification of incorporation when it allegedly redeemed the preferred stock at "an unreasonably low and unfair price").

California is not the only state that requires companies to comply with their agreements with shareholders, nor are companies free to violate the LIBOR Act if they

lack a tie to California. If PennyMac had headquarters in Maryland, not California—such that California law was off the table—Plaintiff could still seek to enforce the terms of his contract, as modified by the LIBOR Act, using basic principles of corporate law. This includes, if he so desired, the ability to seek specific performance of the contract, an equitable remedy. *See, e.g.*, *Namleb Corp. v. Garrett*, 814 A.2d 585, 591 (Md. Ct. Spec. App. 2002) ("Specific performance may be granted in an appropriate case on the basis of the strength of the circumstances and equities of each party."); *accord 26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 464 (Del. Ch. 2023) ("Specific performance is a remedy for a proven breach of contract" (emphasis omitted)). Because avenues for equitable relief are available under Maryland law, there is no conflict with an issue of fundamental California policy here.

Even as to the Court's conclusion regarding relief under the MCPA specifically, reasonable jurists could disagree whether the different approach to remedies constitutes a conflict with fundamental California policy. The Court relied heavily on *Walter v. Hughes Communications, Inc.*, 682 F. Supp. 2d 1031 (N.D. Cal. 2008), finding it "instructive" on the question of whether there was a conflict on California policy. Order 11–12. But at least one other court in this district has rejected *Walter*'s approach of finding a fundamental conflict based on "the differences in remedies between Maryland law and the UCL." *Irwin Nats. v. Securenet, LLC*, 2010 WL 11598030, at *2 (C.D. Cal. May 25, 2010) (finding no conflict, particularly where plaintiff had not shown that other equitable relief was unavailable); *see also, e.g.*, *Palomino v. Facebook, Inc.*, 2017 WL 76901 (N.D. Cal. Jan. 9, 2017) (application of another state's law does not violate California public policy simply because it "affords different rights and remedies"); *Feld v. Am. Exp. Co.*, 2010 WL 9593386, at *4 (C.D. Cal. Jan. 25, 2010) (enforcing Utah choice-of-law provision even though Utah "permits class-actions waivers" and

California does not).[3] The lack of a fundamental conflict is particularly true in this case, where the "equitable" or "injunctive" relief that Plaintiff seeks is the payment of money. Reasonable jurists may disagree that there is a fundamental policy conflict between ordering a defendant to pay money pursuant to an injunction as opposed to as damages.

Separately, reasonable jurists might disagree with this Court's conclusion that California has a materially greater interest than Maryland in "imposing its laws to resolve the current dispute." Order 12–13. Although the complaint pleads that defendants have headquarters in California, Compl. ¶¶ 28–29, PennyMac is organized under the laws of Maryland, *id.* ¶ 28, and the Articles Supplementary at issue are themselves creatures of Maryland law, *see, e.g.*, Md. Code Ann., Corps. & Ass'ns § 8-101(b). Meanwhile, Plaintiff is a resident of New Jersey, and he does not allege that he purchased PennyMac shares or was harmed in California. Compl. ¶ 27. Thus, a reasonable jurist could conclude that California's interest in determining this dispute is minimal.

Maryland, by contrast, has a "significant interest" in "resolving disputes" arising from contracts expressly "governed by" its laws. *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 681 (Md. Ct. Spec. App. 2012). Where contracting parties specifically select Maryland law, they create a legitimate expectation that Maryland's carefully developed legal principles and policy determinations will apply to disputes arising from their agreement. *See Travelers Indem. Co. v. MTS Transp., LLC*, 2012 WL 3929810, at *11 (W.D. Pa. Sept. 7, 2012) (noting Maryland's "significant interest in seeing its law govern contracts issued in its state to ensure consistency and predictability for its citizens."). That is particularly true for parties engaged in multistate transactions, like PennyMac, who seek to minimize the "uncertainty" that occurs when faced with different laws in "every state in which it might be sued." *Wang Lab'ys, Inc. v. Kagan*, 990 F.2d 1126,

[3] "One of the best indications that there are substantial grounds for disagreement on a question of law is that other courts have, in fact, disagreed." *Rollins v. Dignity Health*, 2014 WL 6693891, at *3 (N.D. Cal. Nov. 26, 2014).

1129 (9th Cir. 1993). Thus, a reasonable jurist could conclude that Maryland's interest here is stronger than California's, which provides an independent reason to find that substantial grounds exist for a difference of opinion.

**3. Permitting Immediate Appeal Would Materially Advance the Termination of the Litigation.**

Finally, an immediate appeal of this question would "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Plaintiff's only claim arises under California law. If California law does not apply, his claim must be dismissed. *See supra* pp. 5–6. Although "neither § 1292(b)'s literal text nor controlling precedent requires that the interlocutory appeal have a final, dispositive effect on the litigation," *Reese*, 643 F.3d at 688 (internal quotation marks omitted), where, as here, the appeal would have such a dispositive effect, there can be no question this prong is satisfied. *See Shiguago v. Occidental Petroleum Corp.*, 2009 WL 10672734, at *1 (C.D. Cal. Nov. 23, 2009) (certifying issue for interlocutory appeal where "resolution in Defendants' favor would effectively require dismissal of Plaintiffs' [claims].").

* * *

For all of these reasons, the choice-of-law question satisfies the Section 1292(b) criteria. It would be efficient and appropriate to resolve this threshold issue now, at the outset, before discovery and the further expenditure of time and resources by the parties and the Court.

**B. This Court Should Certify For Immediate Appeal The Question of Whether PennyMac's Fallback Dividend Rates Are Qualifying "Benchmark Replacements" Under The LIBOR Act.**

The UCL defines "unfair competition" as including "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each prong of the UCL is a separate theory of liability. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). Plaintiff purports to bring his claim under the "unlawful" and "unfair" prongs, *see* Compl. ¶¶ 72–82.

In its motion to dismiss, PennyMac argued that Plaintiff's complaint should be dismissed with prejudice because PennyMac has paid dividends on the Preferred Shares in accordance with the Articles as modified by the LIBOR Act. Specifically, PennyMac argued that its actions were not "unlawful" because the fallback provisions in the Articles provide "benchmark replacements" under the plain language of 12 U.S.C. § 5802(3). *See* MTD 14–15. PennyMac further argued that its actions were not "unfair" because, among other things, PennyMac's actions fall within the UCL's safe harbor and the LIBOR Act preempts any state law purporting to compel a rate contrary to the LIBOR Act. *See id.* at 17–19.

This Court, however, determined that the statutory term "benchmark replacement," 12 U.S.C. § 5802(3), was ambiguous, and looked beyond the plain text to legislative history and statutory purpose. Order 16. It concluded that one key purpose of the Act was "to prevent floating-rate instruments from unfairly converting into fixed-rate instruments," and held that, in light of that purpose, "accepting PennyMac's interpretation of its obligations under the Act would result in enforcement of the exact type of contract Congress sought to reform." *Id.*[4] Although the Court did not expressly state that it was adopting Plaintiff's construction of the statute, its holding that Plaintiff has "sufficiently alleged that PennyMac violated the LIBOR Act," Order 17, is grounded in a conclusion that PennyMac's fallback-dividend rate is not a qualifying "benchmark replacement" under the LIBOR Act. This statutory interpretation question satisfies the Section 1292(b) criteria.

[4] The Court rejected PennyMac's argument that its interpretation furthered another statutory purpose—namely, allowing workable contracts to continue operating according to their terms. *Id.* at 16–17. The Court did not dispute that the fallback language in the Articles provides for fixed rates, but held that because Plaintiff had alleged that the parties had not contemplated or agreed to a permanent fixed rate, "allowing PennyMac to issue dividends according to its interpretation [of the Articles] would not support the Act's apparent goal of leaving intact the contractual terms the parties had agreed to." *Id.* at 17 (internal quotation marks omitted).

**1. This Issue Presents a Controlling Question of Law.**

**a. This Issue is Purely Legal.**

A pure legal question is one "that can be resolved without reference to any disputed facts." *Dupree v. Younger*, 598 U.S. 729, 735 (2023). Statutory interpretation is the quintessential example. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 387 (2024) ("[T]he interpretation of the meaning of statutes" is a "question[] of law"); *Ehart v. Lahaina Divers, Inc.*, 92 F.4th 844, 849 (9th Cir. 2024) (same). "[T]he Ninth Circuit has found novel question[s] of statutory interpretation to be particularly appropriate occasions for certification." *Burton v. Prudential Ins. Co. of Am.,* 2014 WL 10537434, at *2 (C.D. Cal. Sept. 12, 2014) (internal quotation marks omitted), *rev'd on other grounds*, 669 F. App'x 829 (9th Cir. 2016); *see, e.g.*, *San Antonio Winery, Inc. v. Jiaxing Micarose Trade Co.*, 53 F.4th 1136, 1140 (9th Cir. 2022); *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 886 (9th Cir. 2017).

Here, the question presented is a "pure question of law" because it involves the interpretation of a federal statutory provision and does not rest on any facts in dispute. There is no dispute that, after disregarding LIBOR- and polling-based provisions in accordance with the LIBOR Act, PennyMac's Articles provide that PennyMac issue dividends at the "dividend rate in effect for the immediately preceding Dividend Period," which in this instance are the respective initial fixed rates for each series. *See* Order 16 ("Applying the Act to Section 4(g) of the Articles . . . leaves operable only the final clause"); Opp. to MTD 13–14 ("The final clause at the end of the waterfall in Section 4(g) [of the Articles] points to a fixed rate . . . ."). Nor is there any dispute that the LIBOR Act does not "alter or impair" contractual fallback provisions that specify a "benchmark replacement" that is not based on LIBOR, allowing those fallbacks to operate according to their terms. *See* 12 U.S.C. § 5803(a)(2), (f)(2); MTD 11–15.

Thus, as this Court recognized, "[t]he parties primarily dispute the meaning and purpose" of 12 U.S.C. § 5802(3), the provision in the LIBOR Act which defines the statutory term "benchmark replacement." Order 15. As PennyMac argued, the plain

language of the statutory text states that a "benchmark replacement" includes any "interest rate or dividend rate," regardless of whether that rate is fixed or variable. 12 U.S.C. § 5802(3); *see* MTD Reply 6–10; *infra* 15–17. In Plaintiff's view, however, a "benchmark replacement" cannot be a fixed rate. Opp. to MTD 11–14. The Court found both readings "plausible," but ultimately decided that the statute is ambiguous and that PennyMac's "actions" do not "comport with either the purpose or overall structure of the LIBOR Act." Order 16.

To review that holding on appeal, the Ninth Circuit would need to consult only a limited universe of legal and undisputed documents—namely, the statute and the Articles Supplementary, of which this Court properly took judicial notice. *See* Order 4–6. The question presented is therefore a "purely legal one" that be "resolved quickly without delving into [the] particular case's facts." *Nat'l Credit Union Admin. Bd. v. Goldman Sachs & Co.,* 2013 WL 12306438, at *6 (C.D. Cal. July 11, 2013); *Doe 1 v. Github, Inc*., 2024 WL 4336532, at *1 (N.D. Cal. Sept. 27, 2024) (certifying "purely legal question of statutory interpretation").

**b. This Issue is Controlling.**

This legal question is "controlling" because "resolution of the issue on appeal could materially affect the outcome of litigation in district court." *In re Cement*, 673 F.2d at 1026. If the Ninth Circuit agrees with PennyMac's construction of the statute, the motion to dismiss must be granted. Plaintiff's theory of liability under both the "unlawful" and "unfair" prongs of the UCL rests on PennyMac's alleged violation of the LIBOR Act. *See* MTD 18. If PennyMac's initial dividend rate fallback qualifies as a "benchmark replacement" under 12 U.S.C. § 5802(3), its use of that rate complies with the terms of the LIBOR Act, and no "unlawful" theory could survive.

Resolution in PennyMac's favor would also dispose of Plaintiff's theory that PennyMac's conduct was "unfair." In his opposition, Plaintiff argued that, even if PennyMac did comply with the LIBOR Act, he still can state a claim under the UCL's "unfairness" prong. Opp. to MTD 15–17. That is wrong. Although it may be

theoretically possible in some cases for a plaintiff to state a claim for an unfair practice under the UCL without a legal violation, this Plaintiff cannot do so. As PennyMac explained in its briefing, the LIBOR Act preempts any state law that would impose a different rate than the LIBOR Act. *See* MTD 18–19. Similarly, the UCL's safe-harbor immunizes UCL-liability practices that are approved by the government. *See* MTD 17–18; *Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d 954, 958 (C.D. Cal. 2015). Plaintiff does not dispute either of these legal points, instead arguing only that there is no preemption and the safe harbor does not apply because PennyMac in fact violated the Act. Opp. to MTD 17–18. Accordingly, if the Ninth Circuit holds that PennyMac arrived at and is applying its rate in accordance with the LIBOR Act, Plaintiff cannot and does not state a claim that the "unfair" prong requires a different rate. *See* MTD 18–19 & n.11.

**2. Substantial Grounds Exist for a Difference of Opinion.**

Construing the LIBOR Act's definition of "benchmark replacement," and whether by the statute's terms fixed dividend rates may qualify as "benchmark replacements," is an issue of first impression. This Court's order highlights the absence of any "relevant authority analyzing the construction [of the LIBOR Act]." Order 16. That no court in this Circuit or any other has "provide[d] . . . guidance" on the issue strongly indicates that substantial grounds exist for a difference of opinion. *Mothershead v. Wofford*, 2022 WL 2755929, at *2 (W.D. Wash. July 14, 2022); *see In re Google Inc. St. View Elec. Commc'ns Litig.*, 2011 WL 13257346, at *1 (N.D. Cal. July 18, 2011) (certifying question for interlocutory appeal "in light of the novelty of the issues presented"); *Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*, 854 F. Supp. 2d 756, 769 (C.D. Cal. 2011) (finding substantial grounds for difference of opinion where there was "no controlling precedent on th[e] issue"), *aff'd*, 744 F.3d 1124 (9th Cir. 2014).

The strength of PennyMac's arguments also support the conclusion that this question is one on which reasonable jurists may disagree. The statute defines a "benchmark replacement" as "a benchmark, ***or an interest rate or dividend rate*** (which

may or may not be based in whole or in part on a prior setting of LIBOR), to replace LIBOR or any interest rate or dividend rate based on LIBOR, whether on a temporary, permanent, or indefinite basis, under or with respect to a LIBOR contract." 12 U.S.C. § 5802(3) (emphasis added). PennyMac maintains that this definition on its face encompasses any "benchmark," "interest rate," or "dividend rate" to replace a LIBOR rate. MTD Reply 5–10. Plaintiff, on the other hand, contends that a "benchmark replacement" must be a "benchmark" only, which is separately defined as "an index of interest rates or dividend rates that is used . . . as the basis of or as a reference for calculating or determining any valuation, payment, or other measurement." 12 U.S.C. § 5802(1). Therefore, in Plaintiff's view, a "benchmark replacement" cannot be a fixed rate. Opp. to MTD 11–14.

The Court found both interpretations "plausible," and determined that the statute was ambiguous. Order 16. In proceeding to compare PennyMac's actions against the "purpose" of the Act, the Court's opinion does not wrestle with how Plaintiff's proffered interpretation of the definition of "benchmark replacement" can be squared with ordinary rules of statutory construction. It cannot. MTD Reply 5–10. By his own acknowledgement, Plaintiff would "remov[e]" the clause "or an interest rate or dividend rate" from the statute, Opp. to MTD 13; MTD Reply 7, which runs directly counter to the well-established principle that each statutory clause is to be given effect. *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207–209 (1997). Nor does Plaintiff offer any compelling reason to depart from the ordinary use of the word "or," which the Supreme Court has held "is almost always disjunctive, that is, the words it connects are to be given separate meanings." *United States v. Woods*, 571 U.S. 31, 45–46 (2013) (internal quotation marks omitted); *see* MTD Reply 8.

In light of these principles and precedent, other reasonable jurists may conclude that the plain language of the LIBOR Act points squarely in PennyMac's favor, and therefore that PennyMac's initial fixed dividend rates qualify as "benchmark replacements" under the LIBOR Act. "'[A]mbiguity' is a term that may have different

meanings for different judges." *Exxon Mobil Corp. v. Allapattah Services, Inc*., 545 U.S. 546, 572 (2005) (Stevens, J., dissenting). If the meaning of the statutory text is plain, that is the end of the matter, and reliance on statutory purpose and legislative history is unnecessary and improper. *See Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text."); *E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 753 (9th Cir. 2003) ("Because the text . . . is unambiguous, we are precluded from considering legislative history").[5]

This statutory interpretation issue of first impression is ready for appeal now. The Ninth Circuit has long recognized that a "novel issue" "on which fair-minded jurists might reach contradictory conclusions" "may be certified for interlocutory appeal without first awaiting development of contradictory precedent," *Reese*, 643 F.3d at 688, and the Court should do so here.

### 3. Permitting Immediate Appeal Would Materially Advance the Termination of the Litigation.

Finally, immediate appeal of this question would materially advance the ultimate termination of this litigation. Plaintiff's complaint is premised on a purported violation of the LIBOR Act. *See* MTD 18. If the Ninth Circuit disagrees and finds that PennyMac's contractual fallback rates are qualifying "benchmark replacements" that should be given effect in compliance with the LIBOR Act, Plaintiffs UCL "unlawful" and "unfair" claims both fail and should be dismissed. *See supra* pp. 14–15.[6] Thus, an

---

[5] Reasonable jurists could also disagree with the Court's reading of the legislative history. For example, the legislative history on which this Court's opinion relied referred to "'problematic fallback language'" when "'contracts convert to fixed-rate instruments ***at the last published value of LIBOR***,'" Order 16 (quoting ECF No. 40-1 at 61) (emphasis added), but the rates at issue here are unrelated to the last published value of LIBOR. And a reasonable jurist could conclude that PennyMac's interpretation is consistent with another purpose of the Act, which is allowing workable contracts to continue operating according to their terms. *See* MTD 13; MTD Reply 13–14.

[6] Even if appellate resolution of the statutory interpretation of "benchmark replacement" did not entirely dispose of a claim under the "unfair prong," the court's

immediate appeal on the statutory question presented "may materially advance the ultimate termination of the litigation" by "ending" it. *Regal Stone Ltd. v. Longs Drug Stores California, L.L.C.*, 881 F. Supp. 2d 1123, 1131 (N.D. Cal. 2012).

* * *

The Court's ruling on the statutory construction of the LIBOR Act's "benchmark replacement" satisfies the Section 1292(b) criteria. It lies at the heart of this dispute—whether PennyMac's use of the initial dividend rates as fallback rates does or does not comply with the Act—and would likely be the subject of an appeal in any event. There is no reason to delay resolution of this fundamental legal question.

### C. The Court Should Stay Further Litigation Pending Resolution of the Appeal.

Defendants also request that the Court stay proceedings pending resolution of any appeal. "A district court has authority to stay proceedings pending a § 1292(b) appeal both under § 1292(b) itself and under the court's inherent authority to manage its docket." *Casas v. Victoria's Secret Stores, LLC*, 2015 WL 13446989, at *5 (C.D. Cal. Apr. 9, 2015); *see also Manes v. City of Santa Ana*, 2023 WL 8115865, at *1 (C.D. Cal. Sept. 5, 2023) (a "court may order a stay of the action pursuant to its power to control its docket and calendar and to provide for a just determination of the cases pending before it" (internal quotation marks omitted)). The Court "has broad discretion to decide whether a stay is appropriate to 'promote economy of time and effort for itself, for counsel, and for litigants.'" *Manes*, 2023 WL 8115865, at *1 (quoting *Ass'n of Irritated Residents*, 634 F. Supp. 2d at 1094; *Filtrol Corp. v. Kelleher*, 467 F.2d 242, 244 (9th Cir. 1972)).

---

guidance would nonetheless "materially advance" the litigation. *See Ass'n of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1093 (E.D. Cal. 2008). Discovery and briefing in those circumstances would focus on different issues, and class certification may be affected. *See In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 989–90 (N.D. Cal. 2016). Certification of even non-dipositive legal questions for immediate appeal is appropriate where, as here, "a putative class action is still in the pre-certification and pleading stage." *Bernal v. Zumiez, Inc.*, 2017 WL 4542950, at *3 (E.D. Cal. Oct. 11, 2017) (internal quotation marks omitted).

When exercising that discretion and "determining whether to stay an action under 28 U.S.C. § 1292(b), a court considers whether (1) resolution by the Ninth Circuit of the issue addressed in [the appealed order] could materially affect this case and advance the ultimate termination of litigation and (2) whether a stay will promote [ ] economy of time and effort for the Court and the parties." *In Re SFPP Right-of-Way Claims*, 2016 WL 11744979, at *2 (C.D. Cal. Dec. 5, 2016) (internal quotation marks omitted); *see also Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 2015 WL 10791930, at *3 (C.D. Cal. Nov. 5, 2015) (applying same factors).

Both factors favor a stay here. First, as described above, resolving either of the issues presented in Defendants' favor will result in the termination of litigation, or at the very least, materially advance its termination. *See supra* pp. 11, 17–18; *Moriarty v. Am. Gen. Life Ins. Co.*, 2021 WL 9563310, at *2 (S.D. Cal. Jan. 26, 2021) (certifying for appeal and granting stay where defendant sought "to resolve the threshold legal question of whether" particular statutes applied to a life insurance policy, because if they did not, "Plaintiff's case [could] no longer proceed"); *see also Finder v. Leprino Foods Co.*, 2017 WL 1355104, at *4 (E.D. Cal. Jan. 20, 2017) ("Allowing the Ninth Circuit to conclusively resolve the validity of roughly half of Plaintiffs' claims … will dramatically clear the landscape of this action.").

Second, a stay promotes judicial economy, conserving the court's and the parties' time and effort while these issues are evaluated on appeal. There is no case schedule in place, and discovery has not yet begun.[7] If the Ninth Circuit agrees with Defendants, the case will be dismissed, and there would be no need for the parties to engage in discovery at all, or other pre-trial litigation practice, such as class certification or dispositive motions. It would be inefficient to proceed with costly discovery and motions practice now, rather than wait to see if it can be avoided altogether. Accordingly, courts often grant stays pending interlocutory appeal, and this Court should

[7] Although styled as equitable relief under the UCL, the relief Plaintiff seeks is monetary, so Plaintiff will not be harmed by any delay.

do the same. *See, e.g.*, *Finder*, 2017 WL 1355104, at *4 ("Forcing [the appealing party] forward on the issues now pending on appeal would largely frustrate the savings in time and effort that the grant of interlocutory appeal would otherwise provide."); *Mehedi v. View, Inc.*, 2024 WL 3748012, at *2 (N.D. Cal. Aug. 8, 2024) (recognizing that "if the parties were required to continue litigating this case, much of the efficiency and benefit of an interlocutory appeal would be lost" and granting stay); *California Dep't of Toxic Substances Control v. Hearthside Residential Corp.*, 2008 WL 8050005, at *9 (C.D. Cal. Dec. 8, 2008) (granting stay).

## IV. CONCLUSION

For the foregoing reasons, Defendants request that this Court certify its Order of February 26, 2025, for interlocutory review pursuant to 28 U.S.C. § 1292(b), amend its Order to state that the necessary conditions for interlocutory review have been met, and issue a stay of further proceedings.

Dated: March 25, 2025

Respectfully submitted,

*/s/ Matthew Donald Umhofer*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Jonas P. Mann

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management LLC*

WILLIAMS & CONNOLLY LLP
Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for PennyMac Mortgage Investment Trust, certifies the brief contains 6,322 words, which complies with the word limit of L.R. 11-6.1.

Dated: March 25, 2025

Respectfully submitted,

*/s/ Matthew Donald Umhofer*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Jonas P. Mann

*Attorneys for Defendants PennyMac Mortgage Investment Trust and PNMAC Capital Management LLC*

WILLIAMS & CONNOLLY LLP
Steven M. Farina (*pro hac vice*)
Melissa B. Collins (*pro hac vice*)

*Attorneys for Defendant PennyMac Mortgage Investment Trust*

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2025, I caused the foregoing **Plaintiff's-Respondent's Answer in Opposition to Petition for Permission to Appeal Pursuant to 28 U.S.C. § 1292(b)** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

Participants in the case who are registered ACMS users will be served by the appellate ACMS system.

I further certify that I caused to be served the foregoing document on this date by email to the following case participants:

Matthew Donald Umhofer
Jonas P. Mann
**UMHOFER, MITCHELL AND KING LLP**
767 South Alameda St., Ste. 270
Los Angeles, CA 90021
Telephone: (213) 394-7979
Email: matthew@umklaw.com
jonas@umklaw.com

*Counsel for Defendants-Petitioners PennyMac Mortgage Investment Trust and PNMAC Capital Management, LLC*

Steven M. Farina
Melissa B. Collins
**WILLIAMS & CONNOLLY, LLP**
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000
Email: sfarina@wc.com
mcollins@wc.com

*Counsel for Defendant-Petitioner PennyMac Mortgage Investment Trust*

*/s/ Daniel E. Barenbaum*
Daniel E. Barenbaum